**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LUCAS CALIXTO**, | ) |
| **TOUNDE DJOHI**, | ) |
| **WANJING LI**<br>  109 Hollybush Ct.<br>  Ballwin, MO 63021, | )<br>)<br>)<br>) |
| **ZEYUAN LI**, | ) |
| **FANG LU**, | ) |
| **HEMBASHIMA SAMBE**<br>  2209 E Roanoke Street,<br>  Seattle, WA 98112, | )<br>)<br>) |
| **JINGQUAN QU**, | ) |
| **EMEKA UDEIGWE**, | ) |
| **XING LU**<br>  5321 NE 24th Terrace,<br>  Apt. 501A<br>  Ft. Lauderdale, FL 33308, | )<br>)<br>)<br>) |
| **YISHENG DAI**<br>  4625 Campbell Drive NE<br>  Apt. 124<br>  Salem, OR 97317, and | )<br>)<br>)<br>) |
| **BRIGHT IZUDIKE**<br>  1015 Rosita St<br>  Arlington, TX 76002, | )<br>)<br>) |
| on behalf of themselves and those similarly<br>situated, | )<br>) |
| **PLAINTIFFS**, | ) |
| **v.** | ) |
| **UNITED STATES DEPARTMENT OF<br>THE ARMY** and **MARK ESPER,** in his<br>official capacity as Secretary, U.S.<br>Department of the Army, | )<br>)<br>)<br>) |
| **DEFENDANTS.** | ) |

**Civil Case No. 1:18-cv-01551-ESH**

**SECOND AMENDED CLASS
ACTION COMPLAINT**

## SECOND AMENDED COMPLAINT

1.      This lawsuit seeks redress on behalf of enlisted United States Army soldiers who were summarily discharged from the Army in violation of military regulations and the law.  As specified more fully herein, Plaintiffs seek, among other things, a declaration that the discharges were unlawful, reinstatement in the military and commensurate restoration of military benefits retroactive to the date of the discharge action, and a declaration that any future discharge actions will be undertaken only in accordance with the law.

2.      While there is no legal justification for the Army's blatant violation of and disregard for its discharge protocols and the denial of due process to these soldiers, Plaintiffs believe that the Army aimed these summary discharge actions at them due to their status as soldiers who enlisted through the Military Accessions Vital to the National Interest ("MAVNI") program, which enables certain non-U.S. citizens to enlist and serve in the U.S. Armed Forces. In order to qualify as MAVNIs, Plaintiffs had to be lawfully present in the United States at the time of enlistment and, consequently, already had passed the immigration-related screening necessary to attain such lawful status.  In addition, all MAVNIs had to satisfy strict enlistment criteria that apply only to MAVNIs, including (1) establishing that they possessed the requisite health care or language skills deemed vital to the national interest, (2) scoring higher on the Armed Forces Qualification Test than all other military enlistees, and (3) passing the background and suitability requirements that all military enlistees – MAVNI or otherwise – must undergo.

3.      In or before 2016, each Plaintiff enlisted in the U.S. Army, either in the Selected Reserve of the Ready Reserve or in the "Regular Army," after having met these enlistment conditions.  Each Plaintiff has been a member of the Army's Delayed Training Program ("DTP")

for Selected Reserve soldiers, or the Army's Delayed Entry Program ("DEP") for Regular Army soldiers.

4.      Beginning in late 2016, the Department of Defense ("DoD") closed the MAVNI program to new enlistees and started subjecting already enlisted and serving MAVNIs to additional, enhanced background investigations (the equivalent of Top Secret security clearance checks plus Counter Intelligence ("CI") reviews) and subsequent so-called military service suitability determinations ("MSSDs").   DoD coordinated with the Department of Homeland Security ("DHS") to stop the processing of MAVNI naturalizations pending the completion of those background investigations and MSSDs.   These DoD and DHS actions are the subject of two related class action lawsuits pending in the United States District Court for the District of Columbia:  *Nio v. DHS* and *Kirwa v. DoD*.

5.      This complaint arises from additional mistreatment and unlawful conduct directed at MAVNIs.  In particular, Plaintiffs are the victims of involuntary and summary administrative discharge decisions that were effected by the Army in contravention of military regulations specifically designed to afford soldiers due process with respect to discharge decisions and in violation of the soldiers' constitutional due process and equal protection rights.   Since the commencement of this litigation, Defendants have acknowledged that MAVNIs subjected to these involuntary administrative discharges fall into two categories:   (1) soldiers who were discharged with unfavorable MSSDs and, (2) soldiers discharged based on reasons other than an unfavorable MSSD, including so-called "refusal to enlist" and "entry level performance and conduct" bases.

6.      There are two principal common themes to the discharge actions:   First, in summarily discharging these soldiers, the Army did not comply with any of the notice and

process pre-conditions to discharge that are mandated by military regulations and the law. Second, the Army did not characterize the discharges as "honorable" or "general – under honorable conditions," but rather specified the discharge "type" as "uncharacterized" or "entry level." These actions have a profound and negative impact on Plaintiffs in terms of, among other things, their reputations, future military service and benefits, and their immigration status.

7.      Indeed, prior to the discharges, Plaintiffs received no notice of any intent to discharge them, let alone the grounds for the discharge or any opportunity to respond or challenge such grounds before the discharge decision was made. For the soldiers purportedly discharged for "conduct" or "performance" reasons, the Army did not provide counseling or efforts at rehabilitation. To this day, many Plaintiffs do not know the specific grounds for the discharge action (beyond, where they exist, the after-the-fact labels provided by the Army pursuant to a Court order in this litigation) and many similarly-situated soldiers remain unsure even to which of these broad discharge categories they belong.

8.      These summary discharges therefore failed in virtually every respect to follow the mandatory procedures established by military regulations. Moreover, the discharges exhibit Defendants' disregard for fundamental fairness to these soldiers whose lives and military careers have been upended by virtue of the Army's conduct. It is somewhat ironic, therefore, that some of the discharge orders cite to an Army Regulation as "authority" for the discharges, while the Army ignored the provisions of that very regulation that prohibit the discharge actions that are complained of herein.

9.      To make matters worse, the circumstances surrounding these summary discharges reflect Army chaos, disarray, and disorder. For instance:

- Some discharge orders purport to have an effective date prior to the order itself;

- In some cases, military units to which soldiers are attached were not informed of the discharge decision until months *after* the purported discharge occurred;

- In some instances, military officials have informed soldiers or others that the discharges were mistaken, or did not happen at all;

- The Army ordered several soldiers to attend military background investigation interviews *after* their purported discharges;

- The Army ordered soldiers to continue drilling with their units *after* their supposed discharge;

- The military has demanded that soldiers refund money to the Army for the service pay they received after the purported discharge, even though the soldiers earned the pay through service and neither the soldiers nor their units were aware of the discharges.

10.     The orderly and mandatory discharge process called for by military regulations, if followed, would have prevented or, at a minimum, reduced this chaos.

11.     This discharge misconduct continued even following the commencement of this action wherein Plaintiff Lucas Calixto demonstrated that Defendants violated the law by summarily discharging him. PV2 Calixto, who received discharge orders although he had received multiple honorable service certifications and although he recently had been promoted, received no explanation for his discharge.  Not even his Army unit had any explanation.  Only following suit, and after PV2 Calixto's filing of a preliminary injunction motion to have his

discharge order revoked, did Defendants capitulate, issue an order revoking the discharge, and represent that he would be reinstated in the Army.

12.     And only after an additional seven plaintiffs filed an amended complaint and preliminary injunction motion on August 3, 2018 did Defendants capitulate by suspending and revoking the discharges of six of those Plaintiffs.

13.     Although Defendants are fully aware through this lawsuit and their own actions that many other MAVNI soldiers had been discharged in a similar fashion in violation of the law, the Army has failed to suspend or revoke all such discharges.

14.     The named Plaintiffs herein are victims of Defendants' unlawful discharge conduct.  Without any notice or opportunity to respond, each of these Plaintiffs purportedly was discharged from the Army or a component thereof, including the U.S. Army Recruiting Command ("USAREC").  And each Plaintiff has suffered and will continue to suffer substantial harm – including to his/her military career, civilian career, immigration status, and/or reputation – unless and until the discharges are rescinded and the soldiers are fully reinstated to their pre-discharge status.

15.     Defendants' conduct violates Army regulations, DoD regulations, and the fundamental requirements of due process and equal protection afforded by the Constitution.  No one should be surprised that in an organization such as the Army, where regulations play a vital role in administration and in protecting soldiers from abusive action, detailed procedures and regulations dictate (a) the conditions and findings that might justify initiation of discharge or separation and (b) the process that must be afforded to soldiers before any such action is taken. What is both surprising and disappointing is that Defendants would ignore those regulations with

respect to MAVNIs and, even when the violations are exposed, continue to do so for Plaintiffs and many similarly-situated MAVNI soldiers.

16.     To make matters worse, Defendants sought to retaliate against Plaintiffs and the proposed class in violation of their First Amendment rights to free speech and to petition the government for redress of the above violations.  In mid-August 2018, less than two weeks after the amended complaint was filed, Defendants created a new process – not applied to any other soldiers except those in the proposed class – to have military lawyers re-review and scour the background investigation files of MAVNI soldiers in search of some basis to accuse these soldiers of criminal conduct.  The Army's retaliatory intent was clear in its internal directive, which explained that the reason for this activity was because MAVNI soldiers had initiated this litigation challenging the lawfulness of their discharges.

17.     In an order dated August 13, 2018 in this action, the Court ordered Defendants to report, on a bi-weekly basis, on "any updates regarding the Army's policy with respect to the administrative separation procedures applicable to DEP and DTP members" (Dkt. 23). Notwithstanding this order, Defendants never notified the Court or Plaintiffs of the Army's efforts to retaliate against separated or soon-to-be separated MAVNIs.

### The Army's October 26 Memo

18.     On October 31, 2018, Defendants reported that it had issued a new separation procedure.  Specifically, Defendants disclosed that an Assistant Secretary for the Army had issued a memorandum dated October 26, 2018 pertaining to separations of certain MAVNI personnel ("the October 26 Memo").  *See* Dkts. 50, 50-1.

19.     As a result of the October 26 Memo, DTP and DEP MAVNIs who have been or will be subject to involuntary administrative discharges fall into one of two categories  – those

7

discharged with an unfavorable MSSD and those discharged for "other reasons" and without an unfavorable MSSD.

20.     The October 26 Memo itself only describes the discharge procedures that will apply to MAVNIs with unfavorable MSSDs.  With respect to both DTP and DEP MAVNI discharges, the Memo states that soldiers with discharge dates effective prior to July 20, 2018 will be offered reinstatement in the Army for the limited purpose of receiving notice and an opportunity to respond to the purported unfavorable MSSD grounds.  And for future DEP or DTP discharges of MAVNIs with unfavorable MSSDs, the October 26 Memo indicates that the soldiers will receive the notice specified in the Memo.

21.     The October 26 Memo is a further acknowledgement and admission by Defendants that its summary discharge actions were not accomplished in accordance with military regulations and the law.  However, even though the Army failed to follow the applicable regulations and the law with respect to both MAVNIs with unfavorable MSSDs and those without unfavorable MSSDs, the Army states that it is only taking certain remedial action (albeit limited) with respect to soldiers with unfavorable MSSDs.  This leaves other discharged soldiers – similarly situated due to the fact they too are victims of unlawful summary discharges – with no offer of reinstatement and no means to challenge, particularly prior to discharge, the purported grounds for their discharges.

22.     Moreover, with respect to the soldiers subject to the procedures set forth in the October 26 Memo, the Army has not yet provided all eligible MAVNIs with reinstatement and/or unfavorable military suitability recommendations notices.  Notably, the Memo indicates that notified soldiers must be provided 30 days to respond to any derogatory information that might lead to their discharge and that new MSSDs should be completed "and appropriate action

initiated" within 90 days of the military suitability recommendation, which Defendants indicated meant 90 days from issuance of the October 26 Memo for military suitability recommendations that pre-dated that Memo.

23.     In addition, the October 26 Memo does not provide any means for soldiers to readily determine whether they will be subject to the procedures therein.  That is because many summarily discharged MAVNI soldiers do not know whether they received an unfavorable MSSD.  Indeed, as the circumstances of many of the Plaintiff representatives herein make clear, many soldiers did not receive discharge orders and even those who obtained them after the fact have discovered that the stated grounds for discharge in those orders are not descriptive, much less accurate.  For instance, soldiers who received discharges that specify "refused to enlist" as the discharge code have since discovered (in addition to the fact that they did not refuse to enlist and in fact already had enlisted) that they had received an unfavorable MSSD, which may have been the actual basis for the discharge.  Unless and until soldiers receive notification that they are subject to the October 26 Memo, many soldiers will not know for certain that they had received an unfavorable MSSD and/or that they will receive the process described in the October 26 Memo.

24.     In addition, even for those soldiers who will be subject to the procedures set forth in the October 26 Memo, many are continuing to suffer either because they have not yet been offered reinstatement or because they have not yet had their discharges revoked or been fully reinstated or restored to their pre-discharge status in the Army.

25.     Finally, because the procedures described in the October 26 Memo have not yet been fully developed or implemented, it remains to be seen whether these procedures fully comport with the military regulations on which they purportedly are based.  For instance, it is not

yet clear whether soldiers will be adequately informed of the so-called derogatory information such that they will have a meaningful opportunity to respond.  And it is not yet clear whether the Army will adequately and appropriately consider the soldiers' responses before making final discharge decisions.

***

26.     Accordingly, Plaintiffs bring this civil action on behalf of themselves and on behalf of a class of all similarly-situated individuals to obtain the relief sought herein, including a declaratory judgment that Defendants' actions are unlawful, an order directing Defendants to set aside and revoke the purported discharges/separations and offer reinstatement to those discharged, and an injunction to bar Defendants from continuing or reinitiating discharge actions against these soldiers except in accordance with applicable regulations and the law.

## JURISDICTION

27.     This action arises under the laws of the United States and the U.S. Constitution. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

## VENUE

28.     Venue is proper in the Court under 28 U.S.C. § 1391(e) because the individual Defendant is an officer of the United States acting in his official capacity in this district, and venue is proper because the United States Department of the Army is present in this district.

## PARTIES

29.     Plaintiff Lucas Calixto resides in Somerville, Massachusetts.  At the time of the initial discharge action, PV2 Calixto was serving with the U.S. Army Reserve's 743rd Transportation Company in Roslindale, Massachusetts.

30.     Plaintiff Tounde Djohi resides in Woodbridge, Virginia.  At the time of the initial discharge action, SPC Djohi was serving with the U.S. Army Reserve's 130th Chemical Company in Fort A.P. Hill, Virginia.

31.     Plaintiff Zeyuan Li has a residence in State College, PA as well as a residence in Irvine, California.  At the time of the initial discharge action, PFC Li was serving with the U.S. Army Reserve's 327th Quartermaster Battalion in Williamsport, Pennsylvania.

32.     Plaintiff Wanjing Li resides in Ballwin, Missouri.  At the time of the initial discharge action, SPC Li was serving with the U.S. Army Reserve's 325th Combat Support Hospital in St. Charles, Missouri.

33.     Plaintiff Fang Lu resides in Silver Spring, Maryland.  At the time of the initial discharge action, SPC Lu was serving with the U.S. Army Reserve's 398th Combat Sustainment Support Battalion in Rockville, Maryland.

34.     Plaintiff Jingquan Qu resides in Forest Hills, New York.  At the time of the initial discharge action, SPC Qu was serving with the U.S. Army Reserve's 716th Quartermaster Company in Jersey City, New Jersey.

35.     Plaintiff Emeka Udeigwe resides in Cleveland, Ohio.  At the time of the initial discharge action, SPC Udeigwe was serving with the U.S. Army Reserve's 463rd Engineering Battalion in Wheeling, West Virginia.

36.     Plaintiff Hembashima Sambe now resides in Seattle, WA.  At the time of the initial discharge action, SPC Sambe was with the U.S. Army Reserve's 17th Psychological Operations Battalion in Austin, Texas (and also was drilling with a unit in the Houston area).

37.     Plaintiff Xing Lu resides in Ft. Lauderdale, Florida.  At the time of the initial discharge action, SPC Lu was enlisted in the DEP.

38.     Plaintiff Yisheng Dai resides in Salem, Oregon.   At the time of the initial discharge action, PFC Dai was enlisted in the DTP.

39.     Plaintiff Bright Izudike resides in Arlington, Texas.   At the time of the initial discharge action, SPC Izudike was enlisted in the DTP.

40.     Defendant United States Department of the Army (the "Army") is responsible for the overall administration of policy for the U.S. Army and Army Reserve.

41.     Defendant Mark Esper is Secretary of the Army.   Mr. Esper is responsible for the overall administration of Department of the Army and Army Reserve.   Plaintiffs sue Mr. Esper solely in his official capacity.

42.     Defendants Army and Esper collectively are referred to as "Defendants."

### *MAVNI Program Changes*

43.     The MAVNI program is a DoD recruiting program, under which certain non-U.S. citizens with critical language and/or medical skills that DoD has identified as "vital to the national interest" can enlist and serve in the United States Armed Forces.   The DoD encouraged soldiers to enlist in the MAVNI program by touting the opportunity as providing an "expedited" path to U.S. citizenship via naturalization.   Since the program's inception in 2008, more than 10,400 soldiers have enlisted in the armed services through the MAVNI program.

44.     On September 30, 2016, DoD began to insist on additional so-called security checks for MAVNIs, requiring that MAVNI soldiers undergo extensive background checks – including completion of a Tier 5 (or "Top Secret") background investigation and completion of a Counter Intelligence review (including interview) – and a second supposed "military service suitability determination," which entails what has proven to be lengthy adjudications by the DoD organization that makes Top Secret clearance determinations and the Army human

resources/personnel group (called "G-1").   The Army suspended recruitment for the MAVNI program in late 2016 such that there have been no new enlistees since that time.

45.   No later than May 2017, DoD and the Army realized that they did not have the resources to complete the mandated checks.  So, instead of completing the checks on the enlisted and serving MAVNI soldiers, DoD and the Army made plans to discharge or separate nearly all of them, and particularly those who had not yet been naturalized.  When that plan was publicly revealed, DoD and the Army were forced to take a different tack.

46.   However, DoD and the Army still lacked the necessary resources to complete the background checks and adjudications.  And, facing litigation in the related *Nio v. DHS* action, DoD determined that most of the *Nio* class members would have their so-called MSSDs completed in advance of their three-year enlistment anniversaries, dates that now have passed for some of the MAVNI soldiers and that are fast-approaching for many others.

47.   Now, MAVNI soldiers are being told that they have been or will be separated or discharged from the military because they are not "suitable" for service, have "refused to enlist," are "personnel security" failures, and the like.  Not only are those statements vague and without the provision of due process called for by Army regulations, DoD regulations, and the Constitution, they are false in many instances.  These soldiers *already* have enlisted and the Army *already* found them suitable for service, **two years or more ago**.  And, although the Army and DoD have not provided soldiers with the requisite processes – either during the background checks and adjudications or during the discharge decision-making – some MAVNI soldiers have obtained, through FOIA and other means, the purported reasons why they supposedly are security "failures."   In large part, those reasons reflect Army mistakes or ineptitude, rather than any legitimate derogatory finding with respect to the soldiers.

13

***The Discharge Actions Against Plaintiffs And Similarly-Situated MAVNI Soldiers***

### Lucas Calixto

48.     PV2 Calixto enlisted in the U.S. military in February 2016 through the MAVNI program and signed an enlistment contract obligating him to serve eight years in the Army Reserve, six years of which must be served in the Selected Reserve of the Ready Reserve.  The Selected Reserve "consists of those units and individuals in the Ready Reserve designated . . . as so essential to initial wartime missions that they have priority over all other Reserves."

49.     Upon enlistment, the Army found PV2 Calixto suitable for military service and assigned him to the 743rd Transportation Company ("743rd TC") in Roslindale, Massachusetts. He took his service oath on March 16, 2016, and began serving with the 743rd TC as a Private (E-1) over two years ago.

50.     In March 2017, PV2 Calixto submitted his N-400 Application for Naturalization to the U.S. Citizenship and Immigration Services ("USCIS"), which included an N-426 Form signed by his commander certifying PV2 Calixto's honorable service in the U.S. military.  On May 10, 2018, on another N-426 Form, the Army again confirmed PV2 Calixto's honorable service.  PV2 Calixto's N-400 Application for Naturalization is pending final adjudication with USCIS.

51.     On June 13, 2018, Headquarters, U.S. Army Reserve Command issued order number 18-164-00004 purporting to discharge PV2 Calixto from the U.S. Army Reserve effective July 1, 2018.  The discharge order set forth no reason for the discharge but listed the type of discharge as "Uncharacterized."  Under the heading "Additional Instructions," the order included the notation "MAVNI – Military Personnel Security."

52.     PV2 Calixto received no prior notice of the Army's discharge decision.   The Army failed to provide PV2 Calixto any opportunity to respond to or otherwise be heard regarding his discharge.   To this day, the Army has not furnished PV2 Calixto any explanation for that discharge decision.

53.     On June 18, 2018, PV2 Calixto submitted a request through his chain of command for the Army to rescind and revoke his discharge order because of the Army's failure to comply with its own regulations.   The Army did not respond to his request.

54.     Three weeks after the commencement of this litigation, and after PV2 Calixto filed a motion for preliminary injunction, Defendants informed the Court that Defendants intended to revoke PV2 Calixto's discharge order and that the "Army will comply with applicable law and regulations governing administrative separation of soldiers . . . in determining whether Plaintiff should be separated."   Dkt. 15.

55.     On July 17, 2018, the Army revoked PV2 Calixto's discharge order.   *See* Dkt. 17-1.   The revocation papers filed with the Court state that "Soldier will be provided a reasonable period of time (not less than 30 calendar days) to respond by endorsement to the notification memorandum."   *Id*. at 3.   No such "notification memorandum" was provided to PV2 Calixto prior to his discharge and no such notification has been provided since his discharge order was revoked.   Defendants further have represented that PV2 Calixto will be subject to the procedures set forth in the October 26 Memo because he received an unfavorable MSSD.   However, PV2 Calixto has not received any notification from the Army pursuant to the October 26 Memo.

56.     The Army did not promptly reinstate PV2 Calixto in the Army, nor did it promptly restore him to his pre-discharge notice status in the military.

### *Tounde Djohi*

57.     Tounde Djohi enlisted in the U.S. Army Reserve as a MAVNI in December 2015 and signed an enlistment contract.  In March 2016, SPC Djohi submitted his N-400 Application for Naturalization to USCIS, which included an N-426 Form signed by his commander certifying SPC Djohi's honorable service in the U.S. military.   On February 1, 2018, the Army again confirmed SPC Djohi's honorable service via a second N-426 Form.  In that same form attesting to his honorable service, the Army stated that unspecified "derogatory information" had been found in his military background investigations that supposedly would "require separation" from the Army.

58.     In the six months following the second N-426, SPC Djohi received no further word regarding any derogatory information or separation and he continued to drill with his unit. In mid-June 2018, however, an Army recruiter informed him that his MSSD results were unfavorable and that he was being processed for separation from the Army.

59.     Thereafter, on June 20, 2018, SPC Djohi received from his recruiter a discharge order issued by USAREC.  The order is dated June 11, 2018 and has an effective discharge date of July 1, 2018.  The discharge order cites AR 135-178, paragraph 15-8 as "Authority."  The order further specifies the "Type of Discharge" as "Entry Level Separation (Conduct Disqualification)."

60.     SPC Djohi contacted Army Headquarters to inquire about the discharge.  The Army informed him that it could not provide any information regarding his discharge and that his background check results could not be provided to him until the year 2042.  In addition, the Army told SPC Djohi – without explanation or specification – that "you do not meet the Army's Personnel Security requirement for continued service."

61.     SPC Djohi received no prior notice of the Army's discharge decision.  The Army failed to provide SPC Djohi any opportunity to respond to or otherwise be heard regarding his discharge.  To this day, the Army has not furnished SPC Djohi any explanation for the discharge decision.  At the time of the discharge decision, the Army did not take into account any statement or evidence from SPC Djohi.

62.     Army personnel also informed SPC Djohi that because of the type of discharge he received, he was not eligible for reenlistment in the military, and Army personnel claimed that because he had received an "unfavorable" MSSD, he would not be eligible for naturalization.

63.     On August 10, 2018, Defendants asserted that SPC Djohi's separation was initiated due to "an unfavorable MSSD due to significant derogatory information" but that the Army was in the process of revoking SPC Djohi's discharge order and that further processing would be suspended until SPC Djohi could "be provided with notice and an opportunity to respond."  *See* Dkt. 22-1, at 3.

64.     Defendants have represented that SPC Djohi is subject to the procedures set forth in the October 26 Memo because he had received an unfavorable MSSD.  However, he has not received any notification pursuant to that Memo.

### ***Wanjing Li***

65.     Wanjing Li enlisted in the U.S. Army Reserve as a MAVNI in February 2016 and signed an enlistment contract.  At the time of her enlistment, she was lawfully present in the United States.

66.     SPC Li began drilling with her Army unit in March 2016.   SPC Li submitted her N-400 Application to USCIS in August 2016.   The application included a duly executed Form N-426 by which the Army certified that SPC Li's honorable service in the military.

17

67.     USCIS interviewed SPC Li, determined that she met all of the requirements for naturalization, approved her naturalization application, and scheduled her to take her naturalization oath on June 23, 2017.  Prior to administering the naturalization oath, USCIS de-scheduled SPC Li's oath ceremony citing "unforeseen circumstances," which were never explained.

68.     In June 2018, the Army, on its own, provided SPC Li with an additional N-426, which again confirmed SPC Li's honorable service.  This second N-426 also indicated that unspecified "derogatory information" that supposedly would "require separation" had been found in SPC Li's newly-mandated military background investigation.

69.     On July 6, 2018, an Army recruiter informed SPC Li via text message that she had been discharged from the Army.  SPC Li later obtained a copy of the discharge order.  That order was dated July 5, 2018, with an effective date of July 5, 2018.  The discharge order did not explain the grounds for the discharge but cites AR 135-178 as "authority" and indicates that the discharge type is "uncharacterized."

70.     The Army gave SPC Li no advance notice of the discharge, no explanation at any time for the purported discharge, and no meaningful opportunity for SPC Li to respond to any purported discharge grounds.

71.     In an August 1, 2018 report to the Court in a related litigation (*Nio v. DHS*), and notwithstanding SPC Li's written orders with the effective discharge date of July 5, DoD represented that SPC Li was *not* "separated" from the military.

72.     On August 10, 2018, Defendants asserted that SPC Li's separation had been initiated due to "an unfavorable MSSD due to significant derogatory information" but that the Army had revoked SPC Li's discharge order on August 9, 2018, and that further processing

would be suspended until SPC Li could "be provided with notice and an opportunity to respond." *See* Dkt. 22-1, at 3.

73.     Defendants have represented that SPC Li is subject to the procedures set forth in the October 26 Memo because she had received an unfavorable MSSD.  However, she has not received any notification pursuant to that Policy and has not been provided an order revoking the discharge order that had been issued.

### *Zeyuan Li*

74.     PFC Zeyuan Li enlisted in the U.S. Army Reserve as a MAVNI in April 2016 and signed an enlistment contract.  PFC Li is a non-U.S. citizen.  At the time of his enlistment, he was lawfully present in the United States.  PFC Li served and drilled with his Army unit from April 2016 through October 2017.

75.     In July 2017, PFC Li submitted his N-400 Application for Naturalization to USCIS, which included an N-426 Form signed by his military unit administrator certifying PFC Li's honorable service in the U.S. military and further stating:  "Request favorable action on PFC Li being granted U.S. citizenship."

76.     On October 31, 2017, unit personnel notified PFC Li by email that he had been discharged.  PFC was not shown any discharge orders at the time..  The Army provided PFC Li no advance notice of or grounds for the discharge, let alone any meaningful opportunity for PFC Li to respond to such notice or grounds.

77.     Additionally, based on DoD reporting to the Court in the related *Nio* action, the Army has stated that PFC Li's MSSD is not complete and the results from his Counter Intelligence screening were not sent to DoDCAF for adjudication.  In those same reports to the Court, DHS stated that the location of PFC Li's naturalization application was "unknown."

78.     On August 10, 2018, Defendants asserted in this litigation – but not in any formal manner to PFC Li directly – that PFC Li was discharged for "refusing to cooperate during the required Counterintelligence (CI) Security Interview."  This was the first time PFC Li learned, even informally, of these (or any other) purported discharge grounds.  Until that time, PFC Li had not received any description from the Army of the grounds for his discharge nor has he been afforded any meaningful opportunity to respond to such grounds, much less prior to his discharge.

79.     PFC Li, through his counsel for his asylum and naturalization applications, recently obtained a copy of one of his supposed discharge orders.  The order, issued by USAREC, is dated October 25, 2017 and has an effective date of November 1, 2017.  The order specifies that his discharge type is "uncharacterized" and that the reason for discharge is "Refuse to Ship."  The discharge ground on this order appears to be inconsistent with the grounds stated by the Army to this Court.  In any event, the discharge ground on the order is incorrect, as PFC Li never refused to ship and had he been notified in advance that the Army intended to discharge him on this basis, he would have been able to explain as much to the Army.

80.     Defendants confirmed that PFC Li is not subject to the procedures set forth in the October 26 Memo.

81.     In 2018, after he had applied for asylum, USCIS placed PFC Li in removal proceedings and has had to retain an attorney to defend himself in those proceedings.

82.     In December 2018, USCIS interviewed PFC Li for naturalization.  PFC Li was told that he passed the requisite Civics and English exams, but that USCIS could not immediately proceed with his naturalization because his case was going to go through a special "legal

review."   USCIS has not provided him notice that his naturalization oath ceremony has been scheduled.

### *Fang Lu*

83.     Fang Lu enlisted in the U.S. Army Reserve as a MAVNI in March 2016 and signed an enlistment contract.  SPC Lu is a non-U.S. citizen.  At the time of her enlistment, she was lawfully present in the United States.  SPC Lu began drilling with her Army unit in April 2016.

84.     SPC Lu submitted her N-400 Application for Naturalization to USCIS in or about March 2017.  The application included a duly executed Form N-426 by which the Army certified SPC Lu's honorable service in the military.   Also in or about March 2017, SPC Lu's commanding officer wrote a letter of recommendation, stating in part that SPC Lu "has been performing outstanding service under my command" and attesting that she "will make a positive impact to readiness of our unit and have a promising career in the U.S. military as I can personally verify her positive character and amazing moral disposition."

85.     In early July 2018, an Army recruiter informed SPC Lu by telephone that she was being discharged from the Army.  SPC Lu first obtained a copy of her discharge order from her recruiter on July 16, 2018.  That order was dated July 6, 2018, with an effective date of August 1, 2018.  The discharge order does not explain the grounds for the discharge but cites AR 135-178 as "authority" and indicates that the discharge type is "Entry Level Separation (Unfavorable MAVNI Investigation Results)."

86.     The Army gave SPC Lu no advance notice of the discharge, no explanation at any time of the purported discharge grounds, and no meaningful opportunity for her to respond to such discharge grounds.

87.     SPC Lu has reason to believe that the discharge order was based on mistaken information, in part because, at the time of the discharge order, her military background investigations were not complete and DoDCAF had not even begun to adjudicate the investigation results.  Among other things, on July 30, 2018 – three weeks after the discharge orders – an investigator contacted SPC Lu stating that he was continuing to work on her military background investigation and had additional questions for her.  In addition, DoD reporting in the related *Nio* case, as of July 20, 2018, indicated that SPC Lu's MSSD was pending.

88.     On August 10, 2018, Defendants asserted that SPC Lu's separation was initiated due to "an unfavorable MSSD due to significant derogatory information" but that the Army had revoked SPC Lu's discharge order on August 9, 2018, and that further processing would be suspended until SPC Lu could "be provided with notice and an opportunity to respond."  *See* Dkt. 22-1, at 4.  Thereafter, Defendants stated that SPC Lu would be subject to the procedures set forth in the October 26 Memo.  To date, SPC Lu has not received any notice pursuant to that Memo.  Furthermore, the Army has not fully reinstated or otherwise restored SPC Lu to her pre-discharge notice status in the Army.

### *Jingquan Qu*

89.     Jingquan Qu enlisted in the U.S. Army Reserve as a MAVNI in February 2016 and signed an enlistment contract.  SPC Qu is a non-U.S. citizen.  At the time of his enlistment, he was lawfully present in the United States.  SPC Qu began drilling with his Army unit in May 2016.

90.     SPC Qu submitted his N-400 Application for Naturalization to USCIS in February 2017.  The application included a duly executed Form N-426 by which the Army certified SPC Qu's honorable service in the military.  In November 2017, the Army executed a second N-426

again confirming SPC Qu's honorable military service.

91.     On July 27, 2018, in response to SPC Qu's emails a week earlier inquiring about his BCT ship date, an Army HR official told SPC Qu that he would not be receiving a BCT ship date because he had been discharged effective December 1, 2016 (almost 19 months earlier). Thereafter, SPC Qu first obtained a copy of the discharge order.  It is dated November 23, 2016. The discharge order does not explain the grounds for the discharge but cites AR 135-178 as "authority" and indicates that the discharge type is "Uncharacterized."

92.     No one from the Army, including his unit, ever informed SPC Qu prior to July 27, 2018 that he had been discharged and, in fact, he continued to drill with his unit from December 2016 through July 2018 and the Army paid him for those drills.  Moreover, SPC Qu paid for insurance related to his military service during that period, and those payments were accepted.

93.     The Army gave SPC Qu no advance notice of the discharge, no explanation at any time for the purported discharge, and no meaningful opportunity for him to respond to any purported discharge grounds.

94.     On August 10, 2018, in response to this litigation, Defendants asserted that SPC Qu's separation was initiated due to "an unfavorable MSSD due to significant derogatory information" but that the Army had revoked SPC Qu's discharge order on August 9, 2018, and that further processing would be suspended until SPC Qu could "be provided with notice and an opportunity to respond."  *See* Dkt. 22-1, at 4-5.

95.     Subsequently, DoD, in the related *Nio* action, have stated that SPC Qu's MSSD is "pending," and Defendants have stated that SPC Qu would be subject to the procedures set forth in the October 26 Memo.  To date, SPC Qu has not received any notice pursuant to the October 26 Memo.

### *Hembashima Sambe*

96.     Hembashima Sambe enlisted in the U.S. Army Reserve as a MAVNI in February 2016 and signed an enlistment contract.  SPC Sambe is a non-U.S. citizen.  At the time of his enlistment, he was lawfully present in the United States.  SPC Sambe began drilling with his Army unit (as a PFC) in October 2016.

97.     SPC Sambe submitted his N-400 Application for Naturalization to USCIS in February 2017.  The application included a duly executed Form N-426 by which the Army certified SPC Sambe's honorable service in the military.

98.     In May 2018, SPC Sambe's unit informed him by email that he had been discharged.  The unit representative told SPC Sambe that he did not know the basis for the discharge.  SPC Sambe subsequently obtained a copy of the discharge order.  It is dated September 15, 2017 with an effective date of October 1, 2017.  The discharge order does not explain the grounds for the discharge but cites AR 135-178 as "authority" and indicates that the discharge type is "Uncharacterized."

99.     On November 29, 2017, almost two months *after* the discharge orders, the Army ordered SPC Sambe to a Counter Intelligence interview as part of his military background investigation.  Moreover, between the date of the supposed discharge and May 2018, SPC Sambe continued to attend drills with his unit.

100.    In July 2018, SPC Sambe had an email exchange with John Sheehy, from USAREC.  Mr. Sheehy informed SPC Sambe that the discharge order was mistaken.  Mr. Sheehy told SPC Sambe that "you have not been discharged" and that the Army was still awaiting his MSSD results.

101.    Thereafter, on July 26, 2018, SPC Sambe received a demand letter from another DoD component, the Defense Finance and Accounting Service ("DFAS").   The DFAS letter claimed that SPC Sambe was a former service member and that he owed the Army more than $1,100 for pay he received after he had been discharged.

102.    No one from the Army, including his unit, ever informed SPC Sambe prior to May 2018 that he had been discharged.   The Army gave SPC Sambe no advance notice of the discharge, no explanation at any time for the purported discharge, and no meaningful opportunity for him to respond to any purported discharge grounds.

103.    On August 10, 2018, Defendants asserted that the Army had revoked SPC Sambe's discharge order on August 8, 2018, and that "separation has not been initiated against him."   *See* Dkt. 22-1 at 4.   To date, the Army has not provided SPC Sambe with any notice pursuant to the October 26 Memo, nor has the Army fully reinstated or otherwise restored SPC Sambe to his pre-discharge status in the Army (including taking the actions necessary to reverse the DFAS action against him).

### ***Emeka Udeigwe***

104.    Emeka Udeigwe enlisted in the U.S. Army Reserve as a non-U.S. citizen MAVNI in March 2016 and signed an enlistment contract.   In January 2017, SPC Udeigwe began drilling with his Army unit and submitted his N-400 Application for Naturalization to USCIS.   The application included a duly executed Form N-426 by which the Army certified SPC Udeigwe's honorable service in the military.

105.    On July 6, 2018, an Army recruiter called SPC Udeigwe and informed him that he was being discharged.   The recruiter provided no explanation for the discharge.   On July 9, 2018, SPC Udeigwe first obtained a copy of the discharge order.   It was dated July 5, 2018 with an

effective date of August 1, 2018. The discharge order did not explain the grounds for the discharge but cited AR 135-178 as "authority" and indicates that the discharge type is "Uncharacterized."

106.    No one from the Army, including his unit, ever informed SPC Udeigwe prior to July 2018 that he had been discharged. The Army gave SPC Udeigwe no advance notice of the discharge, no explanation at any time for the purported discharge, and no meaningful opportunity for him to respond to any purported discharge grounds.

107.    In an August 1, 2018 report to the Court in a related litigation (*Nio v. DHS*), and notwithstanding SPC Udeigwe's written orders with the effective discharge date of August 1, DoD represented that SPC Udeigwe was ***not*** "separated" from the military.

108.    On August 10, 2018, Defendants asserted that SPC Udeigwe's separation was initiated due to "an unfavorable MSSD due to significant derogatory information" but that the Army had revoked SPC Udeigwe's discharge order on August 9, 2018, and that further processing would be suspended until SPC Udeigwe could "be provided with notice and an opportunity to respond." *See* Dkt. 22-1, at 5. Subsequently, Defendants represented that SPC Udeigwe would be subject to the procedures set forth in the October 26 Memo.

109.    SPC Udeigwe never received any of the above-referenced notices. Instead, without further explanation regarding the prior discharge action, SPC Udeigwe received orders to report to basic training in January 2019. Furthermore, without explanation, USCIS scheduled SPC Udeigwe for a naturalization interview, and he became a naturalized U.S. citizen on December 21, 2018.

### *Xing Lu*

110.    Xing Lu is a non-U.S. citizen who enlisted in the U.S. Army as a Regular Army MAVNI on January 19, 2016.  For the next two years, SPC Lu served in the DEP while waiting to be sent to basic training.  During that time, she remained physical fit and regularly attended the Army-sponsored DEP meetings.

111.    SPC Lu attended her CI interview on September 6, 2017 at Fort Jackson.  On January 29, 2018, SPC Lu's Army recruiter informed her that she had been discharged.  In November 2018, SPC Lu first received a copy of a discharge order pertaining to her.  The discharge order, from USAREC, was dated February 2018 but listed an "effective date" of January 19, 2018.  The order provided the following information:

> You are separated from the component indicated.
>
> Authority: AR 135-178
>
> Effective Date: 19 January 2018 (VOCO CONFIRM)
>
> Component:  AR FUTURE SOLDIER PROGRAM, FORT KNOX, KY 40121
>
> Dep Separation Code: ZBD
>
> Additional Instructions:  N/A

112.    SPC Lu did not "refuse to enlist" as the "ZBD" coding on the discharge order indicates.  Beyond the fact that she enlisted in January 2016, on multiple occasions in the fall of 2017, SPC Lu notified the Army that she "opted in," indicating her desire to stay in the military past the 730-day mark following her enlistment.  SPC Lu made her "opt-in" known to the Army, in writing, on September 5, 2017 and again on September 13, 2017.  The Army internally confirmed her "opt-in" via email on September 13, 2017.

27

113.    Thus, SPC Lu was surprised when her recruiter informed her in January 2018 that she had been discharged from the military.  She received no prior notice of the discharge and no opportunity to challenge or respond to a discharge notice prior to the discharge being "effective."

114.    On November 28, 2018, counsel for Defendants confirmed that "Xing Lu is not subject to the procedures outlined in the October 26 [Memo]."

### *Yisheng Dai*

115.    Yisheng Dai enlisted in the U.S. Army as a MAVNI on October 29, 2015.  As a Selected Reservist, he drilled with his unit, the 960th Quartermaster Company in Cedar Rapids, Iowa, many times and was paid for that service.  He was charged premiums for military insurance.

116.    He is a class member in the related *Nio* action.

117.    In October 2017, PFC Dai's recruiter told him orally that he had been discharged from the Army.  Although he asked his recruiter on multiple occasions for a copy of his discharge orders, his recruiter failed to provide him with any discharge paperwork.

118.    On June 7, 2018, PFC Dai finally obtained a copy of the discharge order, which was sent to him in connection with his request to the Army for a certified N-426.  The discharge order, from USAREC, is dated September 11, 2017, with an effective date of October 1, 2017, and includes the following information:

> You are discharged from component shown.
>
> Authority:  AR 135-178
> Effective date: 1 OCT 2017
> Component:  United States Army Reserve
> Type of Discharge:  Uncharacterized
> Additional Instruction: No Travel Required / Unit Request, **ZBD**
> Format:  500

119.    PFC Dai speculates, but does not know, that the Army may have discharged him after refusing to reschedule his CI interview, although he told the Army in advance that he could not attend on the date specified because he was visiting an ailing, hospitalized relative (and even though the Army had previously rescheduled the CI interview, with little to no notice to PFC Dai, for its own convenience).

120.    In any event, PFC Dai did not receive a written notice of his discharge (or grounds therefor) in advance of being discharged.  The Army did not afford PFC Dai any opportunity to respond to or contest the purported discharge.  Nor did the Army provide PFC Dai with any counseling or rehabilitation in advance of discharge.

121.    Moreover, PFC Dai has received conflicting and confusing information about his discharge.  For example, on June 18, 2018, the Army executed an N-426 that certified PFC Dai's service to the "PRESENT" (although PFC Dai had typed on the N-426 that his service period ended on "October 1, 2017") and did not identify him as being "separated" from the military in Part 6 of the form (although PFC Dai had informed the Army when he requested the N-426 that he understood he had been discharged in October 2017).

122.    Contrary to the discharge order, PFC Dai did not "refuse to enlist" as the "ZBD" coding indicates.  As noted, PFC Dai enlisted in the U.S. Army in 2015.  And PFC Dai indicated to his recruiter many times that he wanted to schedule the CI interview and continue serving/be reinstated in the Army.

123.    Notwithstanding this history, Defendants' reporting in this case lists PFC Dai as an "other reason" discharge, with the basis described as "entry level performance and conduct." This discharge ground does not match the "refuse to enlist" coding on PFC Dai's discharge order.

124.    On November 20, 2018, Defendants confirmed that PFC Dai received an other

reasons discharge by informing Plaintiffs' counsel that PFC Dai is "not subject to the procedures

outlined in the October 26 [Memo]."

### *Bright Izudike*

125.    Bright Izudike enlisted in the U.S. Army as a MAVNI on December 17, 2015.  As

a Selected Reservist, he drilled with his unit, the 441st Medical Company at Seagoville, Texas,

as a combat medic and was paid for that service.  He is a class member in the related *Nio* action.

126.    In October 2017, when SPC Izudike's recruiter was scheduling him for the CI

interview, the recruiter informed SPC Izudike that a discharge letter had been found in the

soldier's records.  That discharge order, dated September 15, 2017, was issued by the recruiting

battalion and included the following information:

```
Authority: AR 135-178
Effective date:  1 October 2017 (VOCO Confirmed)
Component:  United States Army Reserve
Type of Discharge:  Uncharacterized
Additional Instructions:  No Travel Required/Unit Request, ZBD
FORMAT:  500
```

127.    SPC Izudike does not know why this discharge order was issued, and his recruiter

and command did not provide him with any further explanation for the discharge documentation.

128.    SPC Izudike did not receive a written notice of his discharge (or grounds therefor)

in advance of being discharged.  The Army did not afford SPC Izudike any opportunity to

respond to or contest the purported discharge.  Nor did the Army provide SPC Izudike with any

counseling or rehabilitation in advance of discharge.

129.    Moreover, SPC Izudike has received conflicting and confusing information about

his discharge.  SPC Izudike has received notices from DFAS, claiming that he owes the

government the amounts he was paid to drill with his unit in October, November, and December 2017. Yet, no one in the Army had informed SPC Izudike that he had in fact been discharged and should not drill. In fact, the Army allowed him to drill and paid him for that service.

130.     In addition, he attended his CI interview on November 21, 2017, which was arranged by his Army recruiter and others within the military and was weeks after his purported discharge was "effective."

131.     In the reporting provided in the related *Nio* action, SPC Izudike's CI results were received by the DoDCAF on January 25, 2018, which is months after his purported discharge.

132.     Further, the *Nio* reporting does not identify a discharge date for SPC Izudike.

133.     Finally, on November 5, 2017 (over a month after the "effective" date of SPC Izudike's purported discharge), a colonel in the Army completed and signed an N-426 form for SPC Izudike and did not identify him as separated (and certified SPC Izudike's service as honorable).

134.     On information and belief, SPC Izudike will not receive the procedures set forth in the October 26 Memo. SPC Izudike has not received an offer of reinstatement from the Army, and DFAS continues to pursue his purported indebtedness to the Army, having issued a "final notice" on October 29, 2018.

***

135.     The circumstances described above with respect to the individually-named Plaintiffs are consistent with known discharge actions taken against other MAVNI enlistees.

### The Summary Discharges Violate Regulations and the Constitution

136.     Defendants' summary discharges – whether of soldiers with unfavorable MSSDs or for "other reasons" (and the soldiers did not have unfavorable MSSDs) – violate Army

31

regulations, DoD regulations, and the fundamental requirements of due process and equal protection.

### *Army Regulations Applicable to Involuntary Administrative Discharges*

137.  All Plaintiffs and proposed class members in this action were the subjects of involuntary administrative discharge actions by Defendants.  This action does not involve discharges that were made on a voluntary basis, *i.e.*, at a soldier's request or with the soldier's understanding and prior consent.

138.  Discharge orders obtained by Plaintiffs (where available) cite AR 135-178 as "authority" for involuntary administrative discharges.  Even the October 26 Memo cites AR 135-178 as governing authority for administrative discharge actions.

139.  Army Regulation 135-178 specifies that its "purpose" is to ensure "the ***orderly*** administrative separation of . . . enlisted soldiers."  AR 135-178 at ¶ 1-1 (emphasis added). Chapter 3, titled "Guidelines for Separation," sets forth the process that must occur in advance of the discharges, specifying that:

> **[T]he commander will notify the Soldier, in writing**, of the matter set forth in this section . . .
>
> (1)  **The basis of the proposed separation**, including the circumstances upon which the action is based, and a reference to the applicable provisions of this regulation.
>
> (2)  **Whether the proposed separation** could result in a discharge from the Army . . . or release from custody or control of the Army.
>
> (3)  The least favorable characterization or description of service authorized **for the proposed separation**.
>
> (4)  The right to obtain copies of documents that will be sent to the separation authority supporting the basis of the ***proposed separation***.  . . .
>
> (5)  The Soldier's right to submit statements.

(6)    The Soldier's right to consult with military legal counsel. . . .

(8)    The right to waive the rights in paragraphs 3-5*a*(4) through (7), in writing . . . after being afforded a reasonable opportunity to counsel with counsel, and that failure to respond within 30 calendar days from the date of receipt of the notice will constitute a waiver of the right.

AR 135-178 at ¶ 3-5*a* (emphases added).

140.    AR 135-178 Chapter 2 provides guidelines on separation and characterization, and notes that "[t]here is a substantial investment in the training" of enlisted Army soldiers. *Id.* at ¶ 2-2*a*. It further provides that "[a]s a general matter, reasonable efforts at rehabilitation should be made ***prior to initiation*** of separation proceedings." *Id.* (emphasis added).

141.    AR 135-178 provides "further guidance" for "specific reasons for separation." *Id.* at ¶ 2-1. These categories include the types of discharge grounds that can be attributed to the soldiers in this action.

142.    For example, when a soldier is to be discharged under the personnel security category (or for "security reasons") – which would include unfavorable MSSD discharges –  the soldier shall be processed in accordance with Army Regulation 380-67. *See* AR 135-178 at ¶ 14-1*h*.

143.    AR 380-67 in turn provides that:

***[N]o unfavorable administrative action shall be taken under the authority of this regulation unless the person concerned has been given***:

*a.*    ***A written statement of the reasons why the unfavorable administrative action is being taken***. The statement shall be as comprehensive and detailed as the protection of sources afforded confidentiality under the provisions of the Privacy Act of 1974 (5 USC 552a) and national security permit. . . .

*b.*    ***An opportunity to reply*** in writing to such authority as the head of the component concerned may designate. . . .

    *c.*     ***A written response to any submission under paragraph b***, stating the final reasons therefore, which shall be as specific as privacy and national security considerations permit.

AR 380-67 at ¶ 8-6 (emphases added).

144.    Army regulations define "unfavorable administrative action" to include any "[a]dverse action taken as the result of personnel security determinations ***and unfavorable personnel security determinations***," which are further defined to include any "nonacceptance for or discharge from the Armed Forces when any of the foregoing actions are based on derogatory information of personnel security significance."   AR 380-67, Glossary Section II (Terms) (emphasis added).

145.    Similarly, soldiers separated for "entry level performance and conduct" are not only specifically entitled to advanced notice as set forth in AR 135-178 at 3-5 (*see* AR 135-178 at ¶ 8-4*a*), but "***[s]eparation processing may not be initiated . . . until the Soldier has been formally counseled under the requirements prescribed by paragraph 2-4***."   AR 135-178 at ¶ 8-2 (emphasis added).

146.    AR 135-178 further provides that:

    *a.*     *General*. ***Commanders must make reasonable efforts to identify Soldiers who are likely candidates for early separation and to improve their chances for retention through counseling, retraining, and rehabilitation before starting separation action***. . . .

    *b.*     *Counseling*. When a Soldier's conduct or performance approaches the point where a continuation of such conduct or performance would warrant initiating a separation action for one of the reasons in paragraph 2–4a, the Soldier will be counseled by a responsible person about their deficiencies. . . . The Soldier's counseling or personnel records must establish that the Soldier was afforded a reasonable opportunity to overcome these deficiencies. . . .

AR 135-178 at ¶ 2-4 (emphasis added).

147.    Additional due process rights and procedures for soldiers facing potential discharge are set forth in Army Regulation 635-200.

148.    Defendants violated Army regulations by making discharge decisions with respect to Plaintiffs without affording them the formal notice, response, and other applicable rights set forth in Army Regulations.

### *Applicable DoD Regulations*

149.    The summary discharges also violated DoD regulations, which are mandatory and binding on the Army.

150.    Pursuant to Department of Defense Instruction ("DoDI") 5200.02, all members of the military are deemed to hold "national security positions."   DoDI 5200.02, Glossary Part II (Definitions); *see also* DoD Manual 5200.02 at ¶ 7.6(b) ("All military positions are national security positions regardless whether or not the Service member requires access to classified information, as established in DoDI 5200.02.").   Plaintiffs – all of whom enlisted in the Army in or prior to 2016, with many having military ranks and having been certified by their commanders as having served honorably – previously had been found eligible for service in a "national security position" at the time of enlistment.   The Army's purported discharges thus constitute denials or revocations of these soldiers' eligibility to hold national security positions.

151.    With regard to such denials or revocations of eligibility, DoDI 5200.02 provides:

> APPEAL PROCEDURES – DENIAL OR REVOCATION OF
> ELIGIBILITY.  Individuals may elect to appeal unfavorable
> personnel security determinations in accordance with the
> procedures set forth in . . . [DoD Manual 5200.02], as applicable,
> or as otherwise authorized by law.

DoDI 5200.02, Enclosure 3, Section 4.

152.     DoD Manual 5200.02 in turn provides that "*[m]ilitary members* who are denied or revoked a favorable national security eligibility determination *will be afforded due process*." DoD Manual 5200.02 at ¶ 7.6(b)(2)(a) (emphasis added).   DoD Manual 5200.02 defines "national security eligibility" as "[t]he status that results from a formal determination by an adjudication facility that a person meets the personnel security requirements for access to classified information *or to occupy a national security position* or one requiring the performance of national security duties."  DoD Manual 5200.02, Glossary Section G.2 (Definitions) (emphasis added).   Because "[a]ll military positions are national security positions," *see* DoD Manual 5200.02 at ¶ 7.6(b), any decision to separate a soldier from the military on personnel security grounds is, by definition, a "national security eligibility" determination.

153.     That manual further provides:

**MINIMUM DUE PROCESS REQUIREMENTS APPLICABLE TO ALL**. *No unfavorable national security eligibility determination will be made without first*:

a.     ***Providing the individual with a comprehensive and detailed written explanation*** of the basis for the unfavorable determination as the national security interests of the United States and other applicable law permit. The [Letter of Denial] or [Letter of Revocation] must include each security concern, the applicable adjudicative guideline(s) related to each concern, and provide an explanation of the kinds and types of information they could provide to support their appeal.

b.     Informing the individual of their right to:

(1)     Be represented by counsel or other representative at their own expense.

(2)     Request the documents, records, and reports upon which the unfavorable national security determination was made.  Be granted an extension to set the timeline by the Component [Personnel Security Appeal Board] if requested documents, records, and reports are not provided promptly.

    c.      **Providing a reasonable opportunity to reply** in writing and to request review of the unfavorable determination.

    d.      Providing the individual written notice of reasons for the determination, the determination of each adjudicative guideline that was provided to the individual in the statement of reasons (SOR) that accompanied the notification of intent (NOI) to deny or revoke the identity of the determination authority, and written notice of the right to appeal unfavorable determinations to a high-level panel. . . .

    f.      Providing the individual an opportunity to appear in person and present relevant witnesses, documents, materials, and information.

    g.      **Providing the individual with a written decision on appeal**.

DoD Manual 5200.02 at ¶ 10.2 (emphasis added).

154.    Still further due process rights and procedures for military members are set forth in ¶ 10.4 of DoD Manual 5200.02.

155.    Additional due process rights and procedures for military members facing potential discharge are set forth throughout DoD Instruction 1332.14.

156.    Defendants violated applicable law by purporting to discharge Plaintiffs without affording them the rights and procedures mandated by DoD Regulations.

### *Constitutional Rights*

157.    In addition to the regulatory violations stated herein, Defendants violated the fundamental requirements of due process under the Fifth Amendment of the U.S. Constitution by purporting to discharge Plaintiffs from the U.S. Army, prior to the expiration of their enlistment contracts, without providing them with an adequate explanation for the discharge, without providing them with any meaningful opportunity to be heard and respond to the grounds, if any, for the discharge action, and without following applicable military guidance and regulations. Additionally, these soldiers' property and/or liberty interests have been implicated by

Defendants' actions.   For example, the discharge characterizations and notations on their discharge orders have stigmatized and have impugned their reputations (and will continue to do so), thereby implicating their liberty interest in due process.

158.   Moreover, Defendants' actions unconstitutionally discriminate against Plaintiffs based on their national origin in violation of Plaintiffs' equal protection rights as guaranteed by the Fifth Amendment of the U.S. Constitution.   For instance, the "MAVNI – Military Personnel Security" notation on some discharge paperwork indicates that Defendants are directing their summary discharge practices at MAVNIs in particular, and that such discharge due process denials are not being applied to non-MAVNI soldiers.

### The Army's Retaliation Against MAVNI Soldiers as a Result of This And Related Lawsuits

159.   PV2 Calixto initiated this action on June 28, 2018 and sought immediate injunctive relief.   After Defendants indicated that they would revoke PV2 Calixto's discharge order rather than attempt to justify their conduct, this Court stayed the action.   On August 3, 2018, additional Plaintiffs filed a motion to lift the stay and an amended complaint, along with a motion for class certification.   The Court lifted the stay on August 8, 2018, and ordered a telephone conference for August 13, 2018.   Following that conference, in which Defendants indicated an intent to revoke discharge orders for most of the newly named Plaintiffs, the Court again stayed briefing on the motions for preliminary injunction and class certification, but ordered reporting from the Defendants as the extent of the discharge violations and any new discharge policy enacted.

160.   On or about August 14, 2018, just eleven days after the Amended Complaint, Defendants, through the Army's 902d Military Intelligence Group located at Fort Meade, Maryland, issued a request for support, which was forwarded by email to various reserve units to

members of the reserve Judge Advocate General Corps ("JAG") as a "902d MI Group support Request" ("The 902 MI Email").   This Army unit is responsible for conducting the enhanced military background investigations to which MAVNI soldiers are now subjected before the Army renders its MSSD and the soldiers are permitted to ship to basic training.   These military background investigations include materials gathered from various database checks plus the soldier's security clearance questionnaire and a report of the CI interview of each soldier.

161.   The 902 MI Email solicited reserve JAGs to assist "[a]s soon as possible" in "reviewing MAVNI screening packets" in order "***to determine whether the applicants admitted to or provided information about a crime that requires reporting to law enforcement.***"   The so-called "screening packets" are the background materials – including the report of CI interview – that are compiled during the MAVNIs enhanced background investigation.

162.   In the "Why" section of the 902 MI Email, the Army expressly admitted the retaliatory rationale behind the Army's urgent request:   ***"MAVNIs are currently suing the federal government claiming they were wrongfully discharged from the Army."***

163.   While MI screeners already had reviewed the soldiers' files, the Army – motivated to retaliate against discharged soldiers for having the courage to expose the Army's misconduct and seek federal court relief – was now recruiting JAG officers to reexamine those records for the specific purpose of finding some alternative basis to justify a discharge.   The 902 MI Email states as much:   ***"Screeners may not have realized that a MAVNI confessed to a crime because their mission was to identify anomalies and they are not law enforcement."***   In other words, the mission assigned to these JAGs was to undertake a one-way review of the file.   This was not an objective analysis to determine if mistakes were made that might change DoD or Army

adjudications, but a results-oriented attempt to uncover grounds to potentially prosecute these soldiers, who sued the Army, or their relatives.

164.    In addition, this scouring of background investigation materials is directed solely at MAVNIs.   Although this same unit generates comparable "packets" for other soldiers undergoing background investigations, there is no indication that JAG lawyers were being solicited to determine if any non-MAVNI "packets" contained evidence of criminal activity that should be reported to law enforcement.

165.    MAVNIs also have learned that they are being subject to differential treatment in their initial CI reviews based on the filing of other, related class actions for MAVNI soldiers (*Kirwa*, *Nio*).  This differential treatment has led to negative CI findings and discharges, or will lead to involuntary discharges under the October 26 Memo.

166.    For example, one MAVNI received negative CI findings as a "MODERATE security risk" on September 13, 2017, with the CI Reviewer listing findings (although not accurate) as follows: "MAVNI is a MODERATE risk.   MAVNI claims to hold no allegiance to US until they revieve [sic] citizenship.  MAVNI also working connected to Lawyer representing MAVNIs in lawsuite [sic] against U.S. Army - Derog."

167.    As another example, upon information and belief, a MAVNI received negative CI findings because "SHE follows the lawsuit by the MAVNIs and SHE feels like the MAVNIs are being harmed because they are described as a threat to National Security."  This individual MAVNI's CI report listed as a loyalty concern that "throughout the interview process SHE said due to […] delays with the MAVNI process, she feels discriminated against and denied her citizenship."

168.    Further, a MAVNI received negative CI findings because "MAVNI was a member of the MAVNI Legal Facebook page.  SHE frequently visited the site for the latest news about the MAVNI program."

169.    Upon information and belief, other MAVNIs have received negative CI results, leading to discharge, based upon their status as class members or proposed class members in lawsuits related to the MAVNI program.

## CLASS ACTION ALLEGATIONS

170.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  The class definition is as follows:

- All soldiers who enlisted in the U.S. Army (including Selected Reserve of the Ready Reserve/DTP and Regular Army/DEP soldiers) through the MAVNI program, and

- were the subject of an involuntary administrative discharge action by the Army (including the Army Recruiting Command and/or the Army Reserve Command) after September 30, 2016, where such discharge or separation was not or will not be characterized by the Army (including "uncharacterized" and "entry level" discharges or separations), and

- where such action was taken without the soldier first being afforded the process due under applicable Army and DoD regulations and the law (including adequate notice of the discharge grounds, an opportunity to respond, due consideration of the soldier's response by the Army, or other requirements of law), and

- where the soldier wants to be reinstated in or remain in the Army.

171.    While the class definition applies to each Plaintiff and class member, pursuant to Rule 23(c)(5), Plaintiffs propose two subclasses in order to separately account for (1) those class members identified by the Army as having an unfavorable MSSD and being subject to the October 26 Memo, and (2) those class members whose discharge (according to the Army) was

for reasons other than an unfavorable MSSD and who will not receive the procedures of the October 26 Memo.

172.   Plaintiffs allege that each subclass meets the requirements for class certification under Rule 23.  In the alternative, Plaintiffs allege that the class as a whole can be certified under Rule 23, without subclasses.

173.   Class action designation is warranted under the criteria set forth in Rule 23(a).

174.   The proposed class meets the numerosity requirement of Rule 23(a)(1) because the members of the class are so numerous that joinder of all members is impractical.

175.   Although the exact number of class members is unknown to Plaintiffs at this time as such information resides exclusively within the province of Defendants and must await Defendants' disclosure/discovery, Defendants' reporting in this action has identified more than 40 class members who received unfavorable MSSDs and were discharged and has provided grounds to believe that more than 40 class members did not receive unfavorable MSSDs, purportedly were discharged for "other reasons," and are not subject to the October 26 Memo.

176.   On September 4, 2018, Defendants reported to the Court that, effective between July 20, 2017 and July 20, 2018, 48 DTP or DEP MAVNIs were discharged due to an unfavorable MSSD.  Dkt. 28.  These 48 individuals include only those whose discharge orders Defendants do not expect to revoke as of that time.  *Id.*  In addition, Defendants reported that a further 454 DTP or DEP MAVNIs were discharged during that same one year period for "other" reasons, including "Entry Level Performance And Conduct," "Refuse to Enlist," and "Unknown," and that these discharges are not expected to be revoked.  *Id.*  These discharges alone, are sufficient to demonstrate numerosity for each of the proposed subclasses and/or for the class as a whole.

177.    On October 19, 2018, Defendants reported to the Court that 22 DEP MAVNIs and 8 DTP MAVNIs had been discharged after July 20, 2018.  Dkt. 48.

178.    In the related actions (*Nio* and *Kirwa*), DoD has identified additional MAVNI soldiers discharged, both from the one-year period above as well as from post-September 30, 2016 dates outside of that period.

179.    In addition, based on DoD reports filed in the related litigation (*see, e.g., Nio*, Dkt. 17-8) and otherwise on information and belief, there are approximately 4,300 MAVNI soldiers (Regular Army/DEP and Selected Reserve/DTP) who were considered "entry-level" post-September 30, 2016 and could be subjected to "uncharacterized" discharges by the Army.  A Pentagon spokesperson has stated that the Army expects to discharge approximately one-third of the MAVNI soldiers still waiting for MSSDs, and earlier DoD estimates suggested that DoD expected closer to half of MAVNI soldiers to receive "unfavorable" adjudications.

180.    The proposed class satisfies the commonality requirement of Rule 23(a)(2) because there are questions of law and fact common to the class.  Among the questions of law and fact common to the class are whether the involuntary and summary discharge actions were contrary to law.

181.    Although the core complaint and commonality among each class member is due to the involuntary and summary nature of the discharge action by the Army, Plaintiffs have proposed that the class be divided into two subclasses due to the October 26 Memo.  As noted, the first subclass consists of MAVNI soldiers who received an unfavorable MSSD.  Those soldiers are subject to the procedures set forth in the October 26 Memo.  The second subclass consists of soldiers who do not have unfavorable MSSDs and who purportedly received a

discharge for another reason and, according to Defendants, will not be subject to the procedures set forth in the October 26 Memo.

182.    The proposed class and subclasses satisfy the typicality requirement of Rule 23(a)(3) because the named Plaintiffs' claims are typical of the claims of each of the class members.  Class members similarly are affected by Defendants' wrongful conduct in violation of the Administrative Procedure Act, applicable Army regulations, DoD regulations, and the U.S. Constitution.

183.    The named Plaintiffs – some of whom are subject to the October 26 Memo and some who are not – will fairly and adequately protect the interests of the class (or subclasses) because their interests are identical to those of the other members of the classes.  Fair and adequate protection of the interests of the class will be ensured further because the named Plaintiffs are represented by competent legal counsel who are experienced in federal court litigation, including class action litigation, and have adequate resources and commitment to represent the class as a whole.

184.    Furthermore, if the named Plaintiffs (and members of the class) were to bring separate suits to address Defendants' practices, actions, and inactions, Defendants may address the discharges of the named Plaintiffs but ignore the discharges and concerns of the remaining class members, thereby exacerbating Defendants' violations of the law and applicable regulations.

185.    Resolving this matter as a class action would promote judicial economy by avoiding overburdening the Court with individual lawsuits brought by each of the dozens or hundreds of Army soldiers who were the victims of the involuntary and summary discharge actions challenged herein.

186.     In addition to qualification for class treatment under Rule 23(b)(1)(a), this case qualifies for class action treatment under Rule 23(b)(2) because Plaintiffs seek injunctive and declaratory relief.  The relief is appropriate for the whole class as Defendants' conduct applies generally to the class as a whole.

## CLAIMS FOR RELIEF

### Count I: Declaratory Judgment

187.     Plaintiffs re-allege paragraphs one through 186 as if fully set forth herein.

188.     28 U.S.C. § 2201 authorizes a court, "[i]n a case of actual controversy within its jurisdiction . . . upon the filing of an appropriate pleading" to "declare the rights and other legal relations of any interested party seeking such declaration."

189.     Army and DoD regulations set forth specific procedures that must be followed before a final discharge decision is made.  Defendants failed to follow those procedures with respect to Plaintiffs, in contravention of the regulations and in violation of Plaintiffs' due process rights.  Accordingly, Plaintiffs seek a declaratory judgment that the final discharge decisions made with respect to Plaintiffs and the Class are unlawful and must revoked.

### Count II: Injunctive Relief

190.     Plaintiffs re-allege paragraphs one through 189 as if fully set forth herein.

191.     Defendants unlawfully and improperly made the final discharge decisions with respect to Plaintiffs and the Class without complying with applicable law including, without limitation, Army Regulation 135-178, Army Regulation 380-67, DoDI 5200.02, DoD Manual 5200.02 (incorporated in DoDI 5200.02 by reference), and the U.S. Constitution.

192.     Plaintiffs have been, and will continue to be, substantially and irreparably harmed by Defendants' unlawful and improper actions, for which there is no adequate remedy at law.

Under the facts and circumstances of this case, the balance of the equities clearly favors Plaintiffs, and injunctive relief is in the public interest.

193.    Plaintiffs seek an injunction as follows:

- Defendants shall issue orders revoking, rescinding, and suspending any discharge actions against class members;

- Defendants shall promptly respond to any class member inquiry as to whether the Army will provide the soldier with the procedures outlined in the October 26 Memo;

- Defendants shall take all actions necessary to fully reinstate and restore class members to their pre-discharge action status in the Army;

- To the extent that Defendants notified other military departments, DoD, or other federal agencies or components, including DHS, of the discharge decisions, Defendants shall promptly notify such entities that the discharges are revoked and void for all purposes;

- Defendants shall refrain from initiating or continuing any retaliatory action against class members;

- Defendants shall not renew or commence new discharge actions against Plaintiffs or the Class except in accordance with applicable law and regulations governing such discharges.

### Count III:  Administrative Procedure Act

194.    Plaintiffs re-allege paragraphs one through 193 as if fully set forth herein.

195.    5 U.S.C. § 706(2) authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

196.    Defendants took the challenged discharge actions against Plaintiffs without complying with applicable law including, without limitation, the requirements of Army

46

Regulation 135-178, Army Regulation 380-67, DoDI 5200.02, and DoD Manual 5200.02 (incorporated in DoDI 5200.02 by reference). Defendants' actions therefore are not in accordance with law and were undertaken without observance of procedure required by law. Furthermore, Defendants' actions were arbitrary and capricious because Defendants failed to comply with their own regulations.

197.    Accordingly, Plaintiffs seeks an order holding unlawful and setting aside the challenged discharge actions pursuant to 5 U.S.C. § 706(2).

### *Count IV: Constitutional Violation – Procedural and Substantive Due Process*

198.    Plaintiffs re-allege paragraphs one through 197 as if fully set forth herein.

199.    The challenged discharge actions deprived Plaintiffs of their constitutionally-protected liberty and/or property interest, including with respect to their reputations, ability to pursue their chosen careers, and/or their timely and appropriate adjudication of their right to naturalization. Defendants took these actions without providing Plaintiffs with the requisite notice and opportunity to be heard.

200.    Defendants' discharge decisions carry significant adverse consequences for soldiers and the nature of their discharges – based on the notations on their discharge orders – are stigmatizing, as they impact their ability to pursue their military careers, their ability to obtain a civilian or non-military government job, and their reputations. Defendants' conduct therefore violates the due process rights of Plaintiffs and the Class under the Fifth Amendment of the U.S. Constitution.

201.    Defendants' conduct with respect to the decision-making and processing of Plaintiffs' separation and discharge from the Army is arbitrary, contrary to DoD and the Army's own guidance and regulations, and shocks the conscience. As such, Defendants' conduct also

violates the substantive due process rights of Plaintiffs and the Class under the Fifth Amendment of the U.S. Constitution.

202.     Plaintiffs request that the Court grant appropriate equitable relief on the foregoing basis.

### Count V: Constitutional Violation – Equal Protection

203.     Plaintiffs re-allege paragraphs one through 201 as if fully set forth herein.

204.     Plaintiffs (as MAVNIs who received "uncharacterized" or "entry level separation" discharges without the required rights and process to which they are entitled) are being treated differently with respect to Defendants' processing of their separation and discharges from the Army.  By treating these MAVNI soldiers differently than soldiers who did not enter through the MAVNI program, and failing to provide  the notice, opportunity to be heard, counseling, rehabilitation, appeal, and/or other rights with respect to the separation/discharge process, Defendants are unconstitutionally discriminating against Plaintiffs (and the Class) based on their national origin in violation of their equal protection rights as guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

205.     In addition, Plaintiffs are being treated differently with respect to Defendants' supposed "criminal reporting requirements" by subjecting Plaintiffs (and the Class) to a re-review of their CI packets for the purpose of identifying potential criminal violations.  By treating these MAVNI soldiers differently than soldiers who did not enter through the MAVNI program and thus do not have their CI packets re-reviewed by JAG officers to identify potential criminal violations, Defendants are unconstitutionally discriminating against Plaintiffs (and the Class) based on their national origin in violation of their equal protection rights as guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

206.    Plaintiffs (and the Class) also are being treated differently with respect to their CI reviews, which has led to separation/discharge or will lead to separation/discharge under the October 26 Memo, by being classified as moderate security risks simply for being class members or proposed class members in lawsuits regarding the MAVNI program.  By treating these MAVNI soldiers differently than soldiers who did not enter through the MAVNI program (and thus are not, by definition, part of a class or proposed class of MAVNI soldiers in any lawsuit), Defendants are unconstitutionally discriminating against Plaintiffs (and the Class) based on their national origin in violation of their equal protection rights as guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

207.    Plaintiffs request that the Court grant appropriate equitable relief on the foregoing basis.

### Count VI: Constitutional Violation – First Amendment Retaliation

208.    Plaintiffs re-allege paragraphs one through 207 as if fully set forth herein.

209.    Plaintiffs engaged in protected conduct by exercising their rights to free speech and to petition the government through filing an amended complaint and motion for class certification in this lawsuit.

210.    Defendants then took a retaliatory action by instituting a policy to re-review the proposed class members' CI screening packets to look for information on potential crimes and to then report those potential crimes to law enforcement for investigation and prosecution.

211.    This action of re-review and referral for criminal prosecution is being applied only to the proposed class members and would deter a person of ordinary firmness, especially a MAVNI whose immigration status, reputation, and livelihood may be adversely affected by any potential criminal prosecution, from speaking up again.

212.    The exercise of Plaintiffs' constitutional rights to free speech and to petition the government in filing this lawsuit was the but-for cause of the adverse action taken against them by Defendants.  Defendants were subjectively motivated to take their retaliatory action against the proposed class because of the protected activity, as evidenced by Defendants' own words in promulgating the policy: "Why:  MAVNIs are currently suing the federal government claiming they were wrongfully discharged from the Army."  In addition, this policy was disseminated a mere eleven days after Plaintiffs filed their amended complaint and motion for class certification.

213.    Plaintiffs request that the Court grant appropriate equitable relief on the foregoing basis.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and the class and subclasses, respectfully requests that this Court:

a.   Assume jurisdiction over this action;

b.   Issue the declaratory judgment requested in Count I of this Complaint;

c.   Grant the injunctive relief requested in Count II of this Complaint;

d.   Grant the relief requested pursuant to the APA (Count III of this Complaint);

e.   Grant the relief requested pursuant to Count IV of this Complaint;

f.   Grant the relief requested pursuant to Count V of this Complaint;

g.   Grant the relief requested pursuant to Count VI of this Complaint;

h.   Award Plaintiffs reasonable costs and attorneys' fees, including under the Equal Access to Justice Act; and

i.   Award such further relief as the Court deems just or appropriate.

Dated:  January 2, 2019

_____/s/ Douglas W. Baruch_____
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Kayla Stachniak Kaplan (D.C. Bar No. 996635)
Neaha P. Raol (D.C. Bar No. 1005816)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:   (202) 639-7003
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs*
