**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| LUCAS CALIXTO, *et al.*, | |
| Plaintiffs, | |
| vs. | Civil Action No. 18-1551 (ESH) |
| DEPARTMENT OF THE ARMY, *et al.*, | |
| Defendants. | |

**DEFENDANTS' MOTION TO DISMISS FOR
LACK OF SUBJECT MATTER JURISDICTION**

Defendants the Secretary of the Army Dr. Mark T. Esper (the "Secretary") and the

Department of the Army (the "Department"), by and through undersigned counsel, respectfully

move under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' Second

Amended Class Action Complaint (ECF No. 61) and for denial of Plaintiff's Rule 23 renewed

motion for class certification (ECF No. 62) for lack of subject matter jurisdiction.

A supporting memorandum of points and authorities with two references and a proposed

order accompany this motion.

Dated:  January 25, 2019

Respectfully submitted,

JESSIE K. LIU, D.C. Bar # 472845
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

*Of Counsel:*

BY: */s/ Roberto C. Martens, Jr.*

JEREMY A. HAUGH
Major, U.S. Army
U.S. Army Legal Services Agency
Litigation Division
9275 Gunston Road

ROBERTO C. MARTENS, JR.
Special Assistant United States Attorney
United States Attorney's Office
Civil Division
555 4th Street, N.W.

Fort Belvoir, VA 22060                          Washington, D.C. 20530
(703) 693-1011                                  (202) 252-2574
jeremey.a.haugh.mil@mail.mil                    roberto.martens@usdoj.gov

JOSEPH G. NOSSE                                 *Attorneys for Defendants*
Major, U.S. Army
U.S. Army Legal Services Agency
Litigation Division
9275 Gunston Road
Fort Belvoir, VA 22060
(703) 693-1013
joseph.g.nosse.mil@mail.mil


## CERTIFICATE OF SERVICE

I certify that on this 25th day of January 2019, I served the foregoing motion to dismiss

with accompanying memorandum of points and authorities and proposed order upon counsel for

Plaintiffs by filing said document using the Court's Electronic Case Filing System.

Dated:  January 25, 2019                        */s/ Roberto C. Martens, Jr.*
                                                ROBERTO C. MARTENS, JR.
                                                Special Assistant United States Attorney
                                                United States Attorney's Office
                                                Civil Division
                                                555 Fourth Street, N.W.
                                                Washington, D.C. 20530
                                                (202) 252-2574
                                                roberto.martens@usdoj.gov

                                                *Attorney for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LUCAS CALIXTO, *et al.*,

          Plaintiffs,

  vs.

DEPARTMENT OF THE ARMY, *et al.*,

          Defendants.

Civil Action No. 18-1551 (ESH)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION BASED ON LACK OF SUBJECT MATTER JURISDICTION

Defendants the Secretary of the Army Dr. Mark T. Esper (the "Secretary") and the Department of the Army (the "Department"), by and through undersigned counsel, respectfully submit this memorandum of points and authorities in support of their motion under Rule 12(b)(1) of the Federal Rules of Civil Procedure to dismiss Plaintiffs' Second Amended Class Action Complaint ("2d Am. Compl.") (ECF No. 61) and for an order denying Plaintiff's Rule 23 renewed motion for class certification (ECF No. 62) for lack of subject matter jurisdiction.

The basis for this motion is that Plaintiffs' Second Amended Class Action Complaint fails to invoke the limited waiver of sovereign immunity provided by section 702 of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, because it does not present the Court with a discrete final agency action that is ripe for this Court's review on the basis of an administrative record created and relied upon by the Department in taking such an action. Instead, this case is an impermissible "Broad Programmatic Attack" on the manner in which the Secretary and the Department have executed and will execute their first statutory duty, which is to recruit individuals for service in the U.S. Army and Army Reserve.  10 U.S.C. § 3013(b)(1).

Because Congress has not waived the United States' sovereign immunity to allow such lawsuits against its federal departments and agencies, respectfully, the Court lacks subject matter jurisdiction to hear Plaintiffs' collective and varied grievances against the Secretary and the Department.  Therefore, Defendants respectfully request that the Court dismiss the Second Amended Complaint for lack of subject matter jurisdiction.  And, having made such a ruling, Defendants respectfully request that the Court deny Plaintiffs' renewed motion for class certification as moot.[1]

## PRELIMINARY STATEMENT

In their Second Amended Complaint, Plaintiffs claim that this lawsuit seeks relief for "soldiers who were summarily discharged from the Army in violation of military regulations and the law." (ECF No. 61 ¶ 1.)  Of the named plaintiffs, only Plaintiffs Zeyuan Li and Yisheng Dai, remain discharged from the Army and are not subject to the provisions of the October 26, 2018 policy memorandum (ECF No. 50-1).

Plaintiffs are a group of eleven foreign born nationals who are lawfully present in the United States.  They were recruited by the United States Army and Army Reserve under a program named Military Accessions Vital to National Interest ("MAVNI") (2d Am. Compl. ¶¶ 2-3), which was a program to recruit individuals with needed language skills or training in healthcare fields (*id.* ¶ 43).  While they were individually waiting to ship to initial entry training, the Department determined that it could not adequately verify their suitability for integration into the service.  (*See id.* ¶ 4.)  The Department therefore cancelled their training orders.  And, in the

---

[1] On January 23, 2019, Defendants filed an opposed motion to defer submission of their substantive opposition to the merits of Plaintiffs' renewed motion for class certification and appointment of class counsel, on the grounds that the issue of this Court's jurisdiction over the subject matter of this action must be resolved before the Court and the parties may proceed to address any other issues.  (ECF Nos. 66 (Motion) & 67 (Errata) at 2.)

case of four of the eleven named Plaintiffs (Calixto, Djohi, Z. Li, and Dai), the Department administratively discharged them from the Army Reserve.  (ECF No. 22-1 and ECF No. 61 ¶¶ 115-124).  In the case of active duty recruit Plaintiff Xing Lu, the Department terminated her Delayed Entry Program ("DEP") enlistment contract in accordance with 10 U.S.C. § 513.

On June 28, 2018, Plaintiff Lucas Calixto ("Calixto") filed this action seeking federal court review of the Department's order discharging him from the Army Reserve under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706.  (Complaint ("Compl.") (ECF No. 1.) at ¶¶ 1, 3, 14, 36-38.)  In doing do, Plaintiff Calixto properly invoked the APA's limited waiver of sovereign immunity that allows persons aggrieved by a discrete and final "agency action" to bring suit against the federal department or agency that took said action to obtain federal court review of that action, and if the court finds that it was unlawful, to declare it as such and to set it aside.  *See* 5 U.S.C. §§ 702 ("Right of review"), 706 ("Scope of review").  In this case, the discrete and final agency action that triggered the APA's limited waiver of sovereign immunity – and that was ripe for federal court review – was the Department's order that discharged Plaintiff Calixto from the Army Reserve.

The Department responded to the action by revoking Plaintiff Calixto's discharge order on July 17, 2018 and it reinstated him in the Army Reserve.  (See Def.'s Stat. Rpt. (ECF No. 16) ¶¶ 3-4.)  On July 20, 2018, the Department also temporarily suspended processing discharges or separations of MAVNI recruits pending reconsideration of its policies and procedures. (ECF No. 22-1, Exh. A).

On August 3, 2018, Plaintiff Calixto filed an Amended Complaint ("Am. Compl." (ECF No. 19)) to obtain federal court review – and what can only be described as federal court "correction" – of the Department's processes and decisions related to the discharge of MAVNI

3

recruits Army-wide.  The Amended Complaint named seven additional Plaintiffs and sought

certification of a class of discharged MAVNI recruits.  (ECF No. 19 at 1 and ¶¶ 1-12, 138-153.)

On October 26, 2018, the Department issued a new policy memorandum that addressed

some, but not all, of Plaintiffs' grievances as stated in the Amended Complaint.  (*See* Def.'s Stat.

Rpt. (ECF No. 50) and Policy Mem. (ECF No. 50-1)).  The policy memorandum orders the

Department to resume processing discharges for MAVNI recruits with an unfavorable MSSD.

(ECF 50-1 ¶ 2.)  However, it provides procedures for MAVNI recruits with an unfavorable

"military service suitability recommendation" ("MSSR") but have not yet received an

unfavorable MSSD (an MSSR is the precursor to an MSSD) to submit matters to attempt to

explain and mitigate the adverse information underlying the MSSR.  (*Id*. ¶ 3.)

The policy memorandum also provides that already discharged members of the DEP (i.e.,

active duty recruits waiting to ship to initial entry training) and the DTP (i.e., reserve recruits

already drilling with their assigned reserve unit while waiting to ship to initial entry training)

who were separated before July 20, 2018 on the basis of an unfavorable MSSD resulting from a

documented counter-intelligence concern will be offered reinstatement into their respective

program for the purpose of being afforded the opportunity to mitigate the adverse security

recommendation.  (*Id*. ¶ 5.)

Plaintiffs allege that the October 26, 2018 policy memorandum addresses some, but not

all, of Plaintiffs' grievances regarding the Departments' execution of the MAVNI program.

Therefore, Plaintiffs filed their Second Amended Class Action Complaint on January 2, 2019.

(ECF No. 61.)  The Second Amended Complaint added three additional named plaintiffs and

again, as the name indicates, seeks certification of a class of MAVNI recruits consisting of two

subclasses.  (*Id*. ¶¶ 170-186.)

The Second Amended Class Action Complaint is a sprawling 50 page, 213 paragraph pleading that asserts a number of collective and individual grievances and alleged injustices sufficient to identify two purported subclasses and to require six counts under which Plaintiffs seeks a variety of declaratory, injunctive and unspecified equitable relief.  (*Id*. ¶¶ 170-186, 187-213.)  In this pleading, Plaintiffs seek to invoke this Court's Article III judicial power to obtain a variety of declaratory, injunctive and equitable relief against the Secretary and the Department. Plaintiffs seek relief under the Declaratory Judgment Act, this Court's inherent power to issue injunctions, the APA, and based on alleged violations of their rights under the free speech, free petition, due process, and equal protection guarantees of the First and Fifth Amendments of the United States Constitution.  (*Id*. at ¶¶ 187-213.)

Plaintiffs have brought to this Court's attention a list of collective and varied grievances and have asked this Court to exercise its Article III judicial power to correct them.  But Plaintiffs' theory of the case lacks one essential element for this Court to exercise its Article III judicial power against the head of an Article II executive branch department:  a waiver by Congress of sovereign immunity.

Plaintiffs rely on the APA as their basis for jurisdiction and, ostensibly, the required waiver of sovereign immunity.  However, like all statutes that waive the United States' sovereign immunity, the APA's waiver is a limited one.  It is limited to actions in which a plaintiff presents a federal court with a *discrete* final agency action that is ripe for the court's review on the basis of the administrative record created and relied upon by the agency in taking said action.

This case started out as a properly alleged albeit somewhat flawed APA case.  The flaw in the original Complaint – and that has carried over and magnified in the Amended Complaint and the current Second Amended Class Action Complaint – is that Plaintiffs seek remedies

against and judicial intervention into the Department's operations that are not available under the APA.[2]  But, putting aside the issue of remedies, the original Complaint was admittedly a proper invocation of APA section 702's limited waiver of sovereign immunity for federal court review of a discrete final agency action:  the Department's order discharging Plaintiff Calixto from the Army Reserve.

But then this case transformed into something very different.  The present Second Amended Class Action Complaint presents this Court with a quintessential example of what the Supreme Court has labelled and denounced as a "Broad Programmatic Attack" – a "BPA" – on a federal department's operations.  Congress has not waived the United States' sovereign immunity to allow such suits.  Respectfully, the Second Amended Class Action Complaint must be dismissed with prejudice and Plaintiff's motion for class certification must be denied as moot.

## THE PLAINTIFFS

The plaintiffs in this case are Plaintiffs Lucas Calixto, Tounde Djohi, Wanjing Li, Zeyuan Li, Fang Lu, Hembashima Sambe, Jingquan Qu, Emeka Udeigwe, Xing Lu, Yisheng Dai, and Bright Izudike.  (2d Am. Compl. at 1.)  They bring this action against the Secretary and the Department on behalf of themselves and a purported class of alleged similarly situated MAVNI recruits.  Their current situations are as follows:

The statuses of Plaintiffs Calixto, Djohi, Wanjing Li, Fang Lu, Hembashima Sambe, Jingquan Qu, and Zeyuan Li have not changed since Defendants' status report filed on August 13, 2018.  (ECF No. 22-1.)  The Army revoked the discharges of Plaintiffs Calixto and Djohi and they remain in the Army.  Plaintiffs W. Li, Lu, Sambe, and Qu were never discharged from the Army and remain in the Army.  Plaintiff Z. Li has been discharged from the Army.

---

[2] See further discussion *infra* point II.

Plaintiff Udeigwe has since received a favorable MSSD and has received orders to report to basic training.  *See* Plaintiffs' Second Amended Complaint (ECF No. 61 ¶ 109).

Plaintiff Xing Lu is a member of the DEP and the only named plaintiff in the DEP.  (ECF No. 61 ¶¶ 110-114).  Plaintiff Lu enlisted in the DEP on January 19, 2016.  (*Id*. ¶ 110).  She was in the DEP awaiting initial entry training for a period of over two years   and, because of a statutory requirement, had to be separated from the DEP.   Nonetheless, Plaintiff Lu indicated her desire to remain in the DEP beyond the two-year mark following her enlistment.  She should have been included in a group petition to the Army Board for the Correction of Military Records ("ABCMR") seeking correction of individual military records to allow DEP members who had already been in the Army beyond the two-year mark to continue in the DEP beyond that time.

The ABCMR granted relief to the group by correcting their military records to move the enlistment date a year forward, allowing them to serve beyond the two-year mark.  Due to an administrative error, Plaintiff Lu was not included in the group.  Plaintiff Lu sought correction of her military records through the Army but was informed that she would need to seek relief through the ABCMR.  At the time the Plaintiffs filed their Second Amended Complaint on January 2, 2019, Plaintiff Lu's petition was pending at the ABCMR.[3]

Plaintiff Yisheng Dai is a DTP member who remains discharged from the USAR. Plaintiff Yisheng Dai's separation was as a result of his refusal to reschedule his

---

[3] Plaintiff Lu filed her petition with the ABCMR in April 2018 seeking reinstatement and approval for continued service in the DEP.  Her petition was granted on January 15, 2019, thereby correcting her enlistment date from January 19, 2016 to January 19, 2017.  The Army has assured the Court that it does not intend to separate individuals who have reached the 730-day mark and it does not intend to separate Plaintiff Lu for that reason.  As a result, Plaintiff Lu is eligible to continue to serve in the DEP.  On January 22, 2019, the Army issued a favorable MSSD for Plaintiff Lu.

counterintelligence interview.  (*See* ECF No. 61 ¶ 119 ("PFC Dai speculates, but does not know, that the Army may have discharged him after refusing to reschedule his CI interview.")). Plaintiff Dai did not receive a MSSD.

Plaintiff Bright Izudike is a DTP member who remains in the USAR.  Plaintiff Izudike received an order from USAREC dated September 15, 2017 which cancelled his reservation for initial entry training.  (ECF No. 61 ¶ 126.)  He did not receive a MSSD.

Plaintiffs claim that this lawsuit seeks relief for "soldiers who were summarily discharged from the Army in violation of military regulations and the law,"  (ECF No. 61 ¶ 1), yet only Plaintiffs Zeyuan Li and Yisheng Dai remain discharged from the Army and are not subject to the provisions of the October 26, 2018 policy memorandum (ECF No. 50-1).

## LEGAL STANDARDS

### A.  Sovereign Immunity

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."  *United States v. Mitchell,* 463 U.S. 206, 212 (1983).  "Consent alone gives jurisdiction to adjudge against a sovereign.  Absent that consent, the attempted exercise of judicial power is void."  *United States v. U.S. Fid. & Guar. Co.*, 309 U.S. 506, 514 (1940).

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).  "A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text…and will not be implied."  *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citation omitted).  Thus, "limitations and conditions upon which the Government consents to be sued must be strictly observed and exceptions thereto are not to be implied."  *Lehman v. Nakshain*, 453 U.S. 156, 161 (1981).

Due to the "limited nature of waivers of sovereign immunity…[a]ny such waiver must be strictly construed in favor of the United States." *Ardestani v. INS*, 502 U.S. 129, 137 (1991); *see also Lane v. Pena*, 518 U.S. 187 at 192 ("[A] waiver of the Government's sovereign immunity will be strictly construed, in terms of its scope, in favor of the sovereign."). Therefore, when a federal court is "confronted with a purported waiver of the Federal Government's sovereign immunity, the Court will 'construe ambiguities in favor of immunity.'" *United States v. Williams*, 514 U.S. 527, 531 (1995).

"Sovereign immunity is jurisdictional in nature. Indeed, the 'terms of [the United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit." *FDIC*, 510 U.S. at 475. "Whether the United States has consented to be sued 'is the sort of jurisdictional question which may be raised at any time, either by the parties or by the court *sua sponte*.'" *Brown v. Sec'y of the Army*, 78 F.3d 645, 648 (D.C. Cir. 1996) (citing *U.S. Fid. & Guar. Co.*, 309 U.S. at 514.)

Finally, "[s]overeign immunity may not be waived by federal agencies." *Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1105 (D.C. Cir. 2005). The federal government's sovereign immunity "is not waived by appearance in any forum because 'officers of the United States possess no power through their actions to waive an immunity of the United States or to confer jurisdiction on a court in the absence of some express provision of Congress.'" *Dep't of the Army v. FLRA*, 56 F.3d 273, 275 (D.C. Cir. 1995) (quoting *United States v. N.Y. Rayon Imp. Co.*, 329 U.S. 654, 660 (1947) (internal citation omitted).

## B.  Standards of Review for this Rule 12(b)(1) Motion to Dismiss For Lack of Subject Matter Jurisdiction.

This motion is predicated on the argument that Plaintiffs are not before this Court to challenge a "discrete" final agency action that is ripe for this Court's review based on the

Department's administrative record for that action, which is the type of challenge authorized by Congress under the limited waiver of sovereign immunity granted in the APA. *See* discussion *infra* Point I; *see also* 5 U.S.C § 706 ("In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party…"); *see generally John Doe, Inc. v. DEA*, 484 F.3d 561, 570 (D.C. Cir. 2007) ("In conducting our judicial review, we focus on the administrative record that formed the basis for the agency's decision, unless 'there was such a failure to explain administrative action as to frustrate effective judicial review.'" (quoting *Tripoli Rocketry Ass'n v. Bureau of ATF&E*, 437 F.3d 75, 83 (D.C. Cir. 2006)). Instead, as the face of the Second Amended Class Action Complaint shows, Plaintiff are before this Court to assert an impermissible "broad programmatic attack" ("BPA") against the Secretary and the Department based on their grievances with the Department's MAVNI vetting and administrative separation procedures.

A Rule 12(b)(1) motion to dismiss for lack of jurisdiction may be presented as a facial or factual challenge. This is a facial challenge to the Second Amended Class Action Complaint. "A facial challenge attacks the factual allegations of the complaint that are contained on the face of the complaint, while a factual challenge is addressed to the underlying facts contained in the complaint." *Al-Owhali v. Ashcroft*, 279 F. Supp. 2d 13, 20 (D.D.C. 2003) (internal quotations and citations omitted). When defendants make a facial challenge, the district court must accept the well-pleaded allegations contained in the complaint as true and consider the factual allegations in the light most favorable to the non-moving party. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006). With respect to a factual challenge, the district court may consider materials outside of the pleadings to determine whether it has subject matter jurisdiction over the claims. *Jerome Stevens Pharmacy, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

The plaintiff bears the responsibility of establishing the factual predicates of jurisdiction by a preponderance of evidence.  *Erby*, 424 F. Supp. 2d at 182.

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction" and "the burden of establishing the contrary rests upon the party asserting jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). "If sovereign immunity has not been waived, a claim is subject to dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction" because courts "may not find a waiver unless Congress's intent is 'unequivocally expressed' in the relevant statute."  *Johnson v. Veterans Affairs Med. Ctr.*, 133 F. Supp. 3d 10, 14 (D.D.C. 2015) (internal citations omitted).

## ARGUMENT

In order to invoke this Court's Article III judicial power against the Secretary and the Department, Plaintiffs have the burden of establishing as a matter of law that they have presented to this court a "discrete" final agency action that is ripe for review on the basis of the Department's administrative record.  Their entire case depends on it.  For this case to go forward, Plaintiffs must show that they have properly invoked the limited waiver of sovereign immunity provided in the APA that allows an Article III federal court to review and set aside an action taken by an Article II executive branch officer or his department.  The only way to invoke the limited waiver is to present this court with a *discrete* final agency action and Plaintiffs have not done that.

The facts alleged and legal theories asserted in the Second Amended Class Action Complaint implicate no other statute that waives sovereign immunity.  There is no allegation of discrimination by a civilian employee such as to implicate the Civil Rights Act; no allegation of personal injury sounding in tort such as to implicate the Federal Tort Claims Act; no claim for

damages arising from breach of contract such as to implicate the Tucker Act; no demand for the production of agency records such as to implicate the Privacy Act or the Freedom of Information Act; and certainly no demand to release a wrongfully imprisoned person such as to implicate the Habeas Corpus Act.  This case can only exist if it is a properly asserted APA case and for the reasons presented below it is not.  As there can be no showing that the Second Amended Class Action Complaint seeks review of a discrete and final agency action, it must be dismissed with prejudice and Plaintiffs' renewed motion for class certification denied as moot.

I.  **COUNT III AND THEREFORE THE ENTIRE COMPLAINT MUST BE DISMISSED BECAUSE IT IS NOT AN APA CLAIM.  IT IS A "BPA" CLAIM:  AN IMPERMISSIBLE BROAD PROGRAMMATIC ATTACK ON THE MANNER IN WHICH THE SECRETARY AND THE DEPARTMENT EXECUTE THEIR STATUTORY DUTY TO "RECRUIT THE FORCE."**

In the Second Amended Class Action Complaint, Plaintiffs allege that "[t]his action arises under the laws of the United States and the U.S. Constitution.  This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and the Administrative Procedures Act ("APA"), 5 U.S.C. § 701 *et seq*."  (2d Am. Compl. ¶ 27.)  The federal question statute does not provide a waiver of sovereign immunity to sue a federal department or agency, *Swan v. Clinton*, 100 F.3d 973, 981 (D.C. Cir. 1996), and even if it did, it would not provide a waiver to assert a wide variety of claims on behalf of a wide variety of plaintiffs based on a wide variety of alleged violations of federal law and the Constitution.  Waivers of sovereign immunity are, after all, limited in nature.  *Ardestani*, 502 U.S. at 137.

The legal sufficiency of the entire Second Amended Class Action Complaint, therefore, rests on whether Count III is a true APA claim, i.e., whether Plaintiffs have properly invoked the limited waiver of sovereign immunity provided by the APA for federal court review of an agency action.  *See Dep't of the Army v. Blue Fox*, 525 U.S. 255, 260 (1999) (APA section 702

"waives the Government's immunity from actions seeking relief 'other than money damages'" however, the waiver "is strictly construed, in terms of scope, in favor of the sovereign."). Thus, for this case to proceed, Plaintiffs must show that their case satisfies the APA's threshold requirement that they have presented to this Court a "discrete" final agency action, *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004), that is ripe for this Court's review on the basis on the Department's administrative record, *John Doe, Inc.*, 484 F.3d at 570.

Looking at the plain face of the Second Amended Class Action Complaint, it is obvious that they have not done that. A review of the plain language of the APA and the Supreme Court's precedent on the meaning of "agency action" explains and confirms that when Plaintiff Calixto and his fellow MAVNI recruits filed their Amended Class Action Complaint (ECF No. 19), and as now relevant here, the Second Amended Class Action Complaint (ECF No. 61), they presented something to this Court that is very different from a true APA claim. They presented this Court an impermissible "BPA" claim – a broad programmatic attack on the manner in which the Secretary and the Department are executing their statutory duty to recruit the force. 10 U.S.C. § 3013(b)(1); *see also Norton*, 542 U.S. at 64. Because Congress has not waived the United States' sovereign immunity for such cases to be asserted against a federal department or agency, the Second Amended Class Action Complaint must be dismissed for lack of subject matter jurisdiction.

To understand the meaning and significance of the term "agency action" with respect to a plaintiff's ability to invoke the APA's limited waiver of sovereign immunity and the narrow scope with which the Supreme Court has interpreted it, a review of the two leading Supreme Court cases on this topic is necessary.

**A.** ***Lujan-Norton:*** **The Supreme Court's Precedent and Guidance on the Limited Waiver of Sovereign Immunity Provided by the APA for Review of Specific "Discrete" Final Agency Actions; Not "Broad Programmatic Attacks."**

1. *Lujan v. National Wildlife Federation:* "Specific" Final Agency Actions.

The Supreme Court's jurisprudence on the APA's limited waiver of sovereign immunity begins with *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990). In *Lujan*, the National Wildlife Federation (the "Federation"), a public interest organization comprised of individuals with varying interests in the use and preservation of public lands, *id*. at 880, filed an action against the Secretary and Department of the Interior and the head of its subordinate agency, the Director of the Bureau of Land Management ("BLM"), *id*. 875. The Federation sought APA review of what it informally referred to as BLM's "land withdrawal review program," which referred to various actions allegedly taken and not taken by BLM to comply with the Federal Land Policy and Management Act of 1976 ("FLPMA"). *Id*. at 875. The Federation alleged that BLM violated various provisions of the FLPMA and the National Environmental Policy Act of 1968 ("NEPA") in the course of reclassifying, withdrawing and returning federal lands to the public domain. *Id*. 879.

The Federation acknowledged that neither FLPMA nor NEPA provide a private right of action for alleged violations of its provisions. *Id*. at 882. The Federation therefore asserted a claim under the APA, and asserted that BLM's various alleged failures to comply with the FLPMA and NEPA violated section 706 because "all of the above actions were 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,' and should therefore be set aside pursuant to [section] 706." *Id*. And, to state its case, the Federation appended to its complaint a schedule of specific-land status determinations that it sought to challenge. *See id*.

BLM moved for summary judgment, and to oppose the motion, the Federation submitted (among other matters) affidavits by two of its members that described how BLM's land management decisions negatively impacted their use and enjoyment of certain federal lands. *Id*. at 880. The district court granted BLM's motion for summary judgment, concluding that the Federation had no standing to seek judicial review of BLM's actions under the APA. *Id*. at 881.

The D.C. Circuit reversed, finding the Federation's affidavits sufficient to defeat BLM's motion for summary judgment and it concluded that "standing to challenge individual classification and withdrawal decisions conferred standing to challenge all such decisions under the land withdrawal review program." *Id*. at 881-82. The Supreme Court granted *certiorari* and reversed. *Id*. at 882, 900.

Although the district court and circuit court framed the issue as one of standing, the Supreme Court analyzed the issue in terms of whether the broadly defined "land withdrawal review program" was, in the first instance, a reviewable "final agency action" under the APA. *See id*. at 890. The Court began by explaining that, under section 702 of the APA ("right of review"), there are "two separate requirements." *Id*. at 882. "First, the person claiming a right to sue must identify some 'agency action' that affects him in a *specified* fashion; it is judicial review 'thereof' to which he is entitled." *Id*. (emphasis added). The Court explained that "[t]he meaning of 'agency action' for purposes of § 702 is set forth in 5 U.S.C. § 551(13)," *id*., which defines "agency action" as "the whole or part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act;" 5 U.S.C. § 551(13).

The Court continued by explaining that "the 'agency action' in question must be 'final agency action.'" *Lujan*, 497 U.S. at 882 (citing section 704 which defines "actions reviewable" as "[a]gency action made reviewable by statute and final agency action for which there is no

other adequate remedy in a court are subject to judicial review.")  The Court then explained that

the second requirement under section 702 is that "the party seeking review under § 702 must

show that he has 'suffered legal wrong' because of the challenged agency action, or is 'adversely

affected or aggrieved' by that action 'within the meaning of a relevant statute."  *Id*. at 883.

Applying this plain reading of sections 702 and 704 of the APA, the Court held that the

challenged "'land withdrawal review program'…is not an "agency action" within the meaning of

§ 702, much less a 'final agency action' within the meaning of § 704."  *Id*. at 890.  The Court

reasoned that the broadly defined "'land withdrawal review program'…does not refer to a single

BLM order or regulation, or even to a completed universe of particular BLM orders and

regulations."  *Id*.  Instead, "the 'land withdrawal review program' extends to, currently at least,

'1250 or so individual classification terminations and withdrawal revocations.'"  *Id*. (citing

*National Wildlife Fed'n v. Burford*, 699 F. Supp. 327, 332 (D.D.C. 1988) (district court

decision)).

The Court then provided guidance that is particularly relevant to the present case:

> Respondent [the Federation] alleges that violation of the law is rampant within this
> program – failure to revise land use plans in proper fashion, failure to submit certain
> recommendations to Congress, failure to consider multiple use, inordinate focus
> upon mineral exploitation, failure to provide required public notice, failure to
> provide adequate environmental impact statements.  Perhaps so.  But respondent
> *cannot seek wholesale improvement of this program by court decree*, rather than in
> the offices of the Department or the halls of Congress, where *programmatic
> improvements* are normally made.  Under the terms of the APA, respondent must
> direct its attack against some *particular* 'agency action' that causes it harm.

*Id*. at 891 (emphasis added).

Regarding the Federation's grievances with BLM's general application of its own

regulations in making land use decisions, the Court stated:

> Some statutes permit broad regulations to serve as the 'agency action,' and thus to be the object of judicial review directly, even before the concrete effects normally required for APA review are felt.  Absent such a provision, however, a regulation is not ordinarily considered the type of agency action 'ripe' for judicial review under the APA *until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action* applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Id*.

In *Lujan*, therefore, the Supreme Court provided its initial view and guidance on the limits of an APA action – it must be directed to a *specific* final agency action; it cannot be used to "seek wholesale improvement" of an agency's program or general operations, or to compel the agency to apply its own regulations outside of the context of a *concrete action*.

The Supreme Court would have occasion to revisit the issue again and to further articulate the limits of judicial review of agency actions in *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55 (2004).

> 2. *Norton v. S. Utah Wilderness Alliance:*  "Discrete" Agency Actions "Legally Required."

In *Norton*, BLM again found itself before the Supreme Court to fend off another attack on the manner in which it managed federal lands under the FLPMA and NEPA.  *Norton*, 542 U.S. at 57.  Whereas in *Lujan* the Federation attacked BLM both for actions taken and not taken, in *Norton* the Southern Utah Wilderness Alliance ("SUWA") specifically mounted an APA section 706(1) attack, i.e., they purported to "compel agency action unlawfully withheld or unreasonably delayed[.]"  *Id*.; *see also* 5 U.S.C. § 706(1) *and compare id*. § 706(2) (allows federal courts to "hold unlawful and set aside agency action, findings, and conclusions[.]")

SUWA's APA section 706(1) attack asserted three claims against BLM and sought declaratory and injunctive relief based on three alleged "agency actions unlawfully withheld": (1) that BLM had violated its "nonimpairment obligation" under the FLPMA by allowing

degradation of certain wilderness study areas due to off-road vehicle ("ORV") use; (2) that BLM had failed to implement provisions in its own land use plans relating to ORV use; and (3) that BLM failed to "take a hard look" at whether, under NEPA, it should undertake supplemental analyses for areas in which ORV use had increased.  *Id*. at 60-61.

The district court dismissed the complaint on grounds of lack of subject matter jurisdiction, reasoning that agency action cannot be compelled under section 706(1) "as long as an agency is taking some action toward fulfilling mandatory, nondiscretionary duties[.]"  *S. Utah Wilderness Alliance v. Norton*, 301 F.3d 1217, 1222 (10th Cir. 2002) (statement of district court's decision).  The 10th Circuit reversed, concluding that BLM's "nonimpairment obligation" was a mandatory, nondiscretionary duty that could be compelled under section 706(1).  *Norton*, 542 U.S. at 61.  The Supreme Court granted *certiorari* and reversed.  *Id*. at 61, 72.

The Court framed the issue as follows:  "[i]n this case, we must decide whether the authority of a federal court under the Administrative Procedures Act (APA) to 'compel agency action unlawfully withheld or unreasonably delayed.' 5 U.S.C. § 706(1)…extends to review of the United States Bureau of Land Management's stewardship of public lands under certain statutory provisions and its own planning documents."  *Id*. at 57.

As in *Lujan*, the Court's analysis in *Norton* was based on the plan language of the APA.  The Court again turned to the definition of "agency action" found in section 551(13), which defines the term as "a list of five categories of decisions made or outcomes implemented by an agency—'agency rule, order, license, sanction, [or] relief.'"  *Id*. at 62 (citing 5 U.S.C. § 551(13)).  The Court reasoned that "[a]ll of those categories involve *circumscribed, discrete agency actions*, as their definitions make clear[.]"  *Id*. (emphasis added).  The Court then

provided the definitions of each of the "circumscribed, discrete" types of "agency action" that

are subject to review under the APA:

- Rule:  "an agency statement of…future effect designed to implement, interpret, or prescribe law or policy;"

- Order:  "a final disposition…in a matter other than rule making;"

- License:  "a 'permit…or other form of permission;'"

- Sanction:  "a 'prohibition…or taking [of] other compulsory or restrictive action;'"

- Relief:  "a 'grant of money, assistance, license, authority,' etc., or 'recognition of a claim, right, immunity,' etc., or 'taking of other action on the application or petition of, and beneficial to, a person[.]'"

*Id*. (quoting 5 U.S.C. § 551(4), (6), (8), (10), (11)) (point format not in original).

And regarding the final clause of the definition of "agency action" provided in section

551(13), i.e., that the term includes "the equivalent or denial thereof, or failure to act[,]" the

Court concluded that although those terms are not defined, "an 'equivalent…thereof' *must also*

*be discrete* (or it would not be equivalent), and a 'denial thereof' must be the denial of a *discrete*

*listed action* (and perhaps denial of a discrete equivalent)."  *Id*. (emphasis added).  And the Court

further concluded that a "'failure to act,' is in our view properly understood as a failure to take

an *agency action*–that is, a failure to take one of the agency (including their equivalents) earlier

defined in § 551(13)."  *Id*. (emphasis in original).

And – crucial to this Court's assessment of the propriety of certain elements of the relief

sought by Plaintiffs in the Second Amended Class Action Complaint – the Court concluded "a

second point central to the analysis of the present case is that the only agency action that can be

compelled under the APA is action *legally required*.  This limitation appears in § 706(1)'s

authorization for courts to 'compel agency action unlawfully withheld.'"  *Id*. at 63.

Based on the above reasoning, the Court held:  "a claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* action that it is *required to take*. These limitations rule out several kinds of challenges.  The limitation to discrete agency action *precludes the kind of broad programmatic attack* we rejected in *Lujan*…."  *Id*. at 64 (citing *Lujan*, 497 U.S. at 871) (third emphasis added).

The Court further explained that "[t]he limitation to required agency action rules out judicial direction of even discrete agency action that is not demanded by law (which includes, of course, agency regulations that have the force of law).  Thus, when an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."  *Id*.

Based on the above holdings, the Court reversed the 10th Circuit's decision because the three actions that SUWA sought to compel BLM to perform were either not "discrete" or not "demanded by law," i.e., the demanded actions lacked specificity or were committed to BLM's discretion with respect to the manner to be performed.  *Id*. at 65-66.  Indeed, the Court specifically rejected SUWA's contention that a federal court can enter an order requiring an agency to correct "general deficiencies in compliance" but "without suggesting any particular manner of compliance," because such general deficiencies "lack the specificity requisite for agency action."  *Id*. at 66.

And as in *Lujan*, the Court in *Norton* provided its underlying rationale and important guidance that is particularly relevant for the present case:

The principal purpose of the APA limitations we have discussed…is to *protect agencies from undue judicial interference* with their lawful discretion, and to *avoid judicial entanglement* in abstract policy disagreements which courts lack both expertise and information to resolve.  If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that *it would ultimately become the task of the supervising court*, rather than the agency, to work out compliance with the broad statutory mandate, *injecting the judge into day-to-day agency management*.

\* \* \*

The prospect of pervasive oversight by federal courts over the manner and pace of agency compliance with such congressional directives *is not contemplated by the APA*.

*Id*. 66-67 (emphasis added).

*Lujan-Norton* and their progeny define the limits of APA lawsuits and establish that those limits are jurisdictional.  They are the "limits" of the limited waiver of sovereign immunity provided by the APA for parties to obtain federal court review of a discrete final agency action—not to attack the agency's execution of its programs or operations.

**B.** ***City of New York v. Department of Defense:*  A Recent Ill-Fated Attempt to Obtain Federal Court Oversight of the Military Departments' Internal Operations.**

*City of New York v. Department of Defense*, No. 18-1699, 2019 U.S. App. LEXIS 1422 (4th Cir. Jan. 16, 2019), decided by the 4th Circuit just nine days prior to submission of this motion, is a case that, in all essential aspects, is on all fours with this one.  It provides a helpful analogy, persuasive authority, and useful analytical framework for the resolution of this motion.[4] Like the case presently before the Court, the *City of New York* case presented a compelling

---

[4]  Counsel for Defendants in this case served as the Department of the Army's agency counsel during the district court proceedings in the *City of New York* case.

underlying set of facts and a strong emotional plea for judicial intervention into the operations of
the military departments.  Nine days ago, the 4th Circuit affirmed its dismissal.

*The City of New York* case arose from the horrific and tragic events known as the
Sunderland Springs Church Shooting that occurred on November 5, 2017.  *City of New York v.*
*Dep't of Defense*, Civ. A. No. 17-1464, 2018 U.S. Dist. LEXIS 70527, at *2 (E.D. Va. Apr. 24,
2018).  On that day, a gunman armed with an AR-15 style assault rifle entered a church in
Sunderland Springs, Texas and opened fire: killing 26 people and wounding an additional 20.[5]
Shortly after the shooting, media reports[6] emerged that the gunman previously served in the U.S.
Air Force; that he was convicted at an Air Force court-martial for domestic assault upon his wife
and stepson; that he received a bad conduct discharge from the Air Force; that the Air Force did
not report his domestic assault conviction to the FBI for inclusion in the National Instant
Criminal Background Check System (NICS) database; and that the gunman had legally
purchased the assault rifle that he used to perpetrate the shooting.  *Id.* at *2-3.

The cities of New York, Philadelphia and San Francisco (collectively, "the Cities") rely
on the accuracy of the NICS database to run effective background checks and to ensure they only
issue firearm permits to qualified applicants.  *See id.* at *6; *City of New York*, 2019 U.S. App.
LEXIS 1422, at *5.  Outraged by the reports that the Air Force did not report the shooter's
domestic assault conviction to the FBI and troubled by a Department of Defense ("DOD")
Inspector General's report of systemic and long-standing compliance deficiencies throughout the

---

[5] David Montgomery *et al.*, *Gunman Kills at Least 26 in Attack on Rural Texas Church*, N.Y.
Times, Nov. 5, 2017, *available at* https://www.nytimes.com/2017/11/05/us/church-shooting-
texas.html (last visited Jan. 24, 2019).

[6] *See, e.g.*, Richard A. Oppel Jr., *Air Force Failed to Report Dozens of Service Members to Gun*
*Database*, N.Y. Times, Nov. 28, 2017, *available at* https://www.nytimes.com/2017/11/28/us/air-
force-devin-kelley-gunman-texas.html (last visited Jan. 24, 2019).

DOD and its subordinate military departments, *see City of New York*, 2019 U.S. App LEXIS 1422, at \*8, the Cities banded together and embarked on an ambitious but ill-fated endeavor to have a federal judge correct the problem.

The Cities filed suit in the United States District Court for the Eastern District of Virginia, *see id.* at \*1, which is the federal judicial district in which the Pentagon is physically located, *see, e.g., Jones v. Hagel*, 956 F. Supp. 2d 284, 288 n.3.  The complaint named as defendants the DOD, its subordinate military departments, the Secretary of Defense and the secretaries of the military departments, and the commanders or directors of the various defense criminal investigative services.  *City of New York*, 2018 U.S. Dist. LEXIS 70527, at \*1.

To their credit, the Cities correctly identified that it is only under the APA's limited waiver of sovereign immunity that a plaintiff may ask a federal court to issue declaratory and injunctive relief against a federal department or agency based on the plaintiff's grievance with an agency action or to compel an agency action "unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706.  The Cities' complaint therefore asserted only one count for relief under the APA.  *City of New York*, Civ. A. No. 17-1464, E.D. Va. Docket No. 1 (Cities Complaint ("Cities Compl.")) at ¶¶ 92-104 (copy provided herewith as "Ref. 1")).  Where the Cities went astray is in failing to understand the meaning of "agency action" under the APA.

The Cities' theory of the case was that the DOD's and the military departments' alleged systemic failure to fully comply with 34 U.S.C. § 40901(e)(1), which is the statute that requires federal agencies to report to the Attorney General (i.e., the FBI) on a quarterly basis persons known to the agency who are disqualified from possessing a firearm, is a "discrete agency action that the agency is required by law to take" and which the court can compel under APA section

706(1).  Ref. 1 (Cities Compl.) at ¶¶ 93-94.  Based on this theory, the Cities sought the following

preliminary and permanent injunctive relief:

> Plaintiffs seek to have the Court compel the Defendants to locate, identify, and report all records in their control that are required to be reported to the Attorney General under § 40901(e)(1), to conduct a thorough review of their records and compliance procedures, and to submit to the Court for approval a Compliance Plan to ensure that all such records are timely and accurately reported to the Attorney General.  Plaintiffs also seek to compel Defendants to submit monthly reports to the Court detailing Defendants' progress in conducting this review and implementing the Compliance Plan.

*City of New York*, 2018 U.S. Dist. LEXIS 70527, at *4; *see also* Ref. 1 (Cities Compl.) at 26-27

(Prayer for Relief)).

The DOD and the military departments moved to dismiss the Cities' complaint on two

primary grounds:  lack of standing and lack of subject matter jurisdiction due to the Cities'

failure to allege a discrete agency action as the basis for their APA claim.  *City of New York*,

2018 U.S. Dist. LEXIS 70527, at *4-5.  During briefing and oral argument on the motion, the

Cities' stood firm in their position that the DOD's and the military department's alleged

collective, widespread, and long-standing failure to fully comply with section 40901(e)(1) is a

"discrete" agency action.  Indeed, during the hearing on the motion to dismiss and the Cities'

motion for a preliminary injunction, counsel for the Cities offered – incredulously – the

following argument:

> …so I want to make one point that I think is really critical here, Your Honor.  In the Supreme Court in *Norton v. Southern Utah Wilderness* said clearly, Courts can compel agency action when, quote, an agency failed to take a discrete agency action that it is required to take.  That is exactly what 706(1) allows for.
>
> This discrete action is quite simple.  They have to submit all of these names no less than quarterly.  We're not asking for them, and we have not alleged, that we care about what the Navy or the Army or the Air Force does in terms of how they collect.  We are not trying to direct them about how they should be doing their job.

> They have a duty.  They have missed that quarterly deadline for the last 20 years.
> And their own papers show it; their own testimony shows it.  So *this is a discrete
> action* that they can in fact be compelled to take, and it's a ministerial act.

*City of New York*, Civ. A. No. 17-1464, E.D. Va. Docket No. 70 (Transcript of Motions Hearing

at 22:11 to 23:3) (emphasis added) (excerpt provided herewith as "Ref. 2").

The district court rejected the Cities' argument and dismissed their complaint.  *City of

New York*, 2018 U.S. Dist. LEXIS 70527, at *10.  The court ruled:  "[i]n addition to failing to

allege a sufficient injury in fact to confer standing, Plaintiffs also fail to plead subject matter

jurisdiction under the APA because they do not allege a discrete 'agency action unlawfully

withheld' that they seek to compel, but instead challenge Defendants' systematic compliance

with a statutory mandate."  *Id.* at *9.  The court's rationale was as follows:

> Plaintiffs' challenge to Defendants' NIAA [NICS Improvement Amendments Act,
> codified at 34 U.S.C. § 40901(e)(1)] compliance is *not a proper challenge to a
> discrete agency action*.  Instead, it is a *'broad programmatic attack' on Defendants'
> compliance with a statute*.  Plaintiffs allege that Defendants 'have systematically
> failed, and continue to systematically fail to provide all [relevant] records to the
> Attorney General, and, in a significant number of instances to provide such records
> at all.'  These allegations do not identify any specific and discrete agency action
> withheld, but instead seek to have this Court supervise and oversee Defendants'
> programs and procedures for compliance with the NIAA by compelling Defendants
> to provide the Court with a compliance plan and monthly reports.  However, *the
> APA 'do[es] not empower a court to supervise an agency's compliance with a
> broad statutory mandate.'*  Thus, because Plaintiffs have failed to identify a discrete
> agency action, they fail to allege jurisdiction for this claim under the APA.

*Id*. at *9-10 (quoting *Norton*, 542 U.S. at 64; *Murray Energy Corp. v. Adm'r of EPA*, 861 F.3d

529, 537 n.4 (4th Cir. 2017)) (internal citations omitted).

The Cities, convinced that their interpretation of the term "discrete" was correct, appealed

to the 4th Circuit, which affirmed the district court's decision.  *City of New York*, 2019 U.S. App.

LEXIS 1422, at *2.  The court declined to review the district court's decision on standing,

instead finding it sufficient to affirm the decision based on the district court's ruling on jurisdiction under the APA. *Id*. at *10-11.

The court began its analysis by stating that APA section 702 "waives the federal government's sovereign immunity for a limited set of suits, brought by 'a person suffering legal wrong because of agency action' to obtain relief 'other than money damages.'" *Id*. at *12 (quoting 5 U.S.C. § 702). The court continued that under APA section 704, "[j]udicial review under the APA…is limited to final agency actions." *Id*. Thus, "[a]s these provisions of the APA make plain, subject matter jurisdiction is lacking if the plaintiff fails to challenge a particular 'agency action' that is fit for review." *Id*.

Rejecting the Cities' expansive and counter-intuitive definition of the term "discrete," the 4th Circuit affirmed the district court's decision, concluding that the Cities' case was a "exactly the sort of 'broad programmatic attack' undertaking for which the APA has foreclosed judicial review." *Id*. at *18. Relying on the Supreme Court's decision in Norton, the 4th Court reasoned:

> This distinction between discrete acts, which are reviewable, and programmatic challenges, which are not, is vital to the APA's conception of the separation of powers. Courts are well-suited to reviewing specific agency decisions, such as rulemakings, orders, or denials. We are woefully illsuited, however, to adjudicate generalized grievances asking us to improve an agency's performance or operations. In such a case, courts would be forced either to enter a disfavored "obey the law" injunction…or to engage in day-to-day oversight of the executive's administrative practices. Both alternatives are foreclosed by the APA, and rightly so.

*Id*. at *13.

Finally, the Court concluded that the NIAA's statutory scheme, which includes measures of accountability *to Congress* for compliance with section 4090(e)(1), "signal that Congress sees this problem as one ripe for legislative oversight and in need of attention by experts in the executive branch. At no point, however, has Congress invited the federal courts into the process.

Perhaps cognizant of the judiciary's inability to oversee and manage a complex scheme of inter-agency collaboration, we have appropriately been left on the sideline." *Id*. at *19.

### C. Count III of the Second Amended Class Action Complaint is a BPA Claim and Therefore It and the Entire Complaint Must be Dismissed.

The preceding discussion, while admittedly extensive, was needed to properly set the stage for analysis of the Second Amended Complaint under the plain language of the APA and the case law that explains the jurisdictional implications of the statute's text.  When Plaintiff Lucas Calixto filed his original Complaint in June 2018, he appeared before this Court as a person "aggrieved by" an agency action (section 702 "Right of Review").  That action was the Department's issuance on June 13, 2018 of a discharge order that purported to separate him from the Army Reserve effective July 1, 2018.  (ECF No. 1 (Compl.) at ¶ 14.)  This was an "agency action" because it was, in name and fact, and "order," which is defined in section 551(13) as "the whole or part of a final disposition…of an agency."  5 U.S.C. § 551(13).  Plaintiff Calixto therefore properly invoked the APA's limited waiver of sovereign immunity by presenting that specific *discrete* agency action to this Court for judicial review.

The advantage that the Cities' complaint has over the present Second Amended Class Action Complaint is that it was, not as a matter of fact but perhaps in a metaphysical sense, limited to one grievance:  the alleged failure of the military departments to report criminal adjudication history to the FBI.  Here, it is not possible to discern which of the various and collective grievances and alleged injustices asserted in the Second Amended Class Action Complaint will form the basis for Plaintiffs' argument, now that the burden has shifted to them to establish this Court's jurisdiction, that Plaintiffs have presented this Court with a discrete agency action as the basis for their APA claim.  In the final analysis, as the face of the Complaint shows

and as the Court will readily conclude, this is not an APA claim.  It is a BPA claim.  And

therefore, it and the entire Second Amended Class Action Complaint must be dismissed.

## II.   COUNTS I, II, IV, V AND VI MUST BE DISMISSED BECAUSE THERE IS NO WAIVER OF SOVEREIGN IMMUNITY THAT ALLOWS PLAINTIFFS TO ASSERT THOSE CLAIMS AGAINST THE SECRETARY OR THE DEPARTMENT

In the absence of a properly alleged APA claim, the remainder of the Second Amended

Complaint falls apart.  A review of the pleadings in this case shows that Plaintiffs are under the

mistaken impression that assertion of an APA claim "opens the door" to seeking relief against

federal departments and agencies under any other legal theory that Plaintiffs can conjure, limited

only by their imaginations and skill at drafting counts in a complaint.  But the APA provides not

only the waiver of sovereign immunity, i.e., the "Right of Review" under section 702, but also

the relief available under sections 702, 705, and 706.  The maximum relief available under the

APA is that which is stated right in the plain language of the statute:  "compel agency action

unlawfully withheld" or "hold unlawful and set aside agency action."  5 U.S.C. § 706.

The Declaratory Judgment Act does not provide a waiver of sovereign immunity.  *See,

e.g.*, *P&V Enters. V. U.S. Army Corps of Engineers*, 466 F. Supp. 2d 134, 141 (2006) ("The

plaintiffs bring this action under the general federal question statute and the Declaratory

Judgment Act, neither of which operate as an independent waiver of sovereign immunity.")

Thus, Plaintiffs' entitlement to a declaration that any action that aggrieved them was "unlawful"

and must be "set aside," if any, must be obtained under the APA.  Likewise, for this Court to find

that any of the actions that aggrieve Plaintiffs were committed in violation of the Constitution

occurred, such finding must also be made under the APA.  But Plaintiffs have not presented this

Court with a discrete final agency action to have invoked the APA's limited waiver of sovereign

immunity and, as a result, this Court's jurisdiction to hear the case.  Therefore, Counts I, II, IV, V and VI must be dismissed along with Count III.

## III.  PLAINTIFFS' MOTION FOR CLASS CERTIFICATION IS MOOT.

For the reasons stated, there can be no showing by Plaintiffs that their expansive, wide-sweeping broad programmatic attack on the Secretary's and the Department's MAVNI vetting and administrative discharge operations is a discrete agency action for which this Court has jurisdiction to hear.  Therefore and respectfully, the Court lacks subject matter jurisdiction to grant Plaintiffs' renewed motion for class certification and appointment of class counsel.  The motion is therefore moot and should be denied on that basis.  *See, e.g., Meyers v. United States*, 96 Fed. Cl. 34, 64 (denying motion for class certification as moot based on court's order granting motion to dismiss under Rule 12(b)(1) and Rule 12(b)(6)).

<u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully request that the Court dismiss the Second Amended Class Action Complaint in its entirety and with prejudice for lack of subject matter jurisdiction.  And, based on that ruling, Defendants respectfully request that the Court deny Plaintiffs' renewed motion for class certification on the grounds that it is moot.

Dated:  January 25, 2019

Respectfully submitted,

JESSIE K. LIU, D.C. Bar # 472845
United States Attorney
for the District of Columbia

DANIEL F. VAN HORN, D.C. Bar # 924092
Chief, Civil Division

*Of Counsel:*

BY: */s/ Roberto C. Martens, Jr.*

JEREMY A. HAUGH
Major, U.S. Army
U.S. Army Legal Services Agency
Litigation Division

ROBERTO C. MARTENS, JR.
Special Assistant United States Attorney
United States Attorney's Office
Civil Division

9275 Gunston Road
Fort Belvoir, VA 22060
(703) 693-1011
jeremey.a.haugh.mil@mail.mil

JOSEPH G. NOSSE
Major, U.S. Army
U.S. Army Legal Services Agency
Litigation Division
9275 Gunston Road
Fort Belvoir, VA 22060
(703) 693-1013
joseph.g.nosse.mil@mail.mil

555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2574
roberto.martens@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

---

THE CITY OF NEW YORK; THE CITY OF
PHILADELPHIA; and THE CITY AND
COUNTY OF SAN FRANCISCO;

       *Plaintiffs,*

    v.

THE UNITED STATES DEPARTMENT OF
DEFENSE; THE UNITED STATES
DEPARTMENT OF THE AIR FORCE; THE
UNITED STATES DEPARTMENT OF THE
NAVY; THE UNITED STATES
DEPARTMENT OF THE ARMY; JAMES N.
MATTIS, in his official capacity as United
States Secretary of Defense; HEATHER A.
WILSON, in her official capacity as United
States Secretary of the Air Force; RICHARD V.
SPENCER, in his official capacity as United
States Secretary of the Navy; DR. MARK T.
ESPER, in his official capacity as United States
Secretary of the Army; DERMOT F.
O'REILLY, in his official capacity as Director
of the Defense Criminal Investigative Service;
COLONEL KIRK B. STABLER, in his official
capacity as Commander of the Air Force Office
of Special Investigations; ANDREW L.
TRAVER, in his official capacity as Director of
the Naval Criminal Investigative Service;
MAJOR GENERAL DAVID P. GLASER, in
his official capacity as Commanding General of
the United States Army Criminal Investigation
Command; and REAR ADMIRAL RICHARD
A. BROWN, in his official capacity as
Commander of the Navy Personnel Command
and Deputy Chief of Naval Personnel;

       *Defendants.*

---

Civil Action No.    1:17-cv-01464

**COMPLAINT**

The City of New York, the City of Philadelphia and the City and County of San Francisco (collectively, the "Plaintiffs"), for their Complaint against the United States Department of Defense ("DoD"); the United States Department of the Air Force (the "Air Force"); the United States Department of the Navy (the "Navy"); the United States Department of the Army (the "Army"); James N. Mattis, in his official capacity as United States Secretary of Defense; Heather A. Wilson, in her official capacity as United States Secretary of the Air Force; Richard V. Spencer, in his official capacity as United States Secretary of the Navy; Dr. Mark T. Esper, in his official capacity as United States Secretary of the Army; Dermot F. O'Reilly, in his official capacity as Director of the Defense Criminal Investigative Service; Colonel Kirk B. Stabler, in his official capacity as Commander of the Air Force Office of Special Investigations; Andrew L. Traver, in his official capacity as Director of the Naval Criminal Investigative Service; Major General David P. Glaser, in his official capacity as the Commanding General of the Army Criminal Investigation Command; and Rear Admiral Richard A. Brown, in his official capacity as Commander of the Navy Personnel Command and Deputy Chief of Naval Personnel (collectively, the "Defendants"), state as follows:

## <u>NATURE OF THE ACTION</u>

1.      Just over one month ago, twenty-six innocent people were murdered and twenty others wounded, in a Texas church in a mass shooting that could, and should, have been prevented.  As detailed below, had Defendants simply followed the law, that shooter never should have been able to purchase the weapon he used.  This suit—brought by three municipalities—seeks narrowly-tailored injunctive relief to make certain that never happens again.

2.      In 2012, Devin P. Kelley, then an Air Force Airman First Class, was court-martialed and convicted of assault against his wife and young stepson.  He was sentenced to twelve months' confinement in a Navy brig in San Diego, California, and given a bad-conduct discharge.

3.      That conviction made it illegal for Kelley to purchase or possess a firearm.  And it should have blocked him from ever again purchasing any gun.  But Kelley was still able to purchase an assault-style rifle as a direct result of Defendants' admitted, systemic and long-standing failure to comply with the law. Kelley then used that weapon on November 5, 2017, to massacre twenty-six people and wound twenty more.

4.      More particularly, Defendants failed to comply with their unambiguous statutory obligation to report to the Federal Bureau of Investigation ("FBI") information about members of the Military Services, like Kelley, previously convicted of crimes that disqualify them from firearms possession.

5.      DoD's own Inspector General admitted to the U.S. Senate, in testimony just three weeks ago, that years of written warnings from his office about this serious problem have long gone unheeded. "[T]he military services still do not consistently report . . . final disposition reports as required," he testified.[1]

6.      The injunction Plaintiffs now seek is intended to prevent such senseless carnage from ever again being inflicted by current or former members of the military who should be

_____

[1] *Firearm Accessory Regulation and Enforcing Federal and State Reporting to the National Instant Criminal Background Check System (NICS): Hearing before the Senate Judiciary Comm.*, 115th Cong. (2017) (testimony of Glenn A. Fine), https://www.judiciary.senate.gov/meetings/firearm-accessory-regulation-and-enforcing-federal-and-state-reporting-to-the-national-instant-criminal-background-check-system-nics ("Fine Testimony"), at 1:08:17.

blocked from acquiring guns or licenses to carry guns.  No new laws are required to achieve that goal.  Instead, this Court need only grant Plaintiffs' request to compel Defendants to diligently implement, and consistently apply, the unambiguous laws that have been on the books for decades.  As Senator John Cornyn (R-Tex.) recently observed, achieving this life-saving goal is "as simple as just getting [Defendants] to do what they're already required to do,"[2] and "[t]here simply is no excuse for not enforcing the current law."[3]

7.      While Attorney General Sessions has now launched an investigation of this issue, the problem here is not with the Attorney General.  His predecessors long ago imposed the necessary legal obligations on these Defendants.  The problem here is that Defendants have not met, and are still not meeting, their long-standing legal obligations.  And the Attorney General—a coordinate member of the Executive Branch—lacks the power to remedy Defendants' non-compliance.

8.      This suit therefore seeks judicial intervention—i.e., intervention by an independent and apolitical branch of government, fully familiar with monitoring, and maintaining, compliance with the law.  This Court clearly has the authority and the jurisdiction required to remedy these long-standing wrongs.  The recent U.S. Senate testimony by the DoD Inspector General that the military services have failed to take his office's recommendations "as

---

[2] Karoun Demirjian, *Gun-Control Rivals Team Up on Bill to Fix Background-Check Database*, Washington Post, Nov. 15, 2017, https://www.washingtonpost.com/powerpost/gun-control-rivals-team-up-on-bill-to-fix-background-check-database/2017/11/15/47b2ee84-ca57-11e7-8321-481fd63f174d_story.html?utm_term=.1cb37359da53.

[3] *Firearm Accessory Regulation and Enforcing Federal and State Reporting to the National Instant Criminal Background Check System (NICS): Hearing before the Senate Judiciary Comm.*, 115th Cong. (2017), https://www.judiciary.senate.gov/meetings/firearm-accessory-regulation-and-enforcing-federal-and-state-reporting-to-the-national-instant-criminal-background-check-system-nics, at 42:16.

seriously as they should have,"[4] and likewise long failed "to take appropriate action to follow up

on those recommendations,"[5] makes the need for such judicial intervention clear.

9.      By way of background, the National Crime Information Center ("NCIC") is one

of three databases that comprise the National Instant Criminal Background Check System

("NICS") for gun sales.  NICS was created decades ago to keep guns out of dangerous hands.  As

Attorney General Sessions recently observed, "NICS is critically important to protecting the

American public from firearms-related violence."[6] The National Rifle Association agrees,

applauding "efforts to ensure that the records of prohibited individuals are entered into NICS."[7]

10.     A critical component of NICS is the statutory direction from Congress to, among

others, DoD, that DoD and its constituent departments regularly report specified information

regarding the criminal history of members of the Military Services for inclusion in the NCIC

database.

11.     DoD's own Inspector General's reports clearly document, however, that, as far

back as 1997, and continuing through the present, Defendants and their predecessors have

systematically and knowingly failed to fulfill that statutory obligation, with the Kelley case just

the latest manifestation of that systemic failure.

---

[4] Fine Testimony, *supra* note 1, at 1:20:33.

[5] *Id.* at 2:11:59.

[6] Memorandum from the Attorney Gen. to the Dir. of the Fed. Bureau of Investigations and the Acting Dir. of the Bureau of Alcohol, Tobacco, Firearms and Explosives (Nov. 22, 2017), https://www.justice.gov/opa/press-release/file/1013606/download?utm_medium=email&utm_source=govdelivery ("Attorney Gen. Memo.).

[7] *Second Amendment, Domestic Violence, Law Enforcement Groups Support the Fix NICS Act,* https://www.cornyn.senate.gov/content/news/second-amendment-domestic-violence-law-enforcement-groups-support-fix-nics-act.

12.     In 1997, and then again in 2015, the DoD Inspector General expressly warned Defendants and their predecessors, in writing, that they had serious compliance problems.  The Inspector General told the Air Force, for example, just two years ago, that it had failed to report 32% of its disqualifying conviction dispositions to the FBI.  Those were *all* dispositions that undeniably disqualified the individuals in question, like Devin Kelley, from ever purchasing a firearm.

13.     Only three weeks ago, the DoD Inspector General released yet another report, dated December 4, 2017, detailing yet again Defendants' non-compliance with their reporting obligations.  Across all the service branches, he reported, fully 31% of all final disposition reports were never provided to the FBI during the period from January 1, 2015 to December 31, 2016.

14.     The 1997, 2015 and 2017 reports by the DoD Inspector General are far from secret documents.  To the contrary, they were widely distributed both inside and outside of DoD, including to Congress, and are also available to the public.[8]

15.     Yet despite those clear warnings, and in direct contravention of their official duties, Defendants still failed to repair this vital reporting system.  And, today, we mourn the loss of twenty-six innocent Americans from Texas that could have been prevented.

---

[8] The 1997 Report is available at https://media.defense.gov/1997/Feb/10/2001715391/-1/-1/1/crimhist.pdf.
The 2015 Report is available at https://media.defense.gov/2015/Feb/12/2001713470/-1/-1/1/DODIG-2015-081.pdf.
The 2017 Report is available at https://media.defense.gov/2017/Dec/05/2001852278/-1/-1/1/DODIG-2018-035.PDF.

16.     The Executive and Legislative branches have had their chances to solve this long-standing problem.  Both failed to do so.  Intervention by this Court is therefore now both necessary and appropriate.

17.     The Plaintiffs here are all past, present and future regular users of NICS or similar state databases that incorporate NICS data.  In conducting background checks that directly or indirectly access NICS, Plaintiffs regularly access the records in, and rely upon the accuracy and completeness of, the NCIC database.

18.     Plaintiffs are therefore each directly impacted by Defendants' systemic and long-standing failures to report disqualifying conviction dispositions, because they each continuously rely upon the accuracy and completeness of the NCIC database.  Yet, as Attorney General Sessions recently observed, NICS is "only as reliable and robust as the information that federal, state, local and tribal government entities make available to it."[9]

19.     Because of Defendants' past and continuing failure to provide mandated records to the background check system, an unknown number of members and former members of the Military Services—whose past convictions legally bar them from buying guns—are able to pass background checks they should fail.  Those individuals can then purchase and/or carry guns they should be prevented from obtaining or carrying, potentially exposing themselves and others to substantial risk of injury.

---

[9] Attorney Gen. Memo., supra note 6.

20. The irreparable injury threatened as a direct result is clear. As the DoD Inspector General recently underscored in his 2017 Report, "[a]ny missing . . . final disposition report can have serious, even tragic, consequences."[10]

21. Plaintiffs therefore, together, now seek immediate injunctive relief to compel Defendants to repair this broken system, and to cure once and for all the potentially deadly gaps in the NCIC database for members or former members of the Military Services.

## PARTIES

*Plaintiff the City of New York*

22. Plaintiff the City of New York is a municipal corporation which, acting by and through its New York Police Department (the "NYPD"), regularly conducts firearm background and criminal history checks that include searches of NICS, including NCIC and the Interstate Identification Index ("III") database.

23. The NYPD is required, under N.Y. Penal Law § 400.00 and 38 R.C.N.Y. ch. 3, 5, to process applications for (a) permits to possess rifles or shotguns ("long gun permits"), and (b) licenses to possess or carry handguns ("handgun licenses").

24. Prior to issuing long gun permits or handgun licenses, the NYPD conducts a background check on a permit or license applicant that includes a search in NICS, specifically NCIC and III, to ensure that the system contains no records indicating that the applicant is not allowed to possess or carry a firearm.

25. In conducting such background checks on long gun permit and handgun license applicants, the NYPD initiates a check of NICS, specifically NCIC and III, by submitting

---

[10] Inspector Gen., U.S. Dep't of Defense, Evaluation of Fingerprint Card and Final Disposition Report Submissions by Military Service Law Enforcement Organizations 6 (Dec. 4, 2017) ("2017 Report").

applicants' fingerprints and other identifying information to the online portal of the New York State Division of Criminal Justice Services, which in turn queries information maintained by the Criminal Justice Information Services Division ("CJIS") of the FBI, to verify whether an applicant is legally permitted to possess a firearm. The NYPD will not issue a long gun permit or handgun license unless an applicant passes that background check and meets the other legal requirements of the City and State of New York.

26. In addition to conducting background checks in conjunction with the issuance of long gun permits and handgun licenses, the NYPD requires an NICS check in conjunction with its administration of New York City's handgun Purchase Authorization system. Before a handgun license holder may purchase a handgun from a federally-licensed gun dealer (a Federal Firearms Licensee ("FFL")), the license holder must obtain a handgun Purchase Authorization, valid for thirty days, from the NYPD. Within that thirty-day period, the license holder may purchase a handgun by presenting the Purchase Authorization to the FFL, having the FFL conduct an NICS check, and having the FFL fill out the Purchase Authorization and record that the license holder passed the NICS check. The license holder must then present the completed Purchase Authorization and firearm for inspection by the NYPD. If the Purchase Authorization confirms that the license holder has passed an NICS check at the point of purchase, the NYPD will record the handgun's make, model, caliber, and serial number on the license holder's handgun license. In this manner, the NYPD requires an NICS check at the point of purchase, and relies on the accuracy and completeness of that NICS check, in implementing the administrative process that governs legal handgun possession in New York City.

27.     The NYPD also accesses NICS, specifically NCIC and III, through the New York State Division of Criminal Justice Services' online portal, to run additional background checks to determine whether or not to return firearms that it has seized to firearms licensees.

28.     In performing these governmental responsibilities and essential activities with which it is tasked, the NYPD regularly accesses NICS, including the NCIC and III databases.  In doing so, the NYPD necessarily relies upon the integrity and completeness of NICS, including the NCIC and III databases.

*Plaintiff the City of Philadelphia*

29.     Plaintiff the City of Philadelphia is a municipal corporation which, acting by and through its Philadelphia Police Department (the "PPD"), regularly conducts background checks that include searches of NICS.  Pursuant to Pennsylvania law, 18 P.S.§ 6019, when residents of Philadelphia apply for a license to carry a firearm, they do so by making an application with the PPD.

30.     The PPD is required by statute to process applications for licenses to carry firearms.  Prior to issuing such licenses, the PPD is required to conduct a background check on the applicant to determine whether the applicant is lawfully permitted to carry a firearm in the City of Philadelphia.

31.     In conducting such background checks, the PPD initiates, through the Pennsylvania Instant Check System ("PICS") administered by the Pennsylvania State Police, a query of the NICS databases, including NCIC.  If that search reveals that the system contains no records indicating that the applicant is not allowed to possess or carry a firearm, PPD will continue to process the application.  If such records are found, however, the application will be denied.

32.     When continued processing of the application is warranted, PPD conducts further background investigation in accordance with Pennsylvania law.  That further investigation includes receipt of reports from at least one other database into which Defendants have failed to properly report all records.  Upon completion of the application process, PPD then makes a determination of whether the carry license applied for will issue.

33.     In performing this governmental responsibility and essential activity with which it is tasked, the PPD regularly, through PICS, accesses NICS, including the NCIC database.  In doing so, the PPD necessarily relies upon the integrity and completeness of NICS, including the NCIC database.

### Plaintiff the City and County of San Francisco

34.     Plaintiff the City and County of San Francisco is a municipal corporation which, acting by and through its San Francisco Police Department (the "SFPD"), regularly relies on background checks conducted through the California Law Enforcement Telecommunication System ("CLETS").  CLETS includes national data from NICS about people who are prohibited from possessing firearms.

35.     The SFPD is required by Cal. Penal Code sections 13730 and 18250 to seize firearms at the scene of domestic violence incidents.  Prior to releasing guns seized in domestic violence or other incidents, the SFPD is required to determine whether the potential recipient of the firearm is lawfully permitted to possess firearms.  This is typically done through the process outlined in California Penal Code sections 33850-33865.  Under that process, the potential recipient of the firearm applies to the California Department of Justice for a determination of whether he or she is eligible to possess firearms.  The California Department of Justice then performs a background check on the potential recipient using CLETS, which includes data from

NICS.  If the CLETS system shows that the potential recipient is not prohibited from possessing firearms, the California Department of Justice is required to issue written notice to that effect.  California Penal Code section 33865(c).  This notice is known as a "gold seal letter," and is valid for thirty days after the State issues it.

36.     When a person timely presents a gold seal letter to the SFPD and requests the return of a firearm, the SFPD conducts additional background and warrant checks to update the information in the gold seal letter.  As part of these checks, the SFPD again accesses CLETS to determine whether the person is prohibited from possessing a firearm.

37.     The failure of NICS to include accurate data on people who are ineligible to possess firearms due to a disqualifying criminal conviction or dishonorable discharge while serving in the military creates false positive results in CLETS, potentially leading to the return of firearms to people who are legally prohibited from possessing them.

38.     In performing this governmental responsibility and essential activity with which it is tasked, the SFPD regularly indirectly accesses NICS, including the NCIC database.  In doing so, the SFPD necessarily relies upon the integrity and completeness of NICS, including the NCIC database.

***The Entity Defendants***

39.     Defendant DoD is an executive branch department of the United States government, charged with providing the military forces needed to prosecute and deter war, and with protecting the security of the United States.  Defendant DoD is headquartered at the Pentagon in Arlington, Virginia, within this judicial district.

40.     Defendant Air Force is the air and space military department of Defendant DoD, and is responsible for the administration and operation of the United States Air Force.  Defendant Air Force is headquartered at the Pentagon in Arlington, Virginia, within this judicial district.

41.     Defendant Navy is the maritime military department of Defendant DoD, and is responsible for the administration and operation of the United States Navy and the United States Marine Corps.  Defendant Navy is headquartered at the Pentagon in Arlington, Virginia, within this judicial district.

42.     Defendant Army is the land-based military department of Defendant DoD, and is responsible for the administration and operation of the United States Army.  Defendant Army is headquartered at the Pentagon in Arlington, Virginia, within this judicial district.

***The Individual Defendants***

43.     Defendant James N. Mattis is the United States Secretary of Defense.  He is the principal defense policy advisor to the President of the United States, and is the leader of Defendant DoD, exercising authority, direction and control over Defendant DoD.  Upon information and belief, Defendant Mattis is based at the Pentagon in Arlington, Virginia, within this judicial district.

44.     Defendant Heather A. Wilson is the United States Secretary of the Air Force.  She is the leader of Defendant Air Force, and exercises authority, direction and control over Defendant Air Force.  Upon information and belief, Defendant Wilson is based at the Pentagon in Arlington, Virginia, within this judicial district.

45.     Defendant Richard V. Spencer is the United States Secretary of the Navy.  He is the leader of Defendant Navy, and exercises authority, direction and control over Defendant

Navy.  Upon information and belief, Defendant Spencer is based at the Pentagon in Arlington, Virginia, within this judicial district.

46.     Defendant Dr. Mark T. Esper is the United States Secretary of the Army.  He is the leader of Defendant Army, and exercises authority, direction and control over Defendant Army.  Upon information and belief, Defendant Esper is based at the Pentagon in Arlington, Virginia, within this judicial district.

47.     Defendant Dermot F. O'Reilly is the Deputy Inspector General for Investigations and Director of the Defense Criminal Investigative Service of Defendant DoD.  He oversees the Defense Criminal Investigative Service, which is the defense criminal investigative organization of Defendant DoD.  Upon information and belief, Defendant O'Reilly is based at the Pentagon in Arlington, Virginia, within this judicial district.

48.     Defendant Colonel Kirk B. Stabler is the Commander of the Air Force Office of Special Investigations.  He oversees the Air Force Office of Special Investigations, which is the defense criminal investigative organization of Defendant Air Force.  Upon information and belief, Defendant Stabler is based in Quantico, Virginia, within this judicial district.

49.     Defendant Andrew L. Traver is the Director of the Naval Criminal Investigative Service.  He oversees the Naval Criminal Investigative Service, which is the defense criminal investigative organization of Defendant Navy.  Upon information and belief, Defendant Traver is based in Quantico, Virginia, within this judicial district.

50.     Defendant Major General David P. Glaser is the Provost Marshal General of the Army and Commanding General of the United States Army Criminal Investigation Command. He oversees the Army Criminal Investigation Command, which is the defense criminal

investigative organization of Defendant Army.  Upon information and belief, Defendant Glaser is based in Quantico, Virginia, within this judicial district.

51.     Defendant Rear Admiral Richard A. Brown is the Commander, Navy Personnel Command/Deputy Chief of Naval Personnel.  He oversees the Navy Corrections and Programs of Defendant Navy.  Upon information and belief, Defendant Brown is based in Millington, Tennessee.

52.     All of the individual Defendants are sued only in their official capacities.

## JURISDICTION AND VENUE

53.     This court has jurisdiction over these claims under 28 U.S.C. § 1331.

54.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1391(e), because acts and omissions described in this Complaint occurred in this judicial district, because the entity defendants are headquartered in this judicial district, and because the individual defendants perform some or all of their official duties in this judicial district.

## FACTUAL ALLEGATIONS

*NICS*

55.     The Department of Justice established NICS pursuant to 34 U.S.C. § 40901, as a national background check system designed to keep guns out of dangerous hands.  NICS is comprised of three centralized databases maintained by the FBI's CJIS—the NICS Index, the III, and NCIC—to which courts, the military and other entities submit records of criminal activity that disqualifies individuals from possessing or carrying firearms.

56.     18 U.S.C. § 922 prohibits the sale or disposition of firearms to, and possession of firearms by, among others, people who have been convicted of certain criminal offenses or who have been dishonorably discharged from the Armed Forces.

57. NICS provides an electronic means for municipalities to obtain information about whether a permit/license applicant is legally prohibited from receiving a permit/license to possess or carry a gun, and about whether a person who has requested the return of a gun seized or otherwise possessed by law enforcement is legally entitled to possess that gun.

58. Every year, background searches through NICS prevent more than 100,000 transfers of guns to individuals who are legally prohibited from owning or possessing a gun and who attempt to purchase firearms from federally licensed dealers.[11]

59. Each year, the accuracy and completeness of the information in NICS becomes increasingly important. As Douglas E. Lindquist, the Assistant Director of CJIS, noted in his December 6, 2017, Senate testimony: "Since 2010, the NICS has experienced a steady increase in the volume of background checks. The last three years have been record-setting and this past 'Black Friday' was the highest volume day in the NICS ['] history."[12]

60. Pursuant to 34 U.S.C. § 40901(e)(1), Congress mandated that any Federal department or agency that has a record demonstrating that a person falls within one of the categories of persons to whom the sale or disposition of firearms is prohibited, must provide that information to the Attorney General "not less frequently than quarterly," and as required by the Attorney General, "as is necessary to enable the system to operate."

61. In 1987, the Inspector General of the Department of Defense issued Criminal Investigations Policy Memorandum Number (CPM No. 10), "Criminal History Data Reporting

---

[11] Jennifer Karberg et al., "Background Checks for Firearm Transfers, 2013-14—Statistical Tables," U.S. Dep't of Justice: Bureau of Justice Statistics, June 2016, https://www.bjs.gov/content/pub/pdf/bcft1314st.pdf.

[12] *Firearm Accessory Regulation and Enforcing Federal and State Reporting to the National Instant Criminal Background Check System (NICS): Hearing before the Senate Judiciary Comm.*, 115th Cong. (2017) (statement of Douglas E. Lindquist), https://www.judiciary.senate.gov/imo/media/doc/Lindquist%20Testimony.pdf.

Requirements," to establish policies and procedures for the defense criminal investigative

organizations ("DCIOs")[13] to report offender criminal history data to the FBI.

62.     DoD Instruction 5505.11, originally issued in 1998, in turn, mandates that DCIOs

and other DoD law enforcement organizations[14] submit to the FBI's CJIS Division "offender

criminal history data for all [m]embers of the Military Services investigated for offenses listed in

Enclosure 2 of this instruction by DCIOs or other DoD law enforcement organizations."[15]

Enclosure 2 of DoD Instruction 5505.11 includes the following offenses: assault, sexual assault,

rape, manslaughter, murder, larceny, robbery and burglary.

63.     Defendants DoD, Air Force, Navy and Army are each therefore obligated by law

to report certain offender criminal history data for members of the Military Services for inclusion

in NICS (and, more specifically, the NCIC database).

64.     Defendants Mattis, Wilson, Spencer, Esper, O'Reilly, Stabler, Traver, Glaser and

Brown are each required, in their official capacities, to oversee the compliance by Defendants

DoD, Air Force, Navy and/or Army with these reporting obligations.

***Devin P. Kelley***

65.     In 2012, a court martial convicted Devin P. Kelley, an Airman First Class serving

at Holloman Air Force base in New Mexico, of assault on his wife and stepson.  Kelley had pled

---

[13] Defense criminal investigative organizations include the Army Criminal Investigation Command, the Naval Criminal Investigative Service, the Air Force Office of Special Investigations, and the Defense Criminal Investigative Services.

[14] DoD law enforcement organizations include "an agency or activity, or any subdivision thereof, chartered and empowered to enforce the criminal laws of the United States on DoD property or during DoD functions anywhere in the world.  A traditional DoD law enforcement organization that employs recognized law enforcement officers are those organizations designated for the security or protection of DoD property, personnel, or places that are subject to the jurisdiction, administration, or in the custody of the DoD." Dep't of Defense, Instruction 5505.11, at 16-17, https://www.hsdl.org/?abstract&did=799999.

[15] *Id.* at 1-2.

guilty to two counts of domestic assault based on allegations of, on multiple occasions, striking, choking, kicking and pulling the hair of his wife and of striking a child under the age of sixteen years "on the head and body with a force likely to produce death or grievous bodily harm."[16]

66.     Kelley's court-martial order left no doubt that his conviction prohibited him from possessing guns, identifying it—in bold, oversized type—as a "Crime of Domestic Violence. 18 U.S.C. § 922(g)(9)."[17]

67.     A general court martial sentenced Kelley to twelve months' confinement at a Navy brig in San Diego and a bad-conduct discharge.  Kelley served his sentence and then left the Air Force in 2014.

68.     Because the crime for which Kelley was convicted was punishable by imprisonment for a term exceeding one year, and also because he was convicted of a crime of domestic violence that met the standard set forth in 18 U.S.C. § 922(g)(9) and 18 U.S.C. § 921(a)(33), the DoD, Air Force and Navy were obligated to report Kelley's criminal history for inclusion in the NCIC database, so that he would be prevented from passing a background check and purchasing a firearm.

69.     The DoD, Air Force and Navy admittedly failed to report Kelley's criminal conviction to the FBI for inclusion in the NCIC database.[18] Defendant Wilson has acknowledged

---

[16] Kelley's court documents are available at https://apps.washingtonpost.com/g/documents/national/read-devin-p-kelleys-assault-and-domestic-violence-court-documents/2617/.

[17] *Id.*

[18] Alex Horton, *The Air Force Says It Failed to Follow Procedures, Allowing Texas Church Shooter to Obtain Firearms,* Washington Post, Nov. 7, 2017, *https*://www.washingtonpost.com/news/checkpoint/wp/2017/11/06/the-air-force-says-it-failed-to-follow-procedures-allowing-texas-church-shooter-to-obtain-firearms/?utm_term=.eab27e5a1e14.

that, with respect to Kelley, it is "pretty clear that the check list [the Air Force] used was not followed by the local office" in New Mexico, and that Kelley's records "should have been" included in NICS.[19] In testimony before the Senate, Defendant Wilson "confirmed that [the] Air Force Office of Special Investigations (AFOSI) and Security Forces investigators failed to report Devin Kelley's criminal history to the Federal Bureau of Investigation (FBI) for inclusion in their criminal history database."[20]

70.     Upon information and belief, the Navy's instruction applicable to Navy confinement facilities inexplicably provided that the confinement facility would *not* report information for inclusion in the NCIC database.

71.     Upon information and belief, in or about April 2016, Kelley purchased the Ruger AR-556 rifle he used in the Texas church shooting from a licensed firearms dealer in San Antonio, Texas.

72.     Upon information and belief, the licensed firearms dealer who sold Kelley that Ruger AR-556 rifle submitted a request for a background check through NICS, including the NCIC database, but that background check identified no disqualifying records for Kelley.

73.     Had the DoD, Air Force and/or Navy complied with their reporting obligations, Kelley's records would have appeared in NICS, and Kelley would not have passed that

---

[19] Kathryn Watson, *Air Force Secretary Says Texas Shooter Was a "Serious Problem" in the Air Force,* CBS News, Nov. 7, 2017, https://www.cbsnews.com/news/air-force-secretary-says-texas-shooter-was-a-serious-problem-in-the-air-force/.

[20] *Firearm Accessory Regulation and Enforcing Federal and State Reporting to the National Instant Criminal Background Check System (NICS): Hearing before the Senate Judiciary Comm.*, 115th Cong. (2017) (statement of the Hon. Heather Wilson), https://www.judiciary.senate.gov/imo/media/doc/Wilson%20Testimony.pdf ("Wilson Testimony").

background check.  The licensed firearm dealer would then have been prohibited from selling him the Ruger AR-556 rifle, pursuant to 18 U.S.C. §§ 922(d)(1) and (9).

74.     But instead Kelley was able to purchase that Ruger AR-556 rifle and, on November 5, 2017, he used it to kill twenty-six people and injure twenty others at the First Baptist Church in Sutherland Springs, Texas.

***Defendants' Long-standing Failure to Comply With Their Statutory Reporting Obligations***

75.     The failure of the DoD, Air Force, Navy and Army to comply with their obligations to report criminal conviction information goes far beyond the Kelley case.  The DoD Inspector General has warned Defendants and their predecessors for at least two decades about their long-standing and systemic failure to comply with the law requiring them to report criminal conviction information, "repeatedly [finding] deficiencies with military services' submission of . . . final distribution reports and other criminal history information to the FBI."[21]

76.     Indeed, as early as 1997, the DoD Inspector General evaluated compliance by the Air Force, Navy and Army with the criminal history data reporting requirements, and published the results of that evaluation on February 10, 1997 (the "1997 Report").  The 1997 Report stated that, over an eighteen-month period, the Air Force had failed to submit final case disposition reports in approximately 50% of its cases; the Navy failed to submit final disposition reports in approximately 94% of its cases; and the Army failed to submit final case disposition reports in approximately 79% of its cases.[22]

77.     In or about 2015, the DoD Inspector General again evaluated compliance by the Air Force, Navy and Marine Corps with the criminal history data reporting requirements, and

---

[21] Fine Testimony, *supra* note 1, at 1:10:15.

[22] Inspector Gen., Dep't of Defense, Evaluation of Department of Defense Compliance with Criminal History Data Reporting Requirements 4, 20 (Feb. 10, 1997).

published the results of that evaluation on February 12, 2015 (the "2015 Report"). The 2015

Report did not include information about the Army's compliance with its requirement to submit

final disposition reports due to "data validation limits."[23]

78. The 2015 Report stated that, for convictions between June 1, 2010 and October

31, 2012, the Air Force still failed to submit final disposition reports in approximately 32% of its

cases, the Navy still failed to submit final disposition reports in approximately 25% of its cases,

and the Marine Corps failed to submit final disposition reports in approximately 33% of its

cases.[24]

79. On November 15, 2017, General Mark Milley, the Army's Chief of Staff and top

General, admitted that the Army likewise failed to alert the FBI of its service members' criminal

history in a "significant" amount of cases—estimating the percentages of unreported criminal

dispositions by the Army to be between 10% and 20%—and acknowledged that reporting

failures is "not just an Air Force problem. This is a problem across all the services where we

have gaps in reporting criminal activity of people in the service."[25]

80. On December 4, 2017, the DoD Inspector General released a third report,

evaluating compliance by the Air Force, Navy, Army and Marine Corps with their criminal

history data reporting requirements (the "2017 Report"). The 2017 Report stated that, for

convictions between January 1, 2015 and December 31, 2016, the Air Force failed to submit

final disposition reports in approximately 14% of its cases, the Navy failed to submit final

---

[23] Inspector Gen., Dep't of Defense, Evaluation of Department of Defense Compliance with
Criminal History Data Reporting Requirements i (Feb. 12, 2015).

[24] *Id.* at 7-8.

[25] *Army Acknowledges Failures to Report Crime Data to FBI After Texas Shooting*, CBS News,
Nov. 15, 2017, *https://www.cbsnews.com/news/army-acknowledges-failures-to-report-crime-
data-to-fbi-after-texas-shooting/*.

disposition reports in approximately 36% of its cases (an increase from the 2015 Report), the Army failed to submit final disposition reports in approximately 41% of its cases (far higher than the Army's Chief of Staff estimated just three weeks earlier), and the Marines Corps failed to submit final disposition reports in approximately 36% of its cases.[26]

81.     Notwithstanding these multiple DoD internal reviews revealing long-standing and systemic failures by the DoD, Air Force, Navy, Army and Marine Corps to comply with their criminal history reporting obligations, all Defendants have failed to cure those systemic problems.

82.     According to the DoD Inspector General, Defendants' failure to comply with their criminal history reporting obligations has persisted for so long because they simply "didn't take [his office's] recommendations as seriously as they should have."[27]

83.     As admitted by Defendant Wilson in her December 6, 2017, Senate testimony, "[a]lthough some corrective measures were implemented after the [2015 Report], particularly by Air Force [Office of Special Investigations], the corrections made were not retroactive and current data from this year shows that we still are not reporting all offender criminal history data as required."[28] Defendant Wilson further admitted that actions taken to remedy prior failures "were insufficient," and that "[o]ne of the things that was not done was a complete retroactive review . . . to ensure that previous cases that were not reported were properly reported."[29]

---

[26] 2017 Report, supra note 10, at i.

[27] Fine Testimony, *supra* note 1, at 1:20:33.

[28] Wilson Testimony, *supra* note 20.

[29] *Firearm Accessory Regulation and Enforcing Federal and State Reporting to the National Instant Criminal Background Check System (NICS): Hearing before the Senate Judiciary Comm.*, 115th Cong. (2017) (testimony of Heater A. Wilson),

84.     Defendants' admitted failure to comply with their obligations at law have left the public broadly exposed to the risk of further gun sales, the issuance of gun carry permits/licenses, and the return of guns to disqualified individuals, who can then become, in effect, ticking human time-bombs.

***Plaintiffs Regularly Rely Upon Defendants' Compliance With Their Statutory Reporting Obligations***

85.     Plaintiffs each have governmental responsibilities, and conduct essential governmental activities, that depend upon the integrity and completeness of NICS.

86.     Through this suit, Plaintiffs seek to follow their respective laws and protect their ongoing interests in, and their ongoing ability to perform, these governmental responsibilities and essential activities, which, in turn, promote public safety and keep guns away from those who are legally prohibited from possessing and/or carrying them under long-standing law.

87.     Gaps in NICS directly interfere with Plaintiffs' ability to perform their governmental responsibilities and essential activities.

88.     Defendants' long-standing and systemic failures to comply with their statutory criminal history reporting obligations interfere directly and specifically with the Plaintiffs' governmental responsibilities to run effective background checks on applicants seeking to possess, carry and/or retrieve firearms, and to issue permits/licenses and/or return firearms only to those eligible to receive them.

89.     As a result, upon information and belief, Plaintiffs may have unwittingly issued permits or licenses to possess and/or carry a firearm; may have unwittingly returned firearms to individuals who should not have received them; and/or will continue to do so in the future,

---

https://www.judiciary.senate.gov/meetings/firearm-accessory-regulation-and-enforcing-federal-and-state-reporting-to-the-national-instant-criminal-background-check-system-nics, at 57:50.

because of Defendants' long-standing and ongoing systemic failures to comply with their reporting obligations.

90.     Ensuring that all individuals with disqualifying convictions or discharges during their military service are indeed included in NICS will redress the injury that Plaintiffs are currently suffering and prevent unqualified individuals from acquiring guns or having a permit or license to carry guns in the future.

91.     Until and unless Defendants consistently comply with their statutory reporting obligations, each passing day creates further opportunities for dangerous individuals who should be, but are not, blocked from purchasing and/or carrying firearms, to acquire those weapons and use them to commit deadly crimes.

## COUNT I

### (Relief Under Administrative Procedure Act, 5 U.S.C. § 706(1))

92.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1-91 as if set forth fully herein.

93.     5 U.S.C. § 706(1) authorizes a Federal Court to "compel agency action unlawfully withheld or unreasonably delayed."

94.     Agency actions reviewable under 5 U.S.C. § 706(1) include an agency's failure to take a discrete agency action that the agency is required by law to take.

95.     Pursuant to 34 U.S.C. § 40901(e)(1), any Federal department or agency that has a record demonstrating that a person falls within one of the categories for whom receipt of a firearm is prohibited under 18 U.S.C. § 922(g) or (n), must provide that information to the Attorney General "not less frequently than quarterly," and as required by the Attorney General

"as is necessary to enable the system to operate in accordance with this section," so that the information can be accurately reported in NICS.

96.     Defendants DoD, Air Force, Navy and Army have records demonstrating that certain persons fall within the categories of persons for whom receipt of a firearm is prohibited under 18 U.S.C. § 922(g) or (n), but have systemically failed, and continue to systemically fail, to provide all such records to the Attorney General, and, in a significant number of instances to provide such records at all, as required by the Attorney General.

97.     Defendants DoD, Air Force, Navy and Army have therefore failed to fulfill their obligations under 34 U.S.C. § 40901(e)(1).

98.     The individual Defendants, acting in their official capacities, have been on notice of the foregoing failures by virtue of the 1997, 2015 and 2017 Reports yet, upon information and belief, have not cured those failures.

99.     Defendants' failure to meet their reporting obligations under 34 U.S.C. § 40901(e)(1) constitutes agency action unlawfully withheld or unreasonably delayed.

100.     The failure to provide all of the information required under 34 U.S.C. § 40901(e)(1) is unreasonable, in light of the fact that the systemic failures of Defendants DoD, Air Force, Navy and Army have been known and publicly reported on multiple occasions.  The individual Defendants have failed to take adequate measures to bring the DoD, Air Force, Navy and Army into compliance with law.

101.     Each Plaintiff has a legal right to access and rely upon information contained in NICS, and to expect that Federal agencies will comply with Federal law in providing timely and accurate information for inclusion in NICS.

102.     Defendants' failures with respect to providing timely and accurate information for inclusion in NICS have caused, and unless enjoined threaten to continue to cause, Plaintiffs and the public at large irreparable harm, for which there is no adequate remedy at law.

103.     Pursuant to 5 U.S.C. § 703, Plaintiffs may bring this APA claim in "any applicable form of legal action, including actions for … writs of prohibitory or mandatory injunction."

104.     Upon compelling such agency action, this Court also has the authority to institute appropriate oversight to ensure that its instructions are followed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter a preliminary, and then final, injunction:

A.   Compelling each of the Defendants, on a schedule to be set by the Court, to locate and identify all records in Defendants' possession, custody or control, or that are generated or otherwise come into Defendants' possession, custody or control, demonstrating that a person falls within one of the categories of persons for whom receipt of a firearm is prohibited under 18 U.S.C. § 922(g) or (n), and to provide the information contained in all past and current such records to the Attorney General not less frequently than quarterly, and as required by the Attorney General, as is necessary to enable NICS to operate accurately and effectively;

B.   Compelling each of the Defendants, on a schedule to be set by the Court, to conduct a thorough review of the records and procedures of Defendants DoD, Air Force, Navy and Army, and to submit to the Court for approval a Compliance Plan to ensure that all applicable records demonstrating that a person falls within

one of the categories of persons for whom receipt of a firearm is prohibited under

18 U.S.C. § 922 (g) or (n) in Defendants' possession, custody or control, or that

are generated or otherwise come into Defendants' possession, custody or control

in the future, are timely and accurately reported to the Attorney General;

C. Compelling each of the Defendants to provide a monthly report to the Court

detailing their progress in conducting their review, and in preparing and

implementing their Compliance Plan, until such time as the Court is satisfied that

Defendants have brought themselves into full compliance with 34 U.S.C. §

40901(e)(1), and will remain in full compliance;

D. Awarding Plaintiffs their costs and reasonable attorneys' fees in this action,

including pursuant to the Equal Access to Justice Act; and

E. Awarding such other and further relief as the Court may deem appropriate.

December 26, 2017                    Respectfully submitted,


Kenneth W. Taber (*pro hac vice* forthcoming) (Lead Counsel)
Matthew F. Putorti (*pro hac vice* forthcoming)
Nicholas M. Buell (*pro hac vice* forthcoming)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1540 Broadway
New York, NY 10036
Phone: 212.858.1000
Fax: 212.858.1500
kenneth.taber@pillsburylaw.com
matthew.putorti@pillsburylaw.com
nicholas.buell@pillsburylaw.com

/s/ Matthew J. MacLean
Matthew J. MacLean (VSB No. 44304)
PILLSBURY WINTHROP SHAW PITTMAN LLP
1200 Seventeenth Street NW
Washington, DC 20036
Phone: 202.663.8000
Fax: 202.663.8007

matthew.maclean@pillsburylaw.com

*Attorneys for all Plaintiffs*

Zachary W. Carter (*pro hac vice* forthcoming)
Eric Proshansky (*pro hac vice* forthcoming)
Melanie C.T. Ash (*pro hac vice* forthcoming)
NEW YORK CITY LAW DEPARTMENT
100 Church Street
New York, NY 10007
Phone: 212.356.2032 / 212.356.2276
Fax: 212.356.2038
zcarter@law.nyc.gov
eproshan@law.nyc.gov
mash@law.nyc.gov

*Attorneys for Plaintiff the City of New York*

Sozi Pedro Tulante (*pro hac vice* forthcoming)
Marcel S. Pratt ((*pro hac vice* forthcoming)
Eleanor N. Ewing (*pro hac vice* forthcoming)
Benjamin H. Field (*pro hac vice* forthcoming)
CITY OF PHILADELPHIA LAW DEPARTMENT
1515 Arch Street, 17th Floor
Philadelphia, PA 19102
(215) 683-5000
sozi.tulante@phila.gov
marcel.pratt@phila.gov
eleanor.ewing@phila.gov
benjamin.field@phila.gov

*Attorneys for Plaintiff the City of Philadelphia*

Dennis J. Herrera (*pro hac vice* forthcoming)
Yvonne R. Mere (*pro hac vice* forthcoming)
Owen J. Clements (*pro hac vice* forthcoming)
SAN FRANCISCO CITY ATTORNEY'S OFFICE
Fox Plaza, 1390 Market Street, 7th Floor
San Francisco, CA 94102-5408
Phone: 415.554.3874
Fax: 415.437.4644
yvonne.mere@sfcityatty.org
owen.clements@sfcityatty.org

*Attorneys for Plaintiff the City and County of San Francisco*

1

<pre>
1                 UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
2                     ALEXANDRIA DIVISION

3
    THE CITY OF NEW YORK, ET AL.  )
4                                  )
                                   )
5        VS.                       )   1:17-CV-1464   CMH
                                   )
6                                  )   ALEXANDRIA, VIRGINIA
                                   )    APRIL 6, 2018
7                                  )
    THE UNITED STATES DEPARTMENT   )
8   OF DEFENSE, ET AL.             )
    _____)
9

10

11

12

13
    _____
14
              TRANSCRIPT OF MOTIONS HEARING
15        BEFORE THE HONORABLE CLAUDE M. HILTON
              UNITED STATES DISTRICT JUDGE
16   _____

17

18

19

20

21

22

23

24  Proceedings reported by stenotype, transcript produced by

25  Julie A. Goodwin.
</pre>

1                        A P P E A R A N C E S

2

3  FOR THE PLAINTIFF:
          PILLSBURY WINTHROP SHAW PITTMAN LLP
4         By:  MR. KENNETH W. TABER
          1540 Broadway
5         New York, New York  10036
          212.858.1000
6         kenneth.taber@pillsburylaw.com

7
          PILLSBURY WINTHROP SHAW PITTMAN LLP
8         By:  MS. LAURA B. LOBUE
                   -AND-
9         MR. JEETANDER T. DULANI
          1200 Seventeenth Street NW
10        Washington, DC  20036
          202.663.8000
11        laura.lobue@pillsburylaw.com
          jeetander.dulani@pillsburylaw.com

12

13

14 FOR THE DEFENDANT:
          UNITED STATES ATTORNEY'S OFFICE
15        By:  MR. DENNIS C. BARGHAAN, JR.
          Deputy Chief, Civil Division
16        2100 Jamieson Avenue
          Alexandria, Virginia  22314
17        703.299.3700

18        U.S. DEPARTMENT OF JUSTICE, CIVIL DIVISION
          By:  MR. DANIEL HALAINEN
19        Trial Attorney, Federal Programs Branch
          20 Massachusetts Avenue, NW
20        Washington, DC  20530
          202.616.8101
21        daniel.j.halainen@usdoj.gov

22

23 OFFICIAL U.S. COURT REPORTER:
          MS. JULIE A. GOODWIN, CSR, RPR
24        United States District Court
          401 Courthouse Square
25        Alexandria, Virginia  22314
          512.689.7587

1  Mr. Dulani, will respond to those legal points on standing --

2          THE COURT:  All right.  Well, let me hear from him

3  then.

4          MR. TABER:  Good.  And then --

5          THE COURT:  Because I've heard enough argument on

6  the -- on the injunction.

7          MR. TABER:  Okay.  Thank you, Your Honor.

8          MR. DULANI:  Good morning, Your Honor.  Jeetander

9  Dulani --

10          THE COURT:  Good morning.

11          MR. DULANI:  -- for plaintiffs.  I'll briefly cover

12  three points here.

13          The question here that the defendants raise is do

14  the plaintiffs have standing?  And the answer is unquestionably

15  yes.  Can agency inaction here, which is what we're talking

16  about -- this is not an issue of an agency making a decision,

17  unless the government is telling us that they sat in a room and

18  decided to defy a clear congressional mandate, which I don't

19  think they've done.  This is their failure to act, which in

20  fact is enforceable under 706(1).

21          And do mandamus principles block this suit?  The

22  answer is no, because the defendants are again confusing the

23  standard from mandamus when this is an administrative action,

24  and clearly the Courts have repeatedly noted that in an

25  administrative context you look at the zone of interest.  It's

1  not an issue of does the statute give you a particular duty to

2  the plaintiff.  You look to the zone of interest.

3          So I'm going to briefly go through those, Your

4  Honor, and -- and I think the case law on this is quite clear.

5          So, as Mr. Taber articulated, the three plaintiffs

6  here have shown injury, in fact, because they regularly access

7  and use the NICS database every day to make decisions about who

8  should or should not be allowed to obtain a firearm.  And

9  the -- as the information that they rely on is the information

10 that defendants are obligated to provide.

11         And they talked about a legal entitlement, so I

12 want to make one point that I think is really critical here,

13 Your Honor.  In the Supreme Court in *Norton v. Southern Utah*

14 *Wilderness* said clearly, Courts can compel agency action when,

15 quote, an agency failed to take a discrete agency action that

16 it is required to take.  That is exactly what 706(1) allows

17 for.

18         This discrete action is quite simple.  They have to

19 submit all of these names no less than quarterly.  We're not

20 asking for them, and we have not alleged, that we care about

21 what the Navy or the Army or the Air Force does in terms of how

22 they collect.  We are not trying to direct them about how they

23 should be doing their job.

24         They have a duty.  They have missed that quarterly

25 deadline for the last 20 years.  And their own papers show it;

23

1  their own testimony shows it.  So this is a discrete action

2  that they can in fact be compelled to take, and it's a

3  ministerial act.

4         Now, the Court in *Norton* was very helpful.  And one

5  of the things that they said was that when you have a discrete

6  agency action that's demanded by law, that, of course,

7  includes -- and I'm quoting here -- includes, of course, agency

8  regulations that have the force of law.

9         So, it simply does not pass any muster to say that

10  their duty is to the Attorney General, Your Honor.  There's an

11  entire regime of background checks here, and I want to direct

12  Your Honor to -- to a couple of -- a couple of those

13  regulations.

14         The very purpose of NICS is to -- is to facilitate

15  these background checks, and the regulations confirm that.

16  28 C.F.R. 25.6(j)(i) says, one of the express purposes of NICS

17  is to, quote, provide information to local criminal justice

18  agencies in connection with the issuance of a firearm-related

19  permit or license.  28 C.F.R. 25.6(d), the NICS will provide

20  POCs - which are plaintiffs here - with electronic access to

21  the system virtually 24 hours each day through the NCSE

22  Communication Network.

23         This is not a bare procedural violation.  It's not

24  divorced from concrete harm.  This is not an inner agency

25  squabble.  Plaintiffs are injured.  They have a right to this

1 information.  Defendants have a legal obligation to provide

2 this information.

3       Your Honor, if they did not have a legal

4 obligation, why is the Inspector General testifying before

5 Congress?  Why are these reports being written?  It doesn't

6 make any sense.  If your duty is to the Attorney General, I

7 would submit that you wouldn't be doing any of this.  You would

8 be fighting with the Department of Justice and saying, hi, we

9 don't have to give this to you.  The fact we didn't give you

10 all of it is -- is of no consequence.

11       And let's be clear, Your Honor, the statute and the

12 regulations do not say that the DoD gets to pick that they're

13 going to submit 25 percent, 50 percent, 75 percent.  When you

14 look at those OIG reports, what you find is when you go

15 function by function some of those functions actually were 75

16 percent deficient, 95 percent deficient.  That's not enough.

17       And again, we are not asking the Court, nor are we

18 asking the Court to allow us to supervise any of that

19 collection.  That's their job.  We're simply asking the Court

20 under 706(1) to compel the discrete agency action that this

21 Court is allowed to -- to compel because they have a duty to

22 report quarterly; simple, full stop.

23       Now, they have argued -- I think I've explained the

24 APA point and the -- and the injury point.  They've also talked

25 about mandamus.  And on mandamus, I'd like to draw the Court's

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

LUCAS CALIXTO, *et al*.,

               Plaintiffs,

   vs.

DEPARTMENT OF THE ARMT, *et al*.,

               Defendants.

Civil Action No. 18-1551 (ESH)

## ORDER

Upon consideration of Defendants' Rule 12(b)(1) motion to dismiss the Second Amended Class Action Complaint (ECF No. 61) for lack of subject matter jurisdiction and for good cause shown, it is hereby ORDERED that the motion is GRANTED.

It is further ORDERED that Plaintiffs' motion for class certification and for appointment of class counsel are DENIED as moot.

IT IS SO ORDERED.

Dated: _____

                                       _____
                                       ELLEN S. HUVELLE
                                       Senior United States District Judge