**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LUCAS CALIXTO, *et al.*, | ) |
| | ) |
| PLAINTIFFS, | ) **Case No. 1:18-cv-01551-ESH** |
| | ) |
| v. | ) |
| | ) **HEARING REQUESTED** |
| UNITED STATES DEPARTMENT OF THE ARMY, *et al.*, | ) |
| | ) |
| DEFENDANTS. | ) |

**REPLY MEMORANDUM IN SUPPORT OF
PLAINTIFFS' RENEWED MOTION FOR CLASS CERTIFICATION
AND APPOINTMENT OF CLASS COUNSEL**

Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Kayla Stachniak Kaplan (D.C. Bar No. 996635)
Neaha P. Raol (D.C. Bar No. 1005816)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:  (202) 639-7003
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT .......................................................................................................................4

I.   The "Sub-Class 1" Claims Are Ripe, and Their Review Should Not
     Be Postponed .........................................................................................................4

     A.   Sub-Class 1 Members Exist and Are Suffering Very Real and
          Serious Hardship...........................................................................................5

     B.   Reviewing the Adequacy of the October 26 Policy Now Does
          Not Harm the Army, and the Harm to Plaintiffs and Putative
          Class Members Outweighs Any Interest of Defendants in
          Postponement................................................................................................8

     C.   Postponement Would Not Benefit the Court, and the State of the
          Administrative Record Is Irrelevant to the "Ripeness" Question ..............11

     D.   The October 26 Policy Is a Reviewable Final Agency Action,
          Even Without Full Implementation, Including Because It Is
          Facially Unlawful.........................................................................................12

     E.   This Court Already Determined That the Complaint Is Not
          Deficient.......................................................................................................15

     F.   Defendants' Knowledge of USCIS's Treatment of
          "Uncharacterized" Discharges Requires Prompt Review of
          Defendants' Discharge "Process" ...............................................................16

II.  The Court Should Grant Class Certification .........................................................17

     A.   Plaintiffs' Class Certification Request Is Appropriate and Does
          Not Improperly Implicate a Merits Decision ..............................................17

     B.   Sub-Class I Members Exist.........................................................................19

     C.   There Are "Live" Claims, and Named Plaintiffs Are Adequate
          Class Representatives...................................................................................19

     D.   Defendants' False Distinction between DTP and DEP MAVNI
          Soldiers Does Not Defeat Commonality or Typicality.................................22

E.    Defendants Focus on Distinctions Among the Reasons for
      Discharges Is Meaningless for Class Certification
      Purposes ................................................................................................... 24

CONCLUSION ....................................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ciba-Geigy Corp. v. EPA*,
   801 F.2d 430 (D.C. Cir. 1986) ............................................................................12

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ..............................................................................................18

*Del Monte Fresh Produce Co. v. United States*,
   570 F.3d 316 (D.C. Cir. 2009) ............................................................................20

*DL v. Dist. Of Columbia,*
   302 F.R.D. 1 (D.D.C. 2013) ..................................................................................4

*Duggan v. Bowen*,
   691 F. Supp. 1487 (D.D.C. 1988) ...............................................................8, 13, 16

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ............................................................................................18

*Garza v. Hargan*,
   304 F. Supp. 3d 145 (D.D.C. 2018) ....................................................................20

*Gutierrez v. Johnson & Johnson*,
   467 F. Supp. 2d 403 (D.N.J. 2006) .....................................................................18

*Kirwa v. United States Dep't of Def.,*
   No. CV 17-1793 (ESH)(RMM) (D.D.C. Oct. 25, 2017) ............................... *passim*

*Littlewolf v. Hodel*,
   681 F. Supp. 929 (D.D.C. 1988) .........................................................................25

*Manker v. Spencer*,
   329 F.R.D. 110 (D. Conn. 2018) .........................................................................18

*Nio v. United States Dep't of Homeland Sec.*,
   323 F.R.D. 28 (D.D.C. 2017) ......................................................................... *passim*

*Powell v. McCormack*,
   395 U.S. 486 (1969) ............................................................................................19

*Ramirez v. United States Immigration & Customs Enf't*,
   338 F. Supp. 3d 1 (D.D.C. 2018) ............................................................18, 24, 25

*R.I.L.-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ........................................................................19

*Robidoux v. Celani*,
    987 F.2d 931 (2d Cir. 1993).....................................................................................4

*Thorpe v. District of Columbia*,
    916 F. Supp. 2d 65 (D.D.C. 2013) ........................................................................21

*Tiwari v. Mattis*,
    No. C17-00242-TSZ (W.D. Wash.) .......................................................................14

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ...............................................................................................18

**Statutes & Rules**

8 U.S.C. § 1440 ...............................................................................................................2

10 U.S.C. § 513 .............................................................................................................23

10 U.S.C. § 12013 .........................................................................................................23

10 U.S.C. § 12685 .........................................................................................................16

Fed. R. Civ. P. 23 .................................................................................................. *passim*

## INTRODUCTION

Defendants' opposition to class certification ignores three critical facts:  (1) In response to the allegations and facts adduced by Plaintiffs, Defendants have presented no facts or evidence that any named Plaintiff or proposed class member received the process due to them under military regulations and the Constitution before the Army took steps to discharge them from the military; (2) Defendants have admitted that certain Plaintiffs and hundreds of proposed class members who already have been "fully" discharged will not (absent judicial order) be accorded any relief or due process, even under the "new" October 26 Policy; and (3) in the more than ten months since this action commenced, Plaintiffs and proposed class members have suffered and are continuing to suffer the effects of Defendants' summary discharge policy for MAVNIs.  These circumstances cannot be ignored or dismissed.  They form the foundation for the claims in this action.  They make the complaint allegations ripe for resolution.  And they tie the Plaintiffs and the putative class members together with a common theme and central claim:  The Army targeted these MAVNI soldiers for summary discharge actions, denied them the due process mandated by law, and caused them harm.

Defendants seek to muddle this clear picture by straying beyond the Complaint's allegations and by attempting to identify, and in some instances create, distinctions among the soldiers that do not bear on the class claims.  But these efforts fall short of defeating class certification.  For purposes of the claims presented here, it makes no difference whether a soldier enlisted in the Army through the Delayed Training Program ("DTP") or the Delayed Entry Program ("DEP").  It also makes no difference whether a soldier was "fully" discharged, partially discharged, or simply slated for an "uncharacterized" discharge.  Nor is it of any relevance to the class certification inquiry what purported involuntary discharge ground the Army relied on for the

discharge actions.  What matters here is that Plaintiffs and every member of the proposed class was deprived of the process required by law in advance of the Army's discharge actions.  And this lack of notice has created substantial harm, including soldiers, military units, USCIS, and others lacking clarity on the basic question of their discharge status.  This confusion was entirely avoidable if only the Army had followed the law.  Among other adverse impacts, examples of the harm to these soldiers includes:

- criminal indictment for allegedly making false statements to USCIS about military separation status;

- exclusion from drilling (including with the threat of police involvement) even while worrying whether they will be punished for not attending drills;

- enhanced risk of deportation and removal proceedings;

- lapses in health insurance coverage;

- invoices and the threat of debt collection and credit ruin (for drilling beyond the supposed discharge date – including so-called "partial" discharge dates);

- denial of naturalization by USCIS on the basis of receiving "uncharacterized" discharges[1];

- inability to obtain the protection and work authorization of "Deferred Action" because USCIS will not recognize their status in the military;

- inability to access the information necessary to address and challenge the grounds for the Army's discharge activity against them;

- loss of a "national security" position;

---

[1]  USCIS is treating an "uncharacterized" discharge as disqualifying for naturalization under 8 U.S.C. § 1440 even though the military recognizes that, under law, regulation, and other authority, such a discharge is "under honorable conditions."

- harm to reputation; and

- anxiety that accompanies all of the above.[2]

These harms were preventable.  At a minimum, the Army's own regulations (had they been followed) are designed to provide the (currently-absent) notice, process, and clarity of action.  And, in the aftermath of the regulatory violations, some of these harms could have been mitigated by fully and actually reinstating the soldiers, clearly revoking the prior discharge orders/actions, and ensuring that the affected soldiers are provided the requisite processing moving forward.[3]

Defendants now seek to capitalize on the chaos they created to defeat class certification, claiming that "even if Plaintiffs were to prevail in this action, it would be unclear as to which proposed class members would be entitled to relief," Dkt. 89 at 1.  That argument is illogical.  *Each* class member would be entitled to the relief being sought here.  Defendants cannot avoid class certification by claiming that they will have a hard time identifying whether a MAVNI soldier received the requisite due process.  Defendants had no difficulty targeting these soldiers for summary discharge actions.  And to the extent they face challenges figuring out who they discharged in this manner (a claim that seems implausible and in any event is entirely unsupported at this juncture), that can be addressed as part of the remedy or relief and does not pose an impediment to class certification.

Given the hundreds of affected MAVNI soldiers and the commonality of their claims (*i.e.*, as victims of involuntarily discharge actions without requisite process), class action treatment is

---

[2]   Note that these harms are not being addressed by the Government voluntarily, even though Defendants are on notice of them.  Defendants' assertion that such issues will be cured through a soldier's direct point of contact in the military has proven untrue.

[3]   In this regard, it is worth noting that soldiers who were subject to discharge actions on the basis of an adverse MSSR or MSSD and would have been fully discharged or remained discharged, but for this lawsuit, have now received favorable MSSDs once the Army reviewed their cases.

an appropriate vehicle to litigate and remedy Defendants' unlawful behavior.[4]  Indeed, the notion

that each of these hundreds of soldiers would have to launch individual lawsuits to challenge the

same summary discharge policy is precisely what class action status is meant to avoid.

## ARGUMENT

### I.     The "Sub-Class 1" Claims Are Ripe, and Their Review Should Not Be Postponed

As Defendants appear to acknowledge, the standard for ripeness involves examining and

balancing two factors: (1) the hardship to Plaintiffs (and putative class members) of withholding

consideration of their claims, and (2) the fitness or suitability of the issues for judicial decision

(*e.g.*, whether the Court or Defendants would benefit from postponing review in order to allow for

sufficient "crystallization" of the policy in question).  Dkt. 89 at 10-11.  Here, Plaintiffs' and the

putative class members' interests in prompt adjudication of the legal issues impacting them

outweigh any interest by Defendants in "crystallizing its policy" through further implementation.

The October 26 Policy has been issued and is a final agency action, and the negative impact of

Defendants' Policy and the related practice already is being felt by certain Plaintiffs and the

putative sub-class 1 members.  Moreover, the October 26 Policy is facially defective and no further

implementation of the policy or postponement of this litigation will change the pure legal questions

---

[4]     It is worth noting that while Defendants first strenuously opposed class certification in the related *Nio* and *Kirwa* cases, they now frequently point to those class actions as a basis to prevent any individual MAVNI's lawsuit, claiming that the individual soldier's claims necessarily overlap with the *Nio* case.  Here, Defendants may be gambling on the prospect that if class certification is denied, many putative class members will not have the wherewithal or resources to challenge the Defendants' summary discharge policies and practices individually, meaning that most of the Army's summary discharge activity would go unchallenged.  Yet, as noted above, any such hardship just bolsters the case for class action status here.  *See DL v. Dist. of Columbia*, 302 F.R.D. 1, 11 (D.D.C. 2013) (factors to be considered in class certification include "financial resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members" (quoting *Robidoux v. Celani*, 987 F.2d 931, 936 (2d Cir. 1993)).

before the Court.  At the same time, postponement will exacerbate the harm these soldiers are facing due to (1) their lack of full reinstatement, (2) the fact that the Army has not fully revoked the discharge actions (or provided evidence of such revocation),  and (3) the Army's continued refusal to treat these soldiers as current military service members.

### A.  Sub-Class 1 Members Exist and Are Suffering Real and Serious Hardship

Defendants argue that sub-class 1 is "devoid of members," claiming that soldiers subject to the October 26 Policy have not been discharged, have had their discharges revoked,[5] or are subject to reinstatement offers,[6] and thus "have not suffered an injury in fact" and have "articulated no hardship." Dkt. 89 at 12-13, 18.  Defendants are wrong and their assertions convey an ignorance or indifference to the suffering of these soldiers.  Even assuming that some soldiers were not "officially" or "fully" discharged, that two soldiers have had their discharges revoked, and that other soldiers have been offered reinstatement under the October 26 Policy, the injuries to these proposed class members continue, including the following:[7]

---

[5]   Defendants' assertion that only two MAVNI soldiers have had their discharges revoked is contradicted by the *Nio* class report, which identifies many discharge revocations.  Perhaps Defendants mean to say that Plaintiffs Calixto and Djohi had their discharges revoked without the reinstatement offer process, but it is problematic that many MAVNI soldiers never have received discharge revocation orders and still are being treated, by Army personnel and USCIS, as if they are discharged.

[6]   Defendants' comment about a soldier "fail[ing]" to respond to a reinstatement offer, Dkt. 89 at 12, is unsupported and suspect.  Defendants should have to specify who was offered reinstatement and how that offer was communicated to any soldier who supposedly "failed" to respond.  To borrow a phrase from Defendants (and use it in an appropriate context), claiming that a soldier has "chosen to waive" the process offered under the October 26 Policy and has "indicated that she does not wish to be reinstated," *id*. at 12, when there is no proof that the soldier ever received the reinstatement offer is "no due process at all," *id*. at 18.

[7]   Plaintiffs will provide the Court with supporting documentation, including declarations, of each described harm upon request.  However, some of the harms are described in the declarations already filed by the Plaintiffs in this case.  *See* Dkt. 20 at Djohi Decl. ¶¶ 20-23; W. Li Decl. ¶¶ 17-18; Z. Li Decl. ¶¶ 13-14; Lu Decl. ¶¶ 25-28; Sambe Decl. ¶¶ 22-25; Qu Decl. ¶¶ 20-23.  Because Plaintiffs and putative sub-class 1 members have not been fully reinstated, have not had the discharge actions taken against them revoked, and have not been provided clear proof that they are

- One putative class member has been criminally indicted for allegedly making false statements to USCIS relating to her purported military discharge or separation. This individual never received a copy of a USARC discharge order and should have received a reinstatement offer had she been "fully" or "officially" discharged because she was told that the USAREC discharge activity against her was due to her background checks.

- Some putative sub-class 1 members are being treated as pariahs by their point of contacts in the Army, who refuse to communicate with these soldiers. This is despite Defendants' claim that all of these individuals are currently serving soldiers who either have not been fully discharged or, if fully discharged, have been offered reinstatement.

- Many putative class members have been barred from drilling, including where one MAVNI was threatened with police involvement when he tried to attend drill. Supposedly, the unit took this action because the MAVNI's N-426 said the same thing that many of the putative class members' N-426s say: The soldier has served honorably but "derogatory information has been found to require separation." This individual appears on the *Nio* reporting as having a "non-recommend" MSSD but not being the subject of a final "official" discharge by the Army. The Army already is treating him as if he has been discharged.

- Other proposed class members are concerned that they will face disciplinary or adverse personnel action if they do not drill. In October 2018, a named Plaintiff received a warning letter from her unit (after she had received a USAREC discharge order), claiming that she had unexcused absences and that under AR 135-191 she was required to attend all scheduled unit training assemblies. Notably, in the *Nio* reporting, she also is identified as

---

currently-serving members of the military, many of the described harms in these previously-filed declarations remain applicable, even nine months later and post-October 26 Policy.

having a non-recommend MSSD but not being the subject of a final "official" discharge by the Army.  These MAVNIs are left to guess as to the right course of action and are in a classic "Catch-22" situation.

- Similarly, certain Plaintiffs and putative class members still face Defense Financial Accounting Services ("DFAS") invoices and the threat of debt collection and credit ruin for allegedly drilling (and receiving Army pay as a result) beyond their supposed discharge dates, even as Defendants claim that they were never discharged from the Army but simply had a training reservation cancelled.[8]

- Some Plaintiffs and putative sub-class 1 members, including MAVNIs whom Defendants claim were never "officially" discharged, have experienced lapses in their medical insurance coverage (through the military) because of the Army's discharge activity.

- Some Plaintiffs and putative sub-class 1 members had their military-issued Common Access Cards ("CAC") taken away or disabled, leaving them with no proof that they are current military members, no access to base, and no access to certain electronic systems where their military records are maintained.

- Without proof of their current military status, MAVNIs find themselves at greater risk of deportation and removal proceedings.  And, it is no longer just "fully" or "officially" discharged MAVNIs who are the subject of removal proceedings – "currently-serving" MAVNIs who have sought asylum have had their applications initially denied and removal proceedings initiated.

---

[8]   Defendants have failed to communicate clearly with DFAS, USCIS, and the rest of the Army that these soldiers have not been and/or are not currently discharged.  Consequently, agency personnel are not listening to the soldiers and do not even accept Defendants' filed statements in this case and the related cases as "proof."

- MAVNIs are unable to gain protection and work authorization through "Deferred Action" because USCIS will not recognize that they remain in the military.

- MAVNIs do not know whether they have been discharged, whether they will be offered reinstatement, whether any discharge will be "revoked," why they are in line for discharge, or whether they will have the chance to respond to those alleged grounds.

- Because of the above, all Plaintiffs and putative class members are left uncertain and anxious about their futures.

These are non-speculative injuries in fact suffered by Plaintiffs and putative class members.

These injuries could be redressed by a favorable decision in this case because the injuries are the result of Plaintiffs and the putative sub-class 1 members having been subjected to some type of discharge activity by the Army,[9] even if not "officially" discharged at this time.  In other words, they are suffering the consequences of being "effectively" or "de facto" discharged. *Duggan v. Bowen*, 691 F. Supp. 1487, 1509 (D.D.C. 1988) ("There is no better party to challenge the agency's policy than this class of aggrieved individuals.  If defendants are arguing that there is *no* party that can challenge their administrative policies, that argument is rejected. . . [The agency] must be held accountable for its actions.  It is not above the law." (emphasis in original)).

  **B. <u>Reviewing the Adequacy of the October 26 Policy Now Does Not Harm the Army, and the Harm to Plaintiffs and Putative Class Members Outweighs Any Interest of Defendants in Postponement</u>**

Defendants claim that the Army would benefit from the postponement of review on the idea that it would allow the Army to actually consider MAVNI recruits prior to discharge in the

---

[9] Defendants, in this and related actions, have admitted that the MSSR, MSSD, and USAREC "training cancellation" are all steps in an "uncharacterized" discharge continuum.  *See, e.g.*, *Nio*, March 20, 2019 Tr. 17:7-20 (the discharge characterization "follows on the heels" of these other steps).

hopes of accessing those soldiers to the next level (*e.g.*, BCT in most instances) and "possibly allowing MAVNIs to continue serving." Dkt. 89 at 17.  But nothing in Plaintiffs' challenge seeks to restrict MAVNIs from continuing to serve or from the Army reconsidering their ill-founded MSSR/MSSD/NSD/discharge decisions for MAVNIs.

The examples identified by the Army only support Plaintiffs' case for immediate review. Without their status as named Plaintiffs in this litigation, Plaintiffs Izidike, Udeigwe, and Lu would not currently be in the Army and "cleared" for further accession.  Defendants admit as much by stating that "the Army has taken steps *since the beginning of this litigation* to access *three named plaintiffs*." Dkt. 89 at 17 (emphasis added).

Moreover, it is not clear why Defendants would offer these three examples in a section calling for the Court to take a hands-off, postponement approach *with respect to the October 26 Policy*.  SPC Lu never received a negative MSSD and was never subject to the October 26 Policy. Plaintiffs Udeigwe and Izidike never received adverse MSSR Notices and thus never provided any "mitigating" information under the October 26 Policy.  In other words, these Plaintiffs should not be touted as justification for allowing the October 26 Policy to play out or proceed to full implementation, as Defendants suggest.  Instead, their experiences bolster Plaintiffs' contention that had the military given these Plaintiffs and other MAVNI soldiers the process due under the law in the first instance, the military would have realized that the discharge actions were wholly unwarranted.  Absent a similar spotlight on the putative class members, through class certification (including for putative class members in sub-class 1) and on-going litigation, there is no reason for anyone to have confidence that Defendants' approach will be as "quick" or as favorable for the vast majority of affected MAVNIs.

The Army already has "postponed" this litigation on multiple occasions:  First, with its purported revocation of Lucas Calixto's discharge but refusal to extend that relief to other wrongfully discharged MAVNI soldiers; second, with its "suspension" of discharge actions (which the Court and Plaintiffs later learned was only a limited suspension[10]); third, with its development of a new policy that led to another complaint amendment and a renewed class certification motion; fourth, with its eleventh-hour request to defer briefing on the class certification motion; and, now, with its mishandled "implementation" of the October 26 Policy.  As admitted in their Opposition, Dkt. 89 at 17, and in this and related actions, the pace for supposed full implementation of the October 26 Policy would involve this Court "postponing" review of these issues (while Plaintiffs and putative class members suffer from "effective" discharge treatment) for another year or more. *See Nio*, 3/20/2019 Tr. 44:4-7 (Government admitted that "once they start to send out the notifications" the pace "will probably be around 30 a week or so."); 3/27/2019 Tr. 4:1-10 and 5:18-20 (Government acknowledged that there were approximately 1,000 soldiers in need of notification); *see also* Dkt. 84 at 1; Dkt. 89 at 17 ("the Army has just recently re-notified 30 MAVNI recruits").  *Since the October 26 Policy was issued, Defendants have sent out only thirty adverse MSSR notices*.  And, they have not completed the steps of the October 26 Policy for a single MAVNI soldier.  Clearly, so-called "full implementation" is not on the horizon, let alone at the Court's doorstep.  All told, Defendants effectively have postponed judgment in this case by ten months already, and they offer no end-date for the current proposed postponement.

Leaving these soldiers in limbo, and in harm's way, for an indefinite period of time is not justified.  Months ago in this case, the Court noted that any postponement of litigation is dependent

---

[10]   The Court warned Defendants that such behavior results in the Court questioning their credibility. Oct. 17, 2018 Tr. 81:4-8.

on Plaintiffs and putative sub-class 1 members being "reinstated pending the outcome of this litigation." The Court then cautioned that, "If that's not happening, then I have a problem on my hands[.]" 10/17/2018 Tr. 46:24-47:5. Plaintiffs submit that the Court does now have a problem on its hands. Thus, even if the Army had legitimate interest in further postponement, that interest easily is outweighed by the harm that Plaintiffs and putative class members face (as described above) without true reinstatement and revocation of any prior discharge orders.

### C. Postponement Would Not Benefit the Court, and the State of the Administrative Record Is Irrelevant to the "Ripeness" Question

Third, Plaintiffs suggest that the Court would benefit from postponing review of the October 26 Policy given that "[t]he administrative record relative to the policy is incomplete." Dkt. 89 at 17. But the October 26 Policy was issued by the Army on October 26, 2018, and the administrative record for that decision must, by definition, be complete. If Defendants now contend that each putative class members' MSSR/MSSD/NSD and discharge activity and all related documentation necessarily are part and parcel of the story here, Defendants should produce that information (or at the very least a listing of those documents to date) to Plaintiffs' counsel and the Court. Under the Local Rules, Defendants were required to provide that listing in January 2019 with their motion to dismiss, LCvR 7(n), and Defendants recently promised to provide the administrative record listing no later than the end of this month. In an April 22, 2019 email among counsel, Defendants made that promise to "file the certified list within 30 days of filing the Answer," without any mention of administrative record incompleteness, *only one day before* they filed their Opposition claiming incompleteness as a justification for postponement. And, Defendants have not contacted Plaintiffs to clarify or adjust that promise. Thus, the excuse that the administrative record is too incomplete to allow review is not well founded.

In addition, Plaintiffs have both "arbitrary and capricious" challenges under the Administrative Procedure Act and Constitutional challenges, including equal protection challenges, which allow for discovery beyond the agency administrative record. There is no reason to postpone the entire case because of alleged "administrative record" incompleteness, particularly if discovery could and should be proceeding in the meantime.

### D. __The October 26 Policy Is a Reviewable Final Agency Action, Even Without Full Implementation, Including Because It Is Facially Unlawful__

Defendants assert that any challenge to the October 26 Policy is premature and that this Court cannot certify a class because of the on-going implementation of the October 26 Policy. Dkt. 89 at 14. Defendants are mistaken. Agency policies do not have to be fully implemented in order to be challenged. The policy itself is a final agency action. *See Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435-37 (D.C. Cir. 1986) (finding complaint raised "a pure legal question as to what procedures [the agency] was obliged to follow" with respect to a party's right to a hearing and explaining that "[o]nce the agency publicly articulates an unequivocal position ... and expects [parties] to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review"). If implementation was a requirement, agencies would drag out implementation so that no policy could ever be challenged, or at least not before the harm to those impacted is irreparable and great. If Defendants were right, this Court would not have allowed the parties to litigate the *Nio* or *Kirwa* cases.

Beyond that, the October 26 Policy is challengeable *on its face,* especially given recent admissions by Defendants. The Complaint alleges that certain military regulations and instructions provide the due process requirements for these soldiers' discharges. With respect to sub-class 1 particularly, the Complaint includes reference to DoDI 5200.02 and AR 380-67. *See e.g.* Dkt. 1 at ¶¶ 17-19, 20-25, 29, 31, 33-34, 37; Dkt. 89 at 9 n.5 (Defendants admit that Plaintiffs claim in

the Complaint that individuals who receive unfavorable MSSDs are to be processed in accordance with DoDI 5200.02 and AR 380-67).[11]   Defendants now contend that the October 26 Policy intentionally omits any reference to these procedures and that they do not apply.  Dkt. 89 at 8 n.3, 9 n.5.  This alone is a basis for challenging the October 26 Policy, and one where it does not make sense to wait for the policy to be "fully implemented" as the Court's merits decision should result in Defendants having to start over (again) with their MSSR Notice process – which cannot possibly be in the best interest of Defendants who value the most "efficient" process, *Nio* Dkt. 246 at 1. And it is not in the best interest of MAVNIs, whose lives (including their naturalization applications) currently are on hold while the Army figures out how to make MSSDs.  *Duggan v. Bowen*, 691 F. Supp. at 1509 (finding the case ripe for review and noting that "[p]eople like plaintiffs [  ], who are seriously harmed by defendants' policy, and have no means to challenge that policy within the agency, cannot simply be consigned forever to ride the merry-go-round.").

The present question of "ripeness" is resolved by the facts pled in the Complaint and Defendants' admissions that the October 26 Policy does not provide these procedures. Defendants' attempt to draw distinctions between the MSSD and NSD process to justify their DoDI 5200.02 and AR 380-67 due process failures, Dkt. 89 at 8 n.3, are (1) arguments that should be tested in litigation and not a "ripeness" challenge, (2) not supported by any legal or factual citations, and (3) disproven by Defendants' own documents and statements.  Although it is not necessary for the Court to delve further into the merits at this stage, Plaintiffs will establish that the Army's policy of denying MAVNI soldiers the due process requirements found in DoDI 5200.02 and AR 380-67 should be set aside, not only because a plain reading of these military

---

[11]     This also puts to rest any claim by Defendants that the Complaint does not include a "proper challenge."  *See also* Section I.E. below.

authorities would have them apply to Plaintiffs and putative class members, but also because Defendants have admitted their application to MAVNIs, including DTP and DEP MAVNIs.

- DoDM 5200.02 has been referenced in the adverse MSSR notices (original and revised) sent pursuant to the October 26, 2017 memo. *See, e.g.*, Dkt. 70-1.

- In the Government reporting filed in the *Nio* case, DoD/Army listed AR 380-67 as the "authority" for the coded "JDK" or "Military Personnel Security Program" discharges, including for at least 8 Nio class members who are DTP soldiers. *Nio*, Dkts. 247-2 and 247-3. This same "JDK" coding was found on the discharge orders of Plaintiff Calixto and other putative class members. *See, e.g.,* Dkt. 2-2.

- Both NSDs and MSSDs are included on the "MAVNI/LPR FY17 Policy Flow 1 Bite" chart, including where one step in the process is described as "MSSD-R Positive NSD (Eligibility)." *See*, *Nio*, Dkt. 154-10 at 2.

- DoD has represented in court proceedings that all MAVNI soldier positions are national security positions. *See* Nov. 28, 2018 Trial Testimony of Stephanie Miller 125:1-15, *Tiwari v. Mattis*, No. C17-00242-TSZ (W.D. Wash.) ("Q. You referred to a national security position. What is a national security position? A. A national security position are all positions within the uniformed military services .… Q. And do individuals who enlist in the military via the MAVNI program hold national security positions? A. They do."). If a MAVNI receives a negative MSSD, he or she loses the national security position. If a MAVNI receives a positive MSSD, he or she is allowed to remain in the national security position (and the NSD is just *pro forma* at that point). *Nio* March 20, 2019 Tr. 9:15-10:5.

14

The October 26 Policy also is ripe for review because the revised MSSR notices[12] being

sent are deficient.  The revised MSSR notices reference pages from an underlying report, such as

the counterintelligence focused security review report ("CI" or "CIFSR") but do not provide the

MAVNI soldier with language from those pages, excerpts from those pages, or copies of the

underlying report.  When one MAVNI soldier recently requested a copy of her report, she was

informed that she would have to gain access to the report through a FOIA request.  Surely due

process requires that a soldier be provided the information being used as the basis for negative

national security determination or discharge action, as the Complaint alleges.  *See e.g.,* Dkt 1 at ¶

22 (the MAVNI must be provided with "a comprehensive and detailed written explanation of the

basis for the unfavorable determination… and provide an explanation of the kinds and types of

information they could provide to support their appeal.").  Telling a soldier that he/she must make

a FOIA request is not adequate process.  Indeed, such requests rarely (if ever) lead to the provision

of material within the soldier's allowed MSSR response time of thirty days, such reports provided

through FOIA often do not have pagination that matches that referenced by Defendants in the

MSSR/MSSD/NSD process, and any information gained through FOIA often is redacted from a

soldier's view (while the same information would have to be provided to the soldier under the

military authority Plaintiffs cite in their Complaint).

Again, the October 26 Policy can and should be reviewed now to prevent further harm to

the soldiers and further delays caused by the Defendants' repeated misguided "fixes" and do-overs.

### E.  This Court Already Determined That the Complaint Is Not Deficient

Defendants refer to their denied Motion to Dismiss to support their claim that the sub-class

1 issues are not "fit" for review because Plaintiffs' claims are a "moving target" and that there is

---

[12]   These are revised versions resulting from Plaintiffs' notification of the deficiencies in the original versions to Defendants in January 2019.

not a "proper challenge" within the Second Amended Complaint.  Dkt. 89 at 13-14.  Because those arguments already have failed before this Court and received no elucidation in Defendants' Opposition, Plaintiffs reference their opposition to the Motion to Dismiss (Dkt. 78-1 at 1-3) as well as the references above to the Complaint allegations challenging Defendants' failure to provide the process described in various military authorities.

**F.   Defendants' Knowledge of USCIS's Treatment of "Uncharacterized" Discharges Requires Prompt Review of Defendants' Discharge "Process"**

Defendants need to promptly address the fact that USCIS is treating "uncharacterized" discharges as something less than "under honorable conditions" discharges.  If not before, since March 2019, the Army has been on notice of USCIS's policy in this regard.  *Nio,* March 20, 2019 Tr. 106:3-22.  Given that policy, the level of process due to these soldiers, all of whom are slated to receive "uncharacterized" discharges, has been raised.  While the October 26 Policy outlines a path to an "uncharacterized" discharge, it does not provide the process rights required under 10 U.S.C. § 12685 and DoDI 1332.14 for soldiers who will be subject to discharges that are treated as something less than honorable.[13]

*** 

Here, where Defendants are on notice of the injuries being suffered by Plaintiffs and putative sub-class 1 class members, even under the October 26 Policy, due to the Army's and others' treatment of these soldiers as "effectively" discharged or "de facto" discharged, and where Defendants have done nothing to prevent or remedy those hardships, there is no justification for further postponement of review of Defendants' October 26 Policy and related discharge practices. *Duggan v. Bowen*, 691 F. Supp. at 1510 ("Defendants also argue that plaintiffs' claims are not ripe

---

[13]   Note that MAVNI DEP soldiers also are "members of a reserve component" per their enlistment contracts.  *See* Ex. 1.  Thus, any statutory and regulatory rights for reservists apply to both DTP and DEP MAVNI soldiers.

for judicial review because further administrative proceedings are necessary to develop the facts [and] plaintiffs have alleged no present, direct and immediate injury that would warrant judicial review. . . . without the acquiescence of the leadership of [the agency], the agency's administrative process is incapable of providing the relief sought by plaintiffs.  [The agency's] policy is final. Further processing of individual cases would serve no purpose but to cause plaintiffs further irreparable harm.  This case is ripe.").

## II.     The Court Should Grant Class Certification

This action presents a central question common to hundreds of putative class members and Plaintiffs:   Can the Army lawfully discharge MAVNI soldiers – through an involuntary administrative discharge without a characterization – without following the mandatory procedures laid out in Army and DoD Regulations and without otherwise affording discharged soldiers the process that is due under the U.S. Constitution?   Addressing this key question through class certification will promote judicial economy and the efficient use of party resources.  Each Rule 23(a) requirement – numerosity, commonality, typicality, and adequacy – is present here, as demonstrated in Plaintiffs' class certification motion.  *See* Dkt. 62.  The requisite Rule 23(b) requirement also is present because separate actions by individual class members could lead to inconsistent and varying adjudications and, alternatively, final injunctive and declaratory relief is appropriate and would apply to the class as a whole.  Dkt. 62 at 15-18.

### A.   Plaintiffs' Class Certification Request Is Appropriate and Does Not Improperly Implicate a Merits Decision

Defendants argue that the Court should not certify the Class because doing so would require the Court to "decide the merits of the case even before the issues have been properly litigated."  Dkt. 89 at 22.  But there is nothing improper with the merits being implicated in class certification.  Instead, a class certification "analysis will frequently entail 'overlap with the merits

of the plaintiff's underlying claim.'  That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'"  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33-34 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)) (finding error in court's refusal to entertain certain arguments as to class certification because they would also be pertinent to the merits determination).

Indeed, the validity of the forty-five-year-old case that Defendants rely on in their argument on this point, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), has been questioned in light of the more recent Supreme Court precedent (explicitly providing for a look beyond the pleadings and into the merits as necessary) in *Comcast* and *Wal-Mart*.  *See, e.g.*, *Manker v. Spencer*, 329 F.R.D. 110, 116 (D. Conn. 2018) ("Since … *Eisen*, this rule has evolved to recognize that class certification analysis may sometimes require a Court to resolve a merits dispute."); *Gutierrez v. Johnson & Johnson*, 467 F. Supp. 2d 403, 407 (D.N.J. 2006) ("in later cases, the Supreme Court has moved away from" *Eisen*).

In addition, Defendants' argument that a class cannot be defined with reference to the unlawful action visited upon them (because it is a merits question as to whether it was unlawful) is wrong.  *See, e.g.*, *Ramirez v. United States Immigration & Customs Enf't*, 338 F. Supp. 3d 1, 49 (D.D.C. 2018) (rejecting argument that class could not be defined – "superficially, at least – by reference to success on the merits of Plaintiffs' claims").  Plaintiffs are alleging that, as MAVNI soldiers subject to receipt of "uncharacterized" discharges, they have been the target of summary discharge actions, which denied them due process.  There is nothing improper in defining the class in the same way that Plaintiffs identify themselves in the Complaint.  Moreover, if the class definition was not limited to soldiers alleging that discharge activity against them was without due

process, there is little doubt that Defendants would use that as an excuse to claim that the class definition is too broad and that class members and Plaintiffs are not similarly situated.

### B. Sub-Class 1 Members Exist

Defendants claim that all soldiers subject to MSSD discharge actions and thus subject to the October 26 Policy currently are serving in the Army because they (1) were never "officially" or "fully" discharged, (2) had their discharges revoked (Plaintiffs Calixto and Djohi only), or (3) have been offered (or purportedly will be offered) reinstatement. Dkt. 89 at 24-25. For the reasons discussed in Section I.A. above, Defendants' claim does not void the putative sub-class 1. Defendants offer no proof for their statements that the individuals in their self-defined categories cannot be class members, while Plaintiffs have identified a host of incidents illustrating that soldiers in the proposed sub-class 1 are not being identified as currently-serving soldiers and are suffering harms from being "effectively" or "de facto" discharged.

### C. There Are "Live" Claims, and Named Plaintiffs Are Adequate Class Representatives

While Defendants cite to *R.I.L.-R v. Johnson* for the proposition that "[t]he plaintiffs must also show that a named plaintiff has a live claim," Dkt. 89 at 20, the case stands for the exact opposite principle. In *R.I.L.-R*, the court provisionally certified a class even though the named plaintiffs' claims were moot at that stage. 80 F. Supp. 3d 164, 183 (D.D.C. 2015) ("The period of allegedly unlawful detention at issue in this case is weeks or months — i.e., the period between ICE's initial denial of release and the point at which detained families are able to obtain IJ redeterminations. This period, while significant enough to create a cognizable injury, is too short for a court to be expected to rule on a certification motion. So long as the policy remains in effect, moreover, new asylum-seeking families are subjected to allegedly wrongful detention. The class population as a whole thus retains a continuing live claim." (internal citations omitted)). In *Powell*

*v. McCormack*, the other case cited by Defendants for this same proposition, the court found that the litigation (which was not a putative class action) should ***not*** be dismissed as moot because the plaintiff still had an unresolved challenge to an allegedly unconstitutional government act even after the congressional exclusion of the plaintiff at the heart of the claims had expired (such that he was reinstated to his seat).  395 U.S. 486, 498 (1969).

The nub of Defendants' argument appears to be that if a Plaintiff is "currently serving," then he or she has no remaining claim.  *See* Dkt. 89 at 24.  But that is not so.  This Court previously noted the following in response to the very same argument by Defendants:  "No one is mooted. ... They're not mooted.  They're not dismissed.  They're still plaintiffs."  10/17/2018 Tr. 71:7-10. Even so-called "currently serving" Plaintiffs already have suffered injury by being subjected to summary discharge actions (at least once) by Defendants, and Defendants' giving themselves a second bite at the discharge apple does not erase this original injury.  MAVNI soldiers who have been "reinstated" can continue to seek relief in the form of declaratory judgment for their previous injuries.  *See Garza v. Hargan*, 304 F. Supp. 3d 145, 159 (D.D.C. 2018) (explaining that a court is still able to grant relief to a named plaintiff who was previously injured by a policy because "the court is able to grant relief in the form of a declaration and permanent injunction addressing [the injurious] policy for the entire class").  *See also Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 321 (D.C. Cir. 2009) ("[A] plaintiff's challenge will not be moot where it seeks declaratory relief as to an ongoing policy.").

The fact that Defendants only now have overturned the improper discharge activity taken against ***some*** of the Plaintiffs, after Plaintiffs challenged the discharge activity, does not insulate Defendants from judicial review of their underlying policy that would leave each and every similarly-situated MAVNI soldier in the position of appealing the discharge activity taken against

them after the fact, rather than being given process in advance of the discharge.  *See Duggan v. Bowen*, 691 F. Supp. 1487, 1510 (D.D.C. 1988) (explaining that "[p]laintiffs are entitled to a fair and accurate initial determination [from the agency and] should not be regularly put to the tedious task of appealing to … overturn erroneous [ ] determinations" and that defendants' persistence in enforcing the challenged policy left the controversy "very much alive").  Indeed, attempts to moot out a class representative prior to a ruling on certification cannot defeat class certification.  *See Thorpe v. Dist. of Columbia*, 916 F. Supp. 2d 65, 66 (D.D.C. 2013) ("[W]hen the 'claims are live when filed but moot before the adjudication of the class certification motion,' courts have recognized an 'inherently transitory' exception to mootness where 'the population of the claimant population is fluid, but the population as a whole retains a continuing live claim.'" (quoting Newberg on Class Actions §§ 2:11, 2:13)); *see also Nio v. United States Dep't of Homeland Sec.*, 323 F.R.D. 28, 30 n.1 (D.D.C. 2017) ("Two of the named plaintiffs have been naturalized, but that does not render the claims of the class moot.").

Moreover, even putting aside Plaintiffs Sambe, Izudike, Lu, and Udeigwe, there is adequate class representation.   This Court previously has observed, "All you need is one class representative."  11/14/18 Tr. at 34:21; *see also id.* at 44:9-11 ("All you're looking for is a couple of people … you need one or two per class."); *id.* at 36:5-6; *id.* at 38:8-10.  Plaintiffs Calixto, Djohi, W. Li, F. Lu, and Qu remain subject to the October 26 Policy, a fact that Defendants admit, Dkt. 89-2 at ¶¶ 8-10, 12, 14.  Plaintiffs Z. Li and Dai remain discharged from the military and are not subject to the October 26 Policy, another fact that Defendants admit, 89-2 at ¶¶ 11, 17.[14]

---

[14]   In their Opposition, Defendants offer no proof or evidence that either one of these "sub-class 2" Plaintiffs was provided process in advance of the Army discharge action against him.

Finally, Defendants do not identify any true conflicts or any reason why these Plaintiffs or their counsel would not litigate this case vigorously as a class action. Instead, Defendants repeat that commonality and typicality do not exist because of factual differences between the soldiers. Plaintiffs address those alleged factual differences below.

### D. Defendants' False Distinction between DTP and DEP MAVNI Soldiers Does Not Defeat Commonality or Typicality

Defendants argue that typicality is no longer satisfied because they have offered reinstatement to the only named Plaintiff who is a DEP soldier. *See, e.g.*, Dkt. 89 at 27 ("DEP members cannot be a part of Plaintiffs' proposed class because Plaintiff Lu cannot adequately represent the class and is the only named Plaintiff who is also a DEP member"). Defendants omit mention of the fact that SPC Lu's reinstatement offer was extended only ***after*** she was added as a named Plaintiff.[15] But, more importantly, Defendants are wrong in their factual and legal assertions about commonalities between DEP soldiers and the putative class.

First, Defendants state, in an effort to distinguish DTP MAVNI soldiers from DEP MAVNI soldiers, that "[DEPs] have not yet taken the oath of enlistment to join the Army," Dkt. 89 at 7. That statement is false. DEP soldiers have taken the oath of enlistment. Not only is the enlistment oath expressly included in their written and executed enlistment agreements, *see* Ex. 1 at 2, but DEPs also attended oath ceremonies.[16] While Defendants try to diminish the standing of these soldiers by referring to them as "recruits," Defendants themselves admit that Army Regulations and statutes that apply only to those "enlisted" in the military apply to DEP MAVNIs. *See, e.g.*,

---

[15] Defendants mistakenly claim that Plaintiffs have not identified any other proposed class member with a claim common to that of SPC Lu. Dkt. 89 at 27. Defendants should have referred to Plaintiffs' briefing where Seongmin Kim was identified. *See* Dkt. 70 at 9 and Dkt. 73 at 5 n.5.

[16] For example, SPC Lu had an enlistment oath ceremony on the afternoon of January 19, 2016 in a room at the Miami MEPS.

Dkt. 89 at 7 (referencing to AR 135-178, which, by its title alone, applies to those "enlisted"), 4 n.1 (referencing 10 U.S.C. § 12013), 7 (referencing 10 U.S.C. § 513).   Similarly, Defendants misleadingly claim that "for all intents and purposes, [DEPs] are not serving in the Army."   Dkt. 89 at 7.   Again, Defendants ignore DEP soldiers' enlistment agreements, which include, *inter alia*, the following provisions: (1) "I also understand that the period of time while I am in the DEP is counted toward fulfillment of my military ***service*** obligation"; (2) the enlistment agreement "is more than an employment agreement.   It effects a change in status from civilian to military member of the Armed Forces"; (3) a DEP soldier currently is serving in a reserve capacity but can be ordered "to active duty" at any time (not only after graduation from BCT and AIT); and (4) a DEP soldier is subject to the Code of Military Justice.   *See* Ex. 1.   Thus, Defendants' attempts to distinguish DEP soldiers from DTP soldiers on the basis of enlistment status fail.

Second, the Court already has indicated that named Plaintiffs who are in the DTP may serve as adequate representatives for DEP class members.   *See* 11/14/18 Tr. at 44:23-24 (noting in discussion of how to identify representatives for a class including DEP soldiers that "the other alternative is they're *Nio* or *Kirwa* class people [comprised of DTP MAVNIs]"); *see also id.* at 39:23-24.   Plaintiffs' claims, whether DEP or DTP, arise from the same conduct by Defendants that provides the basis for all putative class members' claims, namely, the Army's failure to provide mandatory process for MAVNI discharge determinations.   Indeed, the Army itself does not make any relevant distinctions between DEP and DTP soldiers in the October 26 Memo.

Third, Plaintiffs do not define or limit their class to DEP and DTP class members.   For Plaintiffs, the class includes ***any*** MAVNI soldier who is subject to an "uncharacterized" discharge and meets the other elements of the class definition.   That would include DEP and DTP members, but it also would include, particularly for sub-class 2, "former" DTP and DEP MAVNIs who are

23

subject to discharge actions while at BCT, AIT, or before they logged 180 days of active duty service.  Thus, Defendants' attempt to distinguish DEP from DTP MAVNIs also is irrelevant because the class is not limited only to those two groups.

### E. Defendants' Focus on Distinctions Among the Reasons for Discharges Is Meaningless for Class Certification Purposes

In arguing that the putative class members are "so factually diverse" because of the supposed varied reasons for discharge, Dkt. 89 at 26,[17] Defendants ignore the common due process violation at issue, which is sufficient for class certification.  *See Ramirez v. United States Immigration & Customs Enf't*, 338 F. Supp. 3d 1, 46 (D.D.C. 2018) (finding commonality satisfied, despite different procedural postures and different statutory sources of authority for individual class members' detentions, because plaintiffs had identified a "single alleged practice" – the failure to comply with a requirement – "that provides the basis for every class member's injury").  In the related *Nio* case, this Court stated:

> The Court acknowledges the factual variations among class members [including the need for individualized and fact-specific inquiries as to DoD background checks], but finds that they do not impact the overarching questions common to the class: (1) Do defendants have the legal authority to implement these policies and practices? (2) Did defendants implement their new policies and practices in accordance with the strictures of the APA? and (3) Do these policies and practices otherwise violate the Constitution, the APA, or other applicable law? As the Supreme Court has explained, even a single common question can satisfy the commonality requirement.

---

[17]   In identifying a supposed "wide variety o[f] other reasons" for discharges, Dkt. 89 at 26 n.11, Defendants overlook the lengthy hearings before this Court last Summer and Fall where Defendants were unable to explain to the Court why Plaintiffs and putative class members actually were discharged, why the coding for discharges did not reflect the supposed reasons, or how anyone (including each soldier) was supposed to learn the actual grounds for any given discharge.

*Nio v. United States Dep't of Homeland Sec.*, 323 F.R.D. 28, 32 (D.D.C. 2017).   The same questions identified by this Court in *Nio* apply here, and any factual differences between class members do not restrict this Court's ability to certify a class in this case.

Likewise, the relief being sought by Plaintiffs and putative class members is common.   Despite Defendants' claims otherwise, Dkt. 89 at 28, 34, this action only seeks to have all putative Class Members afforded the due process to which they are entitled prior to discharge activity against them, not to have this Court make any military personnel decision about whether these individuals should actually be discharged at the end of that due process or not.   Any need for individualized discharge determinations ***by the Army*** does not defeat the commonality of the issues actually before this Court.   *See Ramirez*, 338 F. Supp. 3d at 48 ("While it is true that the statute demands such individualized determinations, in this suit Plaintiffs challenge Defendants' practice of failing to comply with the statutory provision at all.   They seek injunctive relief requiring only such compliance.   They do not seek a court order mandating any particular outcome with respect to any particular [individual].   That individualized determinations must be made under the statute does not preclude class certification."); *see also Littlewolf v. Hodel*, 681 F. Supp. 929, 938 (D.D.C. 1988) ("Defendants argue that the Court has no power to order such relief and, therefore, the requested alternative relief offers no ground for class certification.   But the propriety of class certification does not depend on the merits of the underlying suit; all the Court may consider is whether the movant has met the requirements of Rule 23.   Defendants' argument, therefore, fails to bolster its opposition to class certification." (internal citation omitted)).

## **CONCLUSION**

For these reasons, Plaintiffs' Motion should be granted.

Dated: May 7, 2019

Respectfully submitted,

_____ */s/ Douglas W. Baruch* _____
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Kayla Stachniak Kaplan (D.C. Bar No. 996635)
Neaha P. Raol (D.C. Bar No. 1005816)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:   (202) 639-7003
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs*

# Exhibit 1



# ENLISTMENT/REENLISTMENT DOCUMENT
# ARMED FORCES OF THE UNITED STATES

## PRIVACY ACT STATEMENT

**AUTHORITY:** 5 U.S.C. 3331; 10 U.S.C. 113, 136, 502, 504, 505, 506, 507, 508, 509, 510, 513, 515, 516, 518, 519, 972, 978, 2107, 2107a, 3253, 3258, 3262, 5540, 8252, 8253, 8257, 8258, 12102, 12103, 12104, 12105, 12106, 12107, 12108, 12301, 12302, 12304, 12305, 12405, 14 USC 351, 632; 32 U.S.C. 301, 302, 303, 304; and Executive Order 9397, November 1943 (SSN).

**PRINCIPAL PURPOSE(S):** To record enlistment or reenlistment into the U.S. Armed Forces. This information becomes a part of the subject's military personnel records which are used to document promotion, reassignment, training, medical support, and other personnel management actions. The purpose of soliciting the SSN is for positive identification.

**ROUTINE USE(S):** This form becomes a part of the Service's Enlisted Master File and Field Personnel File. All uses of the form are internal to the relevant Service.

**DISCLOSURE:** Voluntary; however, failure to furnish personal identification information may negate the enlistment/reenlistment application.

## A. ENLISTEE/REENLISTEE IDENTIFICATION DATA

| 1. NAME *(Last, First, Middle)*<br>LU<br><br>XING NMN | 2. SOCIAL SECURITY NUMBER<br><br>███████ |
|---|---|

| 3. HOME OF RECORD *(Street, City, County, State, Country, ZIP Code)*<br><br>████████████████ | 4. PLACE OF ENLISTMENT/REENLISTMENT *(Mil. Installation, City, State)*<br>MIAMI MEPS<br>DORAL, FL 33166-0000 |
|---|---|

| 5. DATE OF ENLISTMENT/<br>REENLISTMENT *(YYYYMMDD)*<br><br>20160119 | 6. DATE OF BIRTH *(YYYYMMDD)*<br><br>███████ | 7. PREV MIL SVC UPON ENL/REENLIST | YEARS | MONTHS | DAYS |
|---|---|---|---|---|---|
| | | a. TOTAL ACTIVE MILITARY SERVICE | | | |
| | | b. TOTAL INACTIVE MILITARY SERVICE | | | |

## B. AGREEMENTS

8. I am enlisting/reenlisting in the United States *(list branch of service)* ARMY RESERVE
this date for ___ 8 ___ years and ___ 0 ___ weeks beginning in pay grade ___ E-4 ___ of which
___ 4 ___ years and ___ 0 ___ weeks is considered an Active Duty Obligation, and ___ 4 ___ years and
___ 0 ___ weeks will be served in the Reserve Component of the Service in which I have enlisted. If this is an initial enlistment, I must serve a total of eight (8) years, unless I am sooner discharged or otherwise extended by the appropriate authority. This eight service requirement is called the Military Service Obligation. The additional details of my enlistment/reenlistment are in Section C and Annex(es) *(list name of Annex(es) and describe)* **A**

_____

**a. FOR ENLISTMENT IN A DELAYED ENTRY/ENLISTMENT PROGRAM (DEP):**
I understand that I am joining the DEP. I understand that by joining the DEP I am enlisting in the Ready Reserve component of the United States *(list branch of service)* ARMY _____ for a period not to exceed 365 days, unless this period of time is otherwise extended by the Secretary concerned. While in the DEP, I understand that I am in a nonpay status and that I am not entitled to any benefits or privileges as a member of the Ready Reserve, to include, but not limited to medical care, liability insurance, death benefits, education benefits, or disability retired pay if I incur a physical disability. I understand that the period of time while I am in the DEP is NOT creditable for pay purposes upon entry into a pay status. However, I also understand that the period of time while I am in the DEP is counted toward fulfillment of my military service obligation described in paragraph 10, below. While in the DEP, I understand that I must maintain my current qualifications and keep my recruiter informed of any changes in my physical or dependency status, qualifications, and mailing address. I understand that I WILL be ordered to active duty unless I report to the place shown in item 4 above by *(list date (YYYYMMDD))* **20160816 0600** for enlistment in the Regular component of the United States *(list branch of service)* ARMY for not less than ___ 4 ___ years and ___ 0 ___ weeks.

**b. REMARKS:** *(If none, so state.)* **NONE**

**c.** The agreements in this section and attached annex(es) are all the promises made to me by the Government. **ANYTHING ELSE ANYONE HAS PROMISED ME IS NOT VALID AND WILL NOT BE HONORED.**
*(Initials of Enlistee/Reenlistee)* X L.

*(Continued on Page 2)*

**DD FORM 4/1, OCT 2007**        PREVIOUS EDITION IS OBSOLETE

## C. PARTIAL STATEMENT OF EXISTING UNITED STATES LAWS

**9. FOR ALL ENLISTEES OR REENLISTEES:**

I understand that many laws, regulations, and military customs will govern my conduct and require me to do things under this agreement that a civilian does not have to do. I also understand that various laws, some of which are listed in this agreement, directly affect this enlistment/reenlistment agreement. Some examples of how existing laws may affect this agreement are explained in paragraphs 10 and 11. I understand that I cannot change these laws but that Congress may change these laws, or pass new laws, at any time that may affect this agreement, and that I will be subject to those laws and any changes they make to this agreement. I further understand that:

a. My enlistment/reenlistment agreement is more than an employment agreement. It effects a change in status from civilian to military member of the Armed Forces. As a member of the Armed Forces of the United States, I will be:

(1) Required to obey all lawful orders and perform all assigned duties.

(2) Subject to separation during or at the end of my enlistment. If my behavior fails to meet acceptable military standards, I may be discharged and given a certificate for less than honorable service, which may hurt my future job opportunities and my claim for veteran's benefits.

(3) Subject to the military justice system, which means, among other things, that I may be tried by military courts-martial.

(4) Required upon order to serve in combat or other hazardous situations.

(5) Entitled to receive pay, allowances, and other benefits as provided by law and regulation.

b. Laws and regulations that govern military personnel may change without notice to me. Such changes may affect my status, pay, allowances, benefits, and responsibilities as a member of the Armed Forces **REGARDLESS** of the provisions of this enlistment/reenlistment document.

**10. MILITARY SERVICE OBLIGATION, SERVICE ON ACTIVE DUTY AND STOP-LOSS FOR ALL MEMBERS OF THE ACTIVE AND RESERVE COMPONENTS, INCLUDING THE NATIONAL GUARD.**

a. **FOR ALL ENLISTEES:** If this is my initial enlistment, I must serve a total of eight (8) years, unless I am sooner discharged or otherwise extended by the appropriate authority. This eight year service requirement is called the Military Service Obligation. Any part of that service not served on active duty must be served in the Reserve Component of the service in which I have enlisted. If this is a reenlistment, I must serve the number of years specified in this agreement, unless I am sooner discharged or otherwise extended by the appropriate authority. Some laws that affect when I may be ordered to serve on active duty, the length of my service on active duty, and the length of my service in the Reserve Component, even beyond the eight years of my Military Service Obligation, are discussed in the following paragraphs.

b. I understand that I can be ordered to active duty at any time while I am a member of the DEP. In a time of war, my enlistment may be extended without my consent for the duration of the war and for six month after its end (10 U.S.C. 506, 12103(c)).

c. As a member of a Reserve Component of an Armed Force, in time of war or of national emergency declared by the Congress, I may, without my consent, be ordered to serve on active duty, for the entire period of the war or emergency and for six (6) months after its end (10 U.S.C. 12301(a)). My enlistment may be extended during this period without my consent (10 U.S.C. 12103(c)).

d. As a member of the Ready Reserve (to include Delayed Entry Program), in time of national emergency declared by the President, I may, without my consent, be ordered to serve on active duty, and my military service may be extended without my consent, for not more than 24 consecutive months (10 U.S.C. 12302). My enlistment may be extended during this period without my consent (see paragraph 10g).

e. As a member of the Ready Reserve, I may, at any time and without my consent, be ordered to active duty to complete a total of 24 months of active duty, and my enlistment may be extended so I can complete the total of 24 months of active duty, if:

(1) I am not assigned to, or participating unsatisfactorily in, a unit of the Ready Reserve; and

(2) I have not met my Reserve obligation; and

(3) I have not served on active duty for a total of 24 months (10 U.S.C. 12303).

f. As a member of the Selected Reserve or as a member of the Individual Ready Reserve mobilization category, when the President determines that it is necessary to augment the active forces for any operational mission or for certain emergencies, I may, without my consent, be ordered to active duty for not more than 365 days (10 U.S.C. 12304). My enlistment may be extended during this period without my consent (see paragraph 10g).

g. During any period members of a Reserve component are serving on active duty pursuant to an order to active duty under authority of 10 U.S.C. 12301, 12302, or 12304, the President may suspend any provision of law relating to my promotion, retirement, or separation from the Armed Forces if he or his designee determines I am essential to the national security of the United States. Such an action may result in an extension, without my consent, of the length of service specified in this agreement. Such an extension is often called a "stop-loss" extension (10 U.S.C. 12305).

h. I may, without my consent, be ordered to perform additional active duty training for not more than 45 days if I have not fulfilled my military service obligation and fail in any year to perform the required training duty satisfactorily. If the failure occurs during the last year of my required membership in the Ready Reserves, my enlistment may be extended until I perform that additional duty, but not for more than six months (10 U.S.C. 10148).

**11. FOR ENLISTEES/REENLISTEES IN THE NAVY, MARINE CORPS, OR COAST GUARD:** I understand that if I am serving on a naval vessel in foreign waters, and my enlistment expires, I will be returned to the United States for discharge as soon as possible consistent with my desires. However, if essential to the public interest, I understand that I may be retained on active duty until the vessel returns to the United States. If I am retained under these circumstances, I understand I will be discharged not later than 30 days after my return to the United States; and, that except in time of war, I will be entitled to an increase in basic pay of 25 percent from the date my enlistment expires to the date of my discharge.

**12. FOR ALL MALE APPLICANTS:** Completion of this form constitutes registration with the Selective Service System in accordance with the Military Selective Service Act. Incident thereto the Department of Defense may transmit my name, permanent address, military address, Social Security Number, and birthdate to the Selective Service System for recording as evidence of the registration.

*(Initials of Enlistee/Reenlistee)*   X. L.

**DD FORM 4/1 (PAGE 2), OCT 2007**

| NAME OF ENLISTEE/REENLISTEE *(Last, First, Middle)* | SOCIAL SECURITY NO. OF ENLISTEE/REENLISTEE |
|---|---|
| LU XING NMN | ███████████ |

## D. CERTIFICATION AND ACCEPTANCE

**13a.** My acceptance for enlistment is based on the information I have given in my application for enlistment. If any of that information is false or incorrect, this enlistment may be voided or terminated administratively by the Government or I may be tried by a Federal, civilian, or military court and, if found guilty, may be punished.

I certify that I have carefully read this document, including the partial statement of existing United States laws in Section C and how they may affect this agreement. Any questions I had were explained to my satisfaction. I fully understand that only those agreements in Section B and Section C of this document are recorded on the attached annex(es) will be honored. I also understand that any other promises or guarantees made to me by anyone that are not set forth in Section B or the attached annex(es) are not effective and will not be honored.

| b. SIGNATURE OF ENLISTEE/REENLISTEE | c. DATE SIGNED *(YYYYMMDD)* |
|---|---|
| *Xing Lu* | 20160119 |

## 14. SERVICE REPRESENTATIVE CERTIFICATION

a. On behalf of the United States *(list branch of service)* _____ ARMY _____ ,
I accept this applicant for enlistment. I have witnessed the signature in item 13b to this document. I certify that I have explained that only those agreements in Section B of this form and in the attached Annex(es) will be honored, and any other promises made by any person are not effective and will not be honored.

| b. NAME *(Last, First, Middle)* | c. PAY GRADE | d. UNIT/COMMAND NAME |
|---|---|---|
| ZAJONCZKOSKI MARK JOSEPH | E-7 | USA RECRUITING BATTALION |
| e. SIGNATURE | f. DATE SIGNED *(YYYYMMDD)* | g. UNIT/COMMAND ADDRESS *(City, State, ZIP Code)* |
| | 20160119 | MIAMI FL 33166 |

## E. CONFIRMATION OF ENLISTMENT OR REENLISTMENT

**15. IN THE ARMED FORCES EXCEPT THE NATIONAL GUARD (ARMY OR AIR):**
I, _____ XING NMN LU _____ , do solemnly swear (or affirm) that I will support and defend the Constitution of the United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the orders of the officers appointed over me, according to regulations and the Uniform Code of Military Justice. So help me God.

**16. IN THE NATIONAL GUARD (ARMY OR AIR):**
I, _____ , do solemnly swear (or affirm) that I will support and defend the Constitution of the United States and the State of _____ against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; and that I will obey the orders of the President of the United States and the Governor of _____ and the orders of the officers appointed over me, according to law and regulations. So help me God.

**17. IN THE NATIONAL GUARD (ARMY OR AIR):**
I do hereby acknowledge to have voluntarily enlisted/reenlisted this _____ day of _____, _____ in the _____ National Guard and as a Reserve of the United States (list branch of service) _____ with membership in the _____ National Guard of the United States for a period of _____ years, _____ months, _____ days, under the conditions prescribed by law, unless sooner discharged by proper authority.

| 18.a. SIGNATURE OF ENLISTEE/REENLISTEE | b. DATE SIGNED *(YYYYMMDD)* |
|---|---|
| *Xing Lu* | 20160119 |

## 19. ENLISTMENT/REENLISTMENT OFFICER CERTIFICATION
a. The above oath was administered, subscribed, and duly sworn to (or affirmed) before me this date.

| b. NAME *(Last, First, Middle)* | c. PAY GRADE | d. UNIT/COMMAND NAME |
|---|---|---|
| VACH PETR | O-3 | MIAMI MEPS |
| e. SIGNATURE | f. DATE SIGNED *(YYYYMMDD)* | g. UNIT/COMMAND ADDRESS *(City, State, ZIP Code)* |
| | 20160119 | MIAMI FL 33166-5407 |

*(Initials of Enlistee/Reenlistee)* X. L.

**DD FORM 4/2, OCT 2007**          PREVIOUS EDITION IS OBSOLETE.