# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LUCAS CALIXTO, *et al.*,<br><br>PLAINTIFFS,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE ARMY, *et al.*,<br><br>DEFENDANTS. | Case No. 1:18-cv-01551-ESH |

## PLAINTIFFS' RESPONSE TO DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Pursuant to the Court's June 10, 2019 Minute Order, Plaintiffs respectfully submit this response to the Defendants' sur-reply (Dkt. 101). The Court ordered a sur-reply from Defendants requesting support and details for certain of Defendants' assertions about variances among the proposed sub-class 2 members (Dkt. 96). As described below in Part I, Defendants' descriptions of differences between the putative sub-class 2 members are inaccurate and/or irrelevant to the present question. In addition, in Part II below, Plaintiffs address specific questions from the Court regarding Plaintiffs' proposed sub-class 1.

The critical commonality among each Plaintiff and every member of the proposed class is that he or she was denied (and/or still is being denied) the process required by law in advance of Army discharge actions. Given the hundreds of affected MAVNI soldiers who faced, and still face, the same coordinated treatment by the Army – *i.e.,* MAVNI soldiers targeted for unlawful, involuntary discharge actions without due process and the commonality of their resulting legal claims – class action treatment is appropriate and warranted.

1

I. **PROPOSED SUB-CLASS 2: DEFENDANTS' ASSERTIONS REGARDING PURPORTED NON-MSSD OR "OTHER" DISCHARGES ARE INCORRECT AND/OR IRRELEVANT TO THE QUESTION OF CLASS CERTIFICATION**

A. **Defendants Still Have Not Meaningfully Distinguished DEPs from DTPs**

Defendants first claimed that DEPs and DTPs were meaningfully different for class purposes because DEPs, unlike DTPs, simply are "recruits," who have not taken the oath of enlistment and have not "served." Dkt. 89 at 7. Plaintiffs demonstrated that those assertions were wrong, including through reference to the express language in the enlistment agreements of DEP soldiers (Dkt. 92 at 22-24), and Defendants seem to have abandoned that assertion. Now, Defendants make a different argument. They claim that, unlike DTPs, DEPs are assigned only to the United States Army Recruiting Command, and thus do not fall under the provisions of AR 135-178. (Dkt. 101 at 1-2). Yet, even while claiming that AR 135-178 does not apply to DEP MAVNIs and the process for DEPs and DTPs are meaningfully different, Defendants contradict themselves by affirmatively asserting the following:

- "Pursuant to the authority of Army Regulation 135-178, ¶ 1-11, the Commanding General of USAREC may order DEP and DTP . . ." Dkt. 101 at 4.

- "Under the same authority, the Commanding General of USAREC may delegate to the commander of a U.S. Army recruiting battalion separation authority for DEP, Reserve DEP, and DTP members." *Id*.

- "Requests for separation from the DEP or DTP are approved for valid reasons identified in AR 601-210 and AR 135-178 . . ." *Id*.

- "When a valid reason exists to separate a DEP or DTP from USAREC under AR 135-178 . . . , USAREC initiates a separation request using USAREC Form ('UF') 601-210.21 . . . ." *Id*. at 5.

- "The UF 601-210.21 must be signed by the DEP/DTP . . ." *Id*.

- For DEPs/DTPs, "Battalion Operations ('Bn Ops') 'will cancel the [training] reservation' and 'will publish appropriate separation orders within 14 days.'" *Id*. (quoting USAREC Reg. 601-210, Appx. I, ¶ I-4.a.(2)-(3)).

2

Thus, Defendants admit that DEPs and DTPs are to be provided the same process, at least up to a certain point, and that AR 135-178 "authority" applies to both DEPs and DTPs up until that point.

In addition, Defendants do not explain how the supposed "assignment" only to the USAREC allows them to ignore the plain language of AR 135-178 (and, thus, Defendants have avoided answering the Court's specific question about Chapter 3 notice requirements for DEP soldiers under AR 135-178 ¶ 14-7 (*see* Dkt. 96)). Below is an excerpt from Defendants' exhibit copy of AR 135-178 (Dkt. 101-3 at 75):

> **Section II**
> **Separation from the Delayed Entry Program**
>
> **14–5. Basis**
> A Soldier who enlisted in the USAR under the DEP in accordance with AR 601–210 must be processed for separation if they satisfy the conditions in paragraphs 14–5*a* or *b*, and may be processed for separation if they satisfy the conditions in paragraphs 14–5*c* or *d*.
>   *a.* Upon enlistment in the regular Army (para 5–4*a*).
>   *b.* On discovery that the USAR enlistment is defective. The Soldier will be processed for separation under para 7–3.
>   *c.* The Soldier is found to be ineligible for enlistment in the regular Army.
>   *d.* The Soldier declines enlistment in the regular Army and is not being ordered to active duty as a Reserve of the Army (10 USC 12103(b)).
>
> **14–6. Characterization or description**
>   *a.* The service of a Soldier discharged on the basis of paragraph 14–5*a*, is not characterized. (See DD Form 4 (Enlistment/Reenlistment Document Armed Forces of the United States), section G.)
>   *b.* The separation of a Soldier on the basis of paragraph 14–5*c* or paragraph 14–5*d*, will be described as an entry level separation and the service will be uncharacterized.
>
> **14–7. Procedures**
> When it is determined that a member of the DEP is unqualified for further military service or has requested separation, the Commander, U.S. Army RBN, will advise the Soldier, in writing, of the proposed separation and the reasons using the notification procedure (chap 3, sec II).

There can be no doubt under this express language that DEP soldiers are entitled to the notification procedures of Chapter 3 of AR 135-178.

In addition, that DEP-specific section of AR 135-178 *mandates* further process, beyond simple pre-discharge notification to the soldier, including an opportunity for the soldier to respond and the Army's "careful consideration" of any response or rebuttal *prior* to official discharge:

>   *c.* On receipt of the completed endorsement (see fig 3–2) from the Soldier, the Commander, U.S. Army RBN, will make the final determination for retention or separation from the USAR DEP. A careful consideration of the Soldier's statement or rebuttal is mandatory.
>   *d.* If the Soldier is not approved for retention or fails to respond within 30 days from the date of delivery, the authorities cited in paragraph 14–7*a*, will process the Soldier for discharge.
>   *e.* The discharge order (Format 500) will cite this paragraph and regulation as the authority.

Dkt. 101-3 at 75.  And, as shown above, only then can the discharge order be issued to a DEP, and the discharge order must cite AR 135-178 as the authority for the discharge.  Yet, Defendants defiantly protest that AR 135-178 does not apply to DEP soldier discharges.  In another ironic twist, while Defendants ignore the "DEP" references and provisions in AR 135-178 (and the Court's question regarding the same), they note that "[t]here is no specific reference to the 'DTP' in AR 135-178" but go on to explain why that separation authority applies to DTPs nevertheless (Dkt. 101 at 6).

In sum, for purposes of commonality among the sub-class 2 members who are challenging the wholesale lack of process attendant to their discharge actions, there is no meaningful distinction between the basic pre-discharge process that must be afforded DTP soldiers and the process that must be afforded DEP soldiers.[1]

### B. Defendants' Explanations of the Bases for Discharges, and the "Pre-Notification Procedures" for Each, Lack Clarity (Again)[2] and Are Irrelevant Because MAVNIs Are Being Denied Even the Most Basic Due Process

First, Defendants claim that "valid reasons" for DEP or DTP separation fall into three broad categories: "(1) the result of a request from a member of the DEP or DTP; (2) the discovery of an

---

[1]  Indeed, with respect to the proposed sub-class 1, the Army itself does not make any relevant distinctions between DEP and DTP soldiers in the October 26 Memo. Moreover, Defendants' repeated attempt to distinguish DEP from DTP MAVNIs also is irrelevant because the class is not limited only to those two groups. For Plaintiffs, the class includes *any* MAVNI soldier who is subject to an "uncharacterized" discharge and meets the other elements of the class definition. That would include, particularly for sub-class 2, "former" DTP and DEP MAVNIs who are subject to discharge actions while at BCT, AIT, and/or before they logged 180 days of active duty service.

[2]  To add to the ongoing confusion, Defendants identify only two regulations applicable to putative class member discharges and only certain "bases" for discharges, but offer no explanation for the fact that government reporting in the *Nio* case (a) does not identify either of these regulations, (b) identifies a number of other authorities for discharge actions, and (c) includes coding and discharge reasons that do not match those identified by Defendants here. Further, there is no explanation or reconciliation from Defendants for the reasons and authority found on MAVNI discharge orders (or "training cancellation" orders), which do not match Defendants' sur-reply.

erroneous or fraudulent enlistment; or (3) medical disqualifications." Dkt. 101 at 4-5.  However, none of these "reasons" appears to be relevant here.  Defendants do not explain how these reasons apply or why these categories are relevant to the class certification question before the Court.

Next, Defendants claim that the Regulation 601-210 contemplates at least sixteen specific bases for separation as well as an "other" basis, with each one requiring specific documentation and "sometimes" requiring different separation procedures.  Dkt. 101 at 5.  But, Defendants do not explain how those sixteen/seventeen bases or any variation among them are relevant to these soldiers.  Not only do the particular Regulation 601-210 provisions identified by Defendants on their chart (Dkt. 101 at 9) fail to illustrate meaningfully different discharge procedures for the putative class members (for example, Appx. I ¶¶ I-4 and I-11 primarily are about internal administrative data entry procedures), they once again call into question the Army's purported "bases" for discharging soldiers.[3]  Moreover, Defendants concede that under Regulation 601-210, *each* discharged soldier should have had the opportunity to sign (or refuse to sign) a UF 601-210.21.  That is a process/procedure applicable to the entire putative class (and one which was not meaningfully provided across the class based on the experience of the proposed class representatives, as discussed further in Subsection I.C. below, and per Plaintiffs' counsel's awareness of what putative class members have experienced).

---

[3]     Defendants cite Regulation 601-210 Appx. I ¶ I-7 as an applicable authority for their "refuse to enlist" discharges, which is by far the largest category of DEP discharges identified by Defendants (Dkt. 27-2).  However, Appx. I ¶ I-7 is limited to a soldier who fails to report/cannot be located or refuses to enlist in the Regular Army.  We know that the second reason does not apply to most of these DEP soldiers as Defendants have not offered them enlistment in the Regular Army (which for DEP soldiers, who enlisted in a Reserve component while in the DEP, now follows a positive MSSD and BCT shipment plans), and Defendants cannot plausibly claim that all of these DEP soldiers failed to report or could not be located, as Plaintiffs' counsel is aware of many DEP soldiers who purportedly "refuse[d] to enlist" per Army coding who did no such thing.

Defendants' next argument is that there are "significant differences in the pre-notification procedures and requirements for each chapter of AR 135-178." Dkt. 101 at 6.  While Defendants do not detail what those supposed "significant differences" are for the vast majority of the putative class members' discharges, even if they provided that detail, the supposed differences have no bearing on the sub-class commonality question in this case.  Plaintiffs' claim is that putative class members, regardless of the reasons or bases for their discharges are not being provided the required across-the-board notification and opportunity to respond, much less the "pre-notification" procedures attendant to their discharges.[4]

### C. **Defendants' Claim – That Due Process Was Provided to Each Soldier Who Received an "Other Reasons" Discharge – Is Unsupported and Wrong**

Defendants include the following heading in their sur-reply: "Each MAVNI Discharged for Non-MSSD Reasons, Including but Not Limited to Those Listed on ECF No. 27-2, Received the Procedures Required by the Applicable Regulations." Dkt. 101 at 9.  Defendants also assert in their sur-reply that "[t]o determine if a discharge was processed in accordance with regulation and therefore lawful, any review would have to include assessment of the propriety and lawfulness of the basis for discharge, the pre-notification procedural requirements (including counseling and

---

[4] If, as Defendants now contend, "[t]he Army processes discharges for all DEP and DTP recruits—to include MAVNIs—in accordance with the applicable regulations" and "MAVNI DEPs and DTPs are processed for separation in exactly the same manner as non-MAVNI recruits" (Dkt. 101 at 2), then the Army is violating the due process rights of soldiers beyond MAVNIs. Plaintiffs allege and believe that the Army is not treating MAVNIs in the same manner as non-MAVNIs, which is a central tenet of their Equal Protection claim.  At a minimum, however, discovery would be needed to test Defendants' assertions in this regard.  For present purposes, however, the Court is determining the appropriateness of class certification, and the fact that other soldiers are being unlawfully deprived of process by the Army (even if true) does not change the overall typicality and commonality of the claims among the putative class members.  Moreover, Defendants mischaracterize Plaintiffs' claims (Dkt. 101 at 3 n.3). To be clear, Plaintiffs argue that the same procedures should apply to MAVNIs and other soldiers, but are *not* being applied to MAVNIs.

rehabilitative efforts, the notification requirements, and whether the proper separation authority took action. *Id*. at 6. Thus, to make the assertion on page 9 of their sur-reply, Defendants must have engaged in the exercise described on page 6 of their sur-reply (and they must have engaged in that exercise recently, since their class certification opposition stated that it was "unclear" who would be entitled to relief in this action (Dkt. 89 at 1)).

If this exercise was conducted, Defendants should produce evidence of it so that Plaintiffs and the Court can assess the assertion. However, at present, Defendants have pointed to no such evidence, and there is every reason for this Court to question whether it exists at all. To be clear, on this record, there are no facts or evidence that would allow the Court to conclude that any named Plaintiff or proposed class member received the process due to them under military regulations and the Constitution before the Army took steps to discharge them from the military, and detailed allegations in the Complaint assert precisely Plaintiffs' position on that issue.

Notably, the "complete" administrative record produced by Defendants (*see* Dkt. 99-1 (Certified Index of Administrative Record)), which focuses only on the records of the individual plaintiffs, does not include a single UF 601-210.21 or a single Chapter 3 notice, much less evidence of individual counseling or other required "pre-notification" procedures. Beyond this, the "complete" record for Plaintiff Zeyuan Li does not even include a Reserve Command discharge order, and he has yet to receive a copy of one. According to this record, Plaintiff Z. Li not only has not been provided due process, he, contrary to Defendants' repeated assertions otherwise, has not been "fully" discharged but only has had his training reservation cancelled.

Finally, the one "example" Defendants purport to provide is not evidence of proper due process *in advance of* a discharge. There is no mention in the sur-reply or the administrative record of pre-discharge notification to Plaintiff Xing Lu. Had she received such notice, she readily could

have (and would have) told the Army that their records for her were incorrect. She would have been able to show the Army written evidence of what the record should have reflected. But, she was not given notice, and she was then discharged (according to the Army). It was only *after* she was added as a named Plaintiff in this lawsuit that any effort was made to correct these due process failures.

## II. PROPOSED SUB-CLASS 1: "REINSTATED" MAVNIS AND OTHER MAVNIS SUBJECT TO THE OCTOBER 26 POLICY SHOULD BE INCLUDED IN THE CLASS

Within the June 10, 2019 Minute Order, the Court asked Plaintiffs to address "whether their proposed sub-class 1 would include both 1) MAVNIs who were discharged before July 20, 2018 and are subject to the reinstatement offer described in paragraph 5 of the October 26, 2018 Memo, ECF No. [50-1], and 2) MAVNIs who have not yet been discharged but have received an unfavorable MSSR and will be subject to the procedures described in the October 26, 2018 Memo." Plaintiffs' intention is to include both "reinstated" MAVNIs and "unfavorable" MSSR MAVNIs in sub-class 1, as both (1) have suffered and are suffering injuries as a result of Defendants' discharge activity and (2) are being subjected to a facially invalid October 26 Policy.[5]

In a prior submission, Plaintiffs outlined ongoing harms to these soldiers, which included a lack of full reinstatement, the fact that the Army has not fully revoked prior discharge actions (or provided evidence of such revocation), and the Army's continuing refusal to treat these MAVNIs as current military service members. *See* Dkt. 92 at 2-4, 5-8. However, it is worth highlighting here how the Army's discharge activity to date for these soldiers (even if not current formal/final discharge orders) is not only stigmatizing, demoralizing, and anxiety-producing for each class member but has resulted in other, more tangible injury as well, including:

---

[5] To the extent further clarification is necessary in the class definition to ensure all such putative class members are included, Plaintiffs will propose the necessary language.

8

- criminal indictment for allegedly making false statements to USCIS about military separation status;

- exclusion from drilling (including with the threat of police involvement) even while worrying whether they will be punished for not attending drills;

- lapses in health insurance coverage;

- invoices and the threat of debt collection and credit ruin (for drilling beyond the supposed discharge date – including so-called "partial" discharge dates);

- denial of naturalization by USCIS on the basis of receiving "uncharacterized" discharges (including on the basis of only Recruiting Command "training cancellation" orders); and

- inability to obtain the protection and work authorization of "Deferred Action" because USCIS will not recognize their status in the military.

Nearly a year after this lawsuit was initiated, the Army has done nothing to cure these problems for "currently-serving" soldiers and instead has allowed them to be treated as if they have been discharged. Plaintiffs are not asking the Court to adjudicate these adverse consequences on an individual basis for each class member, but rather to vindicate their rights to the process that would halt and preclude them in the first instance.

In addition, the October 26 Policy applicable to both sets of MAVNIs is challengeable *on its face,* especially given admissions by Defendants that the procedures of DoDI 5200.02 and AR 380-67 purposefully were omitted from the October 26 Policy. Certain of these omissions are key, including the Army's obligation to provide the soldier with all supporting documentation (unless classified) for an adverse finding. As alleged in the Complaint, that is not happening under the October 26 Policy, and its absence disadvantages the soldiers both in appealing any adverse MSSR finding, but also in being able to address any USCIS questions based on DoD-provided information.

Just as troubling, the Army now appears to be trying to avoid all of its due process obligations related to members of this class by seeking "MSSR Waivers" from Plaintiffs and

putative class members.[6] These efforts by Defendants are much more widespread and problematic than revealed by Defendants, whose reporting on this issue (Dkt. 98) is woefully inadequate and inaccurate.[7]

## CONCLUSION

For these reasons and the reasons provided in Plaintiffs' prior briefing on this subject, this Court should certify the proposed class.

Dated: June 18, 2019

Respectfully submitted,

   */s/ Douglas W. Baruch*
Douglas W. Baruch (D.C. Bar No. 414354)
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Kayla Stachniak Kaplan (D.C. Bar No. 996635)
Neaha P. Raol (D.C. Bar No. 1005816)
Katherine L. St. Romain (D.C. Bar No. 1035008)
Fried, Frank, Harris, Shriver & Jacobson LLP
801 17th Street, NW
Washington, D.C. 20006
Telephone:  (202) 639-7000
Facsimile:   (202) 639-7003
Email: douglas.baruch@friedfrank.com
Email: jennifer.wollenberg@friedfrank.com

*Counsel for Plaintiffs*

---

[6] For DEP soldiers who have not been able to apply for naturalization because the military's current policy fails to recognize their service (in spite of the description of "service" within their enlistment contracts signed three years ago (Dkt. 92 at 23)), further MSSD delays – whether the result of flub-ups or intentional campaigns by the Army – cause extreme hardship because the soldiers are not able to attend one day of BCT, get an N-426, and apply for naturalization.

[7] The Army's "waiver" initiative is continuing, and Plaintiffs' counsel learn more about this effort on an almost daily basis. Plaintiffs intend to provide further information on these activities at or prior to the June 24, 2019 hearing.