IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| LUCAS CALIXTO, *et al.*, | |
| Plaintiffs, | **Case No. 1:18-cv-01551-PLF** |
| v. | |
| UNITED STATES DEPARTMENT OF THE ARMY, *et al.*, | |
| Defendants. | |

## **PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT**

Plaintiffs respectfully move this Court to grant Plaintiffs leave to file the proposed Third Amended Complaint, attached hereto.

In accordance with Local Civil Rule 7(m), the undersigned counsel for the Plaintiffs met and conferred with counsel for the Defendants regarding this Motion.  Defendants stated that they could not provide consent in advance of reviewing the attached proposed Third Amended Complaint.[1]

For the reasons set forth in Plaintiffs' Memorandum of Points and Authorities in Support of this Motion, leave to file the proposed Third Amended Complaint should be freely given, as directed by Federal Rule of Civil Procedure 15, so that Plaintiffs can supplement the allegations with additional conduct by Defendants that has occurred since the filing of the Second Amended Complaint and can add named plaintiffs representative of the putative class.

WHEREFORE, Plaintiffs respectfully request that this Motion be granted.

---

[1] Given timing constraints, including ongoing factual development in the days prior to this Motion, Plaintiffs were not in a position to provide Defendants with the proposed Third Amended Complaint in advance of this filing.

Dated: November 25, 2020

Respectfully submitted,

/s/ Jennifer M. Wollenberg
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Douglas W. Baruch (D.C. Bar No. 414354)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Tel: 202.739.5313
Fax: 202.739.3001
Email: jennifer.wollenberg@morganlewis.com
Email: douglas.baruch@morganlewis.com

*Counsel for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LUCAS CALIXTO, *et al.*,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>UNITED STATES DEPARTMENT OF THE ARMY, *et al.*,<br><br>　　　　　　Defendants. | **Case No. 1:18-cv-01551-PLF** |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................... 1

II.  BACKGROUND .................................................................................................. 4

    A.  The Original Complaint and Prior Amendments .................................... 4

    B.  Defendants' Post-Second Amended Complaint Conduct and the Proposed Third Amended Complaint ....................................................................... 5

III.  ARGUMENT ...................................................................................................... 7

    A.  Leave to File an Amended Complaint Should Be Freely Granted ......... 7

    B.  The Court Should Grant Plaintiffs Leave to File the Proposed Third Amended Complaint Under Rule 15 ....................................................... 9

IV.  CONCLUSION ................................................................................................. 12

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aftergood v. C.I.A.*,
   225 F. Supp. 2d 27 (D.D.C. 2002) ................................................................. 10

*Driscoll v. George Washington Univ.*,
   42 F. Supp. 3d 52 (D.D.C. 2012). ........................................................... 8, 9, 12

*Jackson v. Teamsters*,
   991 F. Supp. 2d 64 (D.D.C. 2013) ................................................................. 9

*Kas v. Financial General Bankshares, Inc.*,
   105 F.R.D. 453 (D.D.C. 1984) ..................................................................... 12

*Estate of Gaither ex rel. Gaither v. District of Columbia*,
   272 F.R.D. 248 (D.D.C. 2011) ..................................................................... 11

*Firestone v. Firestone*,
   76 F.3d 1205 (D.C. Cir. 1996) ...................................................................... 8

*Fund For Animals v. Hall*,
   246 F.R.D. 53 (D.D.C. 2007) .............................................................. 8, 10, 12

*Lannan Found. v. Gingold*,
   No. CV 13-01090 (TFH), U.S. Dist. LEXIS 176671 (D.D.C. Oct. 25, 2017) ........................ 9

*McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*,
   636 F. Supp. 2d 1 (D.D.C. 2009) ................................................................... 8

*Paxton v. Washington Hosp. Ctr. Corp.*,
   299 F.R.D. 335, 338 (D.D.C. 2014) ................................................................ 12

*Powell v. Internal Revenue Serv.*,
   263 F. Supp. 3d 5 (D.D.C. 2017) ............................................................... 8, 11

*Xingru Lin v. District of Columbia*
   319 F.R.D. 1 (D.D.C. 2016) .......................................................................... 7

*United States v. Hicks*,
   283 F.3d 380, 386 (D.C. Cir. 2002) .................................................................. 7

## Other Authorities

Fed. R. Civ. P. 15 ............................................................................. *passim*

Pursuant to Rule 15 of the Federal Rules of Civil Procedure, Plaintiffs, by and through their undersigned counsel, hereby file this Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Leave to File Third Amended Complaint.  A copy of the proposed Third Amended Complaint is attached as an exhibit to the Motion in accordance with Local Civil Rule 15.1.  For the reasons set forth below, Plaintiffs request that the Motion be granted.

## I.    INTRODUCTION

Plaintiffs are current and former United States Army soldiers who enlisted under the Military Accessions Vital to the National Interest ("MAVNI") program prior to September 2016 and served honorably in the military from the time of their enlistment until the Army undertook summary discharge action against them in contravention of the military regulations and law that require certain due process before an enlisted soldier can be separated from the Armed Forces.  In particular, beginning in late 2016, Defendant United States Department of the Army ("Army") targeted hundreds of MAVNI Selected Reservists and Regular Army soldiers for involuntary administrative discharge actions while they were still in entry-level status (*i.e.*, before they had served 180 days in active duty status).  Bypassing clear military regulations that control these types of discharges, and disregarding the fundamental due process rights of these enlisted personnel, the Army undertook these discharge actions unilaterally and without soldier notice and input.  In fact, in most instances, the affected soldiers received no advanced notice of the discharges and, in all instances, the soldier-victims were not informed of the effect that receiving an "uncharacterized" entry-level discharge would have on key aspects of their civilian life or given the ability to contest the discharge reasons or lack of characterization with that information in hand.  In other words, the discharges of these MAVNIs violated clear and binding military regulations designed to protect soldiers from these types of actions and the Army's conduct was otherwise unconstitutional.

The proposed Third Amended Complaint includes class action allegations, alleging a class

1

comprised of all MAVNI soldiers who were the subject of involuntary administrative discharge action by the Army after September 30, 2016, without being afforded due process (including adequate notice of the discharge grounds, an opportunity to respond, and due consideration of the soldier's response by the Army) and where such discharge was not characterized by the Army (*i.e.*, listed as "uncharacterized" or "entry-level"). While the basics of these class-wide allegations have remained consistent throughout this litigation, it is Defendants' reaction to this litigation with patchwork "solutions" and new procedures that have necessitated Plaintiffs' repeated need to amend the complaint, including the instant proposed amendment, in order to update the allegations and claims for relief to match the most recent situation.

Throughout the course of this litigation, Defendants repeatedly have altered their conduct in response to the allegations and modified their litigation positions in response to Plaintiffs' identification of their unlawful conduct, necessitating amendments to the operative complaint. First, after the original individual plaintiff initiated this action after having been discharged (purportedly) with no notice whatsoever and no opportunity to challenge the basis for any such discharge, Defendants admitted that that the original plaintiff had been denied due process and arranged for revocation of his discharge and his reinstatement. Plaintiffs amended the complaint to account for this action and also to add several similarly situated MAVNIs as plaintiffs who had likewise suffered from unlawful discharge action and to include class action allegations.

Defendants then suspended involuntary discharges of MAVNIs in July 2018 and issued a new policy on October 26, 2018 (the "October 26 Memo") in order to provide for the reinstatement for particular MAVNIs that encompass a certain category of Plaintiffs and the proposed class – those discharged because of negative Military Service Suitability Determinations ("MSSDs") – and for associated procedures by which those individuals would be given process and face future

discharge actions.  While Plaintiffs filed an amended complaint, with the Court's leave, shortly after that policy was implemented, the October 26 Memo had only been in effect for just over two months at that point and many aspects of it had not yet been implemented or tested.  Over the past nearly two years, Plaintiffs have experienced how the October 26 Memo has been put into practice by the Army and precisely how it has failed to provide adequate notice and process or to remediate the Army's unlawful discharge actions.

Meanwhile, in the time since the implementation of the October 26 Memo, the Court has allowed certain directed discovery into class certification with an eye toward Plaintiffs eventually amending the complaint again to add or remove named plaintiffs for class representation purposes. The proposed Third Amended Complaint does just that, removing some previously named plaintiffs and adding additional named plaintiffs/representatives who allege due process violations and harm based on when they suffered the unlawful discharge action and the Army's purported reason for the discharge.  As a result, the proposed Third Amended Complaint divides Plaintiffs subject to "uncharacterized" discharge actions into three categories: (1) MAVNI soldiers (both DTP AND DEP) discharged for MSSD reasons who are or should have been subject to the October 26 Memo; (2) MAVNI DEP and DTP soldiers discharged for other-than-MSSD reasons and thus not subject to the October 26 Memo; and (3) former DEP and DTP MAVNI soldiers discharged for other-than-MSSD reasons while still in entry-level status.[1]

## II.  BACKGROUND

### A.  The Original Complaint and Prior Amendments

A single plaintiff commenced this lawsuit on June 28, 2018 to challenge his discharge from

---

[1] Each of these categories has been a part of the class definition since first alleged in the Amended Complaint (Dkt. 19), as the Court previously has recognized. *See, e.g.*, 07/31/19 Status Hr. Tr. at 39:2-25; 41:16-42:24.

the United States Army, which proceeded against Army regulations and without due process.  Dkt. 1.  As alleged in the original complaint, that plaintiff purportedly was discharged with no notice whatsoever and with no opportunity to challenge the basis for that discharge.  Faced with a motion for preliminary injunction, the Army admitted that the plaintiff had been denied due process and arranged for the revocation of his discharge as well as his so-called reinstatement.  *See* Dkt. 17-1.

Plaintiff's counsel pointed out to Defendants that the problem reached beyond his personal situation, as numerous other MAVNI soldiers also had been discharged against Army regulations and without due process.  However, Defendants refused to engage in discussion or take action regarding anyone beyond the original plaintiff.

Accordingly, Plaintiffs amended their complaint as of right on August 3, 2018, adding seven similarly-situated MAVNIs as plaintiffs on behalf of themselves and a proposed class.  *See* Dkts. 19, 21.  Plaintiffs again sought a preliminary injunction.  On August 13, 2018, in lieu of responding, Defendants notified the Court that they had suspended the involuntary discharges of all MAVNIs as of July 20, 2018, pending the implementation of a new discharge policy.  *See* Dkt. 22.  Defendants also represented that they would reinstate six of the seven newly named Plaintiffs.[2] *Id.*  On the basis of Defendants' representations, the Court stayed the action pending the provision of further information by Defendants.  Dkt. 23.

On October 26, 2018, in response to this litigation, the Army issued the October 26 Memo, which sets forth procedures purportedly applicable to all MAVNI soldiers discharged based on

---

[2] Defendants refused to reinstate the seventh named plaintiff at that time.  But almost a year later after multiple sworn statements from Defendants asserting that he was discharged and would not be offered reinstatement, on July 19, 2019, Defendants admitted that they had been "mistaken" as the Army never actually discharged him.  *See* Dkt. 113.  Defendants' "mistake" resulted in harm to that soldier, including his placement in removal proceedings and the initial denial of his naturalization application based solely on his "uncharacterized" discharge.

adverse MSSDs.  *See* Dkt. 50 (attaching October 26 Memo).  These procedures include (1) written notification of the adverse military service suitability recommendation ("MSSR") and (2) an opportunity for soldiers to respond before the issuance of any MSSD or initiation of any separation according to Army regulations.  The October 26 Memo further provides that soldiers who had been discharged before July 20, 2019 would be offered reinstatement for the purpose of receiving the new notice and process.  Unfortunately, the Army's October 26 Memo provided only a partial solution for affected MAVNI soldiers as the new procedures only applied to the subset of MAVNIs discharged due to an adverse MSSD – those referred to as Category 1 in the proposed Third Amended Complaint – ignoring the sizable group of putative class members who were discharged for other reasons – those referred to as Categories 2 and 3 in the proposed Third Amended Complaint.

Based on the issuance of the October 26 Memo and Defendants' constant shifting of the landscape in response to the litigation, the Court set a deadline for Plaintiffs to file a further amended complaint.  Dkt. 55.  On January 2, 2019, Plaintiffs filed the Second Amended Complaint – naming additional plaintiffs and adding allegations acknowledging the issuance of the October 26 Memo – and renewed their motion for class certification.  Dkts. 61, 62.  On May 16, 2019, the Court denied Defendants' motion to dismiss.  Dkt. 95.

**B.**     **Defendants' Post-Second Amended Complaint Conduct and the Proposed Third Amended Complaint**

After the October 26 Memo was issued and the Court allowed an initial amendment to plead its existence, the Court recognized that further amendment was the appropriate course of action because it was premature at that juncture to determine whether the October 26 Memo procedures provided due process before they had actually been carried out vis-à-vis Plaintiffs.  *See, e.g.*, 07/31/19 Status Hr. Tr. at 46:23-47:4 ("you're going to amend anyways").  The Court also

5

recognized an information deficit with respect to the class action allegations and the identity of purported class members, prompting the Court to allow Plaintiffs to request certain discovery into class certification with an eye towards amendment.  *See* Dkt. 119.

Plaintiffs proposed that the Court order certain discovery and then grant leave to further amend the complaint to account for class information learned through this discovery and additional named plaintiffs and class representatives.  *See* Dkt. 120.  The Court ordered the requested discovery at the end of July 2019, including a process for the parties to exchange information on potential named plaintiffs through October 2019.  *See* Dkt. 123; 139; *see also* 09/11/19 Status Hr. Tr.  The parties then put the anticipated amendment by Plaintiffs on hold while they explored a mediated resolution of the disputes in early 2020, keeping the Court apprised of the mediation status.  *See* 01/21/20 Status Hr. Tr. at 8:7-10; 03/09/20 Status Hr. Tr. at 22:9-17.  As this Court is aware through recent extension requests, the parties continued their discussions even after the formal mediation in an (ultimately unsuccessful) attempt to narrow or resolve the disputes.

Now, Plaintiffs seek leave to amend the complaint just as the parties and the Court anticipated was the appropriate next step in this case following the October 26 Memo's issuance and limited discovery relevant to class certification.  First, the proposed Third Amended Complaint alleges new and continuing conduct following the actual implementation of the October 26 Memo in the time since the Second Amended Complaint was filed.  This implementation period has revealed that that the Army is not properly applying the October 26 Memo procedures to the Category 1 soldiers, including by (1) failing to ensure that eligible soldiers actually receive their reinstatement offers or that reinstatements and suspensions of discharges are actually effectuated, (2) failing to ensure that soldiers actually receive notifications of MSSRs, and (3) failing to ensure that the grounds for these MSSRs are set forth with enough detail to provide soldiers a meaningful

opportunity to respond.   Second, the Third Amended Complaint adds 13 additional named plaintiffs (and removes 7 formerly-named plaintiffs) in order to more clearly capture the three categories of Plaintiffs in the putative class, all of whom are united by the common fact that they are MAVNI soldiers who, since September 30, 2016, have been subjected to "uncharacterized" discharge actions without adequate process.

## III.   ARGUMENT

### A.   Leave to File an Amended Complaint Should Be Freely Granted

Generally, amendments based on events prior to the initial complaint fall within Federal Rule of Civil Procedure 15(a), while amendments prompted by conduct occurring after the commencement of the litigation are considered supplemental amendments under Rule 15(d).  *See United States v. Hicks*, 283 F.3d 380, 386 (D.C. Cir. 2002) (explaining distinction); *see also* Fed. R. Civ. P. 15(d) ("[T]he court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence or event that happened after the date of the pleading to be supplemented.").   Here, the proposed Third Amended Complaint falls under both types of amendments because it both adds additional plaintiffs – who have suffered from the same harm of discharge action without due process as the earlier-named plaintiffs – and adds allegations based on new conduct by Defendants that has occurred since the Second Amended Complaint was filed.

The standard for granting leave to amend is the same under either Rule 15(a) or Rule 15(d):

> [M]otions to amend under Rule 15(a) and motions to supplement under Rule 15(d) are subject to the same standard.  Under either, the decision is within the discretion of the district court, but leave should be freely given unless there is a good reason, such as futility, to the contrary.

*Xingru Lin v. District of Columbia*, 319 F.R.D. 1, 1 (D.D.C. 2016) (internal quotations and citations omitted).  Indeed, Rule 15(a)(2) directs that the "court should freely give leave" to amend a complaint "when justice so requires."  *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("[T]his

mandate is to be heeded." (citation omitted)); *McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 4 (D.D.C. 2009) (Huvelle, J.) ("The decision to grant leave to amend a complaint is left to the court's discretion, but the court must heed Rule 15's mandate that leave is to be freely given when justice so requires." (internal quotations and citations omitted)); *Driscoll v. George Washington Univ.*, 42 F. Supp. 3d 52, 56 (D.D.C. 2012) (Huvelle, J.) ("Rule 15 instructs courts to freely give leave to amend when justice so requires, and the rule is to be construed liberally." (internal quotations and citations omitted)).   As the Supreme Court has explained: "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits." *Foman*, 371 U.S. at 182.

Although leave to amend is committed to the discretion of the district court, denial is "inconsistent with the spirit of the Federal Rules" and amounts to abuse of discretion unless there is a sufficient reason for the denial, such as "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment ...." *Foman*, 371 U.S. at 182; *Firestone v. Firestone*, 76 F.3d 1205, 1208 (D.C. Cir. 1996) ("Although the grant or denial of leave to amend is committed to a district court's discretion, it is an abuse of discretion to deny leave to amend unless there is sufficient reason" for the denial).

Moreover, a Rule 15 motion should be "freely granted when doing so will promote the economic and speedy disposition of the entire controversy between the parties, will not cause undue delay or trial inconvenience, and will not prejudice the rights of any of the other parties to the action." *Powell v. Internal Revenue Serv.*, 263 F. Supp. 3d 5, 7 (D.D.C. 2017) (quotation and citations omitted).  "[T]he court has broad discretion in determining whether to allow supplemental pleadings in the interests of judicial economy and convenience." *Fund For Animals v. Hall*, 246

F.R.D. 53, 54 (D.D.C. 2007) (citations omitted); *Lannan Found. v. Gingold*, No. CV 13-01090 (TFH), U.S. Dist. LEXIS 176671, at *12-13 (D.D.C. Oct. 25, 2017) (Rule 15(d) motion "may be granted where it serves the interests of judicial economy and convenience" (citations omitted)).

Further, because leave to amend or supplement should be liberally granted, the party opposing amendment "bears the burden of showing why an amendment should not be allowed." *Driscoll*, 42 F. Supp. 3d at 57 (quotation and citation omitted); *see also Jackson v. Teamsters*, 991 F. Supp. 2d 64, 67 (D.D.C. 2013) ("the non-movant generally carries the burden in persuading the court to deny leave to amend" under Rule 15 (quotation and citation omitted)).

**B.     The Court Should Grant Plaintiffs Leave to File the Proposed Third Amended Complaint Under Rule 15**

The proposed Third Amended Complaint adds both new allegations based on facts and circumstances that have occurred since the filing of the Second Amended Complaint and new individual, representative named plaintiffs.  As such, Plaintiffs should be permitted to raise these allegations in this litigation via an amended complaint.[3]

Now that the October 26 Memo has been in effect for nearly two years, the proposed Third Amended Complaint pleads facts that have occurred since the Second Amended Complaint that demonstrate precisely why the October 26 Memo does not correct the due process failures of the original unlawful discharge actions for the Category 1 Plaintiffs to whom it applies.  In particular, the proposed Third Amended Complaint pleads additional facts (1) showing that Defendants both have failed to properly implement the October 26 Memo procedures and that their supposed

---

[3] The proposed amendment would be the third amended complaint in this action.  Plaintiffs filed the Amended Complaint (Dkt. 19) as of right on August 3, 2018, in order to add additional plaintiffs after Defendants refused to correct other MAVNI discharges outside of litigation (even though they acknowledged that the Army had to revoke the unlawful discharge of the single original named plaintiff).  The Court granted leave to file the Second Amended Complaint (Dkt. 61) on November 15, 2018, shortly after Defendants notified the Court of the issuance of the October 26 Memo.  *See* Dkt. 55, at 3.

reinstatements provide only illusory relief and (2) alleging the continuing harm being suffered by the individual plaintiffs as a result of the unlawful discharge actions, even for those who have been "reinstated." While these facts have been raised previously with the Court and with Defendants at status conferences and in related filings, amendment would enable this Court to address all of these issues in context and more efficiently.

In addition to these allegations related to conduct by Defendants that occurred after the filing of the Second Amended Complaint, the proposed Third Amended Complaint divides the Plaintiffs and the putative class into three categories based on whether they are subject to the October 26 Memo procedures and based on when they were discharged – either while in the DEP/DTP or after moving out of the DEP/DTP. The proposed Third Amended then adds additional named plaintiff representatives for each of these categories based on the Court-directed discovery into class certification that occurred following the filing of the Second Amended Complaint. The proposed Third Amended Complaint also removes 7 formerly named plaintiffs.

Although the additional Plaintiffs would have the right to commence a new and separate complaint – and designate it as a related action – there is no requirement that they do so, nor would such a separate filing serve the interests of justice or judicial economy. "The interests of judicial economy and convenience would be served where, as here, the plaintiffs' motion to supplement their complaint raises similar legal issues to those already before the court, thereby averting a separate, redundant lawsuit." *Fund For Animals*, 246 F.R.D. at 55 (citation omitted); s*ee also id.* at 54, 55 ("[T]he court has broad discretion in determining whether to allow supplemental pleadings in the interests of judicial economy and convenience" and noting "the judicial interest in hearing all similarly situated claims together" (citation omitted)); *Afterglood v. C.I.A.*, 225 F. Supp. 2d 27, 30 (D.D.C. 2002) ("[L]eave to file a supplemental pleading should be freely permitted

when the supplemental facts connect it to the original pleading." (quotation and citation omitted));

*Estate of Gaither ex rel. Gaither v. District of Columbia,* 272 F.R.D. 248, 252 (D.D.C. 2011)

("Amendments that do not radically alter the scope and nature of the action . . . are especially

favored." (citation omitted)); *Powell*, 263 F. Supp. 3d at 7 (finding that equities favored

supplementing complaint and noting that "dealing with the controversy as one is far preferable to

requiring [plaintiff] to open yet another case.").

Under these circumstances, including where both the parties and the Court have long

contemplated that the next step in this litigation would be the filing of an amended complaint to

add additional representative plaintiffs, Defendants cannot point to any undue prejudice to them

that might warrant denial of Plaintiffs' Motion.  While Defendants already answered the Second

Amended Complaint, this action has not proceeded past that point as only certain targeted, Court-

initiated discovery into the size and make-up of the purported class has occurred.  No discovery

into the merits of the claims has yet been taken, and no administrative record has yet been

produced.

The proposed Third Amended Complaint retains the claims and legal theories from the

Second Amended Complaint, but adds new factual allegations based on additional events that have

occurred since the time the prior pleading was filed and new plaintiffs who have been injured by

the same type of discharge action without due process.

Finally, Defendants cannot plausibly claim that Plaintiffs delayed in seeking to amend.

The past twenty months since the filing of the Second Amended Complaint have been devoted to

(1) court-ordered discovery regarding class action status with the Court's understanding that

Plaintiffs would seek to amend their complaint following such discovery if warranted; (2) Plaintiffs

awaiting ***Defendants'*** actions in implementing the October 26 Memo, which has been a long and

11

drawn-out process; and (3) mediation (and other party discussions to attempt to narrow the issues). Once mediation was put on hold and this Court indicated that it was not inclined to order additional discovery in support of class certification, Plaintiffs requested that the Court set a deadline for an amended complaint.  *See* 07/29/20 Status Hr. Tr. at 23:1-5.  In any event, any delay, in and of itself, cannot be the sole reason for denying a motion to amend.  *See Fund For Animals*, 246 F.R.D. at 55 (stating that the time elapsed cannot serve as the sole reason for denying a motion to supplement complaint, and granting leave to supplement complaint four years after the original complaint filing); *Paxton v. Washington Hosp. Ctr. Corp.*, 299 F.R.D. 335, 338 (D.D.C. 2014) (granting leave to amend complaint four months before trial to add new allegations based on new evidence learned during discovery); *Driscoll*, 42 F. Supp. 3d at 57-58 ("[T]he prolonged nature of a case does not itself affect whether the plaintiff may amend its complaint. Moreover, where, as here, the party opposing amendment has not put forward a colorable basis of prejudice, the contention of undue delay is even less persuasive." (internal quotations and citations omitted)); *Kas v. Financial General Bankshares, Inc.*, 105 F.R.D. 453, 458-59 (D.D.C. 1984) (noting "the strong policy to permit the amending of pleadings," and granting leave to amend complaint to add newly discovered facts and circumstances and new claims not known earlier by plaintiffs).

## IV.   <u>CONCLUSION</u>

For the reasons set out above, Plaintiffs request that their Motion be granted.

Dated: November 25, 2020

Respectfully submitted,

*/s/ Jennifer M. Wollenberg*
Jennifer M. Wollenberg (D.C. Bar No. 494895)
Douglas W. Baruch (D.C. Bar No. 414354)
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004-2541
Tel: 202.739.5313
Fax: 202.739.3001
Email: jennifer.wollenberg@morganlewis.com
Email: douglas.baruch@morganlewis.com

*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**TOUNDE DJOHI**
  14720 Darbydale Avenue
  Woodbridge, VA 22193,

**WANJING LI**
  109 Hollybush Court
  Ballwin, MO 63021,

**JINGQUAN QU**
  7243 Yellowstone Boulevard
  Forest Hills, NY 11375,

**XIONGZHOU ZHANG**
  624 N. 12th Street
  Apt. 9
  Philadelphia, PA 19123,

**FANG LU**
  2010 Aquamarine Terrace
  Silver Spring, MD 20904,

**ANTON TATE**
  11515 Ohio Avenue
  Apt. 4
  Los Angeles, CA 90025,

**YUE YIN**
  3323 Buchanan Court
  Ames, IA, 50010,

**SAI KRISHNA UPPUGANDLA**
  5616 Maltby Road
  Woodinville, WA 98072,

**ZEHUA BIAN**
  1891 Willoway Circle N
  Columbus, OH 43220,

**SAMEER DOGRA**
  32 Stowell Road
  Bedford, NH 03110

**HYUNSUNG KIM**
  1205 N. 10th Place
  Apt. 2416
  Renton, WA 98057,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Civil Case No. 1:18-cv-01551-PLF**

**THIRD AMENDED CLASS
ACTION COMPLAINT**

**GUNAY MIRIYEVA**
 6442 Ambrosia Drive
 Apt. 5304
 San Diego, CA 92124,

**SIDDHI KULKARNI**
 506 Jefferson Street
 Warrensburg, MO 64093,

**ANN TUM**
 131 Alycia Drive
 Apt. 2
 Richmond, KY 40475,

**SANDEEP MAHAT**
 777 W Chandler Boulevard
 Apt. 2328
 Chandler, AZ 85225,

**ANISH SHRESTHA**
 3220 213th Street
 Bayside, NY 11361,

**SHENGFAN YANG**
 14637 23rd Avenue
 Apt. 2FL
 Whitestone, NY 11357,

on behalf of themselves and those similarly
situated,

**PLAINTIFFS**,

**v.**

**UNITED STATES DEPARTMENT OF
THE ARMY** and **RYAN D. McCARTHY,**
in his official capacity as Secretary, U.S.
Department of the Army,

**DEFENDANTS.**

**THIRD AMENDED COMPLAINT**

1.     This lawsuit seeks redress on behalf of United States Army soldiers/veterans who

are on the receiving end of improper discharge actions by the Army in violation of military

regulations and the law.  As specified more fully herein, Plaintiffs seek redress in the form of

2

corrective action for the harms caused as well as a declaration that any future discharge actions will be undertaken only in accordance with the law.

2.       While there is no legal justification for the Army's blatant violation of and disregard for its discharge protocols and the denial of due process to these soldiers, there is evidence that the Army aimed these summary discharge actions at them due to their status as soldiers who enlisted through the Military Accessions Vital to the National Interest ("MAVNI") program, which enables certain non-U.S. citizens to enlist and serve in the U.S. Armed Forces.   In order to qualify as MAVNIs, Plaintiffs had to be lawfully present in the United States at the time of enlistment and, consequently, already had passed the immigration-related screening necessary to attain such lawful status.   In addition to passing the background and suitability requirements that all military enlistees – MAVNI or otherwise – must undergo, all MAVNIs had to satisfy enhanced enlistment criteria that apply only to MAVNIs, including (1) establishing that they possessed the requisite health care or language skills deemed vital to the national interest, and (2) scoring higher on the Armed Forces Qualification Test than all other military enlistees.

3.       In or before 2016, each Plaintiff enlisted in the U.S. Army, either in a reserve component while waiting to be re-assigned to the "Regular Army" or in the Selected Reserve of the Ready Reserve, after having met these enlistment conditions.   Each Plaintiff has been a member of the Army's Delayed Training Program ("DTP") for Selected Reserve soldiers, or the Army's Delayed Entry Program ("DEP") for Regular Army soldiers.

4.       Beginning in late 2016, the Department of Defense ("DoD") closed the MAVNI program to new enlistees and started subjecting already enlisted and serving MAVNIs to additional, enhanced background investigations (including the equivalent of Top Secret security clearance checks plus Counter Intelligence ("CI") reviews) and subsequent so-called military

3

service suitability determinations ("MSSDs").   DoD coordinated with the Department of Homeland Security ("DHS") to stop the processing of MAVNI naturalizations pending the completion of those background investigations and MSSDs.  These DoD and DHS actions were the subject of two related class action lawsuits filed in the United States District Court for the District of Columbia:  *Nio v. DHS* and *Kirwa v. DoD*.  The District Court entered final judgment in favor of the classes in both cases in August and September 2020.

5.      This complaint arises from additional mistreatment and unlawful conduct directed at MAVNIs.  In particular, Plaintiffs are the victims of involuntary and summary discharge actions in contravention of military regulations specifically designed to afford soldiers due process with respect to discharge decisions and in violation of the soldiers' constitutional due process and equal protection rights.  Since the commencement of this litigation, Defendants have acknowledged that MAVNIs subjected to these involuntary administrative discharge actions were subject to discharge actions either due to unfavorable MSSDs or for reasons other than an unfavorable MSSD, including so-called "refusal to enlist," "entry level performance and conduct," and medical/physical bases.

6.      There are two principal common themes to the discharge actions:  First, the Army did not comply with the notice and process pre-conditions to discharge that are mandated by military regulations and the law.  Second, the Army did not characterize the discharges as "honorable" or "general – under honorable conditions," but rather identified the discharges as "uncharacterized" or "entry level."  These actions have a profound and negative impact on Plaintiffs in terms of, among other things, their reputations, future military service and benefits, and their immigration status.

4

7.      Indeed, prior to the discharge actions, most of the Plaintiffs received no notice of any intent to discharge them, let alone the grounds for the discharge or any opportunity to respond or challenge such grounds before the discharge decision was made and the discharge initiated.  For the soldiers purportedly discharged for "conduct" or "performance" reasons, the Army did not provide necessary counseling or opportunities for rehabilitation.  To this day, some Plaintiffs do not know the specific grounds for the discharge action (beyond, where they exist, the after-the-fact labels provided by the Army pursuant to a Court order in this litigation), and many similarly-situated soldiers remain unsure even to which of these broad discharge categories they belong.  None of the Plaintiffs and similarly-situated soldiers received adequate notice in that they were not informed of the serious consequences of receiving an "uncharacterized" or "entry level" discharge, including the impact it would have on their naturalization applications.  Further, given that a federal agency is treating "uncharacterized" discharge paperwork from the Army – such as on Form DD-214 and Form/Format 500 – as a certification from the Army that the soldier did not receive an "under honorable conditions" discharge and therefore was discharged "other than honorably," the Army is obligated to provide the soldiers with the opportunity for a board of officers' proceeding or a court martial proceeding in advance of discharge.  None of the Plaintiffs were provided this opportunity.

8.      Defendants' actions therefore failed to follow the mandatory procedures established by military regulations.  Moreover, the discharges exhibit Defendants' disregard for fundamental fairness to these soldiers whose lives and military careers have been upended by virtue of the Army's conduct.  It is somewhat ironic, therefore, that some of the discharge orders cite to an Army Regulation as "authority" for the discharges, while the Army ignored the provisions of that very regulation prohibiting the discharge actions complained of herein.

5

9.     To make matters worse, the circumstances surrounding Defendants' actions reflect Army chaos, disarray, and disorder.  For instance:

- Some discharge orders purport to have an effective date prior to the order itself;

- In some cases, military units to which soldiers are attached were not informed of the discharge decision until months *after* the purported discharge occurred;

- In some instances, military officials have informed soldiers or others that the discharges were mistaken, or did not happen at all;

- The Army ordered several soldiers to attend military background investigation interviews *after* their purported discharges;

- The Army ordered soldiers to continue drilling with their units *after* their supposed discharge;

- The Army has contacted improperly-discharged soldiers, who were subsequently supposedly reinstated, in an effort to recruit them again;

- The military has demanded that soldiers refund money to the Army for the service pay they received after the purported discharge, even though the soldiers earned the pay through service, neither the soldiers nor their units were aware of the discharge actions, and the Army has since represented that these soldiers were not in fact discharged.

10.    The orderly and mandatory discharge process called for by military regulations, if followed, would have prevented or, at a minimum, reduced this chaos.

11.    This discharge misconduct continued even following the commencement of this action on June 28, 2018, wherein Lucas Calixto demonstrated that Defendants violated the law by summarily discharging him.  SPC Calixto, who received discharge orders although he had received multiple honorable service certifications and although he recently had been promoted, received no explanation for his discharge.  Not even his Army unit had any explanation.  Only following suit, and after SPC Calixto's filing of a preliminary injunction motion to have his discharge order revoked, did Defendants capitulate, issue an order revoking the discharge, and represent that he would be reinstated in the Army.

12.    Only after an additional seven plaintiffs filed an Amended Complaint and preliminary injunction motion on August 3, 2018 did Defendants eventually capitulate by suspending and revoking the discharges of those soldiers as well.

13.    Although Defendants are fully aware through this lawsuit and their own actions that many other MAVNI soldiers have been discharged in a similar fashion in violation of the law, the Army has failed to suspend or revoke all such discharges.  And Defendants have not remedied the harms of improper discharge for those soldiers who have had their discharges revoked and purportedly been "reinstated" in the Army, despite repeated notice of those harms.

14.    The named Plaintiffs herein are victims of Defendants' unlawful discharge conduct. Each of these Plaintiffs has been subjected to improper Army discharge actions.  And each Plaintiff has suffered and will continue to suffer substantial harm – including to his/her military career, civilian career, immigration status, and/or reputation – until the Army takes appropriate corrective action.

7

15.    Defendants' conduct violates Army regulations, DoD regulations, and the fundamental requirements of due process and equal protection afforded by the Constitution.  No one should be surprised that in an organization such as the Army, where regulations play a vital role in administration and in protecting soldiers from abusive action, detailed procedures and regulations dictate (a) the conditions and findings that might justify initiation of discharge or separation action and (b) the process that must be afforded to soldiers before any such action is taken.  What is both surprising and disappointing is that Defendants would ignore those regulations with respect to MAVNIs and, even when the violations are exposed, continue to do so for Plaintiffs and many similarly-situated MAVNI soldiers.

16.    To make matters worse, Defendants sought to retaliate against Plaintiffs and the proposed class in violation of their First Amendment rights to free speech and to petition the government for redress of the above violations.  In mid-August 2018, less than two weeks after the Amended Complaint was filed adding plaintiffs beyond Lucas Calixto, Defendants created a new process – not applied to any other soldiers except those in the proposed class – to have military lawyers re-review and scour the background investigation files of MAVNI soldiers in search of some basis to accuse these soldiers of criminal conduct.  The Army's retaliatory intent was clear in its internal directive, which explained that the reason for this activity was that MAVNI soldiers had initiated this litigation challenging the lawfulness of their discharges.

17.    In an order dated August 13, 2018 in this action, the Court ordered Defendants to report, on a bi-weekly basis, on "any updates regarding the Army's policy with respect to the administrative separation procedures applicable to DEP and DTP members" (Dkt. 23).  Notwithstanding this order, Defendants never notified the Court or Plaintiffs of the Army's efforts to retaliate against separated or soon-to-be separated MAVNIs.

18.     Nor was this the only retaliatory act by Defendants.

**The Army's October 26 Memo**

19.     On October 31, 2018, Defendants reported that the Army had issued a new separation procedure.  Specifically, Defendants disclosed that an Army Assistant Secretary had issued a memorandum dated October 26, 2018 pertaining to separations of certain MAVNI personnel ("the October 26 Memo").  *See* Dkts. 50, 50-1.

20.     As a result of the October 26 Memo, MAVNIs who have been or will be subject to involuntary administrative discharges fall into one of two groups – those discharged with an unfavorable MSSD and those discharged for "other reasons" and without an unfavorable MSSD.

21.     The October 26 Memo itself only describes the discharge procedures that will apply to MAVNIs with unfavorable MSSDs.  With respect to both DTP and DEP MAVNI discharges, the Memo states that soldiers the Army considered actually discharged will be offered reinstatement in the Army for the purpose of receiving notice and an opportunity to respond to the purported unfavorable MSSR/MSSD grounds.  And for future DEP or DTP discharges of MAVNIs with unfavorable MSSRs/MSSDs, including MAVNIs with in-process discharges the Army supposedly suspended as a result of this litigation, the October 26 Memo indicates that the soldiers will receive the notice and process specified in the Memo.

22.     The October 26 Memo is a further, litigation-induced acknowledgement and admission by Defendants that its summary discharge actions were not accomplished in accordance with military regulations and the law.  However, even though the Army failed to follow the applicable regulations and the law with respect to both MAVNIs with unfavorable MSSDs and those without unfavorable MSSDs, the Army stated that it is only taking certain remedial action (albeit limited) with respect to soldiers with unfavorable MSSDs.

23.     Thereafter, the Army conceded that "other reasons" discharges for DTP MAVNIs were not accomplished in accordance with military regulations and the law and represented to this Court that those MAVNIs would be offered reinstatement into the Army.  And, even though the Army now is addressing "MSSD" discharges in the same way regardless of whether the MAVNI is a DTP or a DEP soldier, and even though the Army now has offered reinstatement to DTP "other reasons" discharged MAVNIs, the Army refuses to correct the summary discharges of DEP MAVNIs discharged for "other reasons."  This leaves other discharged soldiers – similarly situated due to the fact that they too are victims of unlawful summary discharges – with no offer of reinstatement and no means to challenge, particularly prior to discharge, the purported grounds for their discharges.

24.     Moreover, with respect to the soldiers subject to the procedures set forth in the October 26 Memo, the Army has not yet provided – even almost two years later – all eligible MAVNIs with reinstatement and/or unfavorable military service suitability recommendation notices.  Notably, the Memo indicates that notified soldiers must be provided 30 days to respond to any derogatory information that might lead to their discharge and that new MSSDs should be completed "and appropriate action initiated" within 90 days of the military suitability recommendation, which Defendants indicated meant 90 days from issuance of the October 26 Memo for military suitability recommendations that pre-dated that Memo.  That memo came out in 2018.

25.     In addition, the October 26 Memo does not provide any means for soldiers to readily determine whether they will be subject to the procedures therein.  That is because many summarily discharged MAVNI soldiers do not know whether they received an unfavorable MSSR or MSSD.  Indeed, as the circumstances of many of the Plaintiff representatives herein make clear,

many soldiers did not receive discharge orders and even those who obtained them after the fact have discovered that the stated grounds for discharge in those orders are not descriptive, much less accurate. For instance, soldiers who received discharges that specify "refused to enlist" as the discharge code have since discovered (in addition to the fact that they did not refuse to enlist and in fact already had enlisted) that they had received an unfavorable MSSD, which may have been the actual basis for the discharge. Unless and until soldiers receive notification that they are subject to the October 26 Memo, many soldiers will not know for certain whether the Army considers them discharged or not at this point, whether they had received an unfavorable MSSD or now have an unfavorable MSSR, and/or that they will receive the process described in the October 26 Memo.

26.     In addition, even for those soldiers who will be subject to the procedures set forth in the October 26 Memo, many are continuing to suffer because either they have not yet been offered reinstatement, have not yet had their discharges revoked or been fully reinstated or restored to their pre-discharge status in the Army, or do not know when they will be subject to the October 26 Memo procedures or what will happen next for them (or if they will remain in entry-level status for their entire period of military service).

27.     Finally, in the twenty-five months since the October 26 Memo has been in place, it has become clear that the procedures do not fully comport with the military regulations on which they purportedly are based. For instance, soldiers are not being adequately informed of the so-called derogatory information that is the grounds for the anticipated discharge action such that they do not have a meaningful opportunity to respond. And it is not yet clear whether the Army will adequately and appropriately consider the responses of soldiers who do have the opportunity to respond before making final discharge decisions.

28.    For example, the "disqualifying condition" listed in the typical MSSR Notice pursuant to the October 26 Memo is two to three sentences long and does not append or include any of the non-classified supporting information for the alleged "disqualifying condition," leaving soldiers to guess at how to respond.

29.    Moreover, the Army's now-established practice for "sending" MSSR Notices pursuant to the October 26 Memo, tracking MSSR Notices, and acknowledging/receiving MSSR Notice responses is seriously flawed.  The Army has not been utilizing appropriately the contact information already in its possession – in records kept by its personnel, in updates provided by the soldiers as directed by the Army, and in updates provided by Plaintiffs' counsel – leading to approximately 69% of MSSR Notices sent to DTP soldiers and 59% of MSSR Notices sent to DEP soldiers being categorized by the Army as "yet to respond/no response received" or "no contact/undeliverable/return to sender," according to reporting by Defendants on February 18, 2020.  Dkt. 160, at 1-2.

30.    The Army also unlawfully shared soldier personally identifiable information by mailing MSSR Notices to the wrong individuals.  Soldiers opened envelopes addressed to them by the Army only to find MSSR Notices belonging to other soldiers inside.

31.    Despite not having previously used all available contact information, such as email addresses, to send MSSR Notices to soldiers, in or around July 2020, the Army began sending email notices to certain soldiers to inform them that it had "previously sent an MSSR and got no response."  The email notice indicated that a substantive response was required within 30 days of receipt of the email.

32.    While this new email notice may finally reach soldiers whom the Army previously had failed to contact, it again demonstrates the failures of the October 26 Memo process because

it also is being sent to soldiers who did previously receive and respond to an MSSR Notice, revealing that the Army still does not know whether or not it has received MSSR Notice responses and necessarily is not considering them, all while the soldiers remain effectively discharged in the interim.

33.     Just as the Army did with its mailing of MSSR Notices, the Army also unlawfully shared soldier personally identifiable information by emailing MSSR Notices to the wrong individuals.

34.     Moreover, even though the soldiers subject to the October 26 Memo procedures supposedly were not actually discharged (because the discharges initiated were supposedly suspended by the Army) or are reinstated to "currently serving" in name, they have not been fully reinstated, the Army has not fully revoked all discharge orders against them, and the Army continues to treat these soldiers as effectively discharged, resulting in further injury.  These injuries include:

> a. criminal indictment for allegedly making false statements to the U.S. Citizenship and Immigration Services ("USCIS") about military separation status when applying for naturalization;
>
> b. exclusion from drilling (including with the threat of police involvement) even while worrying whether they will be punished for not attending drills;
>
> c. lapses in health insurance coverage;
>
> d. invoices and the threat of debt collection and credit ruin (for drilling beyond the supposed discharge date – including for soldiers where the Army claims the discharge was suspended and never fully effectuated);

e. denial of naturalization by USCIS on the basis of receiving "uncharacterized" discharges; and

f. inability to obtain the protection and work authorization of "Deferred Action" because USCIS will not recognize their status in the military.

*The Affected Soldiers/Veterans*

35. As noted above, as a result of the October 26 Memo, MAVNIs affected by Defendants' unlawful involuntary administrative discharge actions fall into two broad groups – MAVNIs subject to discharge treatment due to "unfavorable MSSRs/MSSDs" and MAVNIs subject to discharge treatment for "other reasons," including MAVNIs who received favorable MSSDs and then were discharged before 180 days of active duty service was completed.

36. In summary, the Plaintiffs and similarly-situated soldiers affected by Defendants' unlawful discharges include:

- Category 1: MAVNI soldiers (including current and former DTP and DEP soldiers) subject to "uncharacterized" discharge actions for MSSD reasons and who are or should have been subject to the reinstatement and MSSR notice procedures in the October 26 Memo;

- Category 2: DTP and DEP MAVNI soldiers subject to "uncharacterized" discharge actions for other-than-MSSD reasons; and

- Category 3: Former DTP and DEP MAVNI soldiers (*i.e.*, MAVNIs who moved out of the Delayed Training Program or Delayed Entry Program) subject to "uncharacterized" discharge actions for other-than-MSSD reasons.

37.     MAVNI soldiers continue to be harmed by the lack of notice and lack of adequate process in Defendants' unlawful "uncharacterized" discharge actions, even where the Army has purported to take some steps toward remediation for some of these categories as a result of this litigation.

***

38.     Accordingly, Plaintiffs bring this civil action on behalf of themselves and on behalf of a class of all similarly-situated individuals to obtain the relief sought herein.

<b><u>JURISDICTION</u></b>

39.     This action arises under the laws of the United States and the U.S. Constitution. This Court has jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

<b><u>VENUE</u></b>

40.     Venue is proper in this Court under 28 U.S.C. § 1391(e) because the individual Defendant is an officer of the United States acting in his official capacity in this district and because the United States Department of the Army is present in this district.

<b><u>PARTIES</u></b>

41.     Plaintiff Tounde Djohi resides in Woodbridge, Virginia.  At the time of the discharge action, Specialist ("SPC") Djohi was enlisted in the DTP and serving with the U.S. Army Reserve's 130th Chemical Company in Fort A.P. Hill, Virginia.  SPC Djohi falls into Category 1.

42.     Plaintiff Wanjing Li resides in Ballwin, Missouri.  At the time of the discharge action, SPC Li was enlisted in the DTP and serving with the U.S. Army Reserve's 325th Combat Support Hospital in St. Charles, Missouri.  SPC Li falls into Category 1.

43.     Plaintiff Jingquan Qu resides in Forest Hills, New York.  At the time of the discharge action, SPC Qu was enlisted in the DTP and serving with the U.S. Army Reserve's 716th Quartermaster Company in Jersey City, New Jersey.  SPC Qu falls into Category 1.

44.     Plaintiff Xiongzhou Zhang resides in Philadelphia, Pennsylvania.  At the time of the discharge action, SPC Zhang was enlisted in the DEP.  SPC Zhang falls into Category 1.

45.     Plaintiff Fang Lu resides in Silver Spring, Maryland.  At the time of both discharge actions, SPC Lu was enlisted in the DTP and serving with the U.S. Army Reserve's 398th Combat Sustainment Support Battalion in Rockville, Maryland.  SPC Lu falls into Category 1 because the Army has stated that the initial discharge action against her was for MSSD reasons (and she also may fall into Category 2, but she does not know at this point because the Army has not provided the reason or grounds for the latest discharge action against her).

46.     Plaintiff Anton Tate resides in Los Angeles, California.  At the time of the discharge action, SPC Tate was enlisted in the DTP and serving with the U.S. Army's 730th Transportation Company in Bell, California.  SPC Tate seems to fall into Category 1 because he received an MSSR Notice from the Army, but he may belong in Category 2 as well – he does not know at this time because the Army has not provided him any grounds or reasons for the discharge action.

47.     Plaintiff Yue Yin resides in Ames, Iowa.  At the time of the discharge action, SPC Yin was enlisted in the DTP and serving with the 402nd Engineering Unit in Fort Des Moines, Iowa.  SPC Yin falls into either Category 1 or 2 (the Army has not provided her with the purported grounds for the discharge action, so she does not know if it was on the basis of an MSSR/MSSD or for some other reason).

48.     Plaintiff Sai Krishna Uppugandla resides in Woodinville, Washington.  At the time of the discharge action, SPC Uppugandla was enlisted in the DEP.  SPC Uppugandla falls into

either Category 1 or 2 as the Army has given differing explanations for his discharge – one being that he was discharged due to his background check adjudication and the other that he was discharged for exceeding the 730-day mark without being sent to basic combat training ("BCT") (because he was waiting for the Army to complete its background checks and adjudications for MAVNI soldiers).

49.     Plaintiff Zehua Bian resides in Columbus, Ohio.  At the time of the discharge actions against him, SPC Bian was enlisted in the DTP and serving with the U.S. Army's 304th Engineer Company in Lima, Ohio.  SPC Bian falls into Category 1 and/or Category 2.  The Army has not clearly articulated grounds for its discharge actions and has given SPC Bian only a cursory "unsatisfactory performance" explanation, without any detail of what performance could possibly be considered unsatisfactory since SPC Bian's unit has been holding its drills virtually during the pandemic and SPC Bian has attended and been paid for those drills.

50.     Plaintiff Sameer Dogra resides in Bedford, New Hampshire.  At the time of the discharge action, SPC Dogra was enlisted in the DTP and serving with the U.S. Army's 456th Area Support Medical Company in Somersworth, New Hampshire.  SPC Dogra seems to fall into Category 1 because he received an MSSR Notice from the Army, but he may belong in Category 2 as well – he does not know at this time because the Army has not provided him any grounds or reasons for the discharge action.

51.     Plaintiff Hyunsung Kim resides in Renton, Washington.  At the time of the discharge action, PFC Kim was enlisted in the DEP.  PFC Kim falls into Category 2.

52.     Plaintiff Gunay Miriyeva resides in San Diego, California.  SPC Miriyeva enlisted in the DTP and at the time of the discharge action was in training at Fort Jackson, South Carolina. SPC Miriyeva falls into Category 3.

53.     Plaintiff Siddhi Kulkarni resides in Warrensburg, Missouri.  SPC Kulkarni enlisted in the DEP and at the time of the discharge action was in training at Fort Leonard Wood, Missouri.  SPC Kulkarni falls into Category 3.

54.     Plaintiff Ann Tum resides in Richmond, Kentucky.  PFC Tum enlisted in the DTP and at the time of the discharge action was in training at Fort Jackson, South Carolina.  PFC Tum falls into Category 3.

55.     Plaintiff Sandeep Mahat resides in Chandler, Arizona.  SPC Mahat enlisted in the DTP and at the time of the discharge action was in training at Fort Leonard Wood, Missouri.  SPC Mahat falls into Category 3.

56.     Plaintiff Anish Shrestha resides in Bayside, New York.  SPC Shrestha enlisted in the DEP and at the time of the discharge action was in training at Fort Jackson, South Carolina.  SPC Shrestha falls into Category 3.

57.     Plaintiff Shengfan Yang resides in Whitestone, New York.  PFC Yang enlisted in the DEP and at the time of the discharge action was in training at Fort Benning, Georgia.  PFC Yang falls into Category 3.

58.     Defendant United States Department of the Army (the "Army") is responsible for the overall administration of policy for the U.S. Army and Army Reserve.

59.     Defendant Ryan D. McCarthy is Secretary of the Army.  Mr. McCarthy is responsible for the overall administration of the Department of the Army, U.S. Army, and Army Reserve.  Plaintiffs sue Mr. McCarthy solely in his official capacity.

60.     Defendants Army and McCarthy collectively are referred to as "Defendants."

## *MAVNI Program Changes*

61.     The MAVNI program is a DoD recruiting program, under which certain non-U.S. citizens with critical language and/or medical skills that DoD has identified as "vital to the national interest" can enlist and serve in the United States Armed Forces.  The DoD encouraged soldiers to enlist in the MAVNI program by touting the opportunity as providing an "expedited" path to U.S. citizenship via naturalization.  Since the program's inception in 2008, more than 10,400 soldiers have enlisted in the armed services through the MAVNI program.

62.     On September 30, 2016, DoD began to insist on additional so-called security checks for MAVNIs, requiring that MAVNI soldiers undergo extensive background checks – including completion of a Tier 5 (or "Top Secret") background investigation and completion of a Counter Intelligence review (including interview) – and a second supposed "military service suitability determination," which entails what has proven to be lengthy adjudications by the DoD organization that makes Top Secret clearance determinations and the Army human resources/personnel group (called "G-1").  The Army suspended recruitment for the MAVNI program in late 2016 such that there have been no new enlistees since that time.

63.     No later than May 2017, DoD and the Army realized that they did not have the resources to complete the mandated checks.  So, instead of completing the checks on the enlisted and serving MAVNI soldiers, DoD and the Army made plans to discharge or separate nearly all of them, and particularly those who had not yet been naturalized.  When that plan was publicly revealed, DoD and the Army were forced to take a different tack.

64.     However, DoD and the Army still lacked the necessary resources to complete the background checks and adjudications.  And, facing litigation in the related *Nio v. DHS* action, DoD determined that most of the *Nio* class members would not have their so-called MSSDs completed

in advance of their three-year enlistment anniversaries, dates that now have passed for all of the MAVNI soldiers.

65.     Subsequently, many MAVNI soldiers were told that they have been or will be separated or discharged from the military because they are not "suitable" for service, have "refused to enlist," are "personnel security" failures, and the like.  Not only are those statements vague and without the provision of due process called for by Army regulations, DoD regulations, and the Constitution, they are false in many instances.  These soldiers *already* have enlisted and the Army *already* found them suitable for service, ***now four years or more ago***.  For the MAVNI soldiers who have been able to get some information about their supposed security "failures," in large part, those reasons reflect Army/DoD mistakes or ineptitude, rather than any legitimate derogatory finding with respect to the soldiers.

66.     For the Category 1 soldiers, the failure of the Army to execute its supposed remediation – the October 26 Memo – has left these soldiers effectively discharged.  These soldiers have not been returned to their pre-discharge action status.  And, the Army's delays and ineptitude with respect to the MSSR/MSSD process is now in its fourth and fifth years following these soldiers' enlistments.  MAVNI soldiers did not sign up to serve their entire contracts in an "entry-level" status.

67.     Further, according to the Army, MAVNIs in an "entry-level" status at the time of separation will receive an "uncharacterized" discharge.  At present, because another federal agency is treating the Army's "uncharacterized" discharge paperwork as Army certifications that the soldier received a less than "under honorable conditions" discharge and thus an "other than honorable" discharge, the uncharacterized discharges can disadvantage these MAVNIs in their civilian lives and otherwise.  The Chapter 3 Notice anticipated by the October 26 Memo is not

adequate process for discharges that the Army knows another federal agency will treat as "other than honorable" discharges.

68.     With respect to the Category 2 soldiers, the Army still is treating the DTP soldiers who supposedly were not actually discharged or offered reinstatement as if they are discharged. The Army's latest litigation position is that the DEP soldiers in this Category are *not* entitled to *any* actual notice pre-discharge, much less adequate notice and process associated with an "other than honorable" discharge, which is how another federal agency is interpreting the Army's "uncharacterized" discharge paperwork.

69.     With respect to the Category 3 soldiers, the notice of discharge they received did not inform the soldiers of the consequences of an "uncharacterized" discharge and, in fact, often informed the soldiers that they were receiving "honorable" discharges.  Even though the Army was aware of the other federal agency's policy with respect to "uncharacterized" discharge paperwork, the Army did not warn these soldiers about that discharge even though it gave warnings about characterized "other than honorable" and "general – under honorable conditions" discharges. Because of this lack of information and warning, the soldiers were not given informed opportunities to defend against their discharges and/or discharge characterizations.  None of these soldiers received the opportunity for a proceeding in front of a board of officers or a court martial proceeding, which opportunity is required when the Army is providing an "other than honorable" discharge.

70.     Just as with Category 1, with respect to Categories 2 and 3 – MAVNI soldiers being discharged for reasons other than the background checks – these soldiers have been and are being discharged without adequate notice and process.  With respect to all of these soldiers, because another federal agency is treating the discharge paperwork as Army certifications of an "other than

honorable" discharge, these soldiers' discharges are invalid because the Army is not providing the process required in advance of an "other than honorable" discharge.

### *The Discharge Actions Against Plaintiffs and Similarly-Situated MAVNI Soldiers*

71.     According to Defendants, a MAVNI DTP soldier is not actually discharged by a U.S. Army Recruiting Command ("USAREC") order that appears to be a discharge order, but instead, according to the Army, cancels the soldier's training reservation.   According to Defendants, a MAVNI DTP is discharged only when the U.S. Army Reserve Command ("USARC") issues a discharge order.   Defendants have said that "[o]nce USAREC issues a discharge order, the soldier remains assigned to a U.S. Army Reserve unit, but is ineligible to attend further training.   Once USARC issues a discharge order, the soldier is removed from the rolls of the U.S. Army Reserve and is no longer a member of the U.S. Army on the effective date of the USARC orders."   Dkt. 113, at 1-2.

72.     MAVNI DEP soldiers enlist to serve as full-time active duty soldiers in the Regular Army, unlike DTP soldiers who serve in a "part-time" capacity in the Selected Reserve of the Ready Reserve.   However, DEP soldiers initially are placed in a reserve component (but not the Selected Reserve of the Ready Reserve) with the intention that they serve in that capacity and attend Future Soldier Training Program meetings for up to two years until they ship to basic combat training.   Thus, a MAVNI DEP soldier also is not "fully" separated from the Army until both USAREC *and* USARC issue discharge orders, something Defendants previously recognized in this litigation.   *See* Dkt. 89, at 14-15 ("USAREC orders *do not* separate an individual from the Army." (emphasis in original)).

22

73.     Defendants now assert, however, that a MAVNI DEP soldier is "fully" separated from the Army when only the USAREC issues a discharge order, which is the same order that the Army maintains simply cancels the training reservation for a DTP soldier.

74.     USAREC discharge orders constitute discharge actions for both DTP and DEP soldiers.  Even though the Army has represented that DTP soldiers are not "fully" discharged until a USARC discharge order also is issued, that soldier still suffers adverse consequences upon entry of the USAREC discharge order and is entitled to the process afforded by the applicable Army and DoD regulations and U.S. Constitution, as described more fully below, before such adverse action is taken.  This is especially true given that Army personnel do not understand the distinction the Army has represented in this lawsuit and treats DTP soldiers as effectively discharged with just a USAREC order having been entered at some point.  DTP soldiers suffer further adverse discharge actions upon entry of a USARC discharge order and are entitled to process before such actions. DEP soldiers have been denied even the entry of a USARC discharge order, much less any notice or process accompanying it, under Defendants' new litigation position.

75.     MAVNI former DTP and DEP soldiers who are administratively discharged while in active duty status at what is called "initial entry training" receive discharge orders from their commanders at the appropriate level of authority.  Like DTP and DEP soldiers, these former DTP and DEP soldiers are entitled to the process afforded by the applicable Army and DoD regulations and the U.S. Constitution, as described more fully below, before such adverse action is taken.

### *Category 1 Plaintiffs*

76.     The following plaintiffs fit into Category 1 because they are MAVNI DTP or DEP soldiers discharged or effectively discharged for MSSD reasons and who are or should have been subject to the reinstatement and MSSR notice procedures in the October 26 Memo.

23

77.     Defendants already have admitted that plaintiffs in Category 1 did not receive the requisite notice or process in advance of discharge actions.  These violations have not been remedied even for those plaintiffs who are receiving the procedures in the October 26 Memo because (1) those procedures, as they are being applied by the Army, do not provide sufficient notice or process, and (2) even with reinstatement or supposed discharge suspension, the Army still treats these soldiers as "effectively discharged," making the full relief supposedly offered by the October 26 Memo illusory at best.

78.     In particular, despite the relief promised by the October 26 Memo procedures, the MSSR notices pursuant to the Memo are inadequate, including because (i) they have led to questionable "waivers" of soldiers' rights either due to unclear language or inaccurate information and even pressure provided by recruiters and other Army personnel; (ii) they fail to give adequate information about the bases of MSSR decisions, impacting soldiers' ability to respond; (iii) the Army has failed to ensure delivery of MSSR notices using their best available information for soldiers; and (iv) the Army has failed to provide additional information, additional time, and legal representation requested by the soldiers.

79.     In addition, the October 26 Memo's reference to a Chapter 3 Notice and process for those who ultimately receive an unfavorable MSSD is inadequate as it does not provide for the process required when a soldier is receiving an "other than honorable" discharge, which is how "uncharacterized" discharge paperwork is being used by another federal agency (USCIS).

80.     The Army's inability to complete the process as described in the October 26 Memo will result in many MAVNI soldiers, even those who ultimately receive a favorable MSSD, serving their entire contract periods in an "entry-level" status, which the Army has said will result in the soldiers receiving an "uncharacterized" discharge.  For DEP MAVNIs, most will have no ability

to apply for naturalization if they remain in the DEP for their entire contract period and are not sent to initial entry training.  For both DTP and DEP MAVNIs, they will face the stigma of an "uncharacterized" discharge, which is being treated as an Army certification of an "other than honorable" discharge by another federal agency, without having received the opportunity to defend themselves in front of a board of officers or in a court martial proceeding.  And, despite the relief promised by the suspension of discharge actions or "reinstatement," individuals in Category 1 continue to face adverse consequences due to the initiation of discharges, the existence of USAREC discharge orders, and the Army's failure to recognize reinstatement for all purposes. For example, despite so-called "reinstatement," soldiers continue to be barred from drilling with their units, have not had their benefits like health insurance fully restored, and otherwise are not recognized within DoD as having been reinstated.

### _Tounde Djohi_

81.    Tounde Djohi enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in December 2015 and signed an enlistment contract.  At the time of his enlistment, SPC Djohi was a non-U.S. citizen lawfully present in the United States.  SPC Djohi began drilling with his Army reserve unit after enlistment.

82.    In March 2016, SPC Djohi submitted his N-400 Application for Naturalization to USCIS, which included an N-426 Form signed by his commander certifying SPC Djohi's honorable service in the U.S. military.  On February 1, 2018, the Army again confirmed SPC Djohi's honorable service via a second N-426 Form.  In that same form attesting to his honorable

service, the Army stated that unspecified "derogatory information" had been found in his military background investigations that supposedly would "require separation" from the Army.

83.     In the six months following the second N-426, SPC Djohi received no further word regarding any derogatory information or separation, and he continued to drill with his reserve unit. In mid-June 2018, however, an Army recruiter informed him that his MSSD results were unfavorable and that he was being processed for separation from the Army.

84.     Thereafter, on June 20, 2018, SPC Djohi received from his recruiter a discharge order issued by USAREC.  The order is dated June 11, 2018 and has an effective discharge date of July 1, 2018.  The discharge order cites AR 135-178, paragraph 15-8 as "Authority."  The order further specifies the "Type of Discharge" as "Entry Level Separation (Conduct Disqualification)."

85.     SPC Djohi contacted Army Headquarters to inquire about the discharge.  The Army informed him that it could not provide any information regarding his discharge and that his background check results could not be provided to him until the year 2042.  In addition, the Army told SPC Djohi – without explanation or specification – that "you do not meet the Army's Personnel Security requirement for continued service."

86.     SPC Djohi received no prior notice of or explanation for the Army's discharge decision.  The Army failed to provide SPC Djohi any opportunity to respond to or otherwise be heard regarding his discharge, and, at the time of the discharge decision, the Army did not take into account any statement or evidence from SPC Djohi.

87.     SPC Djohi's discharge records do not include a Chapter 3 notice or any evidence of individual counseling or pre-discharge notification.

88.     Army personnel also informed SPC Djohi that because of the type of discharge he received, he was not eligible for reenlistment in the military, and Army personnel claimed that because he had received an "unfavorable" MSSD, he would not be eligible for naturalization.

89.     On August 10, 2018, Defendants asserted that SPC Djohi's separation was initiated due to "an unfavorable MSSD due to significant derogatory information" (which it did not specify) but that the Army was in the process of revoking SPC Djohi's discharge order and that further processing would be suspended until SPC Djohi could "be provided with notice and an opportunity to respond." *See* Dkt. 22-1, at 3.

90.     Defendants have represented that SPC Djohi is subject to the procedures set forth in the October 26 Memo because he received an unfavorable MSSD.

91.     On June 10, 2020, Defendants represented that SPC Djohi "was reinstated in the U.S. Army Reserve" and "issued an adverse MSSR notice" pursuant to the October 26 Memo.

92.     SPC Djohi received this MSSR Notice, dated June 18, 2019, on July 6, 2019.

93.     Despite the minimal information given in the MSSR Notice, SPC Djohi sent in his response to the MSSR Notice in August 2019.  Even though more than a year has passed, SPC Djohi has received no further information about the status of his MSSR or MSSD, beyond an acknowledgement of receipt of his response to the MSSR Notice.

94.     To this day and despite his supposed "reinstatement," the Army has not fully reinstated or otherwise restored SPC Djohi to his pre-discharge action status in the Army.  For example, SPC Djohi was unable to obtain a new Common Access Card ("CAC card") on his own because his information was no longer appearing in the Army system of record.  He was only able to obtain a CAC card with the in-person help of a recruiter.  SPC Djohi also has been waiting for an MSSD for over a year since submitting a response and cannot be scheduled to ship to basic

combat training until such a determination is made.  Until he attends basic training, his unit has restricted his drill attendance.

95.     SPC Djohi also has had difficulty obtaining information from his local recruiting office due to a legal hold issued by the Army for this litigation and placed in the file of SPC Djohi. Army recruiting personnel would not respond to his text messages and later told him in person that the recruiting station commander had directed no one in the office to speak with him about any issue without first speaking with Army legal counsel.  Based on these interactions, it is clear that Army legal counsel never explained the meaning of the legal hold document, and SPC Djohi's position in the Army has been impacted as a result.

### *Wanjing Li*

96.     Wanjing Li enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in February 2016 and signed an enlistment contract.  At the time of her enlistment, SPC Li was a non-U.S. citizen lawfully present in the United States.  SPC Li began drilling with her Army reserve unit in March 2016.

97.     SPC Li submitted her N-400 Application to USCIS in August 2016.  The application included a duly executed Form N-426 by which the Army certified SPC Li's honorable service in the military.

98.     USCIS interviewed SPC Li, determined that she met all of the requirements for naturalization, approved her naturalization application, and scheduled her to take her naturalization oath on June 23, 2017.  Prior to administering the naturalization oath, USCIS de-scheduled SPC Li's oath ceremony citing "unforeseen circumstances," which were never explained.

99.     In June 2018, the Army, on its own initiative, provided SPC Li with an additional N-426, which again confirmed SPC Li's honorable service.  This second N-426 also indicated that

unspecified "derogatory information" that supposedly would "require separation" had been found in SPC Li's newly-mandated military background investigation.

100.    On July 6, 2018, an Army recruiter informed SPC Li via text message that she had been discharged from the Army.  SPC Li later obtained a copy of the discharge order.  That order was dated July 5, 2018, with an effective date of July 5, 2018.  The discharge order does not explain the grounds for the discharge but cites AR 135-178 as "authority" and indicates that the discharge type is "uncharacterized."

101.    The Army gave SPC Li no advance notice of the discharge, no explanation at any time for the purported discharge, and no meaningful opportunity for SPC Li to respond to any purported discharge grounds.

102.    SPC Li's discharge records do not include a Chapter 3 notice or any evidence of individual counseling or pre-discharge notification.

103.    In an August 1, 2018 report to the Court in a related litigation (*Nio v. DHS*), and notwithstanding SPC Li's written orders with the effective discharge date of July 5, DoD represented that SPC Li was ***not*** "separated" from the military.

104.    On August 10, 2018, Defendants asserted that SPC Li's separation had been initiated due to "an unfavorable MSSD due to significant derogatory information" but that the Army had revoked SPC Li's discharge order on August 9, 2018, and that further processing would be suspended until SPC Li could "be provided with notice and an opportunity to respond."  *See* Dkt. 22-1, at 3.  However, SPC Li has not been provided with an order revoking the discharge order that had been issued.

105.    Defendants have represented that SPC Li is subject to the procedures set forth in the October 26 Memo because she had received an unfavorable MSSD.

106.   On June 10, 2020, Defendants represented that SPC Li is "currently in the U.S. Army Reserve" and "was issued an adverse MSSR notice" pursuant to the October 26 Memo.

107.   Notwithstanding this asserted "issuance," SPC Li never received a mailed MSSR notification letter, despite having confirmed her updated contact information to the Human Resources Command office of her reserve unit in April 2020.  Aware that she had not received the notice, SPC Li even tried to obtain a copy of her MSSR through FOIA and by emailing the Army at usarmy.pentagon.hqda-dcs-g-1.mbx.FOIA@mail.mil beginning in March 2020, all to no avail.

108.   On July 13, 2020, SPC Li received an email from the Army stating:

You were previously sent an adverse Military Service Suitability Recommendation (MSSR) notification (see attached). We have not received a response from you, which should have been annotated on the Acknowledgement of Notice and Election form accompanying the attached MSSR notification letter.  At this time, you have five (5) business days to reply to this email (usarmy.pentagon.hqda-dcs-g-1.mbx.dmpm-mavni-ops@mail.mil) with the Acknowledgement of Notice and Election form completed and attached.  Additionally, you have 30 days from receipt of this notification to submit matters which may refute, correct, explain, extenuate, mitigate, or update the unfavorable information discussed in paragraph 4 of the attached MSSR notification letter.  Should you choose to submit rebuttal matters, they must be provided directly to the DCS G-1 MAVNI email inbox at usarmy.pentagon.hqda-dcs-g-1.mbx.dmpm-mavni-ops@mail.mil.

Be advised, if we do not receive the requested reply within five (5) business days, we will send you the attached MSSR notification via certified mail with return receipt and signature requested to the last residential address we have listed for you in our database.

109.   This email attached an MSSR Notice dated January 2, 2020, which SPC Li had never before seen.

110.   Despite the minimal information given in the MSSR Notice, SPC Li sent in her response to the MSSR Notice in August 2020.

111.   To this day and despite her supposed "reinstatement," the Army has not fully reinstated or otherwise restored SPC Li to her pre-discharge action status in the Army.  For example, SPC Li continues to be locked out of her Army human resources account (HRCAPPS).

### *Jingquan Qu*

112.   Jingquan Qu enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in February 2016 and signed an enlistment contract.  At the time of his enlistment, SPC Qu was a

non-U.S. citizen lawfully present in the United States.  SPC Qu began drilling with his Army reserve unit in May 2016.

113.    SPC Qu submitted his N-400 Application for Naturalization to USCIS in February 2017.  The application included a duly executed Form N-426 by which the Army certified SPC Qu's honorable service in the military.  In November 2017, the Army executed a second N-426 again confirming SPC Qu's honorable military service.

114.    On July 27, 2018, in response to SPC Qu's emails a week earlier inquiring about his basic combat training ship date, an Army HR official told SPC Qu that he would not be receiving a ship date because he had been discharged effective December 1, 2016 (almost nineteen months earlier).  Thereafter, SPC Qu first obtained a copy of the discharge order, dated November 23, 2016.  The discharge order does not explain the grounds for the discharge but cites AR 135-178 as "authority" and indicates that the discharge type is "Uncharacterized."

115.    No one from the Army, including his unit, informed SPC Qu prior to July 27, 2018 that he had been discharged and, in fact, he continued to drill with his reserve unit from December 2016 through July 2018, and the Army paid him for those drills.  Moreover, SPC Qu paid for insurance related to his military service during that period, and those payments were accepted.

116.    The Army gave SPC Qu no advance notice of the discharge, no explanation at any time for the purported discharge, and no meaningful opportunity for him to respond to any purported discharge grounds.

117.    SPC Qu's discharge records do not include a Chapter 3 notice or any evidence of individual counseling or pre-discharge notification.

118.    On August 10, 2018, in response to this litigation, Defendants asserted that SPC Qu's separation was initiated due to "an unfavorable MSSD due to significant derogatory

information" but that the Army had revoked SPC Qu's discharge order on August 9, 2018, and that further processing would be suspended until SPC Qu could "be provided with notice and an opportunity to respond."  *See* Dkt. 22-1, at 4-5.

119.    Subsequently, DoD, in the related *Nio* action, stated that SPC Qu's MSSD is "pending," and Defendants have stated that SPC Qu would be subject to the procedures set forth in the October 26 Memo.

120.    Throughout 2019 and the first half of 2020, SPC Qu did not receive any notice pursuant to the October 26 Memo, despite Plaintiffs' counsel providing an additional current address to Defendants on January 31, 2020.  The Army nevertheless listed SPC Qu's status as "awaiting response" in its May 27, 2020 report.

121.    On June 10, 2020, Defendants represented that SPC Qu "is currently in the U.S. Army Reserve" and "was issued an adverse MSSR notice" pursuant to the October 26 Memo.

122.    Despite this asserted "issuance," SPC Qu never received an MSSR notification letter.  Aware that he had not received the notice, SPC Qu obtained a copy of his MSSR through FOIA, but it was missing the final "Acknowledgement of Notice and Election" page.

123.    On July 13, 2020, SPC Qu received an email from the Army stating:

You were previously sent an adverse Military Service Suitability Recommendation (MSSR) notification (see attached). We have not received a response from you, which should have been annotated on the Acknowledgement of Notice and Election form accompanying the attached MSSR notification letter.  At this time, you have five (5) business days to reply to this email (usarmy.pentagon.hqda-dcs-g-1.mbx.dmpm-mavni-ops@mail.mil) with the Acknowledgement of Notice and Election form completed and attached.  Additionally, you have 30 days from receipt of this notification to submit matters which may refute, correct, explain, extenuate, mitigate, or update the unfavorable information discussed in paragraph 4 of the attached MSSR notification letter.  Should you choose to submit rebuttal matters, they must be provided directly to the DCS G-1 MAVNI email inbox at usarmy.pentagon.hqda-dcs-g-1.mbx.dmpm-mavni-ops@mail.mil.

Be advised, if we do not receive the requested reply within five (5) business days, we will send you the attached MSSR notification via certified mail with return receipt and signature requested to the last residential address we have listed for you in our database.

124.    This email attached an MSSR Notice dated June 18, 2019.

125.    Despite the minimal information given in the MSSR Notice, SPC Qu sent in his response to the MSSR Notice in August 2020.

126.    To this day and despite his supposed "reinstatement," the Army has not fully reinstated or otherwise restored SPC Qu to his pre-discharge action status in the Army.   For example, in February 2020, SPC Qu was denied Tricare health insurance coverage, despite having been reinstated for one-and-a-half years.   SPC Qu also has been unable to obtain letters of recommendation from his unit, and his unit commander has been non-responsive to his requests. In addition, SPC Qu's information appears to have been cancelled or deleted from at least one Army system of record as a Navy recruiter was unable to locate him at all, which has prevented SPC Qu from potentially pursuing a path to officer with a different branch of the military.

### *Xiongzhou Zhang*

127.    Xiongzhou Zhang enlisted in the U.S. Army as a "Regular Army" MAVNI in the DEP program on January 21, 2016.  SPC Zhang is a non-U.S. citizen and was lawfully present in the United States at the time of his enlistment.  As a member of the DEP and until March 2018, SPC Zhang regularly attended the Army-sponsored Future Soldiers meetings while waiting to be sent to basic combat training.

128.    On March 28, 2018, SPC Zhang unexpectedly received a phone call from his recruiter informing him that he had been discharged and his enlistment contract cancelled because of unfavorable MSSD results.  In response to SPC Zhang's request for something in writing, his recruiter sent him a copy of an undated email reading:

> The below MAVNI [Future Soldiers] were just cancelled using code NP.  Final MAVNI MSSD results returned as Unfavorable due to significant credible derogatory information revealed during the CI screening.  Based on this information the [Future Soldiers] listed below are ineligible for enlistment and they have been cancelled in REQUEST.

33

Please inform the [Future Soldiers] of this cancellation and that the Military unsuitability decision may be reported to the United States Citizenship and Immigration Services.

Please have the BN complete DEP/DTP discharge using separation code ZBB, notify the TPU of assignment if a DTP and uplosmiad [sic] the DEP/DTP discharge order in ERM.

129. No one from the Army ever informed SPC Zhang prior to March 28, 2018 that he was being separated.

130. SPC Zhang received no prior notice of or explanation for the Army's discharge decision. The Army failed to provide SPC Zhang any opportunity to respond to or otherwise be heard regarding his discharge, and, at the time of the discharge decision, the Army did not take into account any statement or evidence from SPC Zhang.

131. In May 2017, SPC Zhang had been granted deferred action by USCIS for a period of two years, until May 14, 2019, with the option for renewal.

132. Approximately three months after being discharged, SPC Zhang spoke with the New York Times for an article about the Army's discharge actions that are the subject of this lawsuit. That article was published on July 6, 2018. *See* Dave Phillips, *They Came Here to Serve. But for Many Immigrants, the Army Isn't Interested*, N.Y. Times (July 6, 2018), *available at* www.nytimes.com/2018/07/06/us/army-immigrants-discharge.html. The article named and quoted SPC Zhang.

133. Just over one week after the New York Times article was published, on July 16, 2018, government agents appeared at SPC Zhang's apartment and placed him and his wife under arrest after verbally informing him that USCIS, based on his discharge from the Army, had cancelled his deferred action, which was not set to expire for another ten months. SPC Zhang had received no notice from USCIS about this cancellation. SPC Zhang was subsequently placed in removal proceedings.

134.    In November 2018, SPC Zhang was offered reinstatement in the Army pursuant to the October 26 Memo.  SPC Zhang accepted reinstatement in the Army in December 2018.

135.    Despite accepting reinstatement in December 2018, SPC Zhang has not received an MSSR Notice pursuant to the October 26 Memo.  In an effort to obtain an MSSR Notice, SPC Zhang has submitted updated address information to the Army and has twice filed FOIA requests. SPC Zhang has not been able to obtain information about his MSSR Notice through either method.

136.    Recently, the Army stated that SPC Zhang's MSSR is still "pending," even though, in March 2018, the Army, without notice, discharged SPC Zhang based on an MSSD.

137.    SPC Zhang still is in removal proceedings despite his status as a currently-serving U.S. Army soldier.  He was required to wear an ankle bracelet monitor for a full year, and since June 2019 has been required to report to ICE every week by telephone.

138.    To this day and despite his supposed "reinstatement," the Army has not fully reinstated or otherwise restored SPC Zhang to his pre-discharge action status in the Army.  While SPC Zhang has been informed by recruiters that his name and address appear in the Army's system of record with his enlistment contract, there is no other information available for him, and his files were not transferred when he informed his recruiter of his move from Rochester, New York to Philadelphia, Pennsylvania.

139.    Until SPC Zhang receives and is able to respond to an MSSR Notice, he cannot advance to basic combat training.  Under current Army practices, SPC Zhang cannot receive an N-426 until he begins his basic combat training service, meaning that he is restricted from seeking naturalization based on his military service due to the Army's actions.

### *Category 1 and/or 2 Plaintiffs*

### *Fang Lu*

140.    Fang Lu enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in March 2016 and signed an enlistment contract.  At the time of her enlistment, SPC Lu was a non-U.S. citizen lawfully present in the United States.  SPC Lu began drilling with her reserve Army unit in April 2016.

141.    SPC Lu submitted her N-400 Application for Naturalization to USCIS in or about March 2017.  The application included a duly executed Form N-426 by which the Army certified SPC Lu's honorable service in the military.  Also in or about March 2017, SPC Lu's commanding officer wrote a letter of recommendation, stating in part that SPC Lu "has been performing outstanding service under my command" and attesting that she "will make a positive impact to readiness of our unit and have a promising career in the U.S. military as I can personally verify her positive character and amazing moral disposition."

142.    In early July 2018, an Army recruiter informed SPC Lu by telephone that she was being discharged from the Army.  SPC Lu first obtained a copy of her discharge order from her recruiter on July 16, 2018.  That order was dated July 6, 2018, with an effective date of August 1, 2018.  The discharge order does not explain the grounds for the discharge but cites AR 135-178 as "authority" and indicates that the discharge type is "Entry Level Separation (Unfavorable MAVNI Investigation Results)."

143.    The Army gave SPC Lu no advance notice of the discharge, no explanation at any time of the purported discharge grounds, and no meaningful opportunity for her to respond to such discharge grounds.

144.    SPC Lu's discharge records do not include a Chapter 3 notice or any evidence of individual counseling or pre-discharge notification.

145.    SPC Lu has reason to believe that the discharge order was based on mistaken information, in part because, at the time of the discharge order, her military background investigations were not complete and DoDCAF had not even begun to adjudicate the investigation results.  Among other things, on July 30, 2018 – three weeks after the discharge orders – an investigator contacted SPC Lu stating that he was continuing to work on her military background investigation and had additional questions for her.  In addition, DoD reporting in the related *Nio* case, as of July 20, 2018, indicated that SPC Lu's MSSD was pending.

146.    On August 10, 2018, Defendants asserted that SPC Lu's separation was initiated due to "an unfavorable MSSD due to significant derogatory information" but that the Army had revoked SPC Lu's discharge order on August 9, 2018, and that further processing would be suspended until SPC Lu could "be provided with notice and an opportunity to respond."  *See* Dkt. 22-1, at 4.  Thereafter, Defendants stated that SPC Lu would be subject to the procedures set forth in the October 26 Memo.

147.    On June 10, 2020, Defendants represented that SPC Lu "is currently in the U.S. Army Reserve" and "was issued an adverse MSSR notice" pursuant to the October 26 Memo.

148.    SPC Lu received this MSSR Notice, dated September 9, 2019, on November 9, 2019.

149.    Because of the minimal information given in the MSSR Notice, SPC Lu sent in a response in December 2019, requesting copies of her counterintelligence and SSBI reports and additional time to refute or mitigate the unfavorable information once these documents were received.  After obtaining some of this missing information in December 2019 through her own

FOIA request, SPC Lu sent in a substantive response to the MSSR Notice in January 2020, again requesting copies of documents upon which the Notice was based.

150.    Despite having sent responses in December 2019 and January 2020, the Army's May 27, 2020 report still listed SPC Lu's status as "awaiting response," over four months later. SPC Lu subsequently received an email on July 10, 2020 from an Army email address asserting: "We have not received a response from you, which should have been annotated on the Acknowledgement of Notice and Election form accompanying the attached MSSR notification letter.  At this time, you have five (5) business days to reply to this email (usarmy.pentagon.hqda-dcs-g-1.mbx.dmpm-mavni-ops@mail.mil) with the Acknowledgment of Notice and Election form completed and attached."

151.    SPC Lu re-sent her responses, originally sent in December 2019 and January 2020, to the Army via email on July 10, 2020.  SPC Lu has received no further information on the status of her MSSR or MSSD.

152.    On the afternoon of November 19, 2020, SPC Lu received an email from the Senior Human Resources Sergeant for the 398th Combat Sustainment Support Battalion.  A number of other Army personnel were copied on the email, which stated the following:

> Please see attached discharge order effective 18 NOV 20.  Please note that this order has been password protected. Please refer to the other email that was sent with password instructions. Thank you.

153.    The discharge order, Orders 20-321-00018 from the U.S. Army Reserve Command, is dated November 16, 2020 and provides the following:

```
You are discharged from component shown.

Authority: AR 135-178
Effective date: 18 November 2020
Component: United States Army Reserve
Type of Discharge:  UNCHARACTERIZED
Additional Instructions: NA
Format: 500
```

38

154.    SPC Lu has not been informed of the grounds for this supposed discharge.

155.    SPC Lu drilled with her unit during November 13-15, 2020, but she received no indication that a discharge order was imminent or that there was any problem with her service.

156.    SPC Lu did not receive any notice in advance of this discharge action.  She was not provided any individual counseling or pre-discharge notification.

157.    Even though the Army's October 26 Memo requires a notice under Chapter 3 of AR 135-178, SPC Lu received no such notice.

158.    Even though the discharge order cites AR 135-178, SPC Lu did not receive the notice required for discharges under that regulation.

### *Anton Tate*

159.    Anton Tate enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in January 2016 and signed an enlistment contract.  He enlisted as a Private First Class (E-3) but thereafter was promoted to the rank of Specialist (E-4).  At the time of his enlistment, SPC Tate was a non-U.S. citizen lawfully present in the United States.  SPC Tate began drilling with his Army reserve unit after enlistment.

160.    As part of his naturalization application, SPC Tate submitted a Form N-426 certified by the Army identifying his service as "honorable."  He has never been informed by the commanders in his unit or any other Army personnel that his performance was unsatisfactory or that his conduct was improper.

161.    SPC Tate received an MSSR Notice in early 2020, and he timely provided a response to the finding in that Notice.  On March 3, 2020, the Army acknowledged receipt of that response.

162.    Since that March 3 acknowledgement, SPC Tate has heard nothing from the Army about the MSSR, any MSSD, or any National Security Determination ("NSD").

163.    Since the global pandemic began, SPC Tate's unit has been conducting most of its drills virtually.  However, there was an in-person drill in October 2020.  SPC Tate participated in both the virtual and in-person drills since he submitted his MSSR Notice response.

164.    On November 17, 2020, the Unit Administrator assigned to SPC Tate's unit contacted SPC Tate and sent him a copy of Orders 20-321-00020, dated November 16, 2020.  This order, issued by the U.S. Army Reserve Command, is directed at SPC Tate and states the following:

```
You are discharged from component shown.

Authority: AR 135-178
Effective date: 18 November 2020
Component: United States Army Reserve
Type of Discharge:  UNCHARACTERIZED
Additional Instructions: NA
Format: 500
```

165.    SPC Tate does not know why he has been discharged.  The order does not provide any grounds for the discharge, and SPC Tate is not aware of any grounds that would justify his discharge from the Army.

166.    The Unit Administrator was not able to tell SPC Tate why he received this order or why he was being discharged.  In fact, the Unit Administrator asked SPC Tate if *he* knew the origin of the order.

167.    The Unit Administrator instructed SPC Tate to stop attending drills because SPC Tate will not be paid for his drill service if he is not "on [the] books."

168.    SPC Tate did not receive any notice in advance of this discharge action.  He was not provided any individual counseling or pre-discharge notification.  He did not receive the

written notice described in Chapter 3 of AR 135-178 and described in the Army's October 26 Memo, even though the discharge order cites AR 135-178 as the "authority" for the discharge.

### *Yue Yin*

169.    Yue Yin enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in December 2015, signed an enlistment contract, and took her service oath.   At the time of her enlistment, SPC Yin was a non-U.S. citizen lawfully present in the United States.  Following her enlistment, beginning around March 2016, SPC Yin regularly drilled with her reserve Army unit.

170.    The Army has certified SPC Yin's service as honorable on a Form N-426.

171.    On May 25, 2017, an Army Recruiting Battalion in Minnesota issued order number 145-01, which included the following:

> You are discharged from component shown.
>
> Authority:  AR 135-178
> Effective date: 1 JUNE 2017
> Component:  United States Army Reserve
> Type of Discharge:  Uncharacterized
> Additional Instruction: No Travel Required / Unit Request, **ZFA**
> Format:  500

172.    The Army gave SPC Yin no advance notice of this discharge action, no explanation at any time of the purported discharge grounds, and no meaningful opportunity for her to respond to such discharge grounds.  SPC Yin has never received a Chapter 3 notice under AR 135-178. Nor has she received any pre-discharge individual counseling.

173.    Since issuing that order, the Army has represented multiple times that orders such as SPC Yin's are not orders discharging a DTP soldier from the Army.  The Army has represented that only a discharge order from the Army Reserve Command (USARC) actually discharges a DTP soldier from the Army.

41

174.    SPC Yin has never been provided a discharge order from the Army Reserve Command (USARC).

175.    Yet, Army personnel informed USCIS that SPC Yin was discharged from the Army on the basis of the Recruiting Command (USAREC) discharge order alone.

176.    As a result of that message from the Army to USCIS, USCIS referred SPC Yin to the Justice Department for criminal prosecution, resulting in her indictment and arrest for federal crimes punishable by fines and multi-year imprisonment terms.  According to USCIS, SPC Yin lied to USCIS during her naturalization interview when she stated that the she had not been discharged by the U.S. Army by the Recruiting Command discharge order, even though SPC Yin's statement exactly matched what the Army represented in this litigation on multiple occasions.  It took SPC Yin and her federal defender months – with no help from USCIS or the Army – to convince the U.S. Attorney's Office to dismiss the charges.

177.    Beyond the completely unwarranted criminal indictment, arrest, and prosecution, the Army's discharge action against SPC Yin caused her to be denied naturalization for an extended period of time, leaving her without the benefits of naturalization, including the security that comes with legal status as a U.S. citizen, the ability to travel with a U.S. passport, and the right to vote.  Further, because of Defendants' actions, Ms. Yin lost her job, lost her medical insurance coverage, and had to postpone her educational and career aspirations.

178.    Even though SPC Yin never was validly discharged by the Army (and the Army has acknowledged that), the discharge actions the Army initiated with respect to SPC Yin are having the effect of her being discharged from the perspective of her military service.  SPC Yin has not been able to meaningfully continue with her military service or further her military career because of Defendants' no-notice, improper discharge action in 2017, which Defendants have done

42

nothing to fix.  Even though the Army has represented in this litigation that SPC Yin is not discharged by the order she received, she is coded in Army systems in such a way that her TriCare insurance has not been reinstated, she is not allowed to drill with her unit, she is not able to change her unit, she cannot pursue an officer position (even though she now is a naturalized citizen), she cannot move to a military job that matches the healthcare skillsets she has obtained, and she is not able to re-enlist in the Army or another military branch.

### *Sai Krishna Uppugandla*

179.    Sai Krishna Uppugandla enlisted in the U.S. Army as a MAVNI in December 2015 and was assigned to the DEP.  He signed an enlistment contract as part of his joining the Army and was given the rank of Specialist (E-4).  At the time of his enlistment, SPC Uppugandla was a non-U.S. citizen lawfully present in the United States.  SPC Uppugandla attended the meetings mandated by the Army after his enlistment.

180.    Like many hundreds of other MAVNI soldiers, SPC Uppugandla's ship date for BCT was delayed.  The Army claimed that those dates were adjusted in order to allow the Army to perform additional background checks on MAVNI soldiers.

181.    Because the Army was not forthcoming with information about how long he would have to wait to ship to BCT or where he was in the background check process, SPC Uppugandla tried to locate that information.  SPC Uppugandla reached out to Senator Rob Portman for assistance.  In a letter dated September 13, 2018, the Army wrote, among other things, the following in response to the inquiry from Senator Portman's office:

Given these recent changes to the MAVNI program directed by the USD(P&R), all individuals who enlisted through the MAVNI program must undergo additional security screening before being able to ship to initial entry training.  The Army has implemented and fully complies with the USD(P&R) policy for recent MAVNI enlistments, while the other exceptional Soldiers who previously enlisted through the MAVNI program continue to serve throughout the Force.

The Personnel Security Investigation process that Mr. Uppugandla completed was returned with unfavorable results.  This information, identified during the security screening investigation by the DoD Central Adjudication Facility (DoDCAF), indicates Mr. Uppugandla did not meet requirements established by law for retention in the Army. Accordingly, Mr. Uppugandla was discharged from the Army December 19, 2017.

182.    Prior to receiving a copy of this letter, SPC Uppugandla had not been informed of an Army discharge action.  He thought he was still in the Army and just waiting for the Army's background check results like many hundreds of other MAVNIs.

183.    However, given the grounds for discharge described in the Army's letter to Senator Portman, SPC Uppugandla should have been offered reinstatement under the Army's October 26 Memo.  He never received an offer of reinstatement from the Army.

184.    More recently, when inquiries were made to the Army on SPC Uppugandla's behalf concerning his status and potential reinstatement, the Army reported that he had been discharged in December 2017 and would not be offered reinstatement.  The Army recently reported that his discharge was not because of a background check (as the Army reported to Senator Portman) but because the Army failed to complete the background checks within two years of SPC Uppugandla's enlistment, supposedly necessitating his discharge under the 730-day "time-out" policy.

185.    Since shortly after initiation of this lawsuit in mid-2017, Defendants repeatedly have assured this Court that MAVNI soldiers would not be discharged under the 730-day "time-out" policy.

186.     SPC Uppugandla does not recall ever receiving an "opt-in/opt-out" notice concerning continuing his service in the Army.

187.     SPC Uppugandla does not recall ever "opting out" of continuing his service with the Army.

188.     SPC Uppugandla does not know why he has been discharged because the Army, post-discharge, has asserted two different explanations.

189.     Regardless of the reason for the discharge, SPC Uppugandla did not receive adequate notice in advance of this discharge action.   He was not provided any individual counseling or pre-discharge written notification.   He did not receive the written notice described in Chapter 3 of AR 135-178 and described in the Army's October 26 Memo.

190.     He was not advised that he would be receiving an "uncharacterized" discharge.

191.     To this day, he has not been provided an order discharging him from the Army.

### *Zehua Bian*

192.     Zehua Bian enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in March 2016 and signed an enlistment contract.   He holds the rank of Specialist (E-4).   At the time of his enlistment, SPC Bian was a non-U.S. citizen lawfully present in the United States.   SPC Bian began drilling with his Army reserve unit after enlistment.

193.     As part of his naturalization application, SPC Bian submitted a Form N-426 certified by the Army identifying his service as "honorable."

194.     SPC Bian has been serving with his unit during the pandemic through drills held virtually.   He has identified himself during roll calls, except for the occasions where his name was not called.   For those occasions, he contacted his command separately and was assured that his presence was noted.   He then was paid for those drills.

195.    SPC Bian recently received a document entitled "Notification of Separation Proceedings for Separation under AR 135-178, Chapter 8, Unsatisfactory Performance," which is dated October 27, 2020.  The document states that he is being recommended for an uncharacterized discharge.

196.    SPC Bian does not know why he received this document or is being targeted for discharge.  He has never been informed by the commanders in his unit that his performance was unsatisfactory or that his conduct was improper.

197.    He has not been advised of how his performance was unsatisfactory.  He has not been given the opportunity to improve his performance.  SPC Bian is not aware of any grounds for his discharge from the Army.

198.    If this discharge action is really based on MSSR/MSSD reasons, the Army has not identified it as such or provided SPC Bian with the process described in the October 26 Memo.

199.    If this discharge action is really based on the Army's time-out policy, the Army has not properly identified it as such.  Nor has the Army explained how it can discharge SPC Bian, or any other MAVNI under the time-out policy, given the Army's representations in this case that MAVNIs will not be discharged for that reason and given the Army's admissions that the soldiers cannot be faulted for the excessive delays that have left MAVNIs stuck serving in entry-level status in the DTP and DEP for years.

### *Dr. Sameer Dogra*

200.    Dr. Sameer Dogra, a dentist, enlisted in the U.S. Army Reserve as a MAVNI in the DTP program in December 2015 and signed an enlistment contract.  He enlisted as a Specialist (E-4).  At the time of his enlistment, SPC Tate was a non-U.S. citizen lawfully present in the United States.  SPC Dogra has been drilling regularly with his unit since August 2016.

46

201.    As part of his naturalization application, SPC Dogra submitted a Form N-426 certified by the Army identifying his service as "honorable."  He has never been informed by the commanders in his unit or any other Army personnel that his performance is unsatisfactory or that his conduct is improper.

202.    SPC Dogra received an MSSR Notice in February 2020, and he timely provided a response to the finding in that Notice.

203.    Since providing the response to the MSSR Notice in February 2020, SPC Dogra has heard nothing from the Army about the MSSR, any MSSD, or any NSD.

204.    SPC Dogra attended the in-person drill with his unit in November 2020.

205.    On the morning of November 25, 2020, SPC Dogra received a phone call from someone in his doctor's office, who informed him that they were not able to process claims through his TriCare insurance.  SPC Dogra thereafter contacted TriCare and tried to contact DEERs, but was not able to get the insurance issue resolved.  On November 25, 2020, he also discovered that his military email was not working.

206.    On the afternoon of November 25, 2020, SPC Dogra received a call from a Lieutenant in his unit, who informed him that he had been discharged from the military.  The Lieutenant did not tell him any grounds or reason for the discharge.  When SPC Dogra asked whether his naturalization would be impacted by the discharge, the Lieutenant stated that because SPC Dogra already was naturalized as a U.S. citizen, there would be no impact.

207.    On the afternoon of November 25, 2020, SPC Dogra received a copy of Orders 20-323-00002, dated November 18, 2020. This order, issued by the U.S. Army Reserve Command, is directed at SPC Dogra and states the following:

```
You are discharged from component shown.

Authority: AR 135-178
Effective date: 20 November 2020
Component: United States Army Reserve
Type of Discharge:  UNCHARACTERIZED
Additional Instructions: NA
Format: 500
```

208.    SPC Dogra does not know why he has been discharged.  The order does not provide

any grounds for the discharge, and SPC Dogra is not aware of any grounds that would justify his

discharge from the Army.

209.    SPC Dogra did not receive any notice in advance of this discharge action.  He was

not provided any individual counseling or pre-discharge notification.  He did not receive the

written notice described in Chapter 3 of AR 135-178 and described in the Army's October 26

Memo, even though the discharge order cites that AR 135-178 as the "authority" for the discharge.

### *Category 2 Plaintiffs*

210.    The following plaintiffs fit into Category 2 – MAVNI DTP or DEP soldiers

discharged or effectively discharged for other-than-MSSD reasons and who thus are not subject to

the October 26 Memo.

211.    Defendants already have admitted that DTP plaintiffs in Category 2 did not receive

the requisite notice or process in advance of discharge actions and have indicated that such soldiers

are being offered reinstatement.  However, these violations have not been remedied even for those

plaintiffs offered reinstatement because these soldiers either (i) still are being treated as

"effectively discharged" despite reinstatement, and/or (ii) the Army has failed to acknowledge the

acceptance of reinstatement offers which soldiers properly have submitted.

48

212.     DEP plaintiffs in Category 2 have not been offered reinstatement despite lacking the same requisite notice and process in advance of discharge actions as DTP plaintiffs in the category.

### *Hyunsung Kim*

213.     Hyunsung Kim enlisted in the U.S. Army as a Regular Army MAVNI in the DEP program on June 8, 2015.  PFC Kim is a non-U.S. citizen and was lawfully present in the United States at the time of his enlistment.  As a member of the DEP, PFC Kim remained physically fit and regularly attended the Army-sponsored Future Soldiers meetings from April 2015 to February 2017 while waiting to be sent to basic combat training.  His recruiter frequently noted that he was "motivated and ready to ship."

214.     PFC Kim's original ship date was December 27, 2015.  But, in December 2015, his ship date was moved to March 2016.  In April 2016, the Army involuntarily extended his contract for the second time, so that he was scheduled to remain in the DEP for another year.  Then in June 2016, his ship date was pushed out for the third time to October 2016.  And then in September the date was pushed out for a fourth time to March 2017 before being postponed indefinitely.

215.     In April 2017, PFC Kim moved from Spokane Valley, Washington to Renton, Washington for a job opportunity.  Prior to his move, PFC Kim informed his recruiter of his new contact information and reiterated his desire to ship to basic combat training; his phone number remained the same.

216.     PFC Kim never received any notification of discharge nor was he ever contacted about it.

217.     Instead, PFC Kim periodically attempted to check in with the recruiting offices near his new place of residence, but the recruiters declined to assist him further when he noted that he already was enlisted.

218.     Because his deferred action status was set to expire in April 2019, PFC Kim went to check in with the recruiting office again in early 2019.  On this occasion, the recruiter looked PFC Kim up in the system and found a discharge "order" dated from July 2017.  PFC Kim had never been informed of this discharge.

219.     Inexplicably, the "Contact History Details" for the Spokane Valley recruiting office contain a June 12, 2017 entry reading "Not Interested-Terminate" despite the fact that PFC Kim had continued to express his interest, updated his contact information, and checked in with recruiting offices.

220.     The Army provided PFC Kim no advance notice of or grounds for the discharge, let alone any meaningful opportunity for PFC Kim to respond to such notice or grounds.

### *Category 3 Plaintiffs*

221.     The following plaintiffs fit into Category 3, which is made up of former DTP and DEP MAVNI soldiers (*i.e.*, MAVNIs discharged after they moved out of the Delayed Training Program or Delayed Entry Program) discharged for other-than-MSSD reasons while still in an entry-level status according to the Army.

222.     While these soldiers were informed that they were being discharged, they did not receive proper notice and process because the Army did not provide them with legal counseling regarding their discharges and did not properly inform them of the adverse consequences of receiving "uncharacterized" discharges, including that USCIS would deny their pending naturalization applications on that basis.

223.    The Army certainly did not provide them with a board of officers or court martial proceeding, which is required when the Army gives the soldier an "other than honorable" discharge.  Given that USCIS is treating Form DD-214s with "uncharacterized" as the discharge description as Army certifications of "other than honorable" discharges, such process was necessary unless USCIS's view of the DD-214s is incorrect.

### *Gunay Miriyeva*

224.    Gunay Miriyeva enlisted in the U.S. Army Reserve as a MAVNI in the DTP program on March 14, 2016.  SPC Miriyeva is a non-U.S. citizen and was lawfully present in the United States at the time of her enlistment.  As a member of the DTP, SPC Miriyeva attended drills with her reserve unit prior to shipping to basic combat training.

225.    SPC Miriyeva applied for naturalization on the basis of her military service on March 29, 2018.  On October 4, 2018, USCIS approved SPC Miriyeva's naturalization application but then failed to schedule her for an oath ceremony prior to her shipping to basic combat training.

226.    On November 5, 2018, the U.S. Army shipped SPC Miriyeva to basic combat training in Fort Jackson, South Carolina, where she began serving in an "active duty" status.

227.    While at basic combat training, Army medical personnel diagnosed SPC Miriyeva with a fibroadenoma, and Army physicians told her that she was medically unable to continue serving in the U.S. Army at that time.

228.    In response to SPC Miriyeva's questions about her anticipated separation, U.S. Army personnel told her that she would receive an "honorable" discharge because her service had been honorable and her discharge was due to medical reasons.

229.    On December 21, 2018, the Army issued a DD-214 discharging SPC Miriyeva from active duty because of her medical condition.  The DD-214 lists SPC Miriyeva's discharge type

as "uncharacterized" and states that the discharge was for "failed medical/physical/procurement standards."

230.     The U.S. Army did not provide SPC Miriyeva with legal counseling regarding her discharge, and the Army did not inform SPC Miriyeva that an "uncharacterized" discharge on her DD-214 would be treated as an "other than honorable" discharge, would make her ineligible for naturalization under 8 U.S.C. § 1440, or would otherwise prejudice her in civilian life. SPC Miriyeva never received notice that her uncharacterized discharge would be considered anything less than an honorable discharge, and she was not informed that her discharge would be treated as less than a general-under honorable conditions discharge or as an other than honorable discharge.

231.     Based on this "uncharacterized" discharge, USCIS reopened SPC Miriyeva's previously-approved naturalization decision (which was only awaiting an oath ceremony at that point) and then revoked its prior approval for the sole reason that it did not consider her "uncharacterized" discharge (as reflected on the DD-214) to be an under honorable conditions discharge for purposes of § 1440.

232.     In addition, the reputational effects of having an "uncharacterized" discharge have impacted other areas of SPC Miriyeva's life. For example, SPC Miriyeva is worried that she will be at a disadvantage when applying for jobs and or when her discharge appears in background checks for employment or other purposes. And SPC Miriyeva has concerns about being disadvantaged in her civilian life because of her discharge, given that her "uncharacterized" discharge is being treated by a federal agency as an "other than honorable" discharge. As a result, SPC Miriyeva has begun avoiding mentioning her military service at all when disclosure is not required.

### *Siddhi Kulkarni*

233.    Siddhi Kulkarni enlisted in the U.S. Army as a soldier who ultimately would serve in the Regular Army.  She enlisted through the MAVNI program and began her service in a reserve component in the DEP program on January 22, 2016.  SPC Kulkarni is a non-U.S. citizen and was lawfully present in the United States at the time of her enlistment.

234.    On May 30, 2018, the U.S. Army shipped SPC Kulkarni to basic combat training at Fort Leonard Wood, Missouri, where she began serving in an "active duty" status.

235.    While at basic combat training, SPC Kulkarni suffered serious bilateral pelvic and knee fractures, and Army medical personnel recommended that SPC Kulkarni be transferred to the Warrior Training & Rehabilitation Program, Fitness Training Unit, 43rd AG Battalion "at the earliest opportunity."

236.    After four months of physical rehabilitation and notwithstanding SPC Kulkarni's progress and her expressed desire to complete basic combat training and continue her military service, the Army determined that her pelvic fractures had not yet healed.

237.    On November 7, 2018, on a generic "Counseling Form," the Army informed SPC Kulkarni that her "unsatisfactory duty performance" – *i.e.*, her multiple bone fractures – "may result in initiation of separation action to eliminate you from the Army.  If you are separated for unsatisfactory performance, you could receive an Honorable, General, or Other than Honorable (OTH) Discharge. A General or OTH Discharge could severely prejudice you in civilian life."

238.    The separation-related "Election of Rights" form received by SPC Kulkarni reads: "I understand that if I have less than 6 years of total active and reserve military service on the date of initiation of recommendation for separation, I am not entitled to have my case heard by an administrative separation board unless I am being considered under Other Than Honorable

conditions."  SPC Kulkarni circled "not entitled" to indicate her understanding that she would not be receiving an "Other Than Honorable" discharge.

239.    On December 7, 2018, the Army issued a DD-214 discharging SPC Kulkarni from active duty because of her medical condition.  The DD-214 lists SPC Kulkarni's discharge type as "uncharacterized" and states that the discharge was "for [the] convenience of the government" due to "other designated physical or mental condition not amounting to a disability."

240.    The U.S. Army did not provide SPC Kulkarni with appropriate legal counseling regarding her discharge, and the Army did not inform SPC Kulkarni that an "uncharacterized" discharge would be treated as an "other than honorable" discharge, would make her ineligible for naturalization under § 1440, or would otherwise prejudice her in civilian life.  SPC Kulkarni never received notice that her uncharacterized discharge would be considered anything less than an honorable discharge.  She did not receive notice that her discharge would be treated as less than a general-under honorable conditions discharge or as an other than honorable discharge.

241.    SPC Kulkarni specifically inquired about the possible effect of an uncharacterized discharge on her immigration status.  The Army Trial Defense Service attorney with whom SPC Kulkarni spoke informed her that she did not deal with immigration matters.  SPC Kulkarni then asked her commanding officer if she could have access to a phone to contact her personal immigration attorney, but her commanding officer refused to allow her to do so and insisted that she sign the discharge papers.

242.    SPC Kulkarni applied for naturalization on the basis of her military service on December 21, 2018.  SPC Kulkarni was denied naturalization on June 5, 2019 for the sole reason that she "received an uncharacterized discharge from the U.S. Armed Forces."

### *Ann Tum*

243.    Ann Tum enlisted in the U.S. Army Reserve as a MAVNI in the DTP program on March 17, 2016.  PFC Tum is a non-U.S. citizen and was lawfully present in the United States at the time of her enlistment.  As part of the DTP, PFC Tum attended drills with her reserve unit prior to shipping to basic combat training.

244.    On November 19, 2018, the U.S. Army shipped PFC Tum to basic combat training at Fort Jackson, South Carolina, where she began serving in an "active duty" status.

245.    While at basic combat training, Army medical personnel diagnosed PFC Tum with "essential (primary) hypertension," and, in January 2019, Army physicians determined that she could not continue basic combat training at that time and recommended that she be separated due to her medical condition.

246.    Army personnel told PFC Tum that if she went home rather than remain at basic combat training, then her medical condition would more likely improve, making it easier for her to later return.  The U.S. Army told PFC Tum that she would be able to return to the Army after six months.  This information turned out to be false.   PFC Tum cannot return to the Army because USCIS denied her naturalization application solely on the basis of her uncharacterized discharge and because the Army discontinued non-citizen enlistments under the MAVNI program in September 2016.

247.    The U.S. Army did not provide PFC Tum with legal counseling regarding her discharge, and PFC Tum was not informed that USCIS would deny her pending naturalization application if she received an uncharacterized discharge.

248.    The Army also did not tell PFC Tum that if she remained in the Army during her rehabilitation, resulting in 180 days on active duty, then the Army would have been required to

characterize her discharge on Form DD-214 and, in PFC Tum's case, that discharge characterization would have been "honorable."

249.    On February 19, 2019, the Army issued a DD-214 discharging PFC Tum from active duty because of her medical condition.  The DD-214 lists PFC Tum's discharge type as "uncharacterized" and states that the discharge was for "failed medical/physical/procurement standards."

250.    The Army did not inform PFC Tum that an "uncharacterized" discharge would be treated as an "other than honorable" discharge, would make her ineligible for naturalization under § 1440, or would otherwise prejudice her in civilian life.  PFC Tum never received notice that her uncharacterized discharge would be considered anything less than an honorable discharge.

251.    Based on this "uncharacterized" discharge, PFC Tum was denied naturalization on May 28, 2019 for the sole reason that "[y]our DD Form 214, Certificate of Release or Discharge from Active Duty, reflects that [on, *sic*] February 19, 2019, you received an uncharacterized discharge."

### *Sandeep Mahat*

252.    Sandeep Mahat enlisted in the U.S. Army Reserve as a MAVNI in the DTP program on April 5, 2016.  SPC Mahat is a non-U.S. citizen and was lawfully present in the United States at the time of his enlistment.  As part of the DTP, SPC Mahat attended drills with his reserve unit prior to shipping to basic combat training.

253.    In March 2018, SPC Mahat applied for naturalization on the basis of his military service, but he was not scheduled for his naturalization interview until January 2019.

254.    In August 2018, the U.S. Army shipped SPC Mahat to basic combat training at Fort Leonard Wood, Missouri, where he began serving in an "active duty" status.

56

255.     During a regular physical examination at basic combat training, the Army discovered an issue with one of SPC Mahat's eyes and recommended separation.

256.     SPC Mahat asked about challenging this medical finding, getting assistance from legal counsel (including with respect to how his discharge would relate to his pending naturalization application), and getting a medical waiver so he could continue serving.  In addition, SPC Mahat asked to be retained on duty and to serve in a capacity his condition allowed.

257.     At the time, SPC Mahat's understanding was that he would be receiving an "uncharacterized" discharge, but that this type of discharge was not considered an other than honorable discharge.

258.     Ultimately, in October 2018, the Army discharged SPC Mahat based on the eye condition that the Army determined would not allow SPC Mahat to continue serving in the military.  On October 3, 2018, the Army issued a DD-214 discharging SPC Mahat from active duty.  The DD-214 lists SPC Mahat's discharge type as "uncharacterized."

259.     The U.S. Army did not provide SPC Mahat with legal counseling regarding his discharge, and the Army did not inform SPC Mahat that an "uncharacterized" discharge would be treated as an "other than honorable" discharge, would make him ineligible for naturalization under § 1440, or would otherwise prejudice him in civilian life.  SPC Mahat never received notice that his uncharacterized discharge would be considered anything less than an honorable discharge.  SPC Mahat was not notified that his discharge would be treated as less than a general-under honorable conditions discharge or as an other than honorable discharge.

260.     On March 3, 2020, USCIS issued a Notice of Intent to Deny ("NOID") SPC Mahat's naturalization application unless he can "overcome the findings" that he had not demonstrated that he was discharged from the Army under honorable conditions based on the

"uncharacterized" discharge on his DD-214.  Pursuant to USCIS policy and practice, a NOID specifies all applicable grounds for denying an application.  To date, USCIS has not naturalized SPC Mahat.

### *Anish Shrestha*

261.    Anish Shrestha enlisted in the U.S. Army as a Regular Army MAVNI in December 2015, and initially served in a reserve component in the DEP.  SPC Shrestha is a non-U.S. citizen and was lawfully present in the United States at the time of his enlistment.

262.    In May 2019, the U.S. Army shipped SPC Shrestha to basic combat training at Fort Jackson, South Carolina, where he began serving in an "active duty" status.

263.    While at "reception" in Fort Jackson, an Army physician administered a tuberculosis test to SPC Shrestha and claimed that the results indicated he had incipient tuberculosis.  Without waiting for a formal, confirming diagnosis, SPC Shrestha was required to begin taking medication for tuberculosis.  SPC Shrestha was not allowed to proceed to training, and instead the Army recommended separation.

264.    Once SPC Shrestha returned home to New York, his doctor determined that he did not have tuberculosis.

265.    In June 2019, the Army discharged SPC Shrestha based on the incorrect diagnosis of incipient tuberculosis.  On June 21, 2019, the Army issued a DD-214 discharging SPC Shrestha from active duty.  The DD-214 lists SPC Shrestha's discharge type as "uncharacterized."

266.    The U.S. Army did not provide SPC Shrestha with legal counseling regarding his discharge, and the Army did not inform SPC Shrestha that an "uncharacterized" discharge would be treated as an "other than honorable" discharge, would make him ineligible for naturalization under § 1440, or would otherwise prejudice him in civilian life.  SPC Shrestha never received

notice that his uncharacterized discharge would be considered anything less than an honorable discharge, would be considered less than a general-under honorable conditions discharge, or would be treated as an other than honorable discharge.

267.     In February 2020, SPC Shrestha applied for naturalization on the basis of his military service and was subsequently scheduled for a naturalization interview.

268.     SPC Shrestha requested that his naturalization interview be de-scheduled and put on hold based on his knowledge of the current USCIS policy to deny naturalization solely on the basis of an uncharacterized discharge.   To date, USCIS has not adjudicated SPC Shrestha's naturalization application or indicated that it is adjusting its policy of treating uncharacterized discharges as disqualifying for naturalization under 8 U.S.C. §§ 1439 and 1440.

### *Shengfan Yang*

269.     Shengfan Yang enlisted in the U.S. Army as a Regular Army MAVNI in the DEP program on February 5, 2016, and subsequently renegotiated to enter into a new enlistment contract beginning May 1, 2019.  PFC Yang is a non-U.S. citizen and was lawfully present in the United States at the time of his enlistment.

270.     In May 2019, the U.S. Army shipped PFC Yang to basic combat training at Fort Benning, Georgia, where he began serving in an "active duty" status.

271.     While at basic combat training, PFC Yang's senior drill sergeant conducted a footlocker inspection on September 11, 2019 and found three items considered by the Army to be "contraband": medication PFC Yang had received from the Army that had expired, nicotine pills prescribed by his family doctor to assist him in quitting smoking, and an iPhone charger cable. PFC Yang received three separate counseling forms for these three items.

272.    The counseling forms, all dated September 14, 2019, stated that PFC Yang was counseled "that if this behavior continues, separation under the provisions of AR 635-200 may be initiated; … that if separated prior to ETS, that he/she could receive an honorable, general, or other than honorable discharge for the current term of service, or the term of service would be uncharacterized if less than 180 days had been served on active duty."

273.    The counseling forms also state that PFC Yang was counseled that he "will be given a reasonable chance to bring substandard performance and conduct to acceptable military standards."

274.    Despite this statement and without any additional intervening counseling or conduct events, PFC Yang was recommended for discharge just over one week later.  The form recommending discharge indicates that PFC Yang was counseled that he "could receive an Honorable Discharge, a General (Under Honorable Conditions) Discharge, or Under Other Than Honorable Conditions Discharge."  The form does not mention or describe an "uncharacterized" discharge.

275.    On October 9, 2019, the Army issued a DD-214 discharging PFC Yang from active duty due to "Entry Level Performance and Conduct."  The DD-214 lists PFC Yang's discharge type as "uncharacterized."

276.    The U.S. Army did not provide PFC Yang with legal counseling regarding his discharge, despite PFC Yang's request for such counsel.  The Army did not inform PFC Yang that an "uncharacterized" discharge would be treated as an "other than honorable" discharge, would make him ineligible for naturalization under § 1440, or would otherwise prejudice him in civilian life.  PFC Yang never received notice that his uncharacterized discharge would be considered

anything less than an honorable discharge, that it would be considered less than a general-under honorable conditions discharge, or that it would be considered an other than honorable discharge.

277.     Instead, PFC Yang was verbally told during counseling that he could reenlist in the Army after six months, which matches the discharge counseling form statement regarding reenlistment after a period of time for an "Honorable" or "General" discharge.  PFC Yang later discovered that this statement was inaccurate because he would only be able to reenlist if he was a citizen or a legal permanent resident, but USCIS refuses to naturalize him as a U.S. citizen.

278.     Following his discharge, in May 2020, PFC Yang applied for naturalization on the basis of his military service and included his DD-214 in lieu of a certified N-426.

279.     To date, USCIS has not adjudicated PFC Yang's naturalization application.  Were USCIS to apply its current policy to PFC Yang's naturalization application, it would be denied on the basis of the uncharacterized discharge identified on his DD-214.

*** 

280.    The circumstances described above with respect to the individually-named Plaintiffs are consistent with known discharge actions taken against other MAVNI enlistees.

### The Summary Discharges Violate Regulations and the Constitution

281.    Defendants' summary discharges – whether of soldiers with unfavorable MSSDs or for "other reasons" (where the soldiers did not have unfavorable MSSDs) – and Defendants' failure to provide notice of the unfavorable consequences of such "uncharacterized" discharges and the process necessary when issuing a discharge that is treated as "other than honorable," violate Army regulations, DoD regulations, and the fundamental requirements of due process and equal protection.

### _Army Regulations Applicable to Involuntary Administrative Discharges_

282.    All Plaintiffs and proposed class members in this action were the subjects of involuntary administrative discharge actions by Defendants.  This action does not involve discharges that were made on a voluntary basis, _i.e._, at a soldier's request or with the soldier's understanding and prior informed consent.

283.    All of the discharge actions against Category 1 and 2 Plaintiffs and proposed class members were subject to the Chapter 3 notification procedure of AR 135-178.  This procedure provides the soldier with certain due process rights prior to discharge, including, among other things, the right to be informed of the basis and reasons for discharge, the right to obtain copies of any documents that will be provided to the separation authority, the right to consult with military counsel, and the right to submit a responsive statement.

284.    Discharge orders obtained by Plaintiffs (where available) cite AR 135-178 as "authority" for involuntary administrative discharges.  Even the October 26 Memo cites AR 135-178 as governing authority for administrative discharge actions.

285.    AR 135-178 applies to both DTP soldiers and DEP soldiers without exception.  _See, e.g._, AR 135-178 at ¶¶ 14-5 – 14-7 ("Separation from the Delayed Entry Program").

286.    Army Regulation 135-178 specifies that its "purpose" is to ensure "the **_orderly_** administrative separation of . . . enlisted soldiers." AR 135-178 at ¶ 1-1 (emphasis added).  Chapter 3, titled "Guidelines for Separation," sets forth the process that must occur in advance of the discharges, specifying that:

> **_[T]he commander will notify the Soldier, in writing_**, of the matter set forth in this section . . .

> (1)    **_The basis of the proposed separation_**, including the circumstances upon which the action is based, and a reference to the applicable provisions of this regulation.

(2)     ***Whether the proposed separation*** could result in a discharge from the Army . . . or release from custody or control of the Army.

(3)     The least favorable characterization or description of service authorized ***for the proposed separation***.

(4)     The right to obtain copies of documents that will be sent to the separation authority supporting the basis of the ***proposed separation***.  . . .

(5)     The Soldier's right to submit statements.

(6)     The Soldier's right to consult with military legal counsel.  . . .

(8)     The right to waive the rights in paragraphs 3-5*a*(4) through (7), in writing . . . after being afforded a reasonable opportunity to counsel with counsel, and that failure to respond within 30 calendar days from the date of receipt of the notice will constitute a waiver of the right.

AR 135-178 at ¶ 3-5*a* (emphases added).

287.    Defendants have conceded that this Chapter 3 process applies to DTP soldiers, and AR 135-178 makes clear that any DEP soldiers receiving an involuntary separation likewise will be advised in writing "using the notification procedure" in Chapter 3 of AR 135-178.  *See* AR 135-178 at ¶ 14-7.

288.    AR 135-178 Chapter 2 provides guidelines on separation and characterization and notes that "[t]here is a substantial investment in the training" of enlisted Army soldiers.  *Id.* at ¶ 2-2*a*.  It further provides that "[a]s a general matter, reasonable efforts at rehabilitation should be made ***prior to initiation*** of separation proceedings."  *Id.* (emphasis added).

289.    AR 135-178 provides "further guidance" for "specific reasons for separation."  *Id.* at ¶ 2-1.  These categories include the types of discharge grounds that can be attributed to the soldiers in this action.

290.    For example, when a soldier is to be discharged under the personnel security category (or for "security reasons") – which would include unfavorable MSSD discharges – the

63

soldier shall be processed in accordance with Army Regulation 380-67.  *See* AR 135-178 at ¶ 14-1*h*.

291.    AR 380-67, in turn, provides in relevant part:

*[N]o unfavorable administrative action shall be taken under the authority of this regulation unless the person concerned has been given*:

a.    *A written statement of the reasons why the unfavorable administrative action is being taken*.  The statement shall be as comprehensive and detailed as the protection of sources afforded confidentiality under the provisions of the Privacy Act of 1974 (5 USC 552a) and national security permit. . . .

b.    *An opportunity to reply* in writing to such authority as the head of the component concerned may designate. . . .

c.    *A written response to any submission under paragraph b*, stating the final reasons therefore, which shall be as specific as privacy and national security considerations permit.

AR 380-67 at ¶ 8-6 (emphases added).

292.    Army regulations define "unfavorable administrative action" to include any "[a]dverse action taken as the result of personnel security determinations *and unfavorable personnel security determinations*," which are further defined to include any "nonacceptance for or discharge from the Armed Forces when any of the foregoing actions are based on derogatory information of personnel security significance."   AR 380-67, Glossary Section II (Terms) (emphasis added).

293.    Similarly, soldiers separated for "entry level performance and conduct" not only are entitled to advanced notice as set forth in AR 135-178 at 3-5 (*see* AR 135-178 at ¶ 8-4*a*), but "*[s]eparation processing may not be initiated . . . until the Soldier has been formally counseled under the requirements prescribed by paragraph 2-4*."  AR 135-178 at ¶ 8-2 (emphasis added).

294.    AR 135-178 further provides in relevant part that:

    a.      *General.* ***Commanders must make reasonable efforts to identify Soldiers who are likely candidates for early separation and to improve their chances for retention through counseling, retraining, and rehabilitation before starting separation action*** *.* . . .

    b.      *Counseling.* When a Soldier's conduct or performance approaches the point where a continuation of such conduct or performance would warrant initiating a separation action for one of the reasons in paragraph 2–4a, the Soldier will be counseled by a responsible person about their deficiencies. . . . The Soldier's counseling or personnel records must establish that the Soldier was afforded a reasonable opportunity to overcome these deficiencies. . . .

AR 135-178 at ¶ 2-4 (emphasis added).

    295.    Additional due process rights and procedures for DTP and DEP soldiers facing potential discharge are set forth in Army Regulation 635-200.

    296.    In addition, discharge actions against Category 3 Plaintiffs and proposed class members were subject to the notice procedure of AR 635-200. This procedure provides the soldier with certain due process rights prior to discharge, including, among other things, the right to be informed of the basis and reasons for discharge, the right to obtain copies of any documents that will be provided to the separation authority, the right to consult with military counsel, and the right to submit a responsive statement.

    297.    Army Regulation 635-200, Paragraph 5-11g refers to Paragraph 5-1 of the same regulation: "For characterization of service or description of separation, see paragraph 5-1." Army Regulation 635-200, Paragraph 5-1 reads as follows:

    5-1.  Characterization of service or description of separation

    a. Unless the reason for separation requires a specific characterization, a Soldier being separated for the convenience of the Government will be awarded a character of service of honorable, under honorable conditions, or an uncharacterized description of service if in entry-level status.

    b. No Soldier will be awarded a character of service under honorable conditions under this chapter unless the Soldier is notified of the specific factors in his/her

service record that warrant such a characterization, using the notification procedure. Such characterization is normally inappropriate for Soldiers separated under the provisions of paragraphs 5–4, 5–11, 5–12, 5–15, 5–16, or 5–17.

298.    Thus, the Army Regulations under which certain Category 3 Plaintiffs were discharged provide that it is "normally inappropriate" to award a character of service less than "honorable" (*i.e.*, even general "under honorable conditions," or obviously even less favorable characterizations of service) when a soldier is separated for medical reasons, and that this type of discharge cannot occur without proper notice.  This is because even a general "under honorable conditions" discharge can significantly prejudice a veteran with respect to her civilian life.

299.    Military regulations make clear that an "other than honorable" discharge cannot be provided without the opportunity for a board of officers proceeding, a court martial proceeding, or the like.

300.    Defendants violated military regulations by making discharge decisions with respect to Plaintiffs without affording them the formal notice, response, and other applicable rights set forth in Army Regulations.

301.    The October 26 Memo, as implemented, also continues to violate Army regulations by failing to provide soldiers with appropriate notice and opportunity to respond in advance of discharge actions.

### *Applicable DoD Regulations*

302.    The summary discharges also violated DoD regulations, which are mandatory and binding on the Army.

303.    Pursuant to Department of Defense Instruction ("DoDI") 5200.02, all members of the military are deemed to hold "national security positions."  DoDI 5200.02, Glossary Part II (Definitions); *see also* DoD Manual 5200.02 at ¶ 7.6(b) ("All military positions are national

security positions regardless whether or not the Service member requires access to classified information, as established in DoDI 5200.02.").  Plaintiffs – all of whom enlisted in the Army in or prior to 2016, with many having military ranks and having been certified by their commanders as having served honorably – previously had been found eligible for service in a "national security position" at the time of enlistment.  The Army's purported discharges thus constitute denials or revocations of these soldiers' eligibility to hold national security positions.

304.    With regard to such denials or revocations of eligibility, DoDI 5200.02 provides:

> APPEAL PROCEDURES – DENIAL OR REVOCATION OF ELIGIBILITY. Individuals may elect to appeal unfavorable personnel security determinations in accordance with the procedures set forth in . . . [DoD Manual 5200.02], as applicable, or as otherwise authorized by law.

DoDI 5200.02, Enclosure 3, Section 4.

305.    DoD Manual 5200.02 in turn provides that "*[m]ilitary members* who are denied or revoked a favorable national security eligibility determination *will be afforded due process*."  DoD Manual 5200.02 at ¶ 7.6(b)(2)(a) (emphasis added).  DoD Manual 5200.02 defines "national security eligibility" as "[t]he status that results from a formal determination by an adjudication facility that a person meets the personnel security requirements for access to classified information *or to occupy a national security position* or one requiring the performance of national security duties."  DoD Manual 5200.02, Glossary Section G.2 (Definitions) (emphasis added).  Because "[a]ll military positions are national security positions," *see* DoD Manual 5200.02 at ¶ 7.6(b), any decision to separate a soldier from the military on personnel security grounds is, by definition, a "national security eligibility" determination.

306.    That manual further provides:

> *MINIMUM DUE PROCESS REQUIREMENTS APPLICABLE TO ALL. No unfavorable national security eligibility determination will be made without first*:

a. ***Providing the individual with a comprehensive and detailed written explanation*** of the basis for the unfavorable determination as the national security interests of the United States and other applicable law permit. The [Letter of Denial] or [Letter of Revocation] must include each security concern, the applicable adjudicative guideline(s) related to each concern, and provide an explanation of the kinds and types of information they could provide to support their appeal.

b. Informing the individual of their right to:

(1) Be represented by counsel or other representative at their own expense.

(2) Request the documents, records, and reports upon which the unfavorable national security determination was made. Be granted an extension to set the timeline by the Component [Personnel Security Appeal Board] if requested documents, records, and reports are not provided promptly.

c. ***Providing a reasonable opportunity to reply*** in writing and to request review of the unfavorable determination.

d. Providing the individual written notice of reasons for the determination, the determination of each adjudicative guideline that was provided to the individual in the statement of reasons (SOR) that accompanied the notification of intent (NOI) to deny or revoke the identity of the determination authority, and written notice of the right to appeal unfavorable determinations to a high-level panel. . . .

f. Providing the individual an opportunity to appear in person and present relevant witnesses, documents, materials, and information.

g. ***Providing the individual with a written decision on appeal***.

DoD Manual 5200.02 at ¶ 10.2 (emphasis added).

307. Still further due process rights and procedures for military members are set forth in ¶ 10.4 of DoD Manual 5200.02.

308. Additional due process rights and procedures for military members facing potential discharge are set forth throughout DoD Instruction 1332.14.

309.   Defendants violated applicable law by purporting to discharge Plaintiffs without affording them the rights and procedures mandated by DoD Regulations.

310.   The October 26 Memo purposefully omits DoDI 5200.02 and AR 380-67 from its procedures – including the key Army obligation to provide the soldier with all supporting documentation (unless classified) for an adverse finding – and thus violates applicable law.

### ***Constitutional Rights***

311.   In addition to the regulatory violations stated herein, Defendants violated the fundamental requirements of due process under the Fifth Amendment of the U.S. Constitution by purporting to discharge Plaintiffs from the U.S. Army without providing them with an adequate explanation for the discharge, without providing them with any meaningful opportunity to be heard and respond to the grounds, if any, for the discharge action, and without following applicable military guidance and regulations.  Additionally, these soldiers' property and/or liberty interests have been implicated by Defendants' actions.  For example, another federal agency's treatment of a Form DD-214 (or equivalent discharge paperwork, such as Form/Format 500) with an "uncharacterized" discharge description as an Army certification of an "other than honorable" discharge has stigmatized these soldiers and impugned their reputations (and will continue to do so), thereby implicating their liberty interest in due process.

312.   Moreover, Defendants' actions unconstitutionally discriminate against Plaintiffs based on their national origin in violation of Plaintiffs' equal protection rights as guaranteed by the Fifth Amendment of the U.S. Constitution.  For instance, the "MAVNI – Military Personnel Security" notation on some discharge paperwork indicates that Defendants are directing their summary discharge practices at MAVNIs in particular and that such discharge due process denials are not being applied to non-MAVNI soldiers.

**The Army's Retaliation Against MAVNI Soldiers as a Result of This and Related Lawsuits**

313.    This action was initiated on June 28, 2018 on behalf of single MAVNI and sought immediate injunctive relief.  After Defendants indicated that they would revoke that MAVNI's discharge order rather than attempt to justify their conduct, this Court stayed the action.  On August 3, 2018, additional Plaintiffs filed a motion to lift the stay and an amended complaint, along with a motion for class certification.  The Court lifted the stay on August 8, 2018, and ordered a telephone conference for August 13, 2018.  Following that conference, in which Defendants indicated an intent to revoke discharge orders for most of the newly named Plaintiffs, the Court again stayed briefing on the motions for preliminary injunction and class certification but ordered reporting from the Defendants as to the extent of the discharge violations and any new discharge policy enacted.

314.    On or about August 14, 2018, just eleven days after the Amended Complaint, Defendants, through the Army's 902d Military Intelligence Group located at Fort Meade, Maryland, issued a request for support, which was forwarded by email to various reserve units to members of the reserve Judge Advocate General Corps ("JAG") as a "902d MI Group support Request" ("The 902 MI Email").  This Army unit is responsible for conducting the enhanced military background investigations to which MAVNI soldiers are now subjected before the Army renders its MSSD and the soldiers are permitted to ship to basic combat training.  These military background investigations include materials gathered from various database checks plus the soldier's security clearance questionnaire and a report of the CI interview of each soldier.

315.    The 902 MI Email solicited reserve JAGs to assist "[a]s soon as possible" in "reviewing MAVNI screening packets" in order *to determine whether the applicants admitted to or provided information about a crime that requires reporting to law enforcement*."  The so-

called "screening packets" are the background materials – including the report of CI interview – that are compiled during the MAVNIs' enhanced background investigation.

316.    In the "Why" section of the 902 MI Email, the Army expressly admitted the retaliatory rationale behind the Army's urgent request:  "***MAVNIs are currently suing the federal government claiming they were wrongfully discharged from the Army***."

317.    While MI screeners already had reviewed the soldiers' files, the Army – motivated to retaliate against discharged soldiers for having the courage to expose the Army's misconduct and seek federal court relief – was now recruiting JAG officers to reexamine those records for the specific purpose of finding some alternative basis to justify a discharge.  The 902 MI Email states as much:  "***Screeners may not have realized that a MAVNI confessed to a crime because their mission was to identify anomalies and they are not law enforcement***."  In other words, the mission assigned to these JAGs was to undertake a one-way review of the file.  This was not an objective analysis to determine if mistakes were made that might change DoD or Army adjudications, but a results-oriented attempt to uncover grounds to potentially prosecute these soldiers, who sued the Army, or their relatives.

318.    In addition, this scouring of background investigation materials was directed solely at MAVNIs.  Although this same unit generates comparable "packets" for other soldiers undergoing background investigations, there is no indication that JAG lawyers were being solicited to determine if any non-MAVNI "packets" contained evidence of criminal activity that should be reported to law enforcement.

319.    The Army later represented that the instruction to JAG lawyers was withdrawn, but that statement was made only after the instruction was scrutinized in media reports and brought to this Court's attention.

320.    In addition, despite the instruction to notify the Court of any changes to the discharge policy for MAVNI soldiers, Army personnel – without any warning to the Court or Plaintiffs' counsel – contacted a number of MAVNI soldiers directly and encouraged them to sign away the process rights described by the October 26 Memo, without providing them the opportunity to consult with legal counsel, so that the Army could continue with its summary discharges of MAVNI soldiers.

321.    MAVNIs also have learned that they are being subject to differential treatment in their initial CI reviews based on the filing of other, related class actions for MAVNI soldiers (*Kirwa*, *Nio*).  This differential treatment has led to negative CI findings and discharges, or will lead to involuntary discharges under the October 26 Memo.

322.    For example, one MAVNI received negative CI findings as a "MODERATE security risk" on September 13, 2017, with the CI Reviewer listing findings (although not accurate) as follows: "MAVNI is a MODERATE risk.   MAVNI claims to hold no allegiance to US until they revieve [sic] citizenship.  MAVNI also working connected to Lawyer representing MAVNIs in lawsuite [sic] against U.S. Army - Derog."

323.    As another example, upon information and belief, a MAVNI received negative CI findings because "SHE follows the lawsuit by the MAVNIs and SHE feels like the MAVNIs are being harmed because they are described as a threat to National Security."  This individual MAVNI's CI report listed as a loyalty concern that "throughout the interview process SHE said due to […] delays with the MAVNI process, she feels discriminated against and denied her citizenship."

324.     Further, a MAVNI received negative CI findings because "MAVNI was a member of the MAVNI Legal Facebook page.  SHE frequently visited the site for the latest news about the MAVNI program."

325.     And yet another MAVNI received negative CI findings after he "stated that HE checks out (The MAVNI Facebook Site) for updates, and the founder of the program keeps MAVNIs updated."

326.     Upon information and belief, other MAVNIs have received negative CI results, leading to discharge actions against them, based upon their status as class members or proposed class members in lawsuits related to the MAVNI program.

327.     Defendants have delivered misinformation about MAVNI discharges, to USCIS and otherwise, causing the arrests of MAVNI soldiers.  One of these incidents promptly followed a New York Times article concerning the Army's MAVNI discharge actions, which quoted the targeted MAVNI soldier (a named Plaintiff herein).

328.     Defendants have impugned MAVNI soldiers characters by suggesting that soldiers with unfavorable MSSRs/MSSDs are foreign spies when the true "security risk" assessment ultimately shows something else, such as a "finding" that the soldier is being faulted for phoning his/her parents on the weekends.  Defendants also have suggested that certain soldiers the Army has identified as "other reasons" discharges had been discharged for serious misconduct, but have not substantiated those claims.

## CLASS ACTION ALLEGATIONS

329.    Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.  The class definition is as follows:

- All persons who enlisted in the U.S. Army (including Selected Reserve of the Ready Reserve/DTP and Regular Army/DEP soldiers) through the MAVNI program, and

- have been or will be the subject of an involuntary administrative discharge action by the Army (including USAREC and/or USARC) after September 30, 2016, where such discharge or separation was not or will not be characterized by the Army (including "uncharacterized" and "entry level" discharges or separations), and

- where such action was taken without the person first being afforded the process due under applicable Army and DoD regulations and the law (including adequate notice of the discharge grounds, an opportunity to respond, due consideration of the soldier's response by the Army, and other requirements of law), and

- where the person wants to be reinstated in or remain in the Army.

330.    The critical commonality among each Plaintiff and class member is that he or she enlisted in the Army as a non-citizen through the MAVNI program and is being denied the process required by law in advance of Army "uncharacterized" discharge actions.

331.    While the class definition applies to each Plaintiff and class member, pursuant to Rule 23(c)(5), Plaintiffs propose two subclasses, largely commensurate with Categories 1 and 2 outlined in Paragraph 36 above:

Subclass 1:  Persons (including both MAVNI Selected Reservists who began their service in the DTP and MAVNI Regular Army soldiers who began their service in the DEP) subject to "uncharacterized" discharge actions for MSSR/MSSD reasons and who are (or should be) subject to the procedures in the October 26 Memo;

74

<u>Subclass 2</u>:  DTP and DEP MAVNIs subject to "uncharacterized" discharge actions for other-than-MSSD reasons.

332.    Plaintiffs allege that the class, and each subclass, meets the requirements for class certification under Rule 23.

333.    Class action designation is warranted under the criteria set forth in Rule 23(a).

334.    The proposed class meets the numerosity requirement of Rule 23(a)(1) because the members of the class are so numerous that joinder of all members is impractical.

335.    Although the exact number of class members is unknown to Plaintiffs at this time as such information resides exclusively within the province of Defendants and must await Defendants' disclosure/discovery, Defendants' reporting in this action has identified approximately 2,000 total class members.  *See* Dkts. 127, at 2 & Dkt. 129, at 1 (reporting that 24 former DEP and DTP MAVNIs received an uncharacterized discharge for non-MSSD reasons); Dkt. 122-1, at 2-3 & Dkt. 160, at 1 (reporting 886 DTP and DEP MAVNIs subject to uncharacterized discharge actions for non-MSSD reasons); June 8, 2020 *Calixto* and *Nio* Status Conf. Tr. at 5:9-10 (reporting approximately 1,100 class members subject to the October 26 Memo and "uncharacterized" discharge actions for MSSR/MSSD reasons).

336.    Defendants' reporting identifies approximately 1,100 members for the first proposed sub-class and nearly 900 members for the second proposed subclass.

337.    Defendants' reported numbers are sufficient to demonstrate numerosity for the class as a whole and each proposed subclass.

338.    The proposed class satisfies the commonality requirement of Rule 23(a)(2) because there are questions of law and fact common to the class.  Among the questions of law and fact

common to the class are whether the involuntary and summary "uncharacterized" discharge actions are contrary to law.

339.    The core complaint and commonality among each class member is due to the involuntary and without-appropriate-process nature of the "uncharacterized" discharge action by the Army.  If an "uncharacterized" discharge order or DD-214 is going to be treated as an Army certification of an "other than honorable" discharge, as currently is the case, each class member is entitled to much more process in advance of discharge than they are being provided.  In addition, Plaintiffs have proposed two subclasses.  As noted, the first subclass consists of MAVNIs who received an unfavorable MSSR and/or MSSD.  Those soldiers share the additional common characteristic that they are or should be subject to the procedures set forth in the October 26 Memo. The second subclass consists of persons who share the additional common characteristics that they purportedly received a discharge for a non-MSSD reason while in the DTP or DEP and, according to Defendants, will not be subject to the procedures set forth in the October 26 Memo.

340.    The proposed class and subclasses satisfy the typicality requirement of Rule 23(a)(3) because the named Plaintiffs' claims are typical of the claims of each of the class members.  Class members similarly are affected by Defendants' wrongful conduct in violation of the Administrative Procedure Act, applicable Army regulations, DoD regulations, and the U.S. Constitution.

341.    The named Plaintiffs will fairly and adequately protect the interests of the class (or subclasses) because their interests are identical to those of the other members of the classes.  Fair and adequate protection of the interests of the class will be ensured further because the named Plaintiffs are represented by competent legal counsel who are experienced in federal court

litigation, including class action litigation, and have adequate resources and commitment to represent the class as a whole.

342.    Furthermore, if the named Plaintiffs (and members of the class) were to bring separate suits to address Defendants' practices, actions, and inactions, Defendants may address the discharges of the named Plaintiffs but ignore the discharges and concerns of the remaining class members, thereby exacerbating Defendants' violations of the law and applicable regulations.

343.    Resolving this matter as a class action would promote judicial economy by avoiding overburdening the Court with individual lawsuits brought by each of the hundreds of Army soldiers who were the victims of the discharge actions challenged herein.

344.    In addition to qualification for class treatment under Rule 23(b)(1)(a), this case qualifies for class action treatment under Rule 23(b)(2) because Plaintiffs seek injunctive and declaratory relief.  The relief is appropriate for the whole class as Defendants' conduct applies generally to the class as a whole.

## CLAIMS FOR RELIEF

### *Count I: Declaratory Judgment*

345.    Plaintiffs re-allege paragraphs one through 344 as if fully set forth herein.

346.    28 U.S.C. § 2201 authorizes a court, "[i]n a case of actual controversy within its jurisdiction . . . upon the filing of an appropriate pleading" to "declare the rights and other legal relations of any interested party seeking such declaration."

347.    Army and DoD regulations set forth specific procedures that must be followed before a final discharge decision is made.  Defendants failed to follow those procedures with respect to Plaintiffs, in contravention of the regulations and in violation of Plaintiffs' due process

rights.  Accordingly, Plaintiffs seek a declaratory judgment that the discharge actions taken with respect to Plaintiffs and the Class are unlawful.

348.    Army and DoD regulations set forth specific procedures that must be followed before the Army can issue an other than honorable discharge, such as providing the opportunity for a board of officers' proceeding or a court martial proceeding.  Defendants failed to follow those procedures with respect to Plaintiffs.  Accordingly, Plaintiffs also seek a declaratory judgment that "uncharacterized" DD-214s (and equivalent discharge paperwork such as Form/Format 500) reflect that the discharge from service was **not** other than honorable.

### Count II: Injunctive Relief

349.    Plaintiffs re-allege paragraphs one through 348 as if fully set forth herein.

350.    Plaintiffs and the Class are subject to "uncharacterized" discharges, and their discharges are being treated as "other than honorable" discharges, which causes substantial and irreparable harm to them for which there is no adequate remedy at law.  Under the facts and circumstances of this case, the balance of the equities clearly favors Plaintiffs, and injunctive relief is in the public interest.

351.    Plaintiffs seek an injunction as follows:  Upon request, Defendants, through an authorized official, shall certify that the individual's "uncharacterized" discharge is not an other than honorable discharge, including on Form N-426 for purposes of military naturalization under 8 U.S.C. § 1439 and 8 U.S.C. § 1440.

352.    In the alternative, if the declaratory and injunctive relief described in Paragraphs 348 and 351 above is not provided, Defendants unlawfully and improperly pursued "uncharacterized" discharge actions with respect to Plaintiffs and the Class without complying with applicable law concerning the provision of other than honorable discharges, including

providing the soldier the opportunity to challenge such actions in a pre-discharge board of officers' or court martial proceeding.

353.    Plaintiffs have been, and will continue to be, substantially and irreparably harmed by Defendants' unlawful and improper actions, for which there is no adequate remedy at law. Under the facts and circumstances of this case, the balance of the equities clearly favors Plaintiffs, and injunctive relief is in the public interest.

354.    Plaintiffs seek an injunction as follows:

- Defendants shall issue orders revoking, rescinding, and suspending any discharge actions against class members;

- Defendants shall take all actions necessary to fully reinstate and restore class members to their pre-discharge action status in the Army;

- To the extent that Defendants notified other military departments, DoD, or other federal agencies or components, including DHS and USCIS, of the discharge decisions, Defendants shall promptly notify such entities that the discharges are revoked and void for all purposes;

- Defendants shall refrain from initiating or continuing any retaliatory action against class members;

- Defendants shall not renew or commence new "uncharacterized" discharge actions against Plaintiffs or the Class except in accordance with applicable law and regulations governing the provision of other than honorable discharges.

355.    Defendants unlawfully and improperly pursued these discharge actions with respect to the Category 1 and 2 Plaintiffs and the members of both sub-classes without complying with applicable law including, without limitation, Army Regulation 135-178, Army Regulation 380-67, DoDI 5200.02, DoD Manual 5200.02 (incorporated in DoDI 5200.02 by reference), and the U.S. Constitution.

356.    The Category 1 and 2 Plaintiffs and the members of both sub-classes have been, and will continue to be, substantially and irreparably harmed by Defendants' unlawful and improper actions, for which there is no adequate remedy at law.  Under the facts and circumstances of this case, the balance of the equities clearly favors Plaintiffs, and injunctive relief is in the public interest.

357.    The Category 1 and 2 Plaintiffs seek an injunction as follows:

- Defendants shall issue orders revoking, rescinding, and suspending any discharge actions against the sub-class members;

- Defendants shall promptly respond to any sub-class member inquiry as to whether the Army will provide the member with the procedures outlined in the October 26 Memo;

- Defendants shall take all actions necessary to fully reinstate and restore any sub-class members to their pre-discharge action status in the Army;

- To the extent that Defendants notified other military departments, DoD, or other federal agencies or components, including DHS and USCIS, of the discharge decisions, Defendants shall promptly notify such entities that the discharges are revoked and void for all purposes;

- Defendants shall refrain from initiating or continuing any retaliatory action against sub-class members;

- Defendants shall not renew or commence new discharge actions against the Category 1 or 2 Plaintiffs or the sub-classes except in accordance with applicable law and regulations governing such discharges.

  o  With respect to the Category 1 Plaintiffs and the first sub-class,  Defendants shall promptly and adequately implement the procedures described in the October 26, 2018 Memo, such that Plaintiffs and sub-class members are no longer subjected to discharge treatment without those procedures.

  o  With respect to the Category 2 Plaintiffs and the second sub-class, Defendants, at a minimum, shall provide the equivalent of the notice procedures of Chapter 3 of AR 135-

178 in advance of any discharge on non-MSSD grounds. Where the grounds for discharge require additional process, such as the opportunity for counseling and/or rehabilitation, Defendants shall provide that process in accordance with the applicable law.

### Count III:  Administrative Procedure Act

358.    Plaintiffs re-allege paragraphs one through 357 as if fully set forth herein.

359.    5 U.S.C. § 706(2) authorizes a court to hold unlawful and set aside final agency action found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or without observance of procedure required by law.

360.    Defendants engaged in the challenged discharge actions against Plaintiffs without complying with applicable law including, without limitation, the requirements of Army Regulation 135-178, Army Regulation 380-67, DoDI 5200.02, and DoD Manual 5200.02 (incorporated in DoDI 5200.02 by reference).  Defendants' actions therefore are not in accordance with law and were undertaken without observance of procedure required by law.  Furthermore, Defendants' actions were arbitrary and capricious because Defendants failed to comply with applicable Army and DoD regulations.

361.    Accordingly, the Category 1 and 2 Plaintiffs (and the sub-classes) seek an order holding unlawful and setting aside the challenged discharge actions pursuant to 5 U.S.C. § 706(2). The Category 3 Plaintiffs and the class seek this only as alternative relief if the declaratory and injunctive relief described in Paragraphs 348 and 351 above is not provided,

### Count IV: Constitutional Violation – Procedural and Substantive Due Process

362.    Plaintiffs re-allege paragraphs one through 361 as if fully set forth herein.

363.    The challenged discharge actions deprived Plaintiffs of their constitutionally-protected liberty and/or property interest, including with respect to their reputations, ability to

pursue their chosen careers, and/or the timely and appropriate adjudication of their right to naturalization.  Defendants took these actions without providing Plaintiffs with the requisite notice and opportunity to be heard and other required process.

364.    Defendants' discharge actions carry significant adverse consequences for soldiers, and the nature of their discharges – based on the notations on their discharge orders and the "other than honorable" treatment for veterans with "uncharacterized" discharges – are stigmatizing, as they impact their ability to pursue their military careers, their ability to obtain a civilian or non-military government job, and their reputations.  Defendants' conduct therefore violates the due process rights of Plaintiffs and the Class under the Fifth Amendment of the U.S. Constitution.

365.    Defendants' conduct with respect to the decision-making and processing of Plaintiffs' separation and discharge from the Army is arbitrary, contrary to DoD and the Army's own guidance and regulations, and shocks the conscience.  As such, Defendants' conduct also violates the substantive due process rights of Plaintiffs and the Class under the Fifth Amendment of the U.S. Constitution.

366.    The Category 1 and Category 2 Plaintiffs (and both sub-classes) request that the Court grant appropriate equitable relief on the foregoing basis.  The Category 3 Plaintiffs and the Class as a whole request this relief in the alternative, if the declaratory and injunctive relief described in Paragraphs 348 and 351 above is not provided.

### Count V: Constitutional Violation – Equal Protection

367.    Plaintiffs re-allege paragraphs one through 366 as if fully set forth herein.

368.    Plaintiffs (as MAVNIs who received "uncharacterized" or "entry level separation" discharges without the required rights and process to which they are entitled) are being treated differently with respect to Defendants' processing of their separation and discharges from the

Army.  By treating these MAVNI soldiers differently than soldiers who did not enter through the MAVNI program, and failing to provide the notice, opportunity to be heard, counseling, rehabilitation, appeal, and/or other rights with respect to the separation/discharge process, Defendants unconstitutionally are discriminating against Plaintiffs (and the Class) based on their national origin in violation of their equal protection rights as guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

369.     Upon information and belief, Plaintiffs (and the Class) are the only group of Army soldiers who have spent the majority of their service period in an "entry-level" status.  Plaintiffs are the only group of Army soldiers who are having their "uncharacterized" discharges treated as "other than honorable" discharges.  And, on information and belief, Plaintiffs are the only group of Army soldiers for whom the Army has given its recruiters "loss forgiveness" incentives related to "uncharacterized" discharge actions.

370.     In addition, Plaintiffs were treated differently with respect to Defendants' supposed "criminal reporting requirements" by subjecting Plaintiffs (and the Class) to a re-review of their CI packets for the purpose of identifying potential criminal violations.  By treating these MAVNI soldiers differently than soldiers who did not enter through the MAVNI program and thus do not have their CI packets re-reviewed by JAG officers to identify potential criminal violations, Defendants unconstitutionally discriminated against Plaintiffs (and the Class) based on their national origin in violation of their equal protection rights as guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

371.     Plaintiffs (and the Class) also are being treated differently with respect to their CI reviews, which has led to separation/discharge or will lead to separation/discharge under the October 26 Memo, by being classified as moderate security risks simply for being class members

or proposed class members in lawsuits regarding the MAVNI program.  By treating these MAVNI soldiers differently than soldiers who did not enter through the MAVNI program (and thus are not, by definition, part of a class or proposed class of MAVNI soldiers in any lawsuit), Defendants unconstitutionally are discriminating against Plaintiffs (and the Class) based on their national origin in violation of their equal protection rights as guaranteed by the Due Process Clause of the Fifth Amendment of the U.S. Constitution.

372.    The Category 1 and Category 2 Plaintiffs (and both sub-classes) request that the Court grant appropriate equitable relief on the foregoing basis.  The Category 3 Plaintiffs and the Class as a whole request this relief in the alternative, if the declaratory and injunctive relief described in Paragraphs 348 and 351 above is not provided.

### Count VI: Constitutional Violation – First Amendment Retaliation

373.    Plaintiffs re-allege paragraphs one through 372 as if fully set forth herein.

374.    Plaintiffs engaged in protected conduct by exercising their rights to free speech and to petition the government through filing an amended complaint and motion for class certification in this lawsuit.

375.    Defendants then retaliated by instituting a policy to re-review the proposed class members' CI screening packets to look for information on potential crimes and to then report those potential crimes to law enforcement for investigation and prosecution.

376.    This re-review and referral for criminal prosecution was applied only to the proposed class members and would deter a person of ordinary firmness, especially a MAVNI whose immigration status, reputation, and livelihood may be adversely affected by any potential criminal prosecution, from speaking up again.

377.    The exercise of Plaintiffs' constitutional rights to free speech and to petition the government in filing this lawsuit was the but-for cause of the adverse action taken against them by Defendants.  Defendants were subjectively motivated to take their retaliatory action against the proposed class because of the protected activity, as evidenced by Defendants' own words in promulgating the policy:  "Why:  MAVNIs are currently suing the federal government claiming they were wrongfully discharged from the Army."  In addition, this policy was disseminated within the period immediately after Plaintiffs filed their amended complaint and motion for class certification.

378.    The other retaliatory actions described in Paragraphs 320-328 above, including MAVNI arrests following discussions of their discharges, show the MAVNIs engaged in protected conduct by exercising their rights to free speech and show Defendants taking adverse action against them for exercising their rights.

379.    The Category 1 and Category 2 Plaintiffs (and both sub-classes) request that the Court grant appropriate equitable relief on the foregoing basis.  The Category 3 Plaintiffs and the Class as a whole request this relief in the alternative, if the declaratory and injunctive relief described in Paragraphs 348 and 351 above is not provided.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs, on behalf of themselves and the Class and subclasses, respectfully requests that this Court:

  a. Assume jurisdiction over this action;

  b. Issue the declaratory judgment requested in Count I of this Complaint;

  c. Grant the injunctive relief requested in Count II of this Complaint;

  d. Grant the relief requested pursuant to the APA (Count III of this Complaint);

e.   Grant the relief requested pursuant to Count IV of this Complaint;

f.   Grant the relief requested pursuant to Count V of this Complaint;

g.   Grant the relief requested pursuant to Count VI of this Complaint;

h.   Award Plaintiffs reasonable costs and attorneys' fees, including under the Equal

   Access to Justice Act; and

i.   Award such further relief as the Court deems just or appropriate.


Dated:  November 25, 2020


               */s/ Jennifer M. Wollenberg*
               Jennifer M. Wollenberg (D.C. Bar No. 494895)
               Douglas W. Baruch (D.C. Bar No. 414354)
               Kayla Stachniak Kaplan (D.C. Bar No. 996635)
               Neaha P. Raol (D.C. Bar No. 1005816)

               Morgan, Lewis & Bockius LLP
               1111 Pennsylvania Avenue, NW
               Washington, D.C. 20004
               Telephone:  (202) 739-3000
               Facsimile:   (202) 739-3001
               Email: douglas.baruch@morganlewis.com
               Email: jennifer.wollenberg@morganlewis.com

               *Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LUCAS CALIXTO, *et al.*,

          Plaintiffs,

   v.

UNITED STATES DEPARTMENT OF THE
ARMY, *et al.*,

          Defendants.

**Case No. 1:18-cv-01551-PLF**

**[PROPOSED] ORDER**

Having considered Plaintiffs' November 25, 2020 Motion for Leave to File Third Amended

Complaint, with attached proposed Third Amended Complaint, and Defendants' position

regarding the same, it is hereby

**ORDERED** that Plaintiffs' Motion is **GRANTED** and Plaintiffs have leave to file the

Third Amended Complaint.


Dated: _____          _____

                                 U.S.D.J. Paul L. Friedman